# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA,

*v.*

LaMONICA McIVER

Hon. Jamel K. Semper

Crim. No. 2:25-cr-00388-JKS

## MEMORANDUM OF LAW IN SUPPORT OF CONGRESSWOMAN MCIVER'S MOTION TO DISMISS BASED ON LEGISLATIVE IMMUNITY

August 15, 2025

ARNOLD & PORTER KAYE SCHOLER LLP
One Gateway Center
Suite 1025
Newark, NJ 07102

*Counsel for Congresswoman LaMonica McIver*

On the Memorandum:

Paul J. Fishman
Lee M. Cortes, Jr.
John M. Fietkiewicz
Samuel F. Callahan
Orion de Nevers
Amanda J. Raines

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................... 1

BACKGROUND ................................................................................................... 4

    A.    Congresswoman McIver's Congressional Oversight Authority .............................. 5

    B.    The Department of Justice Charges Congresswoman McIver for Her Conduct During a Congressional Oversight Visit ................................................ 7

ARGUMENT ...................................................................................................... 11

I.    The Speech or Debate Clause Requires Dismissing the Indictment ..................................... 11

    A.    The Speech or Debate Clause Confers Broad Immunity for Legislative Acts ....... 12

    B.    Congresswoman McIver's Inspection of Delaney Hall Was a Legislative Act ...... 14

        1.    Congressional Oversight and Factfinding Are Manifestly Legislative Acts . 14

        2.    Congresswoman McIver's Delaney Hall Inspection Was Manifestly Legislative ...................................................................................... 15

        3.    Even If Congresswoman McIver's Acts Were Not Manifestly Legislative, They Are Protected Based on Their Content, Purpose, and Motive .............. 17

        4.    Congresswoman McIver's Acts Are Protected Under Any Applicable Test.. 20

    C.    The Indictment Necessarily Places Legislative Acts at Issue................................ 20

        1.    The Indictment's Substantive Allegations Relate Exclusively To Legislative Acts ...................................................................................... 21

        2.    The Government's Case and Congresswoman McIver's Defenses Will Inevitably Place Her Legislative Acts at Issue ............................................. 22

        3.    A Criminal Trial Would Undermine the Purpose of the Speech or Debate Clause ....................................................................................... 24

II.    The Separation of Powers Independently Requires Dismissing the Indictment ................... 27

CONCLUSION.................................................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bogan v. Scott-Harris*,
    523 U.S. 44 (1998)...........................................................................................14, 20

*Coffin v. Coffin*,
    4 Mass. 1 (1808) ...................................................................................................28

*Coinbase, Inc. v. Bielski*,
    599 U.S. 736 (2023)..............................................................................................13

*Doe v. McMillan*,
    412 U.S. 306 (1973)...........................................................................................1, 13

*Dombrowski v. Eastland*,
    387 U.S. 82 (1967)................................................................................................13

*Eastland v. U.S. Servicemen's Fund*,
    421 U.S. 491 (1975)...........................................1, 4, 12, 13, 15, 16, 22, 24, 28

*Govt. of the Virgin Islands v. Lee*,
    775 F.2d 514 (3d Cir. 1985)..........................................................................15, 16, 17

*In re Grand Jury Investigation (Menendez)*,
    608 F. App'x 99 (3d Cir. 2015) .............................................................................14

*Gravel v. United States*,
    408 U.S. 606 (1972).......................................................................................1, 12, 16

*Hutchinson v. Proxmire*,
    443 U.S. 111 (1979)...........................................................................................1, 13

*Kilbourn v. Thompson*,
    103 U.S. 168 (1880)......................................................................................12, 28, 29

*McGrain v. Daugherty*,
    273 U.S. 135 (1927)..........................................................................................15, 25

*McSurely v. McClellan*,
    553 F.2d 1277 (D.C. Cir. 1976) (en banc) ....................................................15, 16

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    597 U.S. 1 (2022)..................................................................................................20

*Nixon v. Fitzgerald,*
  457 U.S. 731 (1982)................................................................27, 28

*Supreme Ct. of Virginia v. Consumers Union of U.S., Inc.,*
  446 U.S. 719 (1980)....................................................................27

*Tenney v. Brandhove,*
  341 U.S. 367 (1951).......................................................................1

*Trump v. United States,*
  603 U.S. 593 (2024)..............................................2, 20, 27, 28, 29, 30

*United States v. Brewster,*
  408 U.S. 501 (1972)..............................................2, 12, 13, 28

*United States v. Dowdy,*
  479 F.2d 213 (4th Cir. 1973) ......................................13, 16, 29

*United States v. Goodwin,*
  440 F.2d 1152 (3d Cir. 1971).............................................22

*United States v. Helstoski,*
  442 U.S. 477 (1979)..............................1, 12, 13, 20, 21, 22, 23

*United States v. Helstoski,*
  635 F.2d 200 (3d Cir. 1980)...............................................13

*United States v. James,*
  888 F.3d 42 (3d Cir. 2018)...............................1, 3, 13, 22, 24

*United States v. Johnson,*
  383 U.S. 169 (1966).........................................1, 22, 24, 25, 28

*United States v. McDade,*
  28 F.3d 283 (3d Cir. 1994)...................................................1, 15

*United States v. Menendez,*
  831 F.3d 155 (3d Cir. 2016)...............8, 12, 14, 15, 16, 17, 19

*Youngblood v. DeWeese,*
  352 F.3d 836 (3d Cir. 2003)............................................21, 22

**Constitutional Provisions**

U.S. Const. art. I, § 6, cl. 1...............................................1, 12

**Statutes**

18 U.S.C. § 111(a)(1)...........................................................7

iii

18 U.S.C. § 115(a)(1) ................................................................................................23

Pub. Law No. 118-47, § 527, 138 Stat 460 (2024) ....................................2, 5, 6, 16, 23

**Legislative Materials**

Rule X,
    *Rules of the House of Representatives, One Hundred Nineteenth Congress* ..........................17

Letter from Congresswoman Jamie Raskin, Ranking Member, U.S. House of
    Reps. Comm. on the Judiciary, to Hon. Pam Bondi, Attorney General, U.S.
    Dept. of Justice (June 3, 2025) .................................................................................26

Letter from Congresswoman McIver et al., to Hon. Benjamine Huffman, Acting
    Secretary, DHS, & Hon. Caleb Vitello, Acting Director, ICE (Jan. 24, 2025) .......................5

Letter from Congresswoman McIver et al., to Hon. Kristi Noem, Secretary, DHS,
    & Hon. Caleb Vitello, Acting Director, ICE (Feb. 19, 2025) ................................6, 19

**Executive Branch Materials**

*Scope of Congressional Oversight and Investigative Power With Respect to the
    Executive Branch* 60, 60 Op. O.L.C. (1985) .............................................................24, 25

*Ways and Means Committee's Request for the Former President's Tax Returns
    and Related Tax Information Pursuant to 26 U.S.C. § 6103(f)(1)* 20, 45 Op.
    O.L.C. (2021) ..........................................................................................................24

**Other Authorities**

35 Writings of George Washington (J. Fitzpatrick ed. 1940) ......................................30

*Before recent Delaney Hall uprising, detainees frequently complained about
    conditions*, Bergen Record (June 18, 2025) ..............................................................7

*ICE expands detention capacity with Delaney Hall Facility in New Jersey*, ICE
    (Feb. 26, 2025), https://perma.cc/VX38-QSTD ......................................................6

*Immigration Tele-Town Hall*, bit.ly/3IVDhUX (Jan. 23, 2025) ...............................5, 19

Luis Ferré-Sadurní, *Brad Lander Is Arrested by ICE Agents at Immigration
    Courthouse*, N.Y. Times (June 17, 2025) ...............................................................25

Michael Williams et. al, *US senator forcefully removed from DHS event in LA,
    triggering Democratic outcry on Capitol Hill*, CNN (June 12, 2025),
    https://perma.cc/XVR3-PJ8Y ..................................................................................25

NJ Spotlight News (@NJSpotlightNews), X (May 9, 2025 15:29 ET),
    https://x.com/NJSpotlightNews/status/1920926649777852742 .............................11

Press Release, Former Republican Members of Congress, Former GOP Members
    of Congress Reject Charges Against Congresswoman McIver (May 22, 2025),
    https://perma.cc/B3TV-C5VM ............................................................................26

## INTRODUCTION

The U.S. Constitution's Speech or Debate Clause guarantees Members of Congress that they "shall not be questioned" for their legislative acts. U.S. Const. art. I, § 6, cl. 1. The Framers adopted that Clause to "prevent intimidation by the executive and accountability before a possibly hostile judiciary." *United States v. Johnson*, 383 U.S. 169, 181 (1966). To that end, the Clause shields "Members against prosecutions that directly impinge upon or threaten the legislative process," immunizing them for their legislative acts. *Gravel v. United States*, 408 U.S. 606, 616 (1972). And that immunity is "absolute": "once it is determined that Members are acting within the 'legitimate legislative sphere' the Speech or Debate Clause is an absolute bar to interference." *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 503 (1975) (quoting *Doe v. McMillan*, 412 U.S. 306, 314 (1973)). The Framers believed it was the role of Congress itself, and ultimately the democratic process, to hold Members accountable for their "legislative conduct." *Tenney v. Brandhove*, 341 U.S. 367, 378 (1951).

The law is also clear that the definition of legislative acts is broad. As then-Judge Alito has explained, legislative acts include formal legislative oversight, which is "clearly protected by the Speech or Debate Clause." *United States v. McDade*, 28 F.3d 283, 300 (3d Cir. 1994). In fact, the Government may not even introduce "evidence of a legislative act . . . in a prosecution." *United States v. Helstoski*, 442 U.S. 477, 487 (1979). So when it is clear that a prosecution will "rely upon protected legislative acts," the indictment must be dismissed at the outset. *United States v. James*, 888 F.3d 42, 49 (3d Cir. 2018). In other words, the Clause does not just immunize legislators from conviction; it immunizes them "from the burden of defending themselves" at all. *Hutchinson v. Proxmire*, 443 U.S. 111, 123 (1979).

In addition to the protection of the Speech or Debate Clause, the Supreme Court's recent decision in *Trump v. United States*, 603 U.S. 593 (2024), supports a presumptive immunity for Members of Congress based on the separation of powers between and among the branches. Whereas the Speech or Debate Clause establishes *absolute immunity* for all *legislative acts*, the constitutional separation of powers establishes *presumptive immunity* for all *official acts*. The Supreme Court announced that principle in the context of executive immunity in *Trump*, but its reasoning applies with at least as much force in the context of legislative immunity, where courts have for centuries recognized the imperative of "insuring the independence of individual legislators." *United States v. Brewster*, 408 U.S. 501, 507 (1972).

This prosecution collides with these immunities. The indictment charges a sitting Member of Congress, Congresswoman LaMonica McIver, for a congressionally authorized oversight inspection she conducted with two of her colleagues at Newark's Delaney Hall, a privately run immigration detention center in her District, on May 9, 2025. The Members conducted that inspection pursuant to a duly enacted federal statute that makes it unlawful "to prevent" a "Member of Congress" "from entering, for the purpose of conducting oversight, any" Department of Homeland Security ("DHS") detention center—whether or not the Member "provide[s] prior notice." Pub. Law No. 118-47, § 527, 138 Stat 460 (2024) ("Approps. Act").

Notwithstanding that clear prohibition, DHS agents took substantial steps to interfere with Congresswoman McIver's inspection: they kept her waiting outside the gate when she arrived; placed her in a holding room for more than an hour after she passed through the gate; concocted a scheme to arrest the Mayor of Newark on fabricated, petty-misdemeanor trespassing charges that further delayed the Members' inspection; and then hatched an irresponsible and dangerous attempt to make that arrest and handcuff the Mayor in a crowd of civilians. Only after placing the Mayor

2

in custody and removing him from the premises did the agents give Congresswoman McIver and her colleagues the tour of the facility to which they were legally entitled and that they had requested when they arrived. Throughout the entire episode, the Congresswoman remained on site in her official capacity, intent on performing her statutory and constitutional responsibilities to inspect the facility.

Now, having done their best to interfere with Congresswoman McIver's efforts to carry out her responsibilities, the Executive Branch has charged the Congresswoman for her reaction during a scrum that resulted when armed, masked agents interrupted her inspection and descended on the Mayor to effect his unjustified arrest in a public parking lot. Those charges entirely "rely upon protected legislative acts," just as the Speech or Debate Clause forbids. *James*, 888 F.3d at 49. The indictment alone makes that clear, and the Court can and should dismiss on that basis.

But if more information is necessary to confirm that conclusion, video footage that the government has produced in discovery—and which this Court may consider in assessing legislative immunity—confirms that Congresswoman McIver's acts of legislative oversight would be at the core of any trial in this case. The jury would necessarily hear about her focus on immigration policy, and her history of congressional oversight in that area. They would learn about her February 2025 visit to another immigration detention facility in Elizabeth, and her meeting the following month with Immigration and Customs Enforcement ("ICE") regional officials to discuss such inspections at ICE's office in Newark. The trial would document the Congresswoman's assertion of legislative authority when she arrived at Delaney Hall, and her efforts to pursue those investigatory steps even as agents stonewalled her. The proof would track the agents' escalating obstruction as the Members patiently waited to be admitted, and it would depict Congresswoman McIver's proportional reaction when that interference culminated in the agents' chaotic and

dangerous attempt to arrest Mayor Baraka for trespassing after they had permitted him to enter the premises, and then allowed him to leave after asking him to do so. And the jury would hear that Congresswoman McIver's perseverance succeeded, when the agents ultimately acquiesced and permitted her to inspect the jail.

In that way, the trial would place Congresswoman McIver's legislative acts squarely at issue, asking the jury to evaluate her motives and purpose in undertaking those acts. And it would require the jury to pass judgment on the Congresswoman's reasonable understanding of the scope and applicability of her legislative authority, as well as the agents' unlawful decision to disregard her constitutional role in violation of a federal statute forbidding them from doing so.

The implications are obvious: putting Congresswoman McIver on trial for exercising her constitutionally and statutorily vested duties in this case would deter other Members from conducting legitimate oversight and imperil the separation of powers. That sort of intimidation of independent legislative prerogatives is exactly the evil that legislative immunity was designed to prevent. The indictment must be dismissed "to effectuate its purposes." *Eastland*, 421 U.S. at 501.

## BACKGROUND

Elected in a landslide in 2024, Congresswoman LaMonica McIver is the U.S. Representative for New Jersey's 10th congressional district, an urban district that is home to Newark, where Congresswoman McIver was born and raised. As a freshman Representative from a state with more than 2.2 million immigrants—nearly a quarter of its population—and as a member of the House Committee on Homeland Security, she has made the safety and vitality of New Jersey's immigrant communities one of her chief legislative concerns. As part of that commitment, the Congresswoman has made it a priority to conduct oversight of DHS's private immigration detention facilities.

## A. Congresswoman McIver's Congressional Oversight Authority

Congresswoman McIver has made securing the well-being of New Jersey's immigrant communities a key priority of her time in Congress. At the outset of the new administration, on January 23, 2025, the Congresswoman held a town hall to address the administration's "day-one" executive orders on immigration, assuring her constituents that she would use her post on the Homeland Security Committee to "advocate for the protection of our immigrant communities."[1] The next day, Congresswoman McIver and other members of New Jersey's congressional delegation wrote to DHS raising "serious questions regarding the legal and procedural aspects of" an ICE raid carried out in Newark.[2] And the Congresswoman has continued speaking out on behalf of New Jersey's immigrant population throughout the current administration.

Congresswoman McIver has devoted particular attention to investigating concerns about, and identifying possible legislative responses to, conditions at New Jersey's private immigration detention centers. Under federal law, Members of Congress and their staff have express statutory authority to conduct unannounced oversight inspections of DHS facilities. *See* Approps. Act § 527. The relevant statute specifically forbids DHS from using any federal funds "to prevent" a "Member of Congress" or their staff "from entering, for the purpose of conducting oversight, any facility operated by or for the Department of Homeland Security used to detain or otherwise house aliens." *Id.* § 527(a). The law also specifies that it "may not be construed to require a Member of Congress to provide prior notice of the intent to enter a facility . . . for the purpose of conducting oversight." *Id.* § 527(b). Congress enacted this provision in 2019 to enable Members to conduct real-time oversight over DHS facilities following concern over the separation of migrant families in DHS

---

[1] *Immigration Tele-Town Hall* 2:47 - 3:37, bit.ly/3IVDhUX (Jan. 23, 2025).
[2] Letter from Congresswoman McIver et al., to Hon. Benjamine Huffman, Acting Secretary, DHS, & Hon. Caleb Vitello, Acting Director, ICE (Jan. 24, 2025).

facilities, and it has been carried forward or expanded in DHS appropriation bills ever since. In short, Members of Congress have the express authority to show up at DHS detention facilities with no notice, and the employees of that agency must accommodate and facilitate their request for an inspection.

Congresswoman McIver exercised this statutory authority in early February at an immigration detention center in Elizabeth, which at the time was the only such private facility operating under a contract with ICE in New Jersey. She conducted that inspection together with fellow New Jersey Representatives Bonnie Watson Coleman and Rob Menendez Jr. After the visit, Congresswoman McIver wrote to DHS Secretary Kristi Noem expressing deep concern over DHS's "efforts to expand private immigration detention in New Jersey," and with ICE's treatment of detainees.[3] She continued those efforts in March, meeting with ICE officials in Newark on March 28, 2025, to discuss her oversight mandate.

In the meantime, ICE announced in February 2025 that it had reached an agreement with a private contractor, the GEO Group, to reopen Newark's Delaney Hall, a 1,000-bed federal immigrant processing and detention center—and the first such facility to open under the Trump Administration.[4] Delaney Hall had previously operated in New Jersey until 2017, drawing "allegations of poor conditions and abuse."[5] The City of Newark promptly sued GEO over the reopening. The lawsuit alleged that the facility would be operating without a range of required permits and that, when officials had attempted to conduct "crucial life safety inspections," GEO

---

[3] Letter from Congresswoman McIver et al., to Hon. Kristi Noem, Secretary, DHS, & Hon. Caleb Vitello, Acting Director, ICE (Feb. 19, 2025).

[4] *ICE expands detention capacity with Delaney Hall Facility in New Jersey*, ICE (Feb. 26, 2025), https://perma.cc/VX38-QSTD.

[5] Letter from Congresswoman McIver et al., to Hon. Kristi Noem, Secretary, DHS, & Hon. Caleb Vitello, Acting Director, ICE (Feb. 19, 2025).

"refused to permit the" officials "to enter the building for the inspection." Compl. ¶¶ 3-24, *City of Newark v. Geo Re-Entry Group*, 25-cv-2225 (D.N.J. Apr. 1, 2025), ECF No. 1-5. Since then, detainees have reported going without food for 20-hour stretches, without medication for days at a time, and without visitation rights.[6]

### B. The Department of Justice Charges Congresswoman McIver for Her Conduct During a Congressional Oversight Visit

On May 9, 2025, pursuant to her statutory oversight authority, Congresswoman McIver made an unannounced visit to Delaney Hall. *See* Indictment at 1. Representatives Watson Coleman and Menendez accompanied her. The charges in this case stem entirely from Congresswoman McIver's exercise of that federal authority.

In particular, the indictment charges Congresswoman McIver with three counts of assaulting, resisting, or impeding a federal law enforcement officer in violation of 18 U.S.C. § 111(a)(1). The indictment is skeletal, exaggerated, omits context, and the video evidence squarely contradicts much of it. Yet its three counts and two-dozen or so paragraphs all ultimately amount to a description of a congressional oversight visit: Congresswoman McIver was at Delaney Hall to conduct a federally authorized inspection; ICE interfered with that visit by stonewalling, and then by arresting the Mayor of Newark for trespassing despite the Mayor's having done nothing but follow the directions of government representatives, and the Congresswoman was ultimately allowed to complete her oversight inspection. Any contact between Congresswoman McIver and agents took place during a few moments of that hours-long oversight inspection.

---

[6] *Before recent Delaney Hall uprising, detainees frequently complained about conditions*, Bergen Record (June 18, 2025), https://perma.cc/CP9R-BUKA.

Video evidence that the government has produced in discovery—which courts are free to consider in resolving a motion to dismiss on legislative immunity grounds[7]—adds color to the indictment's allegations, and further reveals that the jury would necessarily evaluate Congresswoman McIver's legislative acts at any trial in this case. Indeed, while the indictment nominally acknowledges the Congresswoman's oversight authority, it otherwise completely obscures and ignores that its allegations categorically describe conduct that took place in the course of a federally authorized oversight inspection that agents obstructed at every turn:

- *Allegation:* Count One alleges that on May 9, 2025, Congresswoman McIver and her congressional delegation "arrived at Delaney Hall allegedly to conduct a congressional oversight inspection." Indictment at 1.

  *Evidence:* Representatives McIver, Watson Coleman, and Menendez identified themselves as Members of Congress, explained they were there to conduct congressionally authorized oversight, and asserted their "right to look at the facility" and inspect its "safety, health, [and] services." *See* Ex. B, CD Axon Body Camera Pre and Arrest.mp4, at 1:34-2:08.

- *Allegation:* The congressional delegation "entered the secured area and proceeded to an interior reception area." Indictment at 2.

  *Evidence:* The Members were told to remain in that small space for about an hour, during which they were denied access to the facility despite their repeated assertions of statutory authority. Nevertheless, the Members spent that hour pursuing their oversight mission, in part by questioning employees about the facility and its operations. During this time, unbeknownst to the Members, ICE was mobilizing its forces: high-level officials of ICE and Homeland Security Investigations ("HSI") reported to the facility; munitions-filled vehicles took formation in its secured parking lot, and approximately 15 armed agents assembled just inside the gates. Ex. B at 6:40-13:30, 16:30-17:23, 20:09-35:14; Ex. A, NEPTZ.avi, at 23:00-23:15, 29:40-29:50, 40:50-41:05; Ex C, Axon_Body_4_Video_2025-05-09_1418_D01AA954X.mp4, at 00:30-00:44; Ex D, Axon_Body_4_Video_2025-05-09_1418_D01AA942W.mp4, at 00:37.

- *Allegation:* As the Members waited in the secured area, "the mayor of Newark [] and members of his security detail arrived in the unsecured area" and "indicated . . . that [the Mayor] was part of the Congressional Delegation's entourage." Indictment at 2. The Mayor was initially

---

[7] *United States v. Menendez*, 831 F.3d 155, 164 (3d Cir. 2016) (citations omitted) ("Although our review at this stage of a prosecution is ordinarily limited to the allegations in the indictment, we can consider extrinsic evidence to determine whether the Speech or Debate Clause applies.").

"denied entry," but was subsequently "allowed to enter into the secured area" for his own safety as protestors to the facility gathered outside. *Id.*

**Evidence:** Upon arrival, the Mayor approached the gate separating the facility's public drive from its private lot and spoke with the gate guard. After 10 minutes, the guard spoke to someone by radio, then invited the Mayor and his security detail to enter the secured area and opened the gate so that they could do so. Using his body-worn camera, an ICE agent recorded that event. Ex. A at 23:42-33:49; Ex. E, AG Axon Body Camera BARAKA Enters Gate.mp4.

- **Allegation:** After inviting the Mayor into the secured area, "V-1" told the Mayor he "could not enter" the secured area "without authorization" and ordered him "to leave." Indictment at 2. Agents warned the Mayor that he "would be arrested if he did not leave the secured area." *Id.*

  **Evidence:** The Mayor had been standing peacefully and quietly in the secured area for approximately 40 minutes when he was approached by a team of agents. Ex. A at 34:07-1:17:20. When they told him to leave, he replied that he had been "let in" and was "waiting for the [Members] to come out." Nevertheless, he also said that he was "fine" to leave and turned to walk out. Ex. F, TA Axon Body Camera Pre-Arrest.mp4, at 4:09-4:35. The Members approached the circle of agents confronting the Mayor as that conversation took place. *Id.*

- **Allegation:** The "Congressional Delegation overheard this conversation and [] protest[ed]." Indictment at 3.

  **Evidence:** Arriving by the Mayor's side, Congresswomen McIver and Watson Coleman reprimanded the agents for "creating a problem" that did not exist. Congresswoman McIver reiterated that the agents had kept them waiting for "over an hour," in blatant violation of federal law, and repeated, "We are here to do our oversight visit." Congressman Menendez summed up the absurdity of the situation the agents had created: "You have an unarmed Mayor of the largest city in the state, and you have two dozen people out here and cars barricading us? This is an act of intimidation and you know it." Ex. F at 4:32-5:58.

- **Allegation:** An HSI agent, identified in the indictment as "V-1," explained that "members of Congress had lawful authority to be in the secured area of Delaney Hall, but that" the Mayor "did not." Indictment at 3.

  **Evidence:** Although the indictment otherwise ignores the oversight context, V-1 verified the Members' lawful authority, explaining, "congressmen are different, congresswomen are different." Ex. F at 7:04-7:12.

- **Allegation:** V-1 then "announced that he was going to place" the Mayor "under arrest." Indictment at 3.

- **Evidence:** V-1 announced this decision only *after* the Mayor had turned to leave and Congresswoman Watson Coleman stopped him to ask: "Mayor, just tell me this, what do you want us to look for?" V-1's announcement prevented the Mayor from answering that question. Ex. F at 7:11-7:25.

9

- *Allegation:* A dispute ensued, and the Mayor was instead "escorted by his security detail outside the gate into the unsecured area of the facility." Indictment at 3.

  *Evidence:* An unidentified man in plain clothes—*not* Congresswoman McIver—moved between V-1 and the Mayor. V-1 did not take the Mayor into custody, and instead permitted him to leave the secured area, saying, "alright . . . walk out." As the Mayor walked out through the gate, Congresswoman Watson Coleman assured him, "We will be your eyes, and your ears." Agents then led the congressional delegation back toward the facility, as if they were finally going to permit the Members' inspection. Ex. G, AG Axon Body Camera Pre-Arrest.mp4, at 04:26; Ex. F at 7:27-9:28.]]

- *Allegation:* After the Mayor complied with HSI's instructions to "leave the secured area," agents placed him under arrest "in the unsecured area." Indictment at 2-3.

  *Evidence:* After a phone call, V-1 announced a decision to arrest Mayor Baraka: "I am arresting the mayor . . . even though he stepped out, I am going to put him in cuffs . . . per the Deputy Attorney General of the United States." Ex. B at 1:16:27-1:17:35. Meanwhile, the Members—who were *still* being prevented from entering the facility—returned to the entrance gate where they learned that the agents were changing course and renewing their plan to arrest the Mayor on baseless charges. Ex. A at 1:26:40-1:26:50; Ex. H, JR Axon Body Camera Arrest.mp4, at 00:30-00:40.

- *Allegation:* As agents moved in to arrest the Mayor, Congresswoman McIver "hurried outside towards the agents" as someone "yelled 'circle the mayor.'" Indictment at 3. Congresswoman McIver then "placed her arms around" the Mayor. *Id.*

- *Evidence:* ICE agents, heavily armed and most of them masked, rushed out of the gate to arrest the Mayor where he was on public property surrounded by reporters, his staff, and members of the public. The Members walked through the gate at approximately the same time. Ex. A at 1:26:50-1:26:56. As a crush of over a dozen agents descended on the Mayor, a man called out to "circle the Mayor," and the Members coalesced around him, holding one another's arms to remain upright in the crowd. Ex. A at 1:26:50-1:27:08; Ex. I, AG Axon Body Camera Arrest.mp4, at 00:47-00:55. Agents and protestors alike pushed toward the Members, destabilizing the group. The Members repeatedly asserted their federal status and instructed the agents not to touch them. Ex. I at 1:00-1:20. Agents nevertheless pressed in on the Members as the crowd formed more tightly around them.

- *Allegation:* During this encounter, Congresswoman McIver "slammed her forearm into the body of" V-1. Indictment at 3. The Congresswoman "also reached out and tried to restrain" the agent "by forcibly grabbing him." *Id.*

  *Evidence:* The video makes clear that any contact between Congresswoman McIver and agents occurred only *after* an ICE agent shoved a man from behind, forcing him into the Members, and sending a torrent of jostling through the crowd. The video shows that Congresswoman McIver's contact with agents was a defensive reaction to that force.

10

- **Allegation:** Count Two alleges that "[f]ollowing the arrest of" the Mayor, Congresswoman McIver "pushed past" another agent "using each of her forearms to forcibly strike" the agent "as she returned inside of the secured area of Delaney Hall." Indictment at 5.

  **Evidence:** After a few short moments, the Mayor made his way to V-1 to submit to arrest, and was promptly dragged back into the secured area and handcuffed. Congresswoman McIver followed, and an agent forcefully shoved her backward before she could reenter the secured area. NJ Spotlight News (@NJSpotlightNews), X (May 9, 2025 15:29 ET), https://x.com/NJSpotlightNews/status/1920926649777852742. Indeed, the agent's use of force against Congresswoman McIver as she was reentering the facility was so egregious that—unlike the officers responding to the Congresswoman's actions—she immediately informed an ICE official that she intended to file a complaint. Ex. I at 3:30-3:43. Congressman Menendez reentered with Congresswoman McIver, and Congresswoman Watson Coleman was escorted back through the gates with the help of agents. After the turmoil subsided, the Members were permitted to enter the building and complete their inspection.

- **Allegation:** Count Three alleges that Congresswoman McIver committed an additional violation of § 111(a) against other unidentified agents in unidentified ways. Indictment at 6.

  **Evidence:** Count Three is a misdemeanor count that adds no substantive allegations to the indictment and depends on all the same legislative acts alleged in the preceding counts.

In short, every single allegation in the indictment occurred during a few moments of an hours-long congressional oversight inspection that ICE obstructed through misdirection and intimidation at every step. Any contact occurred only after an ICE agent shoved a man from behind into Congresswoman McIver and the other Members. And Congresswoman McIver's contact with agents was a reactive, proportional response to what the government has apparently conceded to be a baseless, pretextual, and clearly unlawful arrest in chaotic circumstances that federal agents themselves instigated. Once the agents arrested the Mayor, they finally honored their legal obligation to provide the Members with the tour of the facility that they had requested when they arrived two hours earlier.

## ARGUMENT

### I.    The Speech or Debate Clause Requires Dismissing the Indictment

The indictment charges Congresswoman McIver for her conduct while she was undertaking a quintessential legislative act: a Member of Congress's authorized visit to inspect the

conditions under which ICE—an agency of the Executive Branch—is detaining immigrants using federal funds. Indeed, the indictment and evidence produced in discovery make clear that neither a court nor a jury could evaluate the evidence in this case without referring to and analyzing Congresswoman McIver's legislative acts, placing those acts squarely at issue. Allowing a prosecution for that conduct to advance would deter future congressional efforts to conduct executive oversight, precisely the brand of intimidation that the Speech or Debate Clause was adopted to prevent.

### A. The Speech or Debate Clause Confers Broad Immunity for Legislative Acts

The Speech or Debate Clause ensures that "for any Speech or Debate in either House," Senators and Representatives "shall not be questioned in any other Place." U.S. Const. art. I, § 6, cl. 1. These protections go well beyond "literal speech or debate." *Eastland*, 421 U.S. at 501-04. The Clause extends absolute legislative immunity to all "legislative acts," *United States v. Menendez*, 831 F.3d 155, 165 (3d Cir. 2016)—that is, to any conduct that "took place 'in a session of the House by one of its members in relation to the business before it,'" *Eastland*, 421 U.S. at 503 (quoting *Kilbourn v. Thompson*, 103 U.S. 168, 204 (1880)).

The "fundamental purpose" of the Speech or Debate Clause is to free "the legislator from executive and judicial oversight that realistically threatens to control his conduct as a legislator." *Helstoski*, 442 U.S. at 492 (quoting *Gravel*, 408 U.S. at 618). The Clause was "written into the Constitution" not "for the personal or private benefit of Members of Congress, but to protect the integrity of the legislative process by insuring the independence of individual legislators." *Id.* at 165 (quoting *Brewster*, 408 U.S. at 507). The Supreme Court has "[w]ithout exception . . . read the Speech or Debate Clause broadly to effectuate its purposes." *Eastland*, 421 U.S. at 501.

To be sure, the Clause does not "make Members of Congress super-citizens, immune from criminal responsibility." *Brewster*, 408 U.S. at 516. Illegitimate activities that take place outside

"the legislative process," such as "taking or agreeing to take money for a promise to act in a certain way," are outside the Clause's scope. *Id.* at 525. And no one would contend that purely "personal actions are [] protected." *James*, 888 F.3d at 49.

For legislative acts, though, the protection is "absolute." *Eastland*, 421 U.S. at 501. The Clause "precludes any showing of how a legislator acted" in the course of a legislative act. *Helstoski*, 442 U.S. at 489 (citation modified). That is because "[r]evealing information as to a legislative act . . . would subject a Member to being 'questioned' in a place other than the House or Senate, thereby violating the explicit prohibition of the Speech or Debate Clause." *Id.* at 490. So "once it is determined that Members are acting within the 'legitimate legislative sphere' the Speech or Debate Clause is an absolute bar to interference." *Eastland*, 421 U.S. at 502-03 (quoting *McMillan*, 412 U.S. at 314).

Consistent with that purpose and scope of protection, the Clause requires dismissing an indictment based on legislative acts at the outset of a criminal prosecution. *United States v. Helstoski*, 635 F.2d 200, 202-03 (3d Cir. 1980). For that reason, an order denying legislative immunity is immediately appealable "under the collateral order doctrine," and all further proceedings are automatically stayed upon that appeal. *James*, 888 F.3d at 43; *see Coinbase, Inc. v. Bielski*, 599 U.S. 736, 738 (2023). The Clause thus shields Members of Congress "not only from the consequences of litigation's results but also from the burden of defending themselves." *Hutchinson*, 443 U.S. at 123 (quoting *Dombrowski*, 387 U.S. at 85); *see United States v. Dowdy*, 479 F.2d 213, 22 n.12 (4th Cir. 1973). After all, the Clause "would be of little value if legislators could be subjected to the cost and inconvenience and distractions of a trial" predicated on their legislative acts. *See Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998) (cleaned up).

**B. Congresswoman McIver's Inspection of Delaney Hall Was a Legislative Act**

The Third Circuit applies these Speech or Debate Clause principles using "a two-step framework for identifying legislative acts." *Menendez*, 831 F.3d at 166. The court must start by examining "the form of the act to determine whether it is inherently legislative or non-legislative." *Id.* When an act is either "clearly" legislative or non-legislative in nature, the inquiry must end: "[M]anifestly legislative acts" are protected; manifestly non-legislative acts are not. *Id.* Only when an act is "ambiguously legislative"—in other words, "neither manifestly legislative nor clearly non-legislative"—should the court undertake the second step of assessing whether, based on "the content, purpose, and motive of the act," its "predominant purpose" was legislative. *Id.* at 166, 173.

The conclusion in this case is the same either way. Congresswoman McIver's inspection of Delaney Hall was a "manifestly" legislative act: her sole purpose was to fulfill her constitutional and statutory responsibility of Executive Branch oversight. But even if this Court were to conclude that her activities at Delaney Hall were "ambiguously" legislative, the content, form, and purpose of her visit all confirm that her "predominant purpose" was legislative.[8]

**1. *Congressional Oversight and Factfinding Are Manifestly Legislative Acts***

Congressional oversight conducted "pursuant to an officially sanctioned Congressional" mandate is an unambiguously legislative act. *Menendez*, 831 F.3d at 167-68. As then-Judge Alito explained in *McDade*, formal legislative oversight is "clearly protected by the Speech or Debate Clause." 28 F.3d at 299-300. After all, "oversight is the way Congress evaluates legislation, and in

---

[8] The indictment alone establishes that the charged conduct was "manifestly legislative." *In re Grand Jury Investigation (Menendez)*, 608 F. App'x 99, 101 (3d Cir. 2015). If there were any ambiguity, however, it is well established that courts can consider "extrinsic evidence to determine whether the Speech or Debate Clause applies." *Menendez*, 831 F.3d at 164. Congresswoman McIver accordingly has submitted video footage that the government produced during discovery, which confirms that the indictment's charges are inextricably connected to her legislative acts.

the appropriate manner, monitors the operations of executive departments and agencies." *Id.* at 304 (Scirica J., concurring); *see Eastland*, 421 U.S. at 504 (similar). A congressional "grant of authority is sufficient to show that the" activity is formal. *Eastland*, 421 U.S. at 506. Congressionally authorized oversight is thus a manifestly legislative act—it is obviously "true legislative oversight"—and it "merit[s] Speech or Debate immunity." *Menendez*, 831 F.3d at 169 (quoting *McDade*, 28 F.3d at 304 (Scirica, J., concurring)).

Similarly protected are congressional "fact-finding, information gathering, and investigative activities." *Govt. of the Virgin Islands v. Lee*, 775 F.2d 514, 521 (3d Cir. 1985). The "power of inquiry . . . is an essential and appropriate auxiliary to the legislative function." *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927). Indeed, congressional factfinding and investigative activities are "essential prerequisites to the drafting of bills and the enlightened debate over proposed legislation." *Lee*, 775 F.2d at 521. Thus, there can be "no doubt that information gathering, whether by issuance of subpoenas or field work by a Senator or his staff," is "a necessary concomitant of legislative conduct and thus should be within the ambit of the privilege so that congressmen are able to discharge their constitutional duties properly." *Id.* at 521 (quoting *McSurely v. McClellan*, 553 F.2d 1277, 1286-87 (D.C. Cir. 1976) (en banc)).

### 2. *Congresswoman McIver's Delaney Hall Inspection Was Manifestly Legislative*

In that light, Congresswoman McIver's inspection of Delaney Hall was squarely within the heartland of legislative conduct. As the Third Circuit explained in *Menendez*, "the form of the act [] determine[s] whether it is inherently legislative or non-legislative." 831 F.3d at 166. "Some acts are 'so clearly legislative in nature that no further examination has to be made to determine their appropriate status.'" *Id.* (quoting *Lee*, 775 F.2d at 522). Among those "manifestly legislative" acts is congressional oversight or investigation conducted pursuant to "officially sanctioned Congressional" authority. *See id.* at 167-68.

In *Menendez*, the court contrasted *formal* legislative actions, which are manifestly legislative, with "*informal* efforts to influence the Executive Branch," which are ambiguously legislative. *Id.* at 168 (emphasis added). Members' "actions pursuant to an officially sanctioned Congressional investigation," the court explained, are manifestly "legislative notwithstanding evidence of impure motive" or "evidence that the investigation was performed in exchange for a bribe." *Id.* at 167-68 (citing *Dowdy*, 479 F.2d at 224-26; and then citing *McSurely*, 553 F.2d at 1296). Members' informal efforts "to 'cajole' and 'exhort' Executive Branch officials" on behalf of "a particular person," meanwhile, "are not protected." *Id.* at 168-69 (quoting *Gravel*, 408 U.S. at 625).

Under that rubric, Congresswoman McIver's inspection of Delaney Hall was manifestly legislative because she unquestionably had congressional authority to do so. Federal law gives any Member of Congress the express right, responsibility, and authority to enter, "for the purpose of conducting oversight, any facility operated by or for the Department of Homeland Security used to detain or otherwise house aliens." Approps. Act § 527. Members are not even required "to provide prior notice of" their visits. *Id.* That is a formal grant of authority, and the indictment does not contend otherwise. To the contrary, the indictment *acknowledges* Congresswoman McIver's "lawful authority to be in the secured area of Delaney Hall." Indictment at 3. "That grant of authority is sufficient to show" the oversight inspection was inherently legislative. *Eastland*, 421 U.S. at 506.

And Congresswoman McIver is not just any Member of Congress: she is a Member of the House Committee on Homeland Security. House Rules *require* members of that Committee to "review and study on a continuing basis *all* Government activities relating to homeland security, including the interaction of all departments and agencies with the Department of Homeland

Security." Rule X, cl. 3(g)(1), *Rules of the House of Representatives, One Hundred Nineteenth Congress* (2025) (emphasis added). To that end, the Committee—and its Members—"*shall* review and study on a primary and continuing basis all Government activities, programs and organizations related to homeland security that fall within its primary legislative jurisdiction"—that is, within "homeland security policy" and "administration." Rule X, cl. 1(j), 3(g)(2). And indeed, the indictment concedes that ICE—an agency housed within DHS—uses Delaney Hall "as a federal immigration detention facility," placing it squarely within Congresswoman McIver's general oversight authority and specific legislative jurisdiction. That is all the more reason Congresswoman McIver's inspection was "obviously legislative in nature." *Menendez*, 831 F.3d at 166 (quoting *Lee*, 775 F.2d at 522).

Taken together, Congresswoman McIver visited Delaney Hall under a general authorization to inspect DHS detention facilities *and* a specific mandate to conduct DHS oversight. That "officially sanctioned" exercise of congressional authority comfortably shows that her presence at Delaney Hall was "manifestly legislative activity." *See Menendez*, 831 F.3d at 167-68. "[N]o further examination" is necessary—or permitted. *Menendez*, 831 F.3d at 166.

### 3.  *Even If Congresswoman McIver's Acts Were Not Manifestly Legislative, They Are Protected Based on Their Content, Purpose, and Motive*

The "content, purpose, and motive of" Congresswoman McIver's visit confirm that the "predominant purpose" of her visit was legislative. *Id.* at 166, 173. Indeed, her words and actions—from the start of her visit to Delaney Hall to its conclusion—readily show that her sole purpose on May 9 was exercising her congressional prerogative to see for herself how ICE was treating the people it was paying a private company to incarcerate.

The content of Congresswoman McIver's visit makes clear that she was at Delaney Hall to conduct oversight. When she and her colleagues arrived, they informed the GEO guard, and then

ICE officials, that they were on site to conduct a congressionally authorized oversight inspection, an explanation they repeated for quite some time before they were escorted into an interior guard station. Ex. A at 5:00-8:57. Then, while delayed in a waiting area, the Members peppered GEO officials with questions about the facility, even as officials stonewalled the visit under the pretext of waiting for higher ranking officials to greenlight the inspection. Ex. B at 6:40-13:30, 15:20-17:23, 20:09-35:14. When those officials at last arrived, they marched right past Congresswoman McIver and her colleagues, prompting the Members to follow them outside, where Congresswoman McIver continued imploring them to facilitate the "oversight visit." Ex. F at 5:18-5:21. And despite having been "prevent[ed]" from accessing the facility for hours, the Members did not leave until ICE finally gave them a tour. *See, e.g.*, Ex J, Axon_Body_4_Video_2025-05-09_1547_D01AA739X.mp4.

Congresswoman McIver's legislative purpose and motive for the inspection are equally apparent. The visit was part and parcel of an immigration policymaking agenda she had been pursuing—with ICE's knowledge and at least nominal cooperation—for months. The Congresswoman held an immigration town hall in January 2025, and she followed that event with a letter to ICE seeking information on immigration raids in Newark. She continued her work in February, first conducting an oversight visit at the Elizabeth Detention Center, and then writing to DHS Secretary Noem to express alarm over ICE's plans to "expand private immigrant detention in New Jersey." That letter expressed particular concern about Delaney Hall, a facility in Congressman McIver's district that had previously "faced allegations of poor conditions and abuse."[9] The Congresswoman even met with ICE in March to share her oversight agenda. These

---

[9] Letter from Congresswoman McIver et al., to Hon. Kristi Noem, Secretary, DHS, & Hon. Caleb Vitello, Acting Director, ICE (Feb. 19, 2025).

issues were particularly pressing for Congresswoman McIver given the demographics of the population she represents, and her long-standing pledge to "advocate for the protection of [those] immigrant communities."[10]

*Menendez* is again instructive. The Third Circuit there concluded that then-Senator Menendez's informal meetings with Executive Branch officials were non-legislative because they were undertaken for the purpose of influencing "the Executive Branch specifically on [a friend's] behalf and not on broader issues of policy." *Menendez*, 831 F.3d at 169. The Senator "prepared for the [meetings] with an eye toward [his friend's] specific situation;" the friend "was mentioned specifically during each of the challenged acts;" and the friend was "particularly interested in following up with Senator Menendez on all of the challenged acts." *Id.* at 170-71.

Congresswoman McIver's oversight inspection could not be more different. She visited Delaney Hall only after visiting the facility in Elizabeth, meeting with local ICE officials, and writing to Secretary Noem about Delaney Hall. She then cited her statutory authority and pursued her agenda throughout the visit. And she left the facility only once she had accomplished her legislative objective.

In fact, when ICE reopened Delaney Hall in April amid concerns surrounding its engagement with GEO Group, and in possible violation of Newark's municipal code, it was *inevitable* that Congresswoman McIver would invoke her responsibility and authority to become fully informed about the facility's conditions. That exercise of authority was entirely consistent with her legislative priorities and her committee assignment. And it clearly and indisputably enabled her to more knowledgably address related issues through legislation and appropriations.

---

[10] *Immigration Tele-Town Hall* 2:47 - 3:37, bit.ly/3IVDhUX (Jan. 23, 2025).

#### 4.  Congresswoman McIver's Acts Are Protected Under Any Applicable Test

As that analysis demonstrates conclusively, Congresswoman McIver's conduct is protected under the Third Circuit's "two-step approach" to legislative immunity, and that is enough to rule in her favor. But if this Court had doubts about that conclusion, Supreme Court precedent applying the Speech or Debate Clause makes clear that the Third Circuit's two-step test has "one step too many." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 19 (2022). In particular, the Third Circuit's framework conflicts with the Supreme Court's direction that "[w]hether an act is legislative turns on the *nature of the act*, rather than on the motive or intent of the official performing it"; the act must be considered "stripped of all considerations of intent and motive." *Bogan*, 523 U.S. at 54 (emphasis added). Indeed, following the reasoning of the Supreme Court's decision in *Trump*, an inquiry into legislative motive would raise significant separation-of-powers concerns in light of *Trump*'s holding that courts evaluating claims of *presidential* immunity emphatically "may not inquire into the President's motives." 603 U.S. at 618. Thus, to the extent this Court viewed the Third Circuit's framework as counseling against dismissal, the Supreme Court's test, which depends on the "nature of the act[s]" described in the indictment, would require the Speech or Debate Clause's protection. *Bogan*, 523 U.S. at 54.

### C.  The Indictment Necessarily Places Legislative Acts at Issue

Congresswoman McIver's inspection of Delaney Hall was a manifestly legislative act, and that ends the Speech or Debate Clause inquiry. *See Helstoski*, 442 U.S. at 490. But even if any more inquiry into her legislative acts were permitted, the case still could not proceed. This is a remarkable case in that *every allegation* in the indictment charges the Congresswoman for her conduct during the course of a legislative act, and *necessarily* requires proving the criminality of those actions. Accordingly, if this case proceeded to trial, a jury would *necessarily* be asked to

review and weigh in on the scope of Congresswoman McIver's legitimate oversight authority, and how she understood that authority during her visit.

### 1. The Indictment's Substantive Allegations Relate Exclusively To Legislative Acts

"[E]vidence of a legislative act of a Member may not be introduced by the Government in a prosecution"—indeed, the Government's evidence may not even "*mention* [] a legislative act." *Helstoski*, 442 U.S. at 487, 490 (emphasis added). Yet every allegation in the indictment is a reference to how Congresswoman McIver allegedly "acted" in inspecting Delaney Hall. *Id.* at 489. This motion does not invite the Court to examine the sufficiency of the evidence, but it does ask the Court to consider whether Congresswoman McIver's alleged conduct took place "in the course of exercising [her] legislative authority" and is therefore "privileged from judicial scrutiny," *Youngblood v. DeWeese*, 352 F.3d 836, 841 (3d Cir. 2003).

The indictment charges conduct undertaken in the course of a legislative act from cover to cover. It acknowledges, and the video evidence makes clear, that Congresswoman McIver and her delegation visited "Delaney Hall allegedly to conduct a congressional oversight inspection," and that agents *confirmed* the "members of Congress had lawful authority to be" there. Indictment at 1, 3. Arriving at the facility, the delegation "entered the secured area and proceeded to an interior reception area." Indictment at 2. Video evidence produced by the government confirms that the legislators continued to assert their right to inspect the facility, and used the time for oversight purposes, questioning staff about the facility's conditions. Ex. B at 1:34-2:08, 4:00-4:19, 6:34-12:04, 15:08-15:33, 1:09:40-1:10:03, 1:15:20-1:15:34. The agents interfered with those efforts at least three times: once by stalling the Members' arrival until they could muster an unnecessary and unwarranted group of armed agents; and then twice more with their baseless and shifting assertions that they would be arresting the Mayor for trespassing after inviting him inside the secured area.

21

The charges in this case stem entirely from a two-minute interaction during this two-hour inspection.

As this account makes plain, the allegations in the indictment demonstrate on their face—and the video evidence puts beyond doubt—that *every one of the allegations* in the indictment alleges conduct that took place over a few moments in the middle of an hours-long federally authorized oversight inspection. Evidence of these allegations purporting to show how Congresswoman McIver acted during "the course of exercising [her] legislative authority," *Youngblood*, 352 F.3d at 841, may not "be introduced by the Government," *Helstoski*, 442 U.S. at 487. This case would be meaningless without that conduct—and that ends the Speech of Debate Clause inquiry and requires dismissal. *Eastland*, 421 U.S. at 503.

### 2. The Government's Case and Congresswoman McIver's Defenses Will Inevitably Place Her Legislative Acts at Issue

Even if, contrary to controlling precedent, the Government could avoid the Speech or Debate Clause by extracting discrete conduct from the course of broader legislative acts, the charges here would *still* violate the Speech or Debate Clause because they are *guaranteed* to place Congresswoman McIver's legislative acts and authority squarely at issue. *Johnson*, 383 U.S. at 176-77. The indictment and the nature of the allegations in this case make clear that Congresswoman McIver's "defense quite naturally" will be that her conduct was a reasonable, justified, and proportional way of carrying out a legislative act. *Id.* at 177; *see United States v. Goodwin*, 440 F.2d 1152, 1156 (3d Cir. 1971). That bona fide defense, which the Government would be required to negate, is indivisible from Congresswoman McIver's legislative acts and authority, ensuring that this prosecution would "rely upon protected legislative acts" and "violate the protections" of the Speech or Debate Clause. *James*, 888 F.3d at 49; *see Goodwin*, 440 F.2d at 1156.

The inevitable trajectory of Congresswoman McIver's defense shows that this case would place squarely at issue "how [she] acted" in furtherance of a legislative aim. *Helstoski*, 442 U.S. at 489. The jury would hear about Congresswoman McIver's legislative record, and in particular, her focus on conditions in New Jersey's private immigration detention facilities. The jury would hear about the congressional delegation arriving at Delaney Hall, and the Members repeatedly asserting their statutory "right" to inspect the facility's "safety, health, [and] services." Critically, the video evidence would show agents "prevent[ing]" the delegation from conducting its inspection, and stalling the Members in a holding room for over an hour while the delegation nevertheless persisted in directing investigatory questions at the agents, in violation of the federal statute prohibiting such interference. Approps. Act § 527.

The jury would learn about ICE's escalating obstruction of the investigation, including its forceful "act[s] of intimidation," as the delegation repeatedly asserted its statutory authority. They would see that obstruction culminate in a misguided and dangerous tactical operation to arrest Mayor Baraka on baseless trespassing charges while he was waiting for the Members in a public space where ICE and HSI had told him to go.

The jury would hear that any alleged contact Congresswoman McIver had with agents occurred after an agent shoved bystanders into her, and that such conduct was reasonably proportional to the exigencies of ICE's interference with her authority. Congresswoman McIver would show that her intent was *only* to effectuate her legislative authority—not to commit an assault—and that a federal agent shoved *her* backward as she returned to the facility, even as agents aided Congresswoman Watson Coleman's return. *See* 18 U.S.C. § 115(a)(1) (prohibiting assaults on federal officials, including Members of Congress). And the presentation would conclude with

Congresswoman McIver completing her inspection, consistent with the legislative purpose that uniformly motivated her acts at Delaney Hall.

In sum, any trial would revolve entirely around Congresswoman McIver's legislative acts, and her reasonable understanding of her legislative authority. Indeed, this case would make no sense without it. The Government simply cannot "separate[]" its allegations from Congresswoman McIver's "legitimate legislative purpose." *James*, 888 F.3d at 48. That is fatal to the Government's case. *Johnson*, 383 U.S. at 184-85.

### 3.  *A Criminal Trial Would Undermine the Purpose of the Speech or Debate Clause*

Finally, dismissing the indictment is necessary to "effectuate" the Speech or Debate Clause's "purposes"—the ultimate touchstone of the legislative immunity inquiry. *Eastland*, 421 U.S. at 502. The Speech or Debate Clause was adopted to "insure that the legislative function the Constitution allocates to Congress [is] performed independently," and that legislators are free from "intimidation . . . by the Executive and accountability before a possibly hostile judiciary." *Eastland*, 421 U.S. at 501 (quoting *Johnson*, 383 U.S. at 181). The Clause must be interpreted to vindicate its "prophylactic purposes"—and this prosecution urgently implicates that need. *Johnson*, 383 U.S. at 182.

The indictment charges Congresswoman McIver for her conduct in performing a core legislative function: conducting congressional oversight. As the Executive Branch itself has long recognized, the "Congressional power to conduct inquiries and to exercise oversight respecting the Executive Branch is broad and well-established." *Scope of Congressional Oversight and Investigative Power With Respect to the Executive Branch* 60, 60 Op. O.L.C. (1985); *see Ways and Means Committee's Request for the Former President's Tax Returns and Related Tax Information Pursuant to 26 U.S.C. § 6103(f)(1)* 20, 45 Op. O.L.C. (2021) (similar). That power "is an essential and appropriate auxiliary to the legislative function," and it is one that depends on the ability of

Congress to exercise it "independently." *McGrain*, 273 U.S. at 174, 161. Congress must be able to "investigate the manner in which the Executive Branch has executed existing law in order to determine whether further legislation is necessary." *Scope of Congressional Oversight* at 62.

Legislators have been conducting oversight of Executive Branch immigration activities throughout the Trump Administration—but they have been met with alarming resistance. Mayor Baraka's arrest on baseless trespassing charges resulted in an interrogation and five-hour detention (resulting in dropped charges).[11] Less than two weeks later, California Senator Alex Padilla was forcibly detained while trying to ask DHS Secretary Kristi Noem a question (resulting in no charges).[12] Days after that, ICE forcibly arrested a New York City mayoral candidate for escorting a migrant out of deportation proceedings and asking ICE officers if they had a warrant to effectuate an arrest (resulting in dropped charges).[13] And ICE has now adopted a policy purporting to require Members of Congress to provide seven days' notice in advance of conducting oversight inspections of ICE facilities, a policy that openly defies the federal statute authorizing Members to conduct unannounced inspections, and pursuant to which ICE has prevented a series of lawmakers from conducting statutorily authorized oversight.[14]

Prosecuting Congresswoman McIver is a significant escalation of DHS's efforts to "intimidate[e]" those who would conduct interbranch oversight. *Johnson*, 383 U.S. at 181. The Ranking Member of the House Judiciary Committee has protested this "unprecedented charging decision" as "a blatant attempt to intimidate Members of Congress and to deter us from carrying

---

[11] Compl. ¶¶ 31-32, 43 *Baraka v. Habba*, 25-cv-06846 (June 4, 2025), ECF No. 1.

[12] Michael Williams et. al, *US senator forcefully removed from DHS event in LA, triggering Democratic outcry on Capitol Hill*, CNN (June 12, 2025), https://perma.cc/XVR3-PJ8Y.

[13] Luis Ferré-Sadurní, *Brad Lander Is Arrested by ICE Agents at Immigration Courthouse*, N.Y. Times (June 17, 2025), https://bit.ly/3GPnO8s.

[14] *See* Compl., *Neguse v. ICE*, 25-cv-02463 (D.D.C. July 30, 2025), ECF No. 1 (lawsuit by Members of Congress challenging unlawful policy).

out our constitutional oversight duties."[15] And the chilling warning of a group of former Republican Members of Congress, in "unequivocally reject[ing] the charges against Congresswoman McIver," perhaps framed it best:

> The constitutional duties of Members of Congress include not only passing legislation but also oversight of executive branch implementation of those laws. That is an essential dimension of American checks and balances. Congresswoman McIver was present at the ICE facility as part of her official congressional duties. We believe this extreme response to the events of that day is unwarranted. . . .

> "This behavior by the Trump administration is outrageous," said former Rep. Claudine Schneider. "Every member of Congress, both past and present, should be speaking up. If not, we will very soon lose our ability to do so."[16]

That captures the stakes of this prosecution. The Executive Branch has charged a sitting Member of Congress for her modest, proportional, and reactive response to a flood of armed and masked ICE agents, who irresponsibly instigated a melee while trying to arrest a member of the Congresswoman's policymaking coalition on baseless trespassing charges during a broader effort to obstruct a federally authorized oversight inspection. The U.S. Attorney's Office then filed these charges amid a broader Executive Branch campaign to resist any efforts to regulate or even inquire about its operation of congressionally funded immigration enforcement activities. If these charges are allowed to move forward, they will send a chilling message to Congress on the risk it takes when it scrutinizes the Administration's activities. The Speech or Debate Clause was designed to prevent that kind of message and intimidation.

---

[15] Letter from Congresswoman Jamie Raskin, Ranking Member, U.S. House of Reps. Comm. on the Judiciary, to Hon. Pam Bondi, Attorney General, U.S. Dept. of Justice (June 3, 2025).

[16] Press Release, Former Republican Members of Congress, Former GOP Members of Congress Reject Charges Against Congresswoman McIver (May 22, 2025), https://perma.cc/B3TV-C5VM.

II.    **The Separation of Powers Independently Requires Dismissing the Indictment**

The Speech or Debate Clause provides ample reason to dismiss the indictment. So, too, does an independent constitutional doctrine—the separation of powers. While the Speech or Debate Clause confers *absolute immunity* for all *legislative acts*, recent Supreme Court precedent confirms that the constitutional separation of powers confers *presumptive immunity* for all *official acts*. While the Court announced this principle in *Trump*, a case involving presidential immunity, early decisions applying legislative immunity support its application to the legislative context. Indeed, a disparity between the two immunities across the two political branches of government would itself raise significant constitutional questions. Congresswoman McIver's conduct here undoubtedly consisted of official acts entitled to presumptive immunity, which the Government cannot rebut.

As the Supreme Court has recognized, the "separation-of-powers doctrine justifies a broad[] privilege for Congressmen . . . in criminal actions." *Supreme Ct. of Virginia v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 733 (1980). Applying those principles in the context of executive power, the Supreme Court recently held in *Trump* "that the President is absolutely immune from criminal prosecution for conduct within his exclusive sphere of constitutional authority," and has "presumptive immunity from criminal prosecution for . . . acts within the outer perimeter of his official responsibility," which can be rebutted only when the Government can "show that applying a criminal prohibition to that act would pose no 'dangers of intrusion on the authority and functions of the Executive Branch.'" *Trump*, 603 U.S. at 609, 614 (quoting *Nixon v. Fitzgerald*, 457 U.S. 731, 754 (1982)).

The Court's decision endowed "the President with 'the maximum ability to deal fearlessly and impartially with' the duties of his office." *Id.* at 611 (quoting *Fitzgerald*, 457 U.S. at 752). Otherwise, any "enterprising prosecutor in a new administration [could] assert that a previous

President violated [a] broad statute," and absent "immunity, such types of prosecutions of ex-Presidents could quickly become routine." *Id.* at 640. "The enfeebling of the Presidency and our Government that would result from such a cycle of factional strife is exactly what the Framers intended to avoid." *Id.* "The Constitution does not tolerate such impediments to 'the effective functioning of government.'" *Id.* at 636-37 (quoting *Fitzgerald*, 457 U.S. at 751).

*Trump*'s reasoning applies with equal, if not greater, force to legislators. Since "the Glorious Revolution in Britain, and throughout United States history," immunity "has been recognized as an important protection of the independence and integrity of the legislature"—an even more robust foundation than the precursors to executive immunity. *Johnson*, 383 U.S. at 178. That immunity is rooted in the inherent risk that Members could be constantly exposed to "criminal charges against critical or disfavored legislators by the executive," *id.* at 182, and that a Member facing criminal charges would "divert their time, energy, and attention from their legislative tasks," *Eastland*, 421 U.S. at 503. Immunity must, therefore, extend as far as "necessary to preserve the integrity of the legislative process." *Brewster*, 408 U.S. at 517.

The earliest judicial decisions on the scope of legislative immunity understood this. The classic case of *Coffin v. Coffin*, which the Supreme Court has described as "the most authoritative case in this country on" the scope of legislative immunity, *Kilbourn*, 103 U.S. at 204, explained that immunity presumptively extends "to the giving of a vote, to the making of a written report, and *to every other act resulting from the nature, and in the execution, of the office*." 4 Mass. 1, 27 (1808) (emphasis added). In other words, a Member was "exempt[] from prosecution, for every thing said or done by him, as a representative, *in the exercise of the functions of that office*, without inquiring whether the exercise was regular according to the rules of the house, or irregular and against their rules." *Id.* (emphasis added). *Kilbourn* ratified *Coffin*'s reasoning and, like the

Supreme Court's reasoning in *Trump*, explained that this presumptive immunity might be rebutted in "extraordinary" cases where prosecution would not jeopardize the "functions" of the legislative "bodies." 103 U.S. at 204-05.

The separation of powers accordingly confers an immunity on the official acts of legislators symmetrical with the immunity for the President's official acts. The Speech or Debate Clause confers immunity on *legislative acts*, which represent legislators' "core constitutional powers," and are thus *absolutely immune*. *Trump*, 603 U.S. at 606. The separation of powers extends further, making clear that legislative immunity also covers *official acts*, which represent "the outer perimeter of [the legislator's] official responsibility." *Id.* at 596. But that broader scope comes with a caveat: these acts are only *presumptively immune. Id.* at 614. Immunity for this wider class of official conduct may be rebutted when "the Government can show that applying a criminal prohibition to that act would pose no dangers of intrusion on the authority and functions of the" Legislative Branch. *See Trump*, 603 U.S. at 615 (cleaned up).[17] The prosecution cannot do so here.

For that reason, dismissal is warranted not only under the Speech or Debate Clause, but also under these principles. The indictment plainly charges Congresswoman McIver for official acts. A legislator who "acts pursuant to constitutional and statutory authority [] takes official action to perform the functions of [her] office." *Id.* at 617 (cleaned up). An act is official as long as it is "not manifestly or palpably beyond [the legislator's] authority." *Id.* at 618; *see Dowdy*, 479 F.2d at 226. And in "dividing official from unofficial conduct, courts may not inquire into [] motives." *Trump*, 603 U.S. at 618. The indictment charges Congresswoman McIver for conduct she undertook pursuant to her constitutional prerogative to conduct executive oversight, and her

---

[17] While the Supreme Court's *Trump* decision roots this broad immunity in the constitutional separation of powers, this immunity also could readily be rooted in the Speech or Debate Clause itself, based on the Clause's text, history, and early judicial interpretations discussed above.

express statutory authority to inspect ICE detention facilities, which even the indictment acknowledges. Every single allegation of wrongdoing in the indictment identifies action the Congresswoman allegedly took in response to what she reasonably believed to be ICE's unlawful obstruction of her authority, and the video evidence makes clear that any physical contact by her was a reactive and proportional response to that intrusion. Although "dividing official from unofficial conduct" may in some cases "prove to be challenging," this is not one of those cases. *Id.* at 618, 629.

The Government cannot rebut the presumptive immunity that attaches here. This prosecution is a severe intrusion on the authority and functions of the Legislative Branch—of a piece with a broader Executive Branch campaign to insulate DHS from scrutiny and exact retribution on policymakers who stand in its way. A criminal trial in this case would underwrite a "government 'too feeble to withstand the enterprises of faction,'" give way "to the 'frightful despotism' of 'alternate domination of one faction over another," and desert the spirit "of separated powers designed by the Framers." *Id.* at 642 (quoting 35 Writings of George Washington 226-27 (J. Fitzpatrick ed. 1940)). The Constitution rejects that possibility.

## CONCLUSION

The Court should dismiss the indictment.


Dated: August 15, 2025

ARNOLD & PORTER KAYE SCHOLER LLP

By: _____

Paul J. Fishman
Lee M. Cortes, Jr.
One Gateway Center | Suite 1025
Newark, NJ 07102
Telephone: 973-776-1901

Paul.Fishman@arnoldporter.com
Lee.Cortes@arnoldporter.com
*Counsel for*
*Congresswoman LaMonica McIver*