**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Hon. Jamel K. Semper |
| *v.* | Crim. No. 2:25-cr-00388-JKS |
| LaMONICA McIVER. | |

**CONGRESSWOMAN McIVER'S MOTION TO DISMISS**
**BASED ON SELECTIVE ENFORCEMENT AND PROSECUTION, AND**
**VINDICTIVE PROSECUTION**

August 15, 2025

ARNOLD & PORTER KAYE SCHOLER LLP
One Gateway Center
Suite 1025
Newark, NJ 07102

*Counsel for Congresswoman LaMonica McIver*

On the Memorandum:

Paul J. Fishman
Lee M. Cortes, Jr.
John M. Fietkiewicz
Samuel F. Callahan
Orion de Nevers
Amanda J. Raines

## TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................................................... ii

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND ................................................................................................ 4

    A.    The Justice Department's Sweeping Dismissal of Charges for Assaulting Officers During the January 6 Attack ................................................................... 4

    B.    Congresswoman McIver and Her Immigration Oversight Efforts ........................... 7

    C.    Congresswoman McIver's Visit to Delaney Hall ...................................................... 8

    D.    The Government's Continued Efforts to Hinder Congressional Oversight of Immigration Policy ................................................................................................. 13

ARGUMENT .................................................................................................................... 14

I.    There Is Clear Evidence of Selective Enforcement and Prosecution .................................... 14

    A.    The First and Fifth Amendments Prohibit Enforcement or Prosecution Based on Protected Speech, Affiliation, or the Exercise of Protected Rights ................................. 14

    B.    There Is Clear Evidence of Unconstitutionally Selective Enforcement and Prosecution ............................................................................................................... 17

II.    There Is Clear Evidence of Vindictive Prosecution ............................................................. 26

III.    If This Court Determines That The Existing Factual Record Does Not Provide Clear Evidence, the Court Should Permit Discovery and Conduct an Evidentiary Hearing ........................... 28

CONCLUSION ................................................................................................................. 30

## TABLE OF AUTHORITIES

*Frederick Douglass Found., Inc. v. District of Columbia*,
  82 F.4th 1122 (D.C. Cir. 2023) ........................................................ 3, 15, 16, 17, 18, 20, 21, 22

*NAACP v. Button*,
  371 U.S. 415 (1963) .................................................................................................. 16

*Tenafly Eruv Ass'n v. Borough of Tenafly*,
  309 F.3d 144 (3d Cir. 2002) ...................................................................................... 16

*U.S. v. Adams*,
  870 F.2d 1140 (6th Cir. 1989) ................................................................................... 29

*U.S. v. Esposito*,
  968 F.2d 300 (3d Cir. 1992) ...................................................................................... 27

*U.S. v. Goodwin*,
  457 U.S. 368 (1982) .................................................................................................. 27

*U.S. v. Haggerty*,
  528 F. Supp. 1286 (D. Colo. 1981) ................................................................. 17, 25, 26

*U.S. v. Judd*,
  579 F. Supp. 3d 1 (D.D.C. 2021) .............................................................................. 17

*U.S. v. Michel*,
  2022 WL 4182342 (D.D.C. Sept. 13, 2022) .............................................................. 29

*U.S. v. Mumphrey*,
  193 F. Supp. 3d 1040 (N.D. Cal. 2016) .................................................................... 22

*U.S. v. Ojala*,
  544 F.2d 940 (8th Cir. 1976) ..................................................................................... 25

*U.S. v. Olvis*,
  97 F.3d 739 (4th Cir. 1996) ....................................................................................... 18

*U.S. v. Paramo*,
  998 F.2d 1212 (3d Cir. 1993) .................................................................................... 27

*U.S. v. Torquato*,
  602 F.2d 564 (3d Cir. 1979) ............................................................................. 16, 21, 25

*U.S. v. Warnagiris*,
  No. 21-cr-0382, 2025 WL 341990 (D.D.C. Jan. 30, 2025) ................................... 19, 22

*U.S. v. Washington*,
  869 F.3d 193 (3d Cir. 2017) ............................................................................. 15, 17, 29, 30

*United States v. Jones*,
   159 F.3d 969 (6th Cir. 1998) ...................................................................18, 23, 29

*Wayte v. United States*,
   470 U.S. 598 (1985).................................................................................................17

**Constitutional Provisions**

U.S. Const. art. II, § 2, cl. 1 .........................................................................................6

**Statutes**

18 U.S.C. § 111(a)(1)...................................................................................................13

Pub. L. No. 118-47, div. C, Title V, § 527, 138 Stat 460 (Mar. 23, 2024)................9, 15

**Legislative Materials**

H.R. 10322, 118th Cong. (2024)....................................................................................9

Letter from Congresswoman McIver et al., to Hon. Benjamine Huffman, Acting
   Secretary, DHS, & Hon. Caleb Vitello, Acting Dir., ICE (Jan. 24, 2025),
   https://perma.cc/Q8FJ-FU3D .................................................................................8

Letter from Congresswoman McIver et al., to Hon. Krisi Noem, Secretary, DHS,
   & Hon. Caleb Vitello, Acting Dir., ICE (Feb. 19, 2025),
   https://perma.cc/5W9C-K877 ................................................................................8

**Executive Branch Materials**

Proc. No. 10887, 90 Fed. Reg. 8331 (Jan. 20, 2025).......................................2, 5, 6, 22

*Memorandum on Addressing Risks from Chris Krebs and Government
   Censorship*, 2025 Daily Comp. Pres. Doc. 1 (Apr. 9, 2025),
   https://www.whitehouse.gov/presidential-actions/2025/04/addressing-risks-
   from-chris-krebs-and-government-censorship.................................................2, 6, 21

Dep't of Justice, Justice Manual § 9-85.110 Investigations Involving Members of
   Congress (2024).....................................................................................................25

Dep't of Justice, Mem., *Policies and Procedures in Criminal Investigations
   Involving Members of Congress and Staff* (Nov. 7, 2023) ..............................26, 28

Dep't of Justice, Mem., *Policies and Procedures in Criminal Investigations
   Involving Members of Congress and Staff* (Nov. 7, 2023),
   https://www.justice.gov/archives/dag/media/1323861/dl?inline ...........................25

Memorandum from Acting Dep. Att'y Gen. Emil Bove to Acting Dir., FBI (Jan.
   31, 2025), https://perma.cc/C5NB-KV3V ..............................................................2

Memorandum from Acting Dep. Att'y Gen. Emil Bove to Dir., Exec. Off. for U.S. Atty's et al. (Jan. 31, 2025), https://www.documentcloud.org/documents/25512930-bove-memo ........................................6

*Cuts to Woke Programs*, White House, https://www.whitehouse.gov/wp-content/uploads/2025/05/Cuts-to-Woke-Programs-Fact-Sheet.pdf........................................24

*The First 100 Hours: Historic Action to Kick Off America's Golden Age*, The White House (Jan. 24, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/the-first-100-hours-historic-action-to-kick-off-americas-golden-age ...........22

Office of Congressional Relations, ICE, https://www.ice.gov/leadership/ocr .............................15

Press Release, DHS, *DHS Announces ICE Law Enforcement are Now Facing an 830 Percent Increase in Assaults* (July 15, 2025), https://perma.cc/7YZP-PGWS...................3, 14

Press Release, DHS, *DHS Debunks Fake News Narratives About Law Enforcement During Police Week* (May 16, 2025), https://perma.cc/9XKE-3K3U .................................3, 14

Press Release, DHS, *DHS Debunks Fake News Narratives About Law Enforcement During Police Week* (May 16, 2025), https://www.dhs.gov/news/2025/05/16/dhs-debunks-fake-news-narratives-about-law-enforcement-during-police-week........................................................................28

Press Release, DHS, *ICE Employee Attacked by Rioters After Congressman Doxes Him to Mob at California Marijuana Facility* (July 14, 2025), https://perma.cc/3GNL-PWE6........................................................................3, 14, 27

Press Release, DHS, *Members of Congress Break into Delaney Hall Detention Center* (May 9, 2025), https://perma.cc/G6MH-2KXF .....................................................14, 23

U.S. Atty's Off., Dist. of Columbia, *48 Months Since the Jan. 6 Attack on U.S. Capitol* (Jan. 6, 2025), https://perma.cc/S9EF-ZK43 ..............................................................5

U.S. Department of Justice, Public Integrity Section: *About*, https://www.justice.gov/criminal/criminal-pin .......................................................................25

**Other Authorities**

@AlinaHabba, X.com (Apr. 10, 2025, 10:06 PM), https://x.com/AlinaHabba/status/1910514829674131833........................................................8

@USAttyHabba, X.com (May 19, 2025, 7:56 PM), https://x.com/USAttyHabba/status/ 1924615111198576645/photo/1 ....................................13

Ali Bianco, *Trump Defends His Pardons for Jan. 6 Attack on Capitol*, Politico (Jan. 21, 2025, 8:33 PM), https://www.politico.com/news/2025/01/21/trump-defends-pardons-jan-6-00199843 .......................................................................2, 6

iv

Andrew Solender, *Trump Defends McIver Charges*, Axios (May 20, 2025),
https://www.axios.com/2025/05/20/trump-lamonica-mciver-doj-charges-ice ........................24

Andrew Solender, *Trump Defends McIver Charges: "The Days of that Crap Are
Over"*, Axios (May 20, 2025), https://www.axios.com/2025/05/20/trump-
lamonica-mciver-doj-charges-ice .........................................................................................3

Fox News, x.com (March 25, 2025, 9:54 AM),
http://x.com/FoxNews/ status/1904547557570650524 .........................................................24

Homeland Security (@DHSgov), X (July 11, 2025),
https://x.com/dhsgov/status/1943799482342109463?s=46&t=-VXhB76r-
zYF5B-uEUXYkQ.................................................................................................................15

Human Events Daily with Jack Posobiec, *Newly Appointed New Jersey DA Alina
Habba-Live From the White House*, Human Events (Mar. 27, 2025),
https://podcasts.apple.com/ca/podcast/newly-appointed-new-jersey-da-alina-
habba-live-from/id1585243541?i=1000701160703 ............................................................3, 7

*Immigration Tele-Town Hall*,
https://drive.google.com/file/d/1HBQkSb9Vu3R0oqFnyKDGDpdqkuE1zYpV/view............8

Jacob Sarracino, *Illinois members of Congress say they were denied access to an
ICE facility for second day*, CBS (June 18, 2025),
https://www.cbsnews.com/chicago/news/illinois-members-congress-denied-
access-ice-facility-second-day .............................................................................................15

*The Jan. 6 Attack: The Cases Behind the Biggest Criminal Investigation in U.S.
History*, NPR (Mar. 14, 2025, 5:26 PM),
https://www.npr.org/2021/02/09/965472049/the-capitol-siege-the-arrested-
and-their-stories ...............................................................................................................6, 19

Luis Ferré-Sadurní, *Brad Lander Is Arrested by ICE Agents at Immigration
Courthouse*, N.Y. Times (June 17, 2025) .............................................................................14

Michael Gold, ICE Imposes New Rules on Congressional Visits, N.Y. Times (June 19,
2025), https://www.nytimes.com/2025/06/19/us/politics/ice-congress.html..........................15

Michael Williams et. al, *US Senator Forcefully Removed From DHS Event in LA, Triggering
Democratic Outcry on Capitol Hill*, CNN (June 12, 2025),
https://www.cnn.com/2025/06/12/politics/alex-padilla-removed-noem-press-conference.....14

Sarah N. Lynch et al., *How Trump Defanged the Justice Department's Political
Corruption watchdogs*, Reuters (June 9, 2025) .....................................................................26

## INTRODUCTION

Just months ago, the Department of Justice dismissed cases against hundreds of defendants involved in the January 6, 2021, attack on the U.S. Capitol. Among these dismissals were over 160 prosecutions charging the defendants with violations of 18 U.S.C. § 111 stemming from their assault of federal law enforcement officials who were protecting the Capitol and the Members of Congress and their staff. Video footage showed these defendants throwing explosives, beating federal officers with baseball bats and riot shields, and spraying them with pepper spray, all in an effort to overturn the 2020 presidential election. The Justice Department not only walked away from those charges, but it has since fired career prosecutors, agents, and support staff for their mere participation in the investigations and prosecutions.

This case charges Congresswoman LaMonica McIver, a sitting Democratic Member of Congress, with violating the same federal assault statute. But the similarity ends there. As the government concedes in the indictment, Congresswoman McIver was exercising her statutory and constitutional oversight responsibilities when she visited Delaney Hall—a privately run immigration detention facility that Immigration and Customs Enforcement (ICE) recently re-opened in her District. Unlike the January 6 rioters, Congresswoman McIver had every right to be on those premises. Indeed, she was there to do her job.

There is also a palpable difference between the actions of those at the Capitol on January 6 and Congresswoman McIver's conduct. Footage that the government has provided in discovery shows that federal officials made a series of manipulative, irresponsible, and dangerous decisions that placed dozens of bystanders, as well as three Members of Congress, at risk of physical harm. In fact, the video recorded almost two dozen armed agents and officers of ICE and Homeland Security Investigations (HSI) surging into a crowd in a public space to arrest the Mayor of Newark for supposedly trespassing on federal land. The government, of course, has since dismissed that

ill-conceived and unfounded charge against the Mayor. But during that episode, it was those heavily armed law enforcement personnel who precipitated and were responsible for creating several minutes of physical chaos. In the end, as the indictment implicitly concedes, no federal agent experienced any injury whatsoever.

In that respect, too, January 6 was entirely different. That day, outnumbered Capitol Police officers stood their ground against hundreds—if not thousands—of rioters who were trying to overrun the Capitol to intimidate the legislators inside in hopes of overriding a national election. A substantial number of those brave officers were seriously injured. Yet, the Department of Justice has dropped the charges against over 160 individuals accused of that conduct.

What explains the government's insistence on prosecuting Congresswoman McIver, but not rioters charged with serious violence under the same statute? Senior federal officials have made ample public statements that point inexorably to the answer. In particular, the leadership of the Department of Justice, echoing the President's official proclamation, has described the January 6 prosecutions as "a grave national injustice."[1] These defendants assaulted police officers in an effort to overturn an election that, according to the White House, "was rigged and stolen."[2] To the President, these now-former defendants are "people that actually love our country."[3]

Meanwhile, according to the Department of Homeland Security (DHS), Congresswoman McIver's actions were "just another case of Democratic lawmakers labeling political stunts as

---

[1] Mem. from Acting Dep. Att'y Gen. Emil Bove to Acting Dir., FBI (Jan. 31, 2025) (quoting Proc. No. 10887, 90 Fed. Reg. 8331, 8331 (Jan. 20, 2025)), https://perma.cc/C5NB-KV3V.
[2] *Memorandum on Addressing Risks from Chris Krebs and Government Censorship*, 2025 Daily Comp. Pres. Doc. 1 (Apr. 9, 2025), https://www.whitehouse.gov/presidential-actions/2025/04/addressing-risks-from-chris-krebs-and-government-censorship.
[3] Ali Bianco, *Trump Defends His Pardons for Jan. 6 Attack on Capitol*, Politico (Jan. 21, 2025, 8:33 PM), https://www.politico.com/news/2025/01/21/trump-defends-pardons-jan-6-00199843.

oversight while they endanger the safety of ICE personnel."[4] DHS has stated that "Democratic members of Congress," including "Representative LaMonica McIver (D-NJ)," are the problem.[5] DHS has sought to "[d]ebunk" the notion that Congresswoman McIver's visit to Delaney Hall "was 'oversight.'"[6] President Trump, too, has praised the Justice Department's charges as proof that "[t]he days of woke are over."[7] These statements coincide with then-Interim U.S. Attorney Alina Habba's stated goal of using her office to "turn New Jersey red."[8]

Executive Branch officials may be entitled to hold and express these views or opinions. But the U.S. Constitution forbids those same officials from relying on those views or opinions as the bases for criminal enforcement and prosecution. Because this prosecution is premised on punishing a Democratic official for her disfavored policy views, the indictment must be dismissed.

*First*, there is clear evidence that this prosecution is unconstitutionally selective. A cardinal First Amendment principle is that "the government may not enforce the laws in a manner that picks winners and losers in public debates." *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1142 (D.C. Cir. 2023). The Constitution does not permit the government to distinguish between those it chooses to charge and those whose behavior it chooses to ignore based on the actors' views, the content of their speech, or their partisan affiliation. *Id.*

---

[4] Press Release, DHS, *ICE Employee Attacked by Rioters After Congressman Doxes Him to Mob at California Marijuana Facility* (July 14, 2025), https://perma.cc/3GNL-PWE6.
[5] Press Release, DHS, *DHS Announces ICE Law Enforcement are Now Facing an 830 Percent Increase in Assaults* (July 15, 2025), https://perma.cc/7YZP-PGWS.
[6] Press Release, DHS, *DHS Debunks Fake News Narratives About Law Enforcement During Police Week* (May 16, 2025), https://perma.cc/9XKE-3K3U.
[7] Andrew Solender, *Trump Defends McIver Charges: "The Days of that Crap Are Over"*, Axios (May 20, 2025), https://www.axios.com/2025/05/20/trump-lamonica-mciver-doj-charges-ice.
[8] Human Events Daily with Jack Posobiec, *Newly Appointed New Jersey DA Alina Habba—Live From the White House*, Human Events (Mar. 27, 2025), at 8:41-9:00, https://podcasts.apple.com/ca/podcast/newly-appointed-new-jersey-da-alina-habba-live-from/id1585243541?i=1000701160703.

To be clear, Congresswoman McIver is not guilty of the charges that the Justice Department has filed. But even if its leaders think otherwise, they cannot pursue charges against her because she is a Democrat who conducts oversight of Executive Branch immigration policy, while dismissing charges brought under the same statute against those whose views they share and who engaged in conduct far more egregious. Fatally for this prosecution, statements of Executive Branch officials confirm that this is the sole credible explanation for that difference in treatment. So too does their unexplained circumvention of a mandatory approval process involving the Justice Department's Public Integrity Section—a longstanding safeguard that protects Members of Congress against inconsistent applications of this very powerful law enforcement weapon.

*Second*, and independently, there is clear evidence of vindictive prosecution—that is, prosecution in retaliation for Congresswoman McIver's exercise of protected rights. The Executive Branch has been clear that it views oversight of its immigration policies as a nuisance to be abated. And it has openly stated that it views this prosecution as part of its project to chill that oversight.

*Finally*, even if this Court were to view the current evidentiary record as insufficient to establish a constitutional violation warranting dismissal now, the facts at least warrant *discovery*, which courts grant when the defendant has introduced merely "some evidence" supporting their claim. That standard is amply met here.

## FACTUAL BACKGROUND

### A. The Justice Department's Sweeping Dismissal of Charges for Assaulting Officers During the January 6 Attack

On January 6, 2021, thousands of President Trump's supporters descended on the Capitol to prevent Congress from certifying the results of the 2020 presidential election. During the attack, "over 140 police officers were assaulted—including over 80 from the U.S. Capitol Police and over 60 from the Washington, D.C. Metropolitan Police Department—the Capitol was damaged,

government property was destroyed, and other government property was stolen." U.S. Atty's Off., Dist. of Columbia, *48 Months Since the Jan. 6 Attack on U.S. Capitol* (Jan. 6, 2025), https://perma.cc/S9EF-ZK43 ("*48 Months*"). The Department ultimately charged over 1,500 individuals with federal crimes related to the attack. *Id.* Over 600 were charged with assaulting, resisting, or impeding law enforcement officers or obstructing officers during a civil disorder. *Id.* Of that group, over 170 were charged with using a dangerous weapon or causing serious bodily injury. *Id.*

As of January 2025, over 1,200 individuals had pleaded guilty or been convicted by a jury. *Id.* But hundreds of cases remained pending. *Id.* Among them, for example, was a prosecution charging the defendant with "throwing an explosive device that detonated upon at least 25 officers."[9] In another, the defendant used "a metal bike rack to push against law enforcement officers" and "repeatedly spray[ed] them" with a "chemical spray."[10] A third defendant used "a baseball bat or a riot shield" to assault "multiple police officers for hours," and the next day told an interviewer that the next phase of the plan to overturn the election could be described in "[o]ne word": "Guns."[11]

On Inauguration Day 2025, President Trump issued a presidential proclamation, published in the *Federal Register*, that characterized the January 6 prosecutions as a "grave national injustice that has been perpetrated upon the American people over the last four years." Proc. No. 10887, 90 Fed. Reg. at 8331. The proclamation directed the Attorney General to pursue dismissal "of all pending indictments against individuals for their conduct related to the events at or near the United

---

[9] Stmt. of Facts at 2, *United States v. Ball*, No. 23-cr-160, ECF No. 1-1 (D.D.C. Apr. 27, 2023).
[10] Mot. in Support of Pretrial Detention at 1, 4, *United States v. Boughner*, No. 22-cr-20 (D.D.C. Dec. 19, 2021), ECF No. 9.
[11] Gov's Resp. to Mot. for Release at 1-2, *United States v. Lang*, No. 21-cr-53 (D.D.C. Feb. 21, 2024), ECF No. 127.

States Capitol on January 6, 2021." *Id.* The proclamation also pardoned and granted commutations to the approximately 1,200 individuals already convicted and sentenced. *Id.*[12] During a news conference the next day, the President made clear that he was doing so based on their beliefs: "these were people that actually love our country."[13]

Afterwards, the Justice Department moved to dismiss all pending charges related to January 6.[14] In approximately 160 of those cases, including those described above, the defendant had been charged with assaulting federal officers in violation of 18 U.S.C § 111(a)—the same offense charged here. *Id.*

The White House's official position continues to be that "the 2020 election was rigged and stolen."[15] And Justice Department leadership has embraced the President's partisan characterizations of the January 6 cases. In a January 31 memorandum to Department supervisors, then-Acting Deputy Attorney General Emil Bove directed the termination of several career prosecutors who had been hired "to support casework relating to events that occurred at or near the United States Capitol on January 6, 2021."[16] He explained that President Trump had "appropriately characterized that work as having involved 'a grave injustice that has been perpetrated upon the American people for the past four years.'"[17]

---

[12] This motion does not rely on defendants who received pardons or commutations and thus does not implicate any issues associated with the President's constitutional authority to "grant Reprieves and Pardons for Offences against the United States." U.S. Const. art. II, § 2, cl. 1.

[13] Bianco, *supra* note 3.

[14] *The Jan. 6 Attack: The Cases Behind the Biggest Criminal Investigation in U.S. History*, NPR (Mar. 14, 2025, 5:26 PM), https://www.npr.org/2021/02/09/965472049/the-capitol-siege-the-arrested-and-their-stories.

[15] *Memorandum*, *supra* note 2 (accusing a former DHS official of "falsely and baselessly den[ying] that the 2020 election was rigged and stolen").

[16] Mem. from Acting Dep. Att'y Gen. Emil Bove to Dir., Exec. Off. for U.S. Atty's et al. (Jan. 31, 2025), https://www.documentcloud.org/documents/25512930-bove-memo.

[17] *Id.* (quoting Proc. No. 10887, 90 Fed. Reg. at 8331).

**B. Congresswoman McIver and Her Immigration Oversight Efforts**

Congresswoman LaMonica McIver was elected in 2024 as the first Black woman to represent New Jersey's 10th congressional district. A Democrat, Congresswoman McIver serves on the Committee on Homeland Security and has focused on the Administration's immigration policy. Just 72 hours into the new Administration, she held a town hall to address the "day-one" executive orders on immigration, assuring her constituents that she would use her post on the Homeland Security Committee to "advocate for the protection of our immigrant communities."[18] The next day, Congresswoman McIver and other members of the New Jersey congressional delegation wrote to the Acting DHS Secretary and Acting ICE Director raising "serious questions regarding the legal and procedural aspects of" an ICE raid carried out in Newark the previous night.[19] A month later, Congresswoman McIver and her colleagues sent a letter to DHS Secretary Kristi Noem expressing concern over the Administration's plans to "expand private immigrant detention in New Jersey."[20]

Congresswoman McIver has also sponsored several legislative initiatives targeting immigration reform. Among them are bills that would restrict immigration enforcement at sensitive locations like schools, hospitals, and places of worship; create a pathway to citizenship for undocumented immigrants who arrived in the United States as children; and require DHS officers conducting immigration enforcement to display insignia and provide identification. She has also sponsored legislation to better protect DHS officers—introducing, as her first bill in Congress, the DHS Better Ballistic Body Armor Act, which would increase the availability of

---

[18] *Immigration Tele-Town Hall* at 3:09-22, https://drive.google.com/file/d/1HBQkSb9Vu3R0oqFnyKDGDpdqkuE1zYpV/view.

[19] Letter from Congresswoman McIver et al., to Hon. Benjamine Huffman, Acting Secretary, DHS, & Hon. Caleb Vitello, Acting Dir., ICE (Jan. 24, 2025), https://perma.cc/Q8FJ-FU3D.

[20] Letter from Congresswoman McIver et al., to Hon. Krisi Noem, Secretary, DHS, & Hon. Caleb Vitello, Acting Dir., ICE (Feb. 19, 2025), https://perma.cc/5W9C-K877.

protective body armor designed to fit the bodies of female agents. H.R. 10322, 118th Cong. (2024).

Finally, Congresswoman McIver has conducted field work to investigate, and identify possible legislative responses to, conditions at New Jersey's immigrant detention centers. Under laws in place since 2019, DHS cannot "prevent" Members and their staffs from conducting oversight inspections of such DHS facilities, even when unannounced. Pub. L. No. 118-47, div. C, title V, § 527, 138 Stat 460, 619 (Mar. 23, 2024) ("Approps. Act"). Congresswoman McIver exercised that statutory authority in February 2025, conducting an oversight inspection with Representatives Bonnie Watson Coleman and Rob Menendez, Jr. of the Elizabeth Detention Center, then the only immigrant detention center in the state operated by a private company under a contract with DHS. Following that inspection, Congresswoman McIver and Congressman Menendez met with ICE officials in Newark to ensure that the agency was aware of their intention and mandate to conduct oversight.

### C.  Congresswoman McIver's Visit to Delaney Hall

Making good on their commitment, Representatives McIver, Watson Coleman, and Menendez arrived at Delaney Hall on May 9, 2025, to conduct an unannounced oversight inspection of the facility pursuant to their statutory authority. The indictment's charges and allegations—described in more detail in the accompanying legislative-immunity motion—stem entirely from Congresswoman McIver's alleged conduct in furtherance of that authority. And video evidence that the government has produced in discovery paints a fuller picture.

Shortly after 1:00 pm, Representatives McIver, Watson Coleman, and Menendez arrived at Delaney Hall to inspect the facility. They identified themselves to the gate attendant, explained their purpose, and waited while the guard apparently attempted to contact GEO or ICE personnel. After a few minutes, the three Members peacefully walked through the gate when the guard opened it to permit the entry of a passenger car. They were soon greeted by GEO representatives, then by

an ICE officer, and finally by the GEO facility administrator, who invited them to wait inside the building's security area.

Over the course of the next hour, the Members were advised that ICE's Assistant Field Office Director in Newark was on her way and that only she could address their request for a tour. Representatives McIver and Menendez had not met that official during their visit to ICE's regional office in March, but they had met her supervisor, the ICE Field Office Director. During the hour that the Members were kept waiting, they discussed their congressional enforcement responsibilities with the GEO administrator, and asked a variety of detailed questions about the facility, its contractual relationship with ICE, the inmate population, and the facility's inspection history, training, and maintenance.

Unbeknownst to the Members, while they waited for the ICE officials, Mayor Baraka arrived with members of his staff, including two Newark Police Department officers who are his security detail. Mayor Baraka stood patiently outside the gate, facing the facility and speaking with the GEO gate guard and others. A number of his staff were also present, as were several protestors and a number of individuals with still and video cameras. The group was entirely peaceful.

After a few minutes, the GEO guard began conferring with someone via radio, while looking back towards the entrance of Delaney Hall. He then invited Mayor Baraka and his security detail to enter the secured, fenced perimeter, and opened the gate. As he did so, an ICE officer activated his body worn camera to record the Mayor's peaceful entry. After he crossed the threshold, Mayor Baraka went no further toward the building. Instead, he stood quietly near the gate for approximately 40 minutes—until ICE and HSI officers and agents approached and threatened to arrest him for trespassing.

Also while the Members waited inside the building to inspect the facility, ICE and HSI

personnel were preparing a large and aggressive response. Multiple law enforcement vehicles arrived, at least one of which contained munitions in its trunk. Approximately 15 masked officers also appeared, many in camouflage outfits with visible weapons.

Finally, at approximately 2:30 p.m., more than an hour after the Members had arrived, high-level ICE and HSI personnel streamed through the building where the Members sat, with little acknowledgment of their presence. The crowd included the ICE Field Office Director, ICE Assistant Field Office Director, an HSI Special Agent (referred to in the indictment as "V-1"), along with several others.

At 2:33 p.m., approximately 22 law enforcement personnel, including high ranking ICE and HSI leadership and at least 15 ICE and HSI officers, confronted Mayor Baraka. Led by V-1, the group ordered Mayor Baraka to leave the facility and claimed that he was trespassing. Mayor Baraka responded that he was waiting to leave with the Members; V-1 then threatened him with arrest, and the Mayor pointed out that he had been invited to enter.

By 2:34 p.m., the Members had noticed the interaction outside. They then left the building, confronted the officers, and demanded an explanation. V-1 once again claimed that the Mayor was trespassing; the Mayor retorted that the guard had let him enter. The Members demanded their tour. V-1 then announced that he was going to arrest the Mayor, and video appears to show the Members putting their arms on the Mayor. At no time did V-1 or anyone else admit that the Mayor was correct and that ICE had orchestrated and filmed his entry.

At 2:37 p.m., while the group was still discussing Mayor Baraka's presence, V-1 took a phone call and then immediately announced that Mayor Baraka, and anyone who was not a Member of Congress, must leave or be arrested. Ultimately, after speaking with the mayor's security detail, V-1 told Mayor Baraka to leave and he walked through the gate at 2:39 p.m.

The Members, expecting that they would now receive their tour, walked back toward the building entrance. But only three minutes passed before V-1, after talking on the phone again, reversed course and told the person with whom he was speaking: "I am arresting the mayor. . . . Even though he stepped out, I am going to put him in cuffs." He then announced to the group of ICE and HSI officers: "we are arresting the Mayor right now, per the Deputy Attorney General of the United States. Anyone that gets in our way, I need you guys to give me a perimeter so I can cuff him."

With that announcement, at least 15 armed and masked ICE and HSI officers, led by V-1 and others, marched toward the gate; on the other side, in the area open to the public, there was a crowd of approximately 75 civilians. That group included the unarmed mayor, a group of peaceful protestors (many of whom were elderly), and some individuals with press credentials.

The Members, who had been waiting for ICE to facilitate their inspection, saw the surge of law enforcement officers moving toward the gate. They attempted to catch up so that they could determine what was occurring. Almost simultaneously, the law enforcement personnel and the three Representatives all walked through the gate. As it opened, a man on the other side shouted, "circle the mayor!" As the entire group, including the Members, appeared to do so, the law enforcement agents began to aggressively push their way through the crowd toward the Mayor.

The result of this unnecessary, reckless, and disproportionate escalation by ICE and HSI was predictable: chaos and a serious scuffle involving a great deal of physical contact. Eventually, V-1 pulled the mayor back through the gate. And soon, the Members returned as well—but not before Congresswoman McIver and Congresswoman Watson Coleman were each shoved by federal agents. Other people in the crowd were also shoved by the agents, and at least one member of the public was pulled to the ground.

Once back inside the gate, the agents handcuffed Mayor Baraka, took him off-site, and confined him for several hours until his initial appearance. Congresswoman McIver confronted the officer who had shoved her, told him that he had assaulted her, and stated that she would be filing a complaint.

The Members then returned to the building. The facility's administrator offered Congresswoman Watson Coleman—who is 80 years old—a soda, and the ICE officials finally escorted all three Representatives through the facility so that they could complete their oversight visit. At no point during the entire episode—before the Mayor's arrest, after the melee in the parking lot, during the tour, or before the Members left the facility, did anyone from HSI, ICE, or any other agency say or even suggest to Congresswoman McIver or either of her colleagues that any of them had assaulted any law enforcement official.

On May 19, while simultaneously announcing the dismissal of the baseless trespass charge against Mayor Baraka stemming from these events, the government filed a criminal complaint against Congresswoman McIver charging two counts of forcible assault of a federal officer in violation of 18 U.S.C. § 111(a)(1). Then-Interim U.S. Attorney Alina Habba[21] issued a press release announcing the charges and tying the two decisions together, stating: "The dismissal against the mayor [was] not the end of this matter."[22] Subsequently, the government obtained a three-count indictment, adding an additional violation of § 111(a)(1).

---

[21] Several criminal defendants in this district have moved for dismissal of their indictments and other relief related to Ms. Habba's current status. *See* Mot. to Dismiss, *United States v. Pina*, No. 2:25-cr-436, ECF No. 52-1 (D.N.J. Aug. 11, 2025). Congresswoman McIver may seek appropriate relief depending on the outcome of those proceedings.

[22] @USAttyHabba, X.com (May 19, 2025, 7:56 PM), https://x.com/USAttyHabba/status/1924615111198576645/photo/1.

### D. The Government's Continued Efforts to Hinder Congressional Oversight of Immigration Policy

The events at Delaney Hall marked the first of three times ICE forcefully detained officials investigating its activities in the course of a month.[23] And DHS has since pursued a press strategy to undermine congressional oversight authority over its facilities. Even before the end of the May 9 visit, DHS issued a press release falsely describing Congresswoman McIver and the other Members as having "stormed the [Delaney Hall] gate and broke[n] into the detention facility," calling the visit "a bizarre political stunt."[24] A week later, DHS issued a news release to "[d]ebunk" the notion that the visit to Delaney Hall "was 'oversight'"—"it is actually trespassing and put ICE officers and detainees at risk."[25] DHS renewed this rhetoric in July, issuing a third press release related to Congresswoman McIver, this time suggesting that her actions were "just another case of Democratic lawmakers labeling political stunts as oversight while they endanger the safety of ICE personnel."[26] DHS doubled down on that framing the next day, stating in yet another new post that "Democratic members of Congress," including "Representative LaMonica McIver (D-NJ)," have "been caught red-handed doxing and even physically assaulting ICE officials."[27]

DHS has coupled this rhetoric with a new policy flouting the federal law that authorizes

---

[23] Compl. ¶¶ 31-32, 43 *Baraka v. Habba*, 25-cv-06846 (June 4, 2025), ECF No. 1; Michael Williams et. al, *US Senator Forcefully Removed From DHS Event in LA, Triggering Democratic Outcry on Capitol Hill*, CNN (June 12, 2025), https://www.cnn.com/2025/06/12/politics/alex-padilla-removed-noem-press-conference; Luis Ferré-Sadurní, *Brad Lander Is Arrested by ICE Agents at Immigration Courthouse*, N.Y. Times (June 17, 2025), https://www.nytimes.com/2025/06/17/nyregion/brad-lander-immigration-ice.html.

[24] Press Release, DHS, *Members of Congress Break into Delaney Hall Detention Center* (May 9, 2025), https://perma.cc/G6MH-2KXF.

[25] Press Release, DHS, *DHS Debunks Fake News Narratives About Law Enforcement During Police Week* (May 16, 2025), https://perma.cc/9XKE-3K3U.

[26] Press Release, DHS, *ICE Employee Attacked by Rioters After Congressman Doxes Him to Mob at California Marijuana Facility* (July 14, 2025), https://perma.cc/3GNL-PWE6.

[27] Press Release, DHS, *DHS Announces ICE Law Enforcement are Now Facing an 830 Percent Increase in Assaults* (July 15, 2025), https://perma.cc/7YZP-PGWS.

Members of Congress to conduct unannounced oversight inspections of its facilities. Even though federal law has—for seven years—expressly authorized Members to conduct oversight inspections of DHS detention facilities *without* "provid[ing] prior notice of the intent to enter," Approps. Act § 527 (emphasis added), ICE nonetheless announced in June a policy purporting to require Members of Congress to provide "a minimum of *seven (7) calendar days* [] advance" notice before conducting an oversight visit.[28] Reportedly, DHS now consistently denies Members of Congress oversight access to its facilities under this policy.[29] As a result, a group of Members recently filed suit challenging DHS's policy as an "unlawful effort[] to thwart scrutiny of its facilities"—one that impedes Members' right "to conduct oversight and obtain information about DHS facilities and the conditions of immigration detention." Compl. ¶¶ 12-13, *Neguse v. ICE*, No. 25-cv-2463 (D.D.C. July 30, 2025), ECF No. 1.

## ARGUMENT

### I.    There Is Clear Evidence of Selective Enforcement and Prosecution

#### A.    The First and Fifth Amendments Prohibit Enforcement or Prosecution Based on Protected Speech, Affiliation, or the Exercise of Protected Rights

Two provisions of the U.S. Constitution—the First Amendment and the Equal Protection Clause of the Fifth Amendment—protect criminal defendants against "selective enforcement" and "selective prosecution." *U.S. v. Washington*, 869 F.3d 193, 214 (3d Cir. 2017); *Frederick Douglass*, 82 F.4th at 1140. Those constitutional protections are meaningful guardrails that restrict the

---

[28] Office of Congressional Relations, ICE, https://www.ice.gov/leadership/ocr; *see* Michael Gold, ICE Imposes New Rules on Congressional Visits, N.Y. Times (June 19, 2025), https://www.nytimes.com/2025/06/19/us/politics/ice-congress.html; *see* Homeland Security (@DHSgov), X (July 11, 2025), https://x.com/dhsgov/status/1943799482342109463?s=46&t=-VXhB76r-zYF5B-uEUXYkQ.

[29] *See, e.g.*, Jacob Sarracino, *Illinois members of Congress say they were denied access to an ICE facility for second day*, CBS (June 18, 2025), https://www.cbsnews.com/chicago/news/illinois-members-congress-denied-access-ice-facility-second-day.

otherwise broad discretion of law-enforcement officials and prosecutors to investigate and bring criminal charges. "[A]lthough prosecutorial discretion is broad, it is not unfettered"—"executive discretion" in criminal law enforcement is "subject to constitutional constraints" and "stops short of "unlawful favoritism." *Frederick Douglass*, 82 F.4th at 1137.

### 1. The First Amendments Prohibits Enforcement and Prosecution Made Based on Protected Speech or Party Affiliation

The First Amendment plays a critical role in this arena. "Prosecutorial decisions, like other government actions, cannot turn on the exercise of free speech rights." *Id.* at 1141. In particular, government enforcement action violates the First Amendment if it "turn[s] on the content or viewpoint of speech." *Id.* In addition, "membership in a political party is protected by the First Amendment, and the mere exercise of that right cannot be punished by means of selective prosecution." *U.S. v. Torquato*, 602 F.2d 564, 569 n.9 (3d Cir. 1979).

"A First Amendment challenge to speech-infringing enforcement" does not require proving "bad motive." *Frederick Douglass*, 82 F.4th at 1145 (citing *NAACP v. Button*, 371 U.S. 415, 439 (1963)). Rather, the defendant must show that (1) "he is similarly situated to others against whom the law was not enforced," and (2) that the government's differential treatment of similarly situated defendants "turn[s] on the content or viewpoint of [their] speech." *Id.* at 1141, 1145.

For example, in a recent decision addressing a First Amendment claim of selective enforcement, the D.C. Circuit held that the D.C. government had violated the First Amendment by declining to enforce its defacement ordinance in summer 2020 against criminal-justice protesters who had printed "Black Lives Matter" messages on public sidewalks, while enforcing the ordinance against an anti-abortion organization that had printed "Black Pre-Born Lives Matter" messages on similar sidewalks. *Id.* at 1140-43. The Court recognized that both messages were "political speech" that had been printed on the same "public forum" in similar circumstances;

"[a]llowing the expression of one message while silencing another is quintessential viewpoint discrimination." *Id.* at 1142; *see also, e.g.*, *Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 151, 168 (3d Cir. 2002) (holding that an Orthodox Jewish group was likely to succeed on its First Amendment free-exercise claim for selective enforcement of a facially neutral ordinance).

### 2. The Fifth Amendment Also Prohibits Selective Enforcement and Prosecution

Independently, the Equal Protection Clause of the Fifth Amendment prohibits enforcement actions and prosecutions "deliberately based upon an unjustifiable standard," including "the exercise of protected statutory and constitutional rights." *Wayte v. United States*, 470 U.S. 598, 608 (1985) (quotation omitted). Equal protection claims "are conceptually and doctrinally distinct" from those under the First Amendment. *Frederick Douglass*, 82 F.4th at 1144. To succeed on a Fifth Amendment claim, the defendant must identify "clear evidence" that the action had (1) "a discriminatory effect" (*i.e.*, that the government afforded "different treatment" to "similarly situated" individuals), and (2) "a discriminatory purpose" (*i.e.*, that the action was taken "because of" the impermissible consideration). *Washington*, 869 F.3d at 214.

A person's political party or viewpoint, or her political expression, is such a constitutionally impermissible consideration: "[T]he Government cannot base its decision to prosecute on . . . a defendant's political beliefs." *U.S. v. Judd*, 579 F. Supp. 3d 1, 4 (D.D.C. 2021) (quotation omitted). Likewise, courts dismiss prosecutions based on "the exercise of . . . rights to free speech, association and to petition the government for redress of grievances," or on "statutorily protected" rights—for example, those related to union organizing. *U.S. v. Haggerty*, 528 F. Supp. 1286, 1292-93 (D. Colo. 1981).

**B.    There Is Clear Evidence of Unconstitutionally Selective Enforcement and Prosecution**

### 1. The Government's Treatment of Alleged Assaults Against Federal Law Enforcement Officers Establishes Selective Prosecution and Enforcement

Courts find prosecutions unconstitutional when a defendant "is similarly situated to a person against whom the law was not enforced," except for the defendant's constitutionally protected status or activity. *Frederick Douglass*, 82 F.4th at 1137 (First Amendment); *United States v. Jones*, 159 F.3d 969, 977 (6th Cir. 1998) (Fifth Amendment). The Department of Justice's dismissal of prosecutions arising from the January 6 attack on the Capitol—including those of more than 160 defendants charged with violating the same statute upon which the indictment relies here—is robust evidence of unconstitutional differential treatment.

**a. The relevant defendants are "similarly situated."** Establishing discriminatory effect first requires a showing that the defendant was "similarly situated to a person against whom the law was not enforced." *Frederick Douglass*, 82 F.4th at 1137. Being "similarly situated" for constitutional purposes does not mean that the defendants allegedly did exactly the same thing. Rather, the phrase requires a showing that the "circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them." *Id.*; *see U.S. v. Olvis*, 97 F.3d 739, 744 (4th Cir. 1996) (same).

Under any analysis, the alleged conduct of many January 6 defendants whose cases have now been dismissed was particularly egregious. In one case, for example, the complaint described video evidence of the defendant—who was already on probation for another assault of law enforcement officers and others—"assaulting Metropolitan Police and United States Capitol Police officers," including by "throwing an explosive device that detonated upon at least 25 officers, forcefully shoving against the officers to make entry into the Capitol, throwing a chair or table leg at the entrance, and aiding another subject by handing the subject a large pole right before that

17

subject threw the pole at the officers." Stmt. of Facts at 2, *U.S. v. Ball*, No. 23-cr-160 (Apr. 27, 2023), ECF No. 1-1. And the experience of his victims was terrible. Some officers "thought it was a fragmentation grenade and anticipated pain or significant injury"; "[s]ome thought they were going to die"; and some "suffered psychological trauma from the explosion." *Id.* at 14. "After the explosions," the defendant "faced the officers and extended his left fist up." *Id.* at 12. The Justice Department secured dismissal of this case on January 21, 2025.

That same day, DOJ dismissed another case in which a defendant with a "lengthy and violent criminal history" was seen using "a metal bike rack to push against law enforcement officers and repeatedly spray[ed] them" with a "chemical spray." Mot. in Supp. of Pretrial Detention at 1, 4, *U.S. v. Boughner*, No. 22-cr-20 (D.D.C. Dec. 19, 2021), ECF No. 9.

Those prosecutions were no aberration. Numerous rioters were charged with disturbing acts of politically-motivated violence against federal agents on federal property on January 6th:

- One defendant "assaulted multiple police officers for hours, at times deploying a baseball bat or a riot shield as a weapon and causing serious injury." Shortly after the attack, when asked what would happen next, the defendant told the interviewer, "Guns … That's it. One word." Gov's Resp. to Mot. for Release at 1-2, *U.S. v. Lang*, No. 21-cr-53 (Feb. 21, 2024), ECF No. 127.

- Another defendant was "instrumental in the rioters' breach of the Capitol building through the East Rotunda doors." *U.S. v. Warnagiris*, No. 21-cr-0382, 2025 WL 341990, at *2 (D.D.C. Jan. 30, 2025). When "several officers arrived and attempted to close the East Rotunda doors," including U.S. Capitol Police Sergeant Anthony Warner, "the defendant laced his hands on Sergeant Warner while Sergeant Warner was closing the doors and began to shove him with the full force of his body." *Id.*

- Another defendant, wearing a motorcycle helmet and wielding a flagpole in the Capitol Rotunda, was "forcibly pushing" multiple officers and "strik[ing]" one with the flagpole. Stmt. of Facts at 8, 15, *U.S. v. Adams*, No. 24-mj-337 (D.D.C. Oct. 24, 2024), ECF No. 1-1.

- Another defendant shot pepper spray at a group of officers trying to prevent the rioters from surging up the Capitol steps. Stmt. of Facts at 9, *U.S. v. Amos*, No. 24-mj-209, ECF No. 1-1 (D.D.C. June 26, 2024).

Since Inauguration Day 2025, DOJ has dismissed all of these cases, along with approximately 160

others in which the defendants had been charged with assaults on federal law enforcement officials.[30]

Although the courts describe the constitutional analysis as involving defendants who are "similarly situated," the law does not actually require the defendants who are the comparators to be the same. To the contrary, courts routinely examine factors like the location of the alleged criminal activity, the strength of the evidence that a crime was committed, the relative "culpability" of the two groups, and the "general deterrence value of enforcement." *Frederick Douglass*, 82 F.4th at 1138. Applying all of those factors, Congresswoman McIver's case stands in remarkable contrast to those January 6 cases dismissed by the government.

The dismissed January 6 defendants illegally breached a police barrier and successfully broke into the Capitol to overturn an election; Congresswoman McIver, by contrast, was engaged in a statutorily authorized "congressional oversight inspection," as the indictment acknowledges. Some of the January 6 defendants, moreover, had serious criminal records, including previous assaults; Congresswoman McIver has no criminal history whatsoever. And most important, many of the January 6 defendants were captured on video committing acts of serious violence; *at most*, the indictment charges Congresswoman McIver with "slamm[ing] her forearm into the body of" an officer, "reach[ing] out and tr[ying] to restrain" that officer "by forcibly grabbing him," and "push[ing] past" another officer "while using each of her forearms to forcibly strike" him. indictment at 3, 5.

To be clear, the Congresswoman emphatically denies these allegations, and the video

---

[30] *The Jan. 6 Attack: The Cases Behind the Biggest Criminal Investigation in U.S. History*, NPR (Mar. 14, 2025, at 17:26 PM ET), https://www.npr.org/2021/02/09/965472049/the-capitol-siege-the-arrested-and-their-stories (showing 160 cases involving charges of "Assaulting, Resisting or Impeding Certain Officers" where the court granted the government's motion to dismiss the case and no pardon was involved).

footage described above (and in the legislative-immunity motion) disproves them. But even if those exaggerated allegations were accurate, her alleged conduct was manifestly less egregious than storming the Capitol, throwing explosives, beating officers with bats and riot shields, and spraying them with pepper spray. Some of those defendants had significant criminal histories. Some admitted that they engaged in their assaultive conduct as part of an effort to overturn an election. Some escalated their threats in the subsequent days. Some bragged about their exploits and vowed that they would do it again.

Finally, many law enforcement officers were injured—some very seriously—on January 6. By contrast, there has not been and cannot be any suggestion that any alleged victims were hurt by Congresswoman McIver on May 9. Put simply, there is no conduct-based justification for dismissing the January 6 cases, while continuing to prosecute her.

**b. The basis for the differential treatment is unconstitutional.** In that light, the only serious question is whether the Justice Department's differential treatment has "turned on" a constitutionally impermissible consideration—namely, the content or viewpoint of speech, or partisan affiliation. *Frederick Douglass*, 82 F.4th at 1147; *Torquato*, 602 F.2d at 569 n.9. There is clear evidence that those considerations are at the heart of the government's decisions.

In certain circumstances, of course, it is difficult to parse the reasons that prosecutors decline to continue a case. Individual prosecutions can involve a variety of factors, such as the strength of the evidence, safety of witnesses, and prosecutorial resources. Here, by contrast, the administration engaged in a wholesale dismissal of hundreds of cases, and publicly trumpeted its rationale for doing so. The January 6 defendants engaged in violent acts in service of a partisan cause that this Administration supports: overturning the result of an election that, according to the

White House, was "rigged and stolen."[31] President Trump has referred to these individuals as the "J6 hostages."[32] Indeed, it was the President himself who issued a proclamation directing dismissals of the January 6 prosecutions as "a grave national injustice that has been perpetrated upon the American people over the last four years." 90 Fed. Reg. at 8331. The Justice Department appears not to have engaged in any further analysis, instead fully embracing this partisan rationale and justifying its dismissals based on the President's proclamation. *See, e.g.*, *Warnagiris*, 2025 WL 341990, at *4 ("In this case, the government has not provided a factual basis for dismissal. The only justification is a citation to the presidential proclamation.").

The different treatment of Congresswoman McIver could not be more stark, and the basis not more obvious: it is the "content and viewpoint of [her] speech," and her status as a Democratic legislator. *Frederick Douglass*, 82 F.4th at 1140. And the law is equally stark in its prohibition of such an approach. The government in executing the criminal laws has "no interest, compelling or otherwise, to justify favoring" the January 6 defendants over Congresswoman McIver. *Id.* at 1143. That requires dismissal of this case as a violation of the First Amendment.

Similarly, the pursuit of charges against Congresswoman McIver after the blanket dismissals of cases against January 6 defendants also is "probative of discriminatory intent," which makes the decision a Fifth Amendment violation. *U.S. v. Mumphrey*, 193 F. Supp. 3d 1040, 1063 (N.D. Cal. 2016). Here the disparity is overwhelming. There is a simple difference between this prosecution of Congresswoman McIver and the 160 cases involving assault against federal officers on January 6 that the Justice Department has dismissed: it is all about politics and partisanship.

---

[31] *Memorandum*, *supra* note 2.
[32] *The First 100 Hours: Historic Action to Kick Off America's Golden Age*, The White House (Jan. 24, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/the-first-100-hours-historic-action-to-kick-off-americas-golden-age.

That distinction is precisely what the Constitution forbids.

###### 2. Public Statements and Other Actions of Key Executive Branch Officials Confirm the Government's Discriminatory Purpose

Courts consider statements of law enforcement officials in determining whether they acted with discriminatory purpose. *See, e.g.*, *U.S. v. Jones*, 159 F.3d 969, 977 (6th Cir. 1998) (defendant "made the requisite showing of discriminatory intent" where the officers had created t-shirts celebrating his arrest and sent him a racially stereotyped postcard). And this is a rare case in which a host of government officials have openly stated their unconstitutional intentions.

***Department of Homeland Security.*** During and after Congresswoman McIver's inspection of Delaney Hall on May 9, DHS officials—in a series of public statements that are highly inappropriate and prejudicial—have embraced a partisan and retaliatory view of her conduct. *Supra* pp. 13-15.[33] For example, while her May 9 visit was still going on, DHS issued a press release falsely describing that members of the U.S. House of Representatives had "stormed the gate and broke[n] into the detention facility." The ICE officials on site knew that no such thing had occurred.

More importantly, DHS's releases have openly displayed the agency's contempt for the oversight process. This "goes beyond a bizarre political stunt," said DHS's Assistant Secretary, "and puts the safety of our law enforcement agents and detainees at risk. Members of Congress are not above the law and cannot illegally break into detention facilities."[34] There was, of course, no risk to the safety of anyone that day until ICE and HSI inexplicably waded into a crowd of civilians in the public parking lot to arrest Mayor Baraka for a trespassing violation that he had not

---

[33] Congresswoman McIver has separately moved for an order that DHS remove these statements because they violate of her right to a fair trial under the Fifth and Sixth Amendments.
[34] Press Release, DHS, *Members of Congress Break into Delaney Hall Detention Center* (May 9, 2025), https://perma.cc/G6MH-2KXF.

committed. And there was nothing about the Congresswoman's conduct that was a stunt. She was doing what the laws of the United States give her the authority to do: make sure that ICE's immigration detention facilities funded at public expense are being run appropriately.

**Department of Justice.** DHS's statements and actions do not stand alone. Shortly after her appointment as Interim U.S. Attorney, Alina Habba gave an interview suggesting that her actions as U.S. Attorney would have a partisan political effect. "We could turn New Jersey red"; "[h]opefully while I'm there" as U.S. Attorney, "I can help that cause."[35] And within days of her appointment, Ms. Habba took to Fox News to announce investigations into high-ranking Democratic state officials.[36]

**The President.** President Trump has also connected the prosecution with the Administration's political agenda. When the Justice Department announced charges against

---

[35] Specifically, just days after her appointment, on March 27, Ms. Habba was interviewed in the White House complex for a conservative podcast, *Human Events Daily with Jack Posobiec*, about her "priorit[ies] to look at" when she took office. *Newly Appointed New Jersey DA Alina Habba*, *supra* note 8, at 4:47-49. Ms. Habba found it "disturbing" that there were "more civil cases open than criminal"—and, as the host described, "many of those criminal cases were, you know, J6 cases" or someone "praying on the steps of a pro-life clinic." *Id.* at 4:30-47. The host acknowledged that Ms. Habba "can't talk elections, but we certainly saw the results last time around, and Jersey was very, very close, and I think that's something that with proper governance could potentially be a trend that continues." *Id.* at 8:29-42. Ms. Habba agreed:

> Yeah, I hope so. I hope so. *We could turn New Jersey red.* I really do believe that. There's momentum right now. President Trump's agenda is working. The American people voted for it. Eighty million people voted for it. And I think New Jersey is absolutely close to getting there. So hopefully while I'm there, I can help that cause. And, you know, I'm not a political person in that role. But I can tell you that the one thing I just want to do is make it safer. And once they see that our policies do work, they work. Kicking illegals out, kicking criminals out that are acting as terrorists, that are hurting our people.

*Id.* at 8:41-9:16 (emphasis added).

[36] @AlinaHabba, X.com (Apr. 10, 2025, 10:06 PM), https://x.com/AlinaHabba/status/1910514829674131833 (embedded video at 0:48-58).

Congresswoman McIver, the President endorsed the decision: "The days of woke are over."[37] Thus, as the President indicated, the government has connected this prosecution to its effort to end "wokeness"—an alleged ideology the White House has described as fostering "radical gender and racial ideologies that poison the minds of Americans," and "cultural Marxism."[38] And it has inextricably connected the term "woke" with "[t]he Democrat[ic] Party" in particular.[39]

Together, these statements provide compelling evidence that this prosecution is predicated on two unconstitutional considerations. *First*, they confirm that the government's actions are a reaction to Congresswoman McIver's exercise of her congressional oversight responsibilities. *Second*, the statements explain that this prosecution is based on party affiliation—which also is an unconstitutional consideration. *Torquato*, 602 F.2d at 569 n.9. DHS labels "Democratic members of Congress," including "Representative LaMonica McIver (D-NJ)," as the problem, and the President describes her prosecution as confirming that the "days of woke are over." Congresswoman McIver is being prosecuted not just because she is a Member of Congress, but because she is a *Democratic* Member of Congress who is a thorn in the side of ICE, DHS, and the Administration.

### 3. The Irregularity of the Government's Actions Confirms That Its Enforcement and Prosecution Are Unconstitutionally Selective

Finally, in evaluating a selective prosecution claim, the "government's failure to follow its normal prosecutorial procedures mandates stricter judicial scrutiny of the prosecution." *Haggerty*, 528 F. Supp. at 1293; *see also, e.g.*, *U.S. v. Ojala*, 544 F.2d 940, 943 & n.2 (8th Cir. 1976). Here,

---

[37] Andrew Solender, *Trump Defends McIver Charges*, Axios (May 20, 2025), https://www.axios.com/2025/05/20/trump-lamonica-mciver-doj-charges-ice.
[38] *Cuts to Woke Programs*, White House, https://www.whitehouse.gov/wp-content/uploads/2025/05/Cuts-to-Woke-Programs-Fact-Sheet.pdf.
[39] Fox News, x.com (March 25, 2025, 9:54 AM), http://x.com/FoxNews/status/1904547557570650524.

the "government's prosecutorial measures . . . can only be characterized as abnormal," *Haggerty*, 528 F. Supp. at 1293.

*First*, DOJ has bypassed its long-standing set of procedures specifically designed to protect Members of Congress from improper prosecutions. These procedures, set forth in the Justice Manual and a November 2023 Department Memorandum, require prosecutors to *consult* with DOJ's Public Integrity Section before bringing charges against Members of Congress.[40] Moreover, that Section's *approval* is necessary if the charges are based on actions that Members take in their official capacity. Created "in the wake of the Watergate scandal," the Public Integrity Section has been "staffed with experienced trial attorneys with extensive public corruption experience."[41] Its mandatory procedures are designed to "respect the protections that apply to legislative materials under Article I of the Constitution, and to ensure that cases or matters involving Members of Congress are handled with uniformity and consistency across the Department's offices and litigating decisions."[42]

The U.S. Attorney's Office reportedly ignored these procedures entirely.[43] There apparently was no consultation regarding—let alone approval of—the charges against Congresswoman

---

[40] Dep't of Justice, JUSTICE MANUAL § 9-85.110 Investigations Involving Members of Congress (2024); Dep't of Justice, Mem., *Policies and Procedures in Criminal Investigations Involving Members of Congress and Staff* (Nov. 7, 2023), https://www.justice.gov/archives/dag/media/1323861/dl?inline.

[41] U.S. Department of Justice, Public Integrity Section: *About*, https://www.justice.gov/criminal/criminal-pin.

[42] Dep't of Justice, Mem., *Policies and Procedures in Criminal Investigations Involving Members of Congress and Staff* (Nov. 7, 2023), https://www.justice.gov/archives/dag/media/1323861/dl?inline.

[43] Sarah N. Lynch et al., *How Trump Defanged the Justice Department's Political Corruption watchdogs*, Reuters (June 9, 2025), https://www.reuters.com/investigations/how-trump-defanged-justice-departments-political-corruption-watchdogs-2025-06-09 ("Habba didn't consult with or seek approval from the Public Integrity Section before filing her case in federal court, said two of the people familiar with the department's operations.").

McIver, even though the charging documents expressly acknowledge that the allegations arose during "a congressional oversight inspection" and that "members of Congress had lawful authority to be there." Crim. Compl., ECF No. 1, attach. B ¶¶ 3, 10. This unexplained departure from "normal prosecutorial procedures" also shows that Congresswoman McIver was "selectively prosecuted on the basis of [her] protected activities." *Haggerty*, 528 F. Supp. at 1293, 1295.

*Second*, the timing of the charges against Congresswoman McIver—particularly when announced in connection with the dropping of an entirely unsustainable charge against Mayor Baraka—further supports a finding of unconstitutional motive. The Justice Department's perceived need to charge *some* Democratic politician in connection with the episode at Delaney Hall, and to do so quickly, reinforces that there is no legitimate basis for this prosecution.

## II.    There Is Clear Evidence of Vindictive Prosecution

The fact that Congresswoman McIver is being prosecuted for unconstitutionally *selective* reasons is enough for dismissal. But the same evidence and circumstances also establish that her prosecution was *vindictive*, and the indictment should be dismissed on that basis as well.

A vindictive prosecution is one in which the government is retaliating against someone who was "exercising a protected statutory or constitutional right." *U.S. v. Goodwin*, 457 U.S. 368, 372 (1982). Vindictive prosecution violates the Due Process Clause of the Fifth Amendment, and can be proven in two ways. *First*, the defendant can establish "actual vindictiveness"—*i.e.,* direct evidence that the prosecutor harbored a personal animus toward the defendant. *U.S. v. Esposito*, 968 F.2d 300, 303 (3d Cir. 1992). *Second*, a defendant can succeed by showing "a reasonable likelihood of a danger that the [government] might be retaliating against the accused for lawfully exercising a right." *Id.* (citing *Goodwin*, 457 U.S. at 372). In the latter situation, courts apply a "presumption of vindictiveness"; to overcome that presumption, the government must show "legitimate, objective reasons for its conduct." *U.S. v. Paramo*, 998 F.2d 1212, 1220 (3d Cir. 1993).

The evidence here establishes both actual vindictiveness and gives rise to a presumption of vindictiveness that the government cannot rebut. The evidence supporting a showing of vindictive prosecution in large part overlaps with the evidence that establishes selective prosecution, described in detail above. But certain evidence bears particular emphasis because it underscores the government's *retaliatory* motive.

In particular, DHS's statements and actions beginning on the day of the Delaney Hall inspection and continuing since provide strong evidence that the goal of this prosecution is to deter Congresswoman McIver's (and other legislators') legitimate exercise of their statutorily protected oversight responsibilities. DHS has criticized "Democratic lawmakers" for "labeling political stunts as oversight while they endanger the safety of ICE personnel,"[44] and has conducted a press campaign to "[d]ebunk" the notion that the visit to Delaney Hall "was 'oversight.'"[45] DHS has since detained other officials investigating its activities, and has promulgated and appears to be enforcing a new, unlawful policy of barring Members of Congress from unannounced inspections. In the same vein, the government has also circumvented DOJ's mandatory approval procedures that were designed specifically to "respect the protections" that legislators possess under the Constitution, and to ensure "that cases or matters involving Members of Congress are handled with uniformity and consistency."[46]

Finally, the events as they unfolded on May 9 provide strong confirmation that the

---

[44] Press Release, DHS, *ICE Employee Attacked by Rioters After Congressman Doxes Him to Mob at California Marijuana Facility* (July 14, 2025), https://perma.cc/3GNL-PWE6.
[45] Press Release, DHS, *DHS Debunks Fake News Narratives About Law Enforcement During Police Week* (May 16, 2025), https://www.dhs.gov/news/2025/05/16/dhs-debunks-fake-news-narratives-about-law-enforcement-during-police-week.
[46] Dep't of Justice, Mem., *Policies and Procedures in Criminal Investigations Involving Members of Congress and Staff* (Nov. 7, 2023), https://www.justice.gov/archives/dag/media/1323861/dl?inline.

prosecution here rests on a retaliatory animus. *Supra* pp. 9-13. Instead of permitting Members of Congress to conduct what should have been a routine oversight visit, Executive Branch officials took deliberate and reckless steps to drive the visit into chaos—from deploying multiple law enforcement vehicles, to sending in a group of masked and armed officers, to pursuing a baseless and aggressive arrest of the Mayor. After physical contact predictably ensued, the government, far from taking responsibility for its escalation, has insisted on criminal prosecution as retribution for Congresswoman McIver's participation in these events. Clearly, the Executive Branch does not like scrutiny of its immigration policies and practices. But due process does not permit prosecutions as a form of retaliation when such scrutiny lawfully occurs.

### III.    If This Court Determines That The Existing Factual Record Does Not Provide Clear Evidence, the Court Should Permit Discovery and Conduct an Evidentiary Hearing

Even if the Court were to conclude that dismissal is not yet warranted, the information that is already available would at least cry out for additional discovery regarding Congresswoman McIver's claims of selective and vindicative prosecution.[47]

Courts grant defendants discovery and hold evidentiary hearings on claims of selective enforcement and prosecution, and claims of vindictive prosecution, even when they find the existing factual record insufficient to support dismissal. *See, e.g.*, *Jones*, 159 F.3d at 978; *U.S. v. Michel*, 2022 WL 4182342, at *8 (D.D.C. Sept. 13, 2022) (holding hearing "because the Government ha[d] not yet proffered an explanation for the" indictment and it may have been issued for vindictive reasons). To obtain discovery, the defendant must merely introduce "some evidence" supporting the elements of her claim. *Washington*, 869 F.3d at 220-21; *U.S. v. Adams*, 870 F.2d

---

[47] Congresswoman McIver has sought discovery related to any potential race-based motivation for the government's action in this case. She reserves the right to move to dismiss or for additional discovery on a race-based selective prosecution theory if evidence supporting such a motion emerges in discovery.

1140, 1145 (6th Cir. 1989). Courts have "considerable discretion" in determining whether this standard is met and, if so, over the scope of discovery. *Washington*, 869 F.3d at 222.

Here, there is more than merely "some evidence." In *Jones*, for example, the Sixth Circuit reversed the denial of discovery on a selective prosecution claim when a Black defendant had identified racially insensitive statements by local law enforcement officials and had presented evidence that the relevant local police department had declined to refer "non-African-American defendants" arrested for similar drug crimes for federal prosecution. 159 F.3d at 976, 978. The evidence here is far more substantial.

At a minimum, discovery is warranted on Congresswoman McIver's claim of selective *enforcement* related to DHS's conduct. In *Washington*, the Third Circuit confirmed that the standard for discovery in support of selective *enforcement* claims is less stringent than for selective *prosecution* claims. 869 F.3d at 219-20. The Third Circuit explained that certain concerns that can counsel against discovery related to prosecutorial motive do not apply in the selective enforcement context, which focuses on the actions of law enforcement officials. *Id.* at 216-17. Thus, to support discovery for a selective enforcement claim, the defendant must show only "'some evidence' of discriminatory *effect*." *Id.* at 220-21 (emphasis added).

Moreover, because First Amendment claims do not require proof of an improper motive, discovery on that claim requires only "some evidence" that this prosecution rests on Congresswoman McIver's viewpoint, protected expression, or party affiliation. *See supra* pp. 16-17. If this case does not provide "some evidence" of that conclusion, it is hard to know what would. Congresswoman McIver is being prosecuted for the same offense as the 160 defendants charged with assaulting officers at the U.S. Capitol whose cases have been dismissed. Key officials have stated their goal of hindering legislative oversight of their immigration detention policies. And the

Justice Department circumvented safeguards designed to prevent legislators from baseless prosecutions like this one. Those facts warrant dismissal of the indictment. But at minimum, they support additional discovery, which would dispel any doubt.

## CONCLUSION

The Court should dismiss the indictment or, alternatively, should permit discovery and an evidentiary hearing.

Dated: August 15, 2025

ARNOLD & PORTER KAYE SCHOLER LLP

By: _____
Paul J. Fishman
Lee M. Cortes, Jr.
One Gateway Center | Suite 1025
Newark, NJ 07102
Telephone: 973-776-1901
Paul.Fishman@arnoldporter.com
Lee.Cortes@arnoldporter.com

*Counsel for Congresswoman LaMonica McIver*