# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, | Hon. Jamel K. Semper |
| *v.* | Crim. No. 2:25-cr-00388-JKS |
| LaMONICA McIVER | |

## MEMORANDUM OF LAW IN SUPPORT OF CONGRESSWOMAN McIVER'S MOTION TO RESTRAIN THE GOVERNMENT'S EXTRAJUDICIAL STATEMENTS

August 15, 2025

ARNOLD & PORTER KAYE SCHOLER LLP
One Gateway Center
Suite 1025
Newark, NJ 07102

*Counsel for Congresswoman LaMonica McIver*

On the Memorandum:

Paul J. Fishman
Lee M. Cortes, Jr.
John M. Fietkiewicz
Samuel F. Callahan
Orion de Nevers
Amanda J. Raines

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...........................................................................................II

INTRODUCTION .......................................................................................................... 1

ARGUMENT .................................................................................................................. 2

I.      THE GOVERNMENT IS FORBIDDEN FROM MAKING STATEMENTS THAT
        CREATE A SUBSTANTIAL LIKELIHOOD OF MATERIAL PREJUDICE ................. 2

II.     THE GOVERNMENT'S STATEMENTS IN THIS CASE INFLICT A SUBSTANTIAL
        RISK OF MATERIAL PREJUDICE................................................................. 6

        A.   The "Break-In" Post.............................................................................. 6

        B.   The "Storming the Gate" Post............................................................... 9

        C.   The "Fake News" Post ......................................................................... 11

        D.   The "Doxing" Post................................................................................ 13

        E.   The "Assaults" Post ............................................................................. 15

CONCLUSION............................................................................................................. 17

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Berger v. United States*,
    295 U.S. 78 (1935)................................................................................4

*Delaney v. United States*,
    199 F.2d 107 (1st Cir. 1952)...............................................................4

*Gannett Co. v. DePasquale*,
    443 U.S. 368 (1979).........................................................................2, 3

*Gentile v. State Bar of Nevada*,
    501 U.S. 1030 (1991)....................................................................2, 3, 4

*Levine v. U.S. Dist. Ct. for Cent. Dist. of California*,
    764 F.2d 590 (9th Cir. 1985) ...............................................................6

*Patterson v. Colorado*,
    205 U.S. 454 (1907)..............................................................................1

*Sheppard v. Maxwell*,
    384 U.S. 333 (1966).........................................................................2, 4

*Silverthorne v. United States*,
    400 F.2d 627 (9th Cir. 1968) ...............................................................4

*United States v. Brown*,
    218 F.3d 415 (5th Cir. 2000) ...........................................................3, 4

*United States v. Grace*,
    401 F. Supp. 2d 1057 (D. Mont. 2005)................................................5

*United States v. McGregor*,
    838 F. Supp. 2d 1256 (M.D. Ala. 2012) ...........................................4, 5

*United States v. Perryman*,
    No. 12-CR-0123, 2013 WL 4039374 (E.D.N.Y. Aug. 7, 2013)..........4, 6

*United States v. Scarfo*,
    263 F.3d 80 (3d Cir. 2001)...............................................................3, 4

*United States v. Scrushy*,
    No. CR-03-BE-0530-S, 2004 WL 848221 (N.D. Ala. Apr. 13, 2004)......3

*United States v. Smith*,
    985 F. Supp. 2d 506 (S.D.N.Y. 2013) ............................................................ 3, 4, 5

*United States v. Watson*,
    No. 23-CR-00082, 2025 WL 510814 (E.D.N.Y. Feb. 16, 2025) ............................... 6

**Regulations**

28 C.F.R.
    § 50.2 ........................................................................................................... 1
    § 50.2(b)(1) .................................................................................................. 6
    § 50.2(b)(3) .................................................................................................. 5
    § 50.2(b)(3)(iv) ................................................................................ 5, 13, 15, 16
    § 50.2(b)(6)(i) ................................................................................. 5, 9, 14, 16
    § 50.2(b)(6)(iv) ...................................................................................... 5, 9
    § 50.2(b)(6)(v) ...................................................................................... 5, 8, 10
    § 50.2(b)(6)(vi) ................................................................................ 5, 8, 10, 12, 14

**Court Rules**

L.Cr.R.
    101.1 ........................................................................................................... 1
    101.1(b)(1) .................................................................................... 5, 9, 14, 16
    101.1(b)(3) .......................................................................................... 5, 8, 10
    101.1(b)(4) ................................................................................. 5, 8, 10, 12, 14
    101.1(b)(5) .................................................................................. 5, 13, 15, 16
    101.1(d) ....................................................................................................... 6

N.J. Rules Prof'l Conduct
    R. 3.6 ........................................................................................................... 1
    R. 3.6(1) ...................................................................................... 5, 9, 14, 16
    R. 3.6(3) ............................................................................................ 5, 8, 10
    R. 3.6(4) ................................................................................... 5, 8, 10, 12, 14
    R. 3.6(5) .................................................................................... 5, 13, 15, 16
    R. 3.6(6) ............................................................................... 5, 9, 10, 12, 14, 16
    R. 3.6(b) ....................................................................................................... 5

**Other Authorities**

DHS (@DHSgov), X (May 10, 2025, at 14:28 ET),
    https://x.com/DHSgov/status/1921271072147546558 ............................................. 9

Press Release, DHS, *DHS Announces ICE Law Enforcement are Now Facing an
830 Percent Increase in Assaults* (July 15, 2025), https://perma.cc/7YZP-
PGWS .......................................................................................................... 15

Press Release, DHS, *DHS Debunks Fake News Narratives About Law Enforcement During Police Week* (May 16, 2025), https://perma.cc/9XKE-3K3U ..............................................................................................................8, 11

Press Release, DHS, *ICE Employee Attacked by Rioters After Congressman Doxes Him to Mob at California Marijuana Facility* (July 14, 2025), https://perma.cc/3GNL-PWE6 ........................................................................13

Press Release, DHS, *Members of Congress Break into Delaney Hall Detention Center* (May 9, 2025), https://perma.cc/G6MH-2KXF .............................................6

U.S. Dep't of Justice, *Justice Manual*
§ 1-7.500 ...............................................................5, 9, 10, 12, 14, 16
§ 1-7.600 ..................................................................5, 13, 15, 16
§ 1-7.610(A) ..............................................................5, 9, 14, 16
§ 1-7.610(B) ..............................................................................9
§ 1-7.610(C) ..............................................................................9
§ 1-7.610(D) ..........................................................................5, 9
§ 1-7.610(E) ..................................................................5, 8, 10
§ 1-7.610(F) ......................................................5, 8, 10, 12, 14

# INTRODUCTION

As Justice Holmes explained over a century ago, the fairness of our criminal justice system requires "that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." *Patterson v. Colorado*, 205 U.S. 454, 462 (1907). That cardinal principle is embodied in our Constitution's Fifth and Sixth Amendments, which protect the rights of a criminal defendant to a fair trial by an impartial jury. And this Court, the U.S. Department of Justice, and the New Jersey Bar have respectively promulgated rules and regulations to secure those rights, by limiting what prosecutors and their investigative colleagues may say publicly about a defendant facing criminal charges. *See* L.Cr.R. 101.1; 28 C.F.R. § 50.2; U.S. Dep't of Justice, *Justice Manual*; N.J. Rules Prof'l Conduct, R. 3.6.

Since May 9, 2025, the Government has repeatedly ignored those requirements and foundational principles. In particular, the Department of Homeland Security ("DHS")—the agency responsible for investigating this case and whose agents would inevitably be the primary prosecution witnesses at trial—has issued at least five public statements over the last three months that have imperiled Congresswoman McIver's right to a fair trial, and that will continue to do so for as long as they are publicly accessible. Individually and collectively, those statements are extraordinarily prejudicial: they unequivocally declare Congresswoman McIver's guilt; they assail the defenses DHS expects her to assert; they demean her as a "gutter politician" responsible for purportedly escalating rates of assault on ICE agents; and they attempt to associate her with "Murderers, Rapists, Suspected Terrorists, and Gang Members" supposedly housed in the detention facility that the Congresswoman inspected on May 9, 2025, as part of her congressionally authorized oversight responsibility.

DHS's statements are false. But even on their own terms, they violate long-standing regulations and ethical rules that protect the rights of criminal defendants and the integrity of the judicial process. Such statements have no place in any prosecution—much less a high-profile case like this one—where the jury's verdict must "be based on evidence received in open court, not from outside sources." *Sheppard v. Maxwell*, 384 U.S. 333, 351 (1966).

Congresswoman McIver has a right to "a trial by an impartial jury free from outside influences," *id.* at 362, and as the Supreme Court has explained, this Court has an obligation to protect that right by mitigating the prejudicial effects of pretrial publicity, *Gannett Co. v. DePasquale*, 443 U.S. 368, 378 (1979). To that end, Congresswoman McIver moves the Court for an order directing the Government to: (1) remove all the materials discussed below from public view, and certify that they have done so; (2) refrain from all similar conduct related to this matter; (3) abide by all applicable rules and regulations, including those of this Court; and (4) produce all other public statements that DHS or its agents have made regarding this matter, regardless of the platform on which they were posted or the form in which they were issued.[1]

## ARGUMENT

## I.    The Government is Forbidden From Making Statements that Create a Substantial Likelihood of Material Prejudice

The Fifth and Sixth Amendments to the Constitution guarantee the right "to a fair trial by 'impartial' jurors." *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1075 (1991) (opinion of Rehnquist, C.J.). "Few, if any, interests under the Constitution are more fundamental." *Id.* An "outcome affected by extrajudicial statements would violate that fundamental right." *Id.* The trial

---

[1] Congresswoman McIver may seek further relief, including moving to dismiss the indictment, if the Government makes additional prejudicial statements or does not remove the prejudicial statements it has already made.

court's "primary and overriding interest . . . must be [the defendant's] Sixth Amendment right to a fair trial," which includes preserving the right to "a fair trial by an impartial jury, free from outside influences." *United States v. Scrushy*, No. CR-03-BE-0530-S, 2004 WL 848221, at *1 (N.D. Ala. Apr. 13, 2004).

Trial judges, therefore, have "an affirmative constitutional duty to minimize the effects of prejudicial pretrial publicity." *United States v. Scarfo*, 263 F.3d 80, 90 (3d Cir. 2001) (quoting *Gannett*, 443 U.S. at 378). And that responsibility is at its zenith "in high-profile cases," in which the court must be particularly vigilant to "avoid the creation of a 'carnival atmosphere.'" *United States v. Smith*, 985 F. Supp. 2d 506, 540 (S.D.N.Y. 2013) (quoting *United States v. Brown*, 218 F.3d 415, 429 (5th Cir. 2000)).

Although the First Amendment plays a vital role in securing the transparency of criminal prosecutions, the statements "of lawyers representing clients in pending cases may be regulated under a less demanding standard than" statements in other contexts. *Scarfo*, 263 F.3d at 92 (quoting *Gentile*, 501 U.S. at 1074 (opinion of Rehnquist, C.J.)). The rationale is simple: "because attorneys have access to information through discovery and client communication, and because their statements are likely to be received as especially authoritative," their commentary poses a particularly acute "threat to a pending proceeding's fairness." *Id.* at 93.

A "lawyer actively participating in a trial, particularly an emotionally charged criminal prosecution, is not merely a person and not even merely a lawyer. He is an intimate and trusted and essential part of the machinery of justice, an officer of the court in the most compelling sense." *Gentile*, 501 U.S. at 1072 (opinion of Rehnquist, C.J.) (citation omitted). That is especially applicable to federal prosecutors, as the Supreme Court has observed for nearly a century. The "United States Attorney is the representative not of an ordinary party to a controversy, but of a

3

sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935).

These principles apply equally to the "Government and its partners in [] law enforcement." *United States v. Perryman*, No. 12-CR-0123, 2013 WL 4039374, at *13 (E.D.N.Y. Aug. 7, 2013). There is "no difference between prejudicial publicity instigated by a" U.S. Attorney's Office, or by some other "arm" of government. *Silverthorne v. United States*, 400 F.2d 627, 632 (9th Cir. 1968) (quoting *Delaney v. United States*, 199 F.2d 107, 114 (1st Cir. 1952)). "The prosecution is by the 'United States of America,'" and it is the obligation of the United States to prevent "the damaging effect of . . . hostile publicity." *Id.* at 633 (quoting *Delaney*, 199 F.2d at 114). In fact, the entire "executive arm" bears that responsibility. *Id.* at 632 (quoting *Delaney*, 199 F.2d at 114). The court is therefore obliged to prevent Executive Branch statements that pose a "substantial likelihood of material prejudice" to a prosecution. *Scarfo*, 263 F.3d at 93 (quoting *Gentile*, 501 U.S. at 1075 (opinion of Rehnquist, C.J.)).[2]

The qualities of statements that impose a substantial likelihood of material prejudice are well-recognized. Indeed, a "number of rules, regulations, and ethical canons" enumerate categories that presumptively violate the bar on prejudicial commentary. *Smith*, 985 F. Supp. 2d at 536. This Court's local rules, the Department of Justice's own regulations and guidance, and the New Jersey Rules of Professional Responsibility all identify familiar types of statements that are presumed to

---

[2] The Third Circuit's "substantial likelihood of material prejudice" standard is readily satisfied in this case, even though *Sheppard*'s "reasonable likelihood" of prejudice standard should apply. 384 U.S. at 363. The courts of appeal are split on this question, *United States v. McGregor*, 838 F. Supp. 2d 1256, 1261-62 (M.D. Ala. 2012) (describing split), although the difference may be of modest significance given the court's broad duty to protect the rights of criminal defendants under even the substantial likelihood standard, *see United States v. Brown*, 218 F.3d 415, 427 (5th Cir. 2000) (the "difference between these two standards is not clear").

impose an intolerable likelihood of material prejudice. *See id.* at 536-37; *United States v. Grace*, 401 F. Supp. 2d 1057, 1060-63 (D. Mont. 2005); *United States v. McGregor*, 838 F. Supp. 2d 1256, 1263-64 (M.D. Ala. 2012). Six of those categories, which are identified almost identically across these sources, are particularly relevant here:

1. ***Defendant's character***. The Government may not comment on the character, credibility, reputation, or criminal record of a defendant. L.Cr.R. 101.1(b)(1); 28 C.F.R. § 50.2(b)(6)(i); U.S. Dep't of Justice, *Justice Manual* § 1-7.610(A); N.J. Rules Prof'l Conduct, R. 3.6(1) (Official Comment by Supreme Court (Nov. 17, 2003)).

2. ***Witness's character***. The Government may not comment on the character, credibility, reputation, or criminal record of a witness. L.Cr.R. 101.1(b)(1); 28 C.F.R. § 50.2(b)(6)(iv); *Justice Manual* § 1-7.610(D); N.J. Rules Prof'l Conduct, R. 3.6(1).

3. ***Nature of evidence.*** The Government may not comment on the nature of physical evidence expected to be presented in the case. L.Cr.R. 101.1(b)(3); 28 C.F.R. § 50.2(b)(6)(v); *Justice Manual* § 1-7.610(E); N.J. Rules Prof'l Conduct, R. 3.6(3).

4. ***Guilt.*** The Government may not express an opinion as to the guilt or innocence of a defendant. L.Cr.R. 101.1(b)(4); 28 C.F.R. § 50.2(b)(6)(vi); *Justice Manual* § 1-7.610(F); N.J. Rules Prof'l Conduct, R. 3.6(4).

5. ***Prejudicial information.*** The Government may not make statements regarding information the official knows or reasonably should know is likely to be inadmissible as evidence in a trial and would if disclosed create a substantial risk of prejudice to an impartial trial. L.Cr.R. 101.1(b)(5); 28 C.F.R. § 50.2(b)(3)(iv); *Justice Manual* § 1-7.600; N.J. Rules Prof'l Conduct, R. 3.6(5).

6. ***Presumption of innocence.*** The Government may not issue a statement that a defendant has been charged with a crime, unless there is included therein a statement explaining that the charge is merely an accusation and that the defendant is presumed innocent until and unless proven guilty. *Justice Manual* § 1-7.500; N.J. Rules Prof'l Conduct, R. 3.6(6).[3]

These provisions apply to "all stages of criminal proceedings, including investigation before a grand jury, the post-arrest pretrial period, jury selection, and jury trial through verdict."

---

[3] These rules also enumerate limited and specific categories of information that *is* disclosable, which typically cover "incontrovertible, factual matters" like the defendant's name, the text of the charge, and the identity of the agency leading the investigation. 28 C.F.R. § 50.2(b)(3); *see Justice Manual* § 1-7.500; N.J. Rules Prof'l Conduct R. 3.6(b).

L.Cr.R. 101.1(d); *see* 28 C.F.R. § 50.2(b)(1). And they provide the analytical framework for this motion: Any statement that violates these rules is a presumptively improper form of pretrial publicity. *See, e.g.*, *United States v. Watson*, No. 23-CR-00082, 2025 WL 510814, at *6-7 (E.D.N.Y. Feb. 16, 2025). Courts have broad remedial authority to address publicity violations, from the "modest" remedy of directing removal of prejudicial publications, all the way up to dismissing an indictment. *Perryman*, 2013 WL 4039374, at *13; *see, e.g.*, *Levine v. U.S. Dist. Ct. for Cent. Dist. of California*, 764 F.2d 590, 599 (9th Cir. 1985).

## II.    The Government's Statements In This Case Inflict a Substantial Risk of Material Prejudice

Under these established standards, the Government's public statements about Congresswoman McIver manifestly prejudice her right to a fair trial. DHS has issued at least five public posts since May—one on social media and the rest as press releases—that each trigger the presumption of prejudice many times over. These publications, which began on the day of Congresswoman McIver's oversight inspection at Delaney Hall, prejudice Congresswoman McIver in the public's eye, influence the potential jury venire, and send a message to the Government's own witnesses—many of whom are themselves DHS employees—about its preferred framing of the case.

### A.    The "Break-In" Post

*The Post.* DHS's false and inflammatory publicity began on May 9, 2025, when DHS issued its first press release, apparently posted after Congresswoman McIver had arrived at Delaney Hall and as events there were still "evolving."[4]

---

[4] Press Release, DHS, *Members of Congress Break into Delaney Hall Detention Center* (May 9, 2025), https://perma.cc/G6MH-2KXF.

The press release purports to describe the events then unfolding at Delaney Hall: "Today, as a bus of detainees was entering the security gate of Delaney Hall Detention Center, a group of protestors, including two members of the U.S. House of Representatives, stormed the gate and broke into the detention facility. Representatives Robert Menendez, Jr. and Bonnie Watson Coleman and multiple protestors are holed up in a guard shack, the first security check point."

Virtually all of that was false. There was no bus of detainees. No members of the House of Representatives "stormed the gate or broke into the facility." No protestors entered the secured area. To the contrary, as the Government's own video recordings make clear, Ex. A, NEPTZ.avi at 4:35-8:24, the Members of Congress walked, unaccompanied by any members of the public, through the open gate alongside a passenger car, and then spent several minutes speaking calmly and patiently with the employees who received them inside. And the Members did not voluntarily "hole up" on the premises—they were escorted into a waiting area, where their congressionally authorized inspection was then stalled for approximately an hour.

The release also provides a statement from DHS Assistant Secretary for Public Affairs Tricia McLaughlin, which reiterated the false accusations of the Members "storming" and "illegally break[ing] in[]":

> Members of Congress storming into a detention facility goes beyond a bizarre political stunt and puts the safety of our law enforcement agents and detainees at risk. Members of Congress are not above the law and cannot illegally break into detention facilities. Had these members requested a tour, we would have facilitated a tour of the facility. This is an evolving situation.

To be sure, the press release identifies only Representatives Menendez and Watson Coleman, and does not name Congresswoman McIver. Nonetheless, it is an obviously false and highly prejudicial description of the events that underlie the charges against her, and subsequent DHS posts

discussing Congresswoman McIver's indictment contain links to this release, openly connecting it to the Congresswoman's charges.[5]

After completely mischaracterizing the events involving Congresswoman McIver, the press release pivots to a purported sample of Delaney Hall detainees, accusing them of MS-13 membership, homicide, aggravated assault, and other firearm and drug- related crimes. The release also identifies the "Top 5 Egregious Arrests" effected by Newark's ICE Enforcement and Removal Operations, characterizing them as wanted for terrorism, rape, dangerous sexual conduct on a child by a caretaker, and other violent crimes and acts of sexual misconduct.

*The Prejudice.* DHS's press release has all the hallmarks of a prejudicial pretrial statement. To start, its false account of the events frames the evidence in a way that will influence the public, jury venire, and possible witnesses' perception of events. *See* L.Cr.R. 101.1(b)(3); 28 C.F.R. § 50.2(b)(6)(v); *Justice Manual* § 1-7.610(E); N.J. Rules Prof'l Conduct, R. 3.6(3). As explained, the press release's description of how events played out at Delaney Hall—which would be a central factual issue for the jury to resolve at trial—is complete fantasy, and extremely prejudicial. The Members did *not* storm the gate; there was *no* bus of detainees; and *no* protestors entered with the Members—yet the press release claims all of that is true.

The release was also the first in a series of Department statements that prejudge Congresswoman McIver's guilt. *See* L.Cr.R. 101.1(b)(4); 28 C.F.R. § 50.2(b)(6)(vi); *Justice Manual* § 1-7.610(F); N.J. Rules Prof'l Conduct, R. 3.6(4). In particular, the release asserts that the Members "*illegally*" "broke into the detention facility," jeopardizing "the safety of . . . law enforcement agents and detainees." Yet it provides no disclaimer or caveat noting the presumption

---

[5] Press Release, DHS, *DHS Debunks Fake News Narratives About Law Enforcement During Police Week* (May 16, 2025), https://perma.cc/9XKE-3K3U.

of innocence. *See Justice Manual* § 1-7.500; N.J. Rules Prof'l Conduct, R. 3.6(6). It then sets its sights on the Congresswoman's defenses, reframing this federally authorized oversight inspection as "a bizarre political stunt." That characterization prejudges a question central to the dispute in this case: As Congresswoman McIver's motion to dismiss on the basis of legislative immunity explains, her oversight authority may form the core premise for several of her defenses at any trial in this case.

Along the way, the press release also assails the character of Congresswoman McIver, and of Representatives Menendez and Watson Coleman, who are themselves potential witnesses in this case. *See* L.Cr.R. 101.1(b)(1); 28 C.F.R. § 50.2(b)(6)(i), (iv); *Justice Manual* § 1-7.610(A), (D); N.J. Rules Prof'l Conduct, R. 3.6(1). In particular, DHS attacks all three Members, accusing them of illegally "storming" Delaney Hall with an envoy of protestors, an assertion that is demonstrably false. The release also takes a pass at degrading the Members' character by association—specifically, associating them with Delaney Hall's "most egregious" detainees, including "murderers, rapists, suspected terrorists, and gang members."

All this harm is ongoing. The press release was last updated on May 12, 2025, and remains easily accessible on the DHS website as of this filing.

### B.    The "Storming the Gate" Post

*The Post.* The day after the Delaney Hall inspection, DHS shared edited video footage of the Delaney Hall events on the social media platform, *X*. With a siren icon as the lede, DHS's official *X* account posted: "WATCH: US Congresswoman, LaMonica McIver (wearing a red blazer), storms the gate of Delaney Hall Detention Center ASSAULTING an ICE agent."[6]

---

[6] DHS (@DHSgov), X (May 10, 2025, at 14:28 ET), https://x.com/DHSgov/status/1921271072147546558.

DHS's post on *X* is a 26-second, edited video clip from an unattributed source. The video follows Congresswoman McIver as she returns to Delaney Hall's secured area in a scrum of people, allegedly making contact with others along the way. The video is edited to feature instant replays and slow-motion footage of any contact involving the Congresswoman during that brief interlude. Those shots also zoom in to exclude wider angles that show her being pushed along through the crowd.

In the three months during which the "Storming the Gate" Post has been featured on DHS's *X* account, the video has attracted 1.8 million views, 10,000 likes, 3,000 reposts, and nearly 2,000 comments. The current top comment demands: "Hold her for 2 years with no trial like they did to J6ers!" Although DHS posted the video on May 10, 2025, it remains on the Department's *X* account at the time of this filing.

***The Prejudice.*** The *X* post carries additional obvious indicators of prejudice. The post renders another definitive verdict on Congresswoman McIver's guilt: she "ASSAULT[ED] an ICE agent." *See* L.Cr.R. 101.1(b)(4); 28 C.F.R. § 50.2(b)(6)(vi); *Justice Manual* § 1-7.610(F); N.J. Rules Prof'l Conduct, R. 3.6(4). That statement alone, asserted in the name of the federal agency that investigated the conduct in this case and whose officers would likely be the lead witnesses at a trial, is as prejudicial as such statements come. And it is accompanied by no disclaimer that Congresswoman McIver is presumed innocent or that the Government's charges allegations are just that. *See Justice Manual* § 1-7.500; N.J. Rules Prof'l Conduct, R. 3.6(6).

Worse, this post does not merely address the nature of the evidence: it is an *actual release of video footage* that the Government seems likely to offer at trial. *See* L.Cr.R. 101.1(b)(3); 28 C.F.R. § 50.2(b)(6)(v); *Justice Manual* § 1-7.610(E); N.J. Rules Prof'l Conduct, R. 3.6(3). And the recording is heavily edited, offering replays and slow motion reels for dramatic effect. Yet the

10

post does not disclose how else the video may have been altered. It is also completely devoid of context, showing less than 30 seconds of an hours-long oversight visit and omitting any mention of the Members' statutory authority to inspect the facility, or of ICE's baseless arrest of the Mayor of Newark. Meanwhile, the post has spread to millions of people and solicited thousands of comments from members of the public, who are now proclaiming their prejudgments on the case, and sharing those judgments in ways that will unavoidably influence the perception of potential jurors, witnesses, and Administration officials.

### C. The "Fake News" Post

*The Post.* One week after the Department's *X* post, and just three days before the criminal complaint was filed in this case, DHS issued a "police week" themed post purporting to "set the record straight on misleading news narratives and reporting."[7]

The premise for the "Fake News" Post was a purported "413% increase in assaults" against ICE agents; the release attributed that alleged jump to "[a]ttacks and smears against ICE" from "members of Congress" and others. The post proceeded from that premise to "debunk" six of the narratives responsible for this worrisome trend.

The first target of the "debunking" agenda was the narrative that the "Delaney Hall Storming was 'oversight' by Congressional members." *Id.* In particular, the release states: "At least three members of Congress, Representatives Robert Menendez, Jr., LaMonica McIver and Bonnie Watson Coleman, claimed that breaking into Delaney Hall was 'oversight'—but it is actually trespassing and put ICE officers and detainees at risk." *Id.* "Video footage"—which the release then supplies with a link to the May 10 *X* post described above—"shows McIver assaulting

---

[7] Press Release, DHS, *DHS Debunks Fake News Narratives About Law Enforcement During Police Week* (May 16, 2025), https://perma.cc/9XKE-3K3U.

an ICE officer." The release then reiterates, in a bullet point that links to the original "Break-In" press release, that "Delaney Hall currently confines murderers, rapists, suspected terrorists and gang members." The release also challenges the need for oversight of Delaney Hall (commenting on another ongoing federal case in the process) by claiming that "allegations made by Newark politicians that Delaney Hall does not have the proper permitting are false." The post wraps up its discussion of Delaney Hall by asserting that "[t]here was no need for Congressional members to storm Delaney Hall—they could have just scheduled a tour." The post follows this discussion of Delaney Hall by going on to "debunk" five other instances of purportedly fake news from across the country. The press release was last updated on June 25, 2025, and remains on DHS's website at the time of this filing.

*The Prejudice.* This press release is another direct government statement that Congresswoman McIver is guilty, and another attempted rebuttal of her anticipated defenses. *See* L.Cr.R. 101.1(b)(4); 28 C.F.R. § 50.2(b)(6)(vi); *Justice Manual* § 1-7.610(F); N.J. Rules Prof'l Conduct, R. 3.6(4). The release states without reservation that Congresswoman McIver assaulted an ICE officer, and links to edited video footage that DHS claims proves that assertion. It then anticipates Congresswoman McIver's legislative immunity and other potential defenses by denying that she was conducting "oversight," and countering that she was instead "trespassing and put[ting] ICE officers and detainees at risk." That, of course, is also false. And again, the release fails to mention the Congresswoman's express statutory authority to conduct unannounced oversight inspections, and omits that she is presumed innocent. *See Justice Manual* § 1-7.500; N.J. Rules Prof'l Conduct, R. 3.6(6).

The press release also perpetuates DHS's efforts to denigrate the character of Congresswoman McIver and possible witnesses, accusing her and other Members of contributing

to a 413% increase in assaults on ICE officers through their alleged "[a]ttacks and smears" on agents. And it conjures that exceptionally prejudicial accusation against Congresswoman McIver out of thin air, pretending that there is some legitimate statistical connection behind it. Of course, such a highly inflammatory and baseless statement would never be admissible at trial. *See* L.Cr.R. 101.1(b)(5); 28 C.F.R. § 50.2(b)(3)(iv); *Justice Manual* § 1-7.600; N.J. Rules Prof'l Conduct, R. 3.6(5). The post also doubles down on associating Congresswoman McIver and the other Members with the "murderers, rapists, suspected terrorists and gang members" reportedly detained at Delaney Hall, and goes on to connect the Members with five other purportedly false narratives about ICE activities.

### D.  The "Doxing" Post

*The Post.* On July 14, 2025, one month after the indictment was filed, DHS issued a press release regarding an incident that allegedly took place during an ICE enforcement raid in California.  Inexplicably, the release connects Congresswoman McIver to those unrelated events.[8]

The release sets out to describe an ICE enforcement raid in California that was allegedly met by a "mob of rioters who attacked federal immigration authorities as they executed a criminal search warrant at a marijuana facility." The release accuses a Democratic California congressman of joining the mob and "doxing" an ICE employee, allegedly leading to the employee's being "attacked by rioters and sent to the emergency room." The post includes photographs of the employee's reported injury, and of ICE officers in combat gear responding to the protest. It concludes by listing the criminal records of detainees at the facilities in question, which included rape, kidnapping, child molestation, and other serious crimes.

---

[8] Press Release, DHS, *ICE Employee Attacked by Rioters After Congressman Doxes Him to Mob at California Marijuana Facility* (July 14, 2025), https://perma.cc/3GNL-PWE6.

After providing this inflammatory description of the California incident—with which Congresswoman McIver had no involvement whatsoever—the press release seeks to connect her to the event. The post renews DHS's prior assertions that Congresswoman McIver is contributing to an increase in assaults on ICE agents, now claiming that "ICE agents are facing a 700% increase in assault"—a nearly 300 percentage point increase from the 413% May figure. The release blames that skyrocketing statistic on "radical members of Congress like . . . LaMonica McIver [for] openly encouraging and leading their supporters in assaulting law enforcement." The post claims that the California incident and the events at Delaney Hall were "just . . . case[s] of Democratic lawmakers labeling political stunts as oversight while they endanger the safety of ICE personnel." The post was last updated on July 15 and remains on DHS's website at the time of this filing.

*The Prejudice.* The press release is another direct assertion of Congresswoman McIver's culpability, proclaiming that a federal agency has deemed her guilty of "assaulting law enforcement," and "encouraging and leading" others to do the same. Neither assertion, of course, contains any disclaimer that she is innocent unless proven guilty. *See* L.Cr.R. 101.1(b)(4); 28 C.F.R. § 50.2(b)(6)(vi); *Justice Manual* §§ 1-7.500, 1-7.610(F); N.J. Rules Prof'l Conduct, R. 3.6(4), (6). And this post, too, attacks her defenses, characterizing her inspection as a "political stunt[]" without even a nod to her authority to conduct such oversight. It is also another affront to the Congresswoman's character, accusing her—without any basis—of causing or contributing to the alleged increase in assaults on ICE officers. *See* L.Cr.R. 101.1(b)(1); 28 C.F.R. § 50.2(b)(6)(i); *Justice Manual* § 1-7.610(A); N.J. Rules Prof'l Conduct, R. 3.6(1). And, as in its previous posts, DHS again deploys the tactic of guilt by association, drawing unfounded connections between Congresswoman McIver and an alleged assault on an ICE employee on the other side of the country, as well as with the violent detainees apparently housed in that region. *See* L.Cr.R.

101.1(b)(5); 28 C.F.R. § 50.2(b)(3)(iv); *Justice Manual* § 1-7.600; N.J. Rules Prof'l Conduct, R. 3.6(5).

### E. The "Assaults" Post

***The Post.*** DHS issued a fifth post about the Congresswoman in the form of another press release on July 15, 2025, which repeated yet again the agency's accusations that Congresswoman McIver was driving an increase in assaults on ICE agents.[9]

This latest post focuses even more directly on the phantom statistics surrounding assaults on ICE agents. After reporting the previous day that such assaults had escalated 700% year-over-year, and reporting in May that they were up by 413%, DHS now asserted that assaults on ICE had increased by 830%—an uptick of 130% in 24 hours. And, of course, DHS insists again that Congresswoman McIver and other Democratic lawmakers are to blame. "Mainstream media lies and hysterical political rhetoric are directly contributing to a massive surge in attacks on federal immigration enforcement officers." "In recent weeks, both the media and politicians have escalated their anti-ICE rhetoric. Democratic members of Congress have been caught red-handed doxing and even physically assaulting ICE officials." The post then explicitly ties Congresswoman McIver to this trend: "Earlier this year, Representative LaMonica McIver (D-NJ) trespassed on and stormed the Delaney Hall detention facility, where she proceeded to physically assault an ICE officer. She has been indicted on federal assault charges." Like the May 9 press release, this release also quotes Assistant Secretary McLaughlin, who claims that "crazed rhetoric from gutter politicians [is] inspiring a massive increase in assaults." The release accompanies these allegations with a photo of the bloodied ICE employee's hand from the day before, and a photo of a sign

---

[9] Press Release, DHS, *DHS Announces ICE Law Enforcement are Now Facing an 830 Percent Increase in Assaults* (July 15, 2025), https://perma.cc/7YZP-PGWS.

allegedly left on a Portland ICE agent's lawn that read, "F**k you." The post was last updated on July 15, 2025, and remains on DHS's website at the time of this filing.

***The Prejudice.*** Once again, DHS insists publicly that Congresswoman McIver "stormed" Delaney Hall.  But by mid-July, when DHS issued this press release, the U.S. Attorney's Office had already provided the defense with video recordings confirming that she did no such thing. In addition, for the fifth time in as many posts, DHS declares Congresswoman McIver guilty, concluding that she "trespassed" at Delaney Hall and "proceeded to physically assault an ICE officer." *See* L.Cr.R. 101.1(b)(1); 28 C.F.R. § 50.2(b)(6)(i); *Justice Manual* § 1-7.610(A); N.J. Rules Prof'l Conduct, R. 3.6(1). The post again omits her federal oversight authority, and is equally silent on her presumed innocence. *See Justice Manual* § 1-7.500; N.J. Rules Prof'l Conduct, R. 3.6(6). From there, the post turns to Congresswoman McIver's character, shoring up its judgment of guilt with unfounded personal attacks, reiterating the imaginary claim that Congresswoman McIver is responsible for multiplying the number of assaults against ICE agents. *See* L.Cr.R. 101.1(b)(1); 28 C.F.R. § 50.2(b)(6)(i); *Justice Manual* § 1-7.610(A); N.J. Rules Prof'l Conduct, R. 3.6(1). The post pairs that character attack with a now familiar effort to affiliate Congresswoman McIver with unrelated instances of alleged wrongdoing—in particular, incidents involving ICE employees in California and Oregon, depicted in inflammatory photographs, with which she has no connection at all. *See* L.Cr.R. 101.1(b)(5); 28 C.F.R. § 50.2(b)(3)(iv); *Justice Manual* § 1-7.600; N.J. Rules Prof'l Conduct, R. 3.6(5).

\*     \*     \*

The conduct charged in this case took place at a facility run pursuant to a DHS contract; involved DHS agents who instigated and exacerbated the chaotic events at Delaney Hall; was investigated by DHS agents; and would undoubtedly be tried with several DHS agents as key

witnesses. Yet DHS has published at least five statements over the last three months that imperil Congresswoman McIver's right to a fair trial. In that way, this arm of the prosecution team has wielded its unique position of authority to publicly render its own verdict on Congresswoman McIver's guilt; assail and defame her character and the character of other potential witnesses; advance a manufactured narrative around the evidence upon which the prosecution will rely at trial; and make huge efforts—without any factual basis—to tie the Congresswoman to DHS's "Most Egregious" detainees, to a purported rise in assaults against ICE agents, and to a series of alleged incidents involving ICE around the country with which the Congresswoman has no connection at all. All the while, DHS has omitted any mention of Congresswoman McIver's constitutional and statutory oversight authority, given the back of the hand to the presumption of innocence, and ignored all other context from the Delaney Hall inspection.

## CONCLUSION

The statements DHS has issued in this matter pose a profound risk of prejudicing the public, the jury venire, and the potential witnesses in this case. To mitigate that prejudice, Congresswoman McIver requests an order that the Government (1) remove the posts discussed above from public view, and certify that they have done so; (2) refrain from all similar conduct related to this matter; (3) abide by all applicable rules and regulations, including those of this Court; and (4) produce to Congresswoman McIver every public statement that DHS or any federal employee has made about this matter, regardless whether those statements appeared on official government websites or on other platforms or apps, including, but not limited to, *X*, Facebook, Instagram, or Truth Social.

Dated: August 15, 2025

ARNOLD & PORTER KAYE SCHOLER LLP

By: _____

Paul J. Fishman
Lee M. Cortes, Jr.
One Gateway Center | Suite 1025
Newark, NJ 07102
Telephone: 973-776-1901
Paul.Fishman@arnoldporter.com
Lee.Cortes@arnoldporter.com

*Counsel for Congresswoman LaMonica McIver*