# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Jamel K. Semper |
| | : | |
| v. | : | Crim. No. 25-00388 (JKS) |
| | : | |
| LaMONICA McIVER | : | |

_____

## MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANT'S MOTIONS TO DISMISS, TO COMPEL DISCOVERY AND TO RESTRAIN EXTRAJUDICIAL STATEMENTS

_____

TODD BLANCHE
U.S. Deputy Attorney General

ALINA HABBA
Acting United States Attorney
Special Attorney
970 Broad Street
Newark, New Jersey 07102
(973) 645-2700

On the Brief:

Mark J. McCarren
Benjamin D. Bleiberg
Assistant U.S. Attorneys

## **<u>TABLE OF CONTENTS</u>**

<u>**Page**</u>

TABLE OF AUTHORITIES ................................................................................. iv

PRELIMINARY STATEMENT ........................................................................... 1

FACTUAL BACKGROUND ................................................................................ 1

    A.    The Events at Delaney Hall on May 9, 2025 ........................................... 1

    B.    The Presidential Pardon of the January 6 Defendants ......................... 4

    C.    The Administration's Immigration Policy and  Actions Taken to Protect Law Enforcement Officers ............................................................ 8

The Court Should Deny Defendant's Motion to Dismiss Whether Based on Selective Prosecution, Selective Enforcement or Vindictive Prosecution ....................... 10

I.    This Court Should Deny Defendant's Motion To Dismiss On The Basis Of Alleged Selective Prosecution and Selective Enforcement ............................. 10

    A.    Defendant Bears the Burden of Proving Selective Prosecution and Selective Enforcement by Providing Clear Evidence of Discriminatory Effect and Discriminatory Purpose ......................................................... 10

    B.    Defendant Does Not Identify Similarly Situated Individuals Who Were Not Prosecuted or Investigated for the Same Conduct ......................... 14

        1.    The January 6 Defendants Are Not Similarly Situated Because They Were Pardoned And Could No Longer Be Prosecuted ...... 14

        2.    Regardless, the January 6 Defendants Are Not Similarly Situated and There is No Discriminatory Effect ......................... 17

        3.    The Defendant's Selective Enforcement Allegations Against DHS Fail for Similar Reasons ..................................................... 22

    C.    Defendant Fails to Show "Clear Evidence" of Discriminatory Purpose ............................................................................................. 24

        1.    Defendant's Claim that the U.S. Attorney's Office's Failed to Adhere to DOJ Policy is Meritless. ........................................... 25

2.    None of the Statements Made by the U.S. Attorney Provide Clear Evidence of Discriminatory Purpose ................................ 29

3.    Statements Made by President Trump Provide No Evidence of Discriminatory Intent.................................................. 32

4.    Defendant Offers No Clear Evidence That DHS's Investigation Was Motivated By A Discriminatory Purpose........................... 33

II.    This Court Should Deny Defendant's Motion To Dismiss On The Basis Of Vindictive Prosecution ........................................................ 37

A.    Defendant Bears the Burden of Proving Evidence of Actual Vindictiveness or Sufficient Facts Giving Rise to a Presumption of Vindictiveness........................................................... 38

B.    Defendant Has Fallen Well Short of Meeting Her Initial Burden of Showing Vindictiveness, and In Any Event, the Government Has Proffered Legitimate, Objective Reasons For Charging Her............... 40

III.    This Court Should Deny Defendant's Request For Discovery And An Evidentiary Hearing ..................................................... 44

A.    Defendant Cannot Show That She Is Entitled To Discovery To Support Her Selective Prosecution Claim. ............................................ 45

B.    Defendant Cannot Show That She Is Entitled To Discovery In Support Of Her Selective Enforcement Claim. .................................... 47

C.    Defendant Cannot Show That She is Entitled to Discovery in Support of Her Vindictive Prosecution Claim. ..................................... 48

This Court Should Deny Defendant's Motion to Dismiss on the Basis of Immunity Conferred by the Speech and Debate Clause................................... 50

I.    The Speech or Debate Clause ............................................. 50

II.    Defendant's Actions As Alleged in the Indictment are not Immunized by the Speech or Debate Clause. ....................................... 57

III.    This Court Should Not Invoke *Trump v. United States* to Invent A New Form Of Immunity for Members of Congress Beyond What is Already Afforded Under the Speech or Debate Clause....................................... 63

Defendant's Motion For Additional Discovery Pursuant to Rule 16 ........................ 69

I.    Surveillance and Other Video Requests............................... 69

        a.    Internal Video From Delaney Hall Relating to Defendant's ..... 69

        b.    All Body Worn Camera Footage that was Captured.................. 70

  II.    Defendant's Requests for Written or Digital Communications............ 72

  III.    Defendant is not Entitled to Internal Policies of DHS and ICE Relating to Crowd Escalation or Conducting Arrests......................................... 74

Defendant's Motion to Restrain the Government from Making Extrajudicial Statements Should be Denied as Moot ........................................... 69

CONCLUSION..................................................................................... 80

# <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**                                                                                                 **<u>Page(s)</u>**

*Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Platkin*,
   742 F. Supp. 3d 421 (D.N.J. 2024) ......................................................................... 22

*Blackledge v. Perry*,
   417 U.S. 21 (1974) ............................................................................................ 38, 39

*Bordenkircher v. Hayes*,
   434 U.S. 357 (1978) .......................................................................................... 10, 38

*Brady v. Maryland*,
   373 U.S. 83 (1963) ...................................................................................... 72, 73, 74

*Clinton v. Jones*,
   520 U.S. 681 ............................................................................................................. 67

*Eastland v. U.S. Servicemen's Fund*,
   421 U.S. 491 (1975) ................................................................................................. 65

*Frederick Douglass Found., Inc. v. District of Columbia*,
   82 F.4th 1122 (D.C. Cir. 2023) ............................................................................... 13

*Gov't of the V.I. v. Lee*,
   775 F.2d 514 (3d Cir. 1985) ............................................................................. passim

*Gravel v. United States*,
   408 U.S. 606 (1972) ...................................................................................... 50, 51, 55

*Groppi v. Leslie*,
   436 F.3d 331 (7th Cir. 1971) ................................................................................... 60

*Harvard v. Cesnalis*,
   973 F.3d 190 (3d Cir. 2020) .............................................................................. 12, 18

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ................................................................................................. 11

*Kilbourn v. Thompson*,
   103 U.S. 168 (1880) .......................................................................................... 65, 66

*Nixon v. Fitzgerald*,
   457 U.S. 731 (1982) ...................................................................................... 64, 66, 67, 68

*Nordlinger v. Hahn,*
    505 U.S. 1 (1992) ............................................................................ 12, 18

*Trump v. Mazars USA, LLP*
    591 U.S. 848 (2020) ................................................................................ 67

*Trump v. United States,*
    603 U.S. 593 (2024) ...................................................................... passim

*United States v. Armstrong,*
    517 U.S. 456 (1996) ....................................................................... passim

*United States v. Banuelos,*
    763 F. Supp. 3d 1 (D.D.C. 2025) ............................................................. 17

*United States v. Bass,*
    536 U.S. 862 (2002) .............................................................. 24, 47, 48

*United States v. Batchelder,*
    442 U.S. 114 (1979) ................................................................................ 10

*United States v. Biaggi,*
    853 F.2d 89 (2d Cir. 1988) .................................................................... 51

*United States v. Biden,*
    729 F. Supp. 3d 410 (D. Del. 2024) .................................... 12, 38, 48, 49

*United States v. Brewster,*
    408 U.S. 501 (1972) ........................................................................ passim

*United States v. Brown,*
    740 F.3d 145 (3d Cir. 2014) ................................................................. 22

*United States v. Bucci,*
    582 F.3d 108 (1st Cir. 2009) ................................................................. 49

*United States v. Campbell,*
    410 F.3d 456 (8th Cir. 2005) ................................................................ 39

*United States v. Caro,*
    597 F.3d 608 (4th Cir. 2010) ................................................................ 76

*United States v. Chemical Foundation, Inc.,*
    272 U.S. 1 (1926) ........................................................................... 10, 45

v

*United States v. Cotton,*
    535 U.S. 625 (2002) ........................................................................... 73

*United States v. Esposito,*
    968 F.2d 300 (3d Cir. 1992)..................................................... 38, 39, 42

*United States v. Flynn,*
    507 F. Supp. 3d 116 (D.D.C. 2020) ..................................................... 15

*United States v. Foster,*
    No. 24-1538, 2025 WL 985387 (3d Cir. Apr. 2, 2025) ........................... 47

*United States v. Giusini,*
    No. CR 24-318 (BAH), 2025 WL 275683 (D.D.C. Jan. 23, 2025)............ 17

*United States v. Goodwin,*
    457 U.S. 368 (1982) .............................................. 10, 38, 39, 40

*United States v. Haggerty,*
    528 F. Supp. 1286 (D. Colo. 1981) ..................................................... 26

*United States v. Hedaithy,*
    392 F.3d 580 (3d Cir. 2004)..................................................... 12, 15, 45

*United States v. James,*
    888 F.3d 42 (3d Cir. 2018)................................................... passim

*United States v. Judd,*
    579 F. Supp. 3d 1 (D.D.C. 2021) ................................................... 20, 21

*United States v. Koh,*
    199 F.3d 632 (2d Cir. 1996)..................................................... 40

*United States v. Lewis,*
    517 F.3d 20 (1st Cir. 2008)................................................. 12, 25

*United States v. Lloyd,*
    992 F.2d 348 (D.C. Cir. 1993) ..................................................... 76

*United States v. Maniktala,*
    934 F.2d 25 (2d Cir. 1991)..................................................... 76

*United States v. McDade,*
    28 F.3d 283 (3d Cir. 1994)..................................................... 52

*United States v. Menendez,*
   720 F. Supp. 3d 301 (S.D.N.Y. 2024) ......................................................... 51, 54, 55

*United States v. Menendez,*
   831 F.3d 155 (3d Cir. 2016) ............................................................................... passim

*United States v. Nixon,*
   418 U.S. 683 (1974) ...................................................................................................... 10

*United States v. Oliver,*
   787 F.2d 124 (3d Cir. 1986) ...................................................................................... 38

*United States v. Paramo,*
   998 F.2d 1212 (3d Cir. 1993) ........................................................................... 38, 39, 44

*United States v. Perez-Otero,*
   No. CR 21-474 (ADC), 2023 WL 2351900 (D.P.R. Mar. 3, 2023) ........................... 59

*United States v. Ramirez,*
   233 F.3d 318 (2000) ...................................................................................................... 73

*United States v. Renzi,*
   651 F.3d 1012 (9th Cir. 2011) ..................................................................................... 55

*United States v. Rhodes,*
   Crim. No. 22-cr-15 (APM), 2022 WL 3042200 (D.D.C. Aug. 2, 2022) ................... 19

*United States v. Ross,*
   511 F.2d 757 (5th Cir. 1975) ...................................................................................... 76

*United States v. Sanders,*
   211 F.3d 711 (2d Cir. 2000) .................................................................................. 38, 49

*United States v. Schoolcraft,*
   879 F.2d 64 (3d Cir. 1989) .................................................................................... 12, 38

*United States v. Taylor,*
   686 F.3d 182 (3d Cir. 2012) .................................................................................. 12, 13

*United States v. Texas,*
   599 U.S. 670 (2023) ...................................................................................................... 11

*United States v. Torquato,*
   602 F.2d 564 (3d Cir. 1979) ...................................................................................... 13

vii

*United States v. Urena,*
   989 F.Supp.2d 253 (S.D.N.Y. 2013) ........................................................ 76

*United States v. Warnagiris,*
   Crim. No. 21-0382 (PLF), 2025 WL 341990 (D.D.C. Jan. 30, 2025)...................... 17

*United States v. Washington,*
   869 F.3d 193 (3d Cir. 2017)........................................................... passim

*United States v. Washington,*
   Crim. No. 13-171-2, 2021 WL 120958 (E.D. Pa. Jan. 13, 2021) ........................... 13

*United States v. Wilson,*
   262 F.3d 305 (4th Cir. 2001) ................................................................ 49

*United States v. Young,*
   No. 23-CR-241 (GMH) 2024 WL 3030656 (D.D.C. June 17, 2024)...................... 19

*Wayte v. United States,*
   470 U.S. 598 (1985) ................................................................... passim

*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952) ........................................................................ 64

## State Cases

*Coffin v. Coffin,*
   4 Mass. 1 (1808).......................................................................... 65, 73

## Federal Statutes

18 U.S.C. § 13.................................................................................. 4

18 U.S.C. § 111............................................................................. passim

## State Statutes

N.J.S.A. 2C:18-3................................................................................ 4

## Federal Rules

Fed. R. Civ. P. 8(a) ........................................................................... 13

Fed. R. Civ. P. 16 ......................................................................... passim

Fed. R. Evid. 401(b) ................................................................................... 59

## **Other Authorities**

Granting Pardons and Commutation of Sentences for Certain Offenses Relating to
the Events at or Near the United States Capitol on January 6, 2021,
Proclamation No. 10887, 90 Fed. Reg. 8331 (Jan. 29, 2025) ................................... 5

Ending the Weaponization of the Federal Government,
Exec. Order No. 14147, 90 Fed. Reg. 8235 (Jan. 29, 2025),..................................... 6

Protecting the American People Against Invasion,
Exec. Order No. 14159, 90 Fed. Reg. 8443 (Jan. 29, 2025),..................................... 8

George Anastaplo, *Abraham Lincoln, Lawyers, and the Civil War: Bicentennial
Explorations,*" 35 Okla. City L.Rev. 1 (Spring 2010) ............................................. 60

*Charles W. Johnson IV, Comment The Doctrine of Official Immunity: An
Unnecessary Intrusion into Speech or Debate Clause Jurisprudence,*
43 Cath. U. L. Rev. 535 (1994)................................................................................. 68

ix

## PRELIMINARY STATEMENT

On June 10, 2025, a grand jury sitting in Newark, New Jersey returned a three-count indictment against Representative LaMonica McIver ("Defendant" or "McIver"), charging her with three counts of assaulting, resisting, opposing, impeding intimidating and interfering with a federal officer, in violation 18 U.S.C. § 111(a)(1).  On August 15, 2025, Defendant filed four separate pretrial motions seeking to (1) dismiss the indictment on the basis of selective prosecution, selective enforcement and vindictive prosecution; (2) dismiss the indictment on the basis that she is immune from prosecution pursuant to the Speech or Debate Clause of Article I of the United States Constitution; (3) have the Court order additional enumerated discovery pursuant to Federal Rule of Criminal Procedure 16; and (4) restrain the Government's extrajudicial statements.  *See* ECF Nos. 19-22. For the reasons that follows, Defendant's motions should be denied.[1]

## FACTUAL BACKGROUND

### A.    The Events at Delaney Hall on May 9, 2025

On May 9, 2025, Defendant arrived at the Delaney Hall Immigration Detention Facility in Newark, New Jersey, to conduct an unscheduled inspection tour of the facility in conjunction with her Congressional oversight responsibilities. *See* Indictment, *United States v. McIver*, Crim. No. 25-388 (JKS) (hereinafter "*Ind.*"), at ¶ 2.  Accompanied by her Congressional colleagues, Representatives Bonnie Watson Coleman and Robert Menendez, Jr. (collectively, the "Representatives" or the "Congressional Delegation"),

---

[1] Defendant has consented that the Government's response to her four motions may be consolidated into one responsive brief up to and including the total number of pages contained in the four briefs she filed in support of her various motions.

she soon thereafter entered through the front gate into the secured area of the facility. The three Representatives proceeded to a waiting room area located further into the Delaney Hall's grounds where they waited for their inspection to begin while speaking with some of Delaney Hall's officials.  *See Ind.*, at ¶¶ 4-5.

A short time later, the Mayor of Newark ("Mayor"), who was not a member of the Congressional Delegation and who was not authorized to conduct an unscheduled inspection tour of the facility, arrived outside the Delaney Hall gate along with an aide and two members of his security detail.  After initially being informed that he was not authorized to enter the facility, the Mayor and his entourage were allowed just within the interior of the gate by the facility's security guard who was concerned that the gathering protestors outside of the fence might rush the gate at some point and create a safety issue. *See Ind.*, at ¶¶ 5-6.

After the Mayor had waited inside of the gate in the secured area of the facility for a considerable period of time, the Special Agent in Charge ("SAC") of Immigration and Customs Enforcement ("ICE") in New Jersey, who had traveled to Delaney Hall upon learning of the arrival of the various officials at the location, approached the Mayor along with a substantial number of ICE officers and agents.  The three Representatives, including the Defendant, left the waiting area of the facility and walked to the vicinity of the discussion that had begun between the ICE SAC and the Mayor just inside the Delaney Hall gate. *See Ind.*, at ¶ 9.

During the ensuing conversation, the SAC informed the Mayor that he, unlike the three Members of Congress, was not authorized to be on the Delaney Hall grounds.  The

Mayor was warned that if he did not leave, he would be arrested. *Id.* The Mayor did not comply with the instructions to leave. After a tense conversation involving several of the ICE officials as well as the Mayor and the Representatives, the SAC indicated that he was going to arrest the Mayor. The Defendant yelled "Hell, no! Hello No!" *See id.* at ¶ 10. Thereafter, the Defendant and the other two Representatives surrounded the Mayor and prevented federal officials from placing the Mayor in handcuffs. *Id.* at 11. Shortly after this effort to impede the Mayor's arrest, the Mayor, escorted by one of the Representatives, left through the Delaney Hall gate which had been opened to allow his departure. *See id.* The Mayor then stood in the parking lot area just outside the gate amongst dozens of protestors and his security detail. The three Representatives remained in the secured area of the facility. *See id.*

The SAC then gathered more than a dozen of the ICE officers and agents and announced that after consulting with the Deputy Attorney General, the group would be proceeding out the gate to effect the arrest of the Mayor. The officers were instructed to switch on their body worn cameras before exiting through the gate. The SAC along with more than a dozen agents and officers then walked through the Delaney Hall gate into the parking lot in the unsecured area beyond the gate. After they did so, the three Representatives, including Defendant, slipped through the gate out into the parking lot. *See id.* at ¶ 12. As this was occurring, an unidentified male yelled out "[c]ircle the Mayor," apparently encouraging the numerous protestors and others to attempt to prevent the ICE officers and agents from arresting the Mayor. *See id.* Among those heeding this cry was Defendant, who quickly attempted to place her arms around the

Mayor while the SAC and other federal law enforcement officers attempted to handcuff him. *Id.* Despite Defendant's now second effort to impede the Mayor's arrest, and during the ensuing chaos, agents were able to place the handcuffs around at least one of the Mayor's wrists and started leading the Mayor back toward the gate in an effort to bring him inside the secured area of Delaney Hall, away from the dozens of protestors just outside the gate. During this time, Defendant barreled after the Mayor and the SAC, making forcible contact with the SAC and one other ICE officer before she reentered through the gate. *See id.* at ¶¶ 12-13.

After the situation had calmed down and the gate had been re-closed, the Mayor was taken back into the facility to complete the arrest process. A short while later, the three Representatives, including McIver, were provided a guided tour of the Delaney Hall facility as they had requested.

That same day, a federal Complaint was filed against the Mayor, charging him with trespassing in violation of 18 U.S.C. ¶ 13, and N.J.S.A. 2C:18-3. Thereafter, on May 21, 2025, the charges against the Mayor were dismissed.

On May 19, 2025, a federal Complaint was filed against McIver, charging her with three counts of assaulting, resisting, impeding, and interfering with a federal officer, in violation 18 U.S.C. § 111(a)(1). On or about June 10, 2025, a federal Grand Jury returned an Indictment containing the same three charges.

On or about August 15, 2025, McIver filed the instant motions.

**B.    The Presidential Pardon of the January 6 Defendants**

According to McIver, "[o]n January 6, 2021, thousands of President Trump's supporters descended on the Capitol," with a singular purpose: "to prevent Congress

4

from certifying the results of the 2020 presidential election." *See* ECF 20-1, at 4.[2] In the four years that followed, over 1,500 of those individuals were federally charged and prosecuted for criminal acts they had taken at or near the United States Capitol that day (the "January 6 Defendants"), including many who assaulted law enforcement officers, and were charged under 18 U.S.C. § 111(a).[3]

On January 20, 2025, President Trump issued a Proclamation granting a blanket pardon or commutation of sentences "for certain offenses relating to the events at or near the United States Capitol on January 6, 2021" (the "Pardon").[4]  According to President Trump, "[t]his proclamation ends a grave national injustice that has been perpetrated upon the American people over the last four years and begins a process of national reconciliation." *Id.*  In an executive order issued the same day (the "Weaponization Executive Order"), President Trump asserted that "the Department of Justice has ruthlessly prosecuted more than 1,500 individuals associated with January 6, and simultaneously dropped nearly all cases against BLM [Black Lives Matter] rioters," as

---

[2] The citations set forth in this responsive brief correspond to the ECF number assigned to Defendant's respective motion's briefs followed by the page number at the bottom of the page of that brief.

[3] Press Release, U.S. Department of Justice, Attorney General Merrick B. Garland Statement on the Fourth Anniversary of the January 6 Attack on the Capitol (Jan. 6, 2025),        https://www.justice.gov/archives/opa/pr/attorney-general-merrick-b-garland-statement-fourth-anniversary-january-6-attack-capitol; ECF 20-1, at 4-5.

[4] Granting Pardons and Commutation of Sentences for Certain Offenses Relating to the Events at or Near the United States Capitol on January 6, 2021, Proclamation No. 10887,    90    Fed.    Reg.    8331    (Jan.    29,    2025),    *available    at* https://www.govinfo.gov/content/pkg/FR-2025-01-29/pdf/2025-01950.pdf.

an example of "weaponization of prosecutorial power" under the prior administration that the administration aimed to address.[5]

In addition to including almost all the January 6 Defendants who were convicted and sentenced, President Trump, "[a]cting pursuant to the grant of authority in Article II, Section 2, of the Constitution of the United States," also broadly pardoned all defendants associated with January 6 who were charged and awaiting trial or sentencing, and directed the Attorney General to dismiss any pending indictments. *See* Pardon; *see also* ECF 20-1, at 19 n.30 (citing NPR article stating "Nearly every defendant, including those who assaulted police and conspired to plan the attack, received a pardon. In 14 cases, Trump granted the defendants a commutation, ending their prison sentence, but leaving the felony on their records."). Because the Pardon did not give the Department of Justice ("DOJ") any discretion to continue prosecuting any of the still-pending cases for the pardoned January 6 Defendants, prosecutors immediately began filing motions to dismiss the remaining cases, including the six exemplar January 6 cases McIver cites in her brief. *See* ECF 20-1, at 5, 18.[6]

Upon receiving this Pardon, a January 6 Defendant could subsequently request a certificate of pardon from U.S. Department of Justice's Office of the Pardon Attorney, by

---

[5] *See* Ending the Weaponization of the Federal Government, Exec. Order No. 14147, 90 Fed. Reg. 8235 (Jan. 29, 2025), *available at* https://www.govinfo.gov/content/pkg/FR-2025-01-28/pdf/2025-01900.pdf.

[6] Citing *United States v. Warnagiris*, No. 21-CR-0382 (D.D.C.); *United States v. Ball*, No. 23-CR-160 (D.D.C.); *United States v. Boughner*, No. 22-CR-20 (D.D.C.); *United States v. Lang*, No. 21-CR-53 (D.D.C.); *United States v. Amos*, No. 24-CR-00395 (D.D.C.); and *United States v. Adams*, No. 24-MJ-337 (D.D.C.)

clicking on a link on the Office's website that reads "Request a Certificate of Pardon Relating to the Events on January 6, 2021."[7]  The website states that "On January 20, 2025, President Trump granted clemency for certain offenses relating to the events at or near the United States Capitol on January 6, 2021. As directed by the President's clemency proclamation, the Office of the Pardon Attorney is ready to issue certificates of pardon to the people covered by the clemency proclamation."[8] To request a certificate of pardon, January 6 Defendants were required to email the Office of the Pardon Attorney their name, prison register number if they had one, and district court case number, with the phrase "January 20, 2025 Pardon Certificate" in the subject line. No distinction was made between requests for defendants with pending cases and final convictions. *See id.*

A list of individuals who requested and were issued a certificate of pardon is maintained by the Office of the Pardon Attorney and is publicly available.[9]  Included on the list are two of the six exemplar January 6 Defendants whose cases were still pending when they were pardoned. *See* Gov. Ex. A. An additional 24 January 6 Defendants whose cases were still pending when they were pardoned also requested and received certificates of pardon. *See* Gov. Ex. B.[10]

---

[7] *See* Office of the Pardon Attorney, www.justice.gov/pardon.

[8]    www.justice.gov/pardon/president-trumps-proclamation-granting-pardons-and-commutations-sentences-certain-offenses.

[9] Freedom of Information Act (FOIA) release - pardon certificate recipients, https://www.justice.gov/pardon/freedom-information-act-foia-release-pardon-certificate-recipients.

[10] On September 2, 2025, the undersigned Assistant U.S. Attorneys spoke with the Deputy Pardon Attorney from the Office of the Pardon Attorney who confirmed that: (i) the January 6 Defendants with then-pending cases received pardons under the

### C.    The Administration's Immigration Policy and Actions Taken to Protect Law Enforcement Officers

On January 20 and 21, 2025, President Trump additionally announced a shift in administration priorities concerning immigration enforcement, issuing several executive orders addressing the administration's new immigration policies.    Among those executive orders was the "Executive Order Protecting the American People Against Invasion" (the "Immigration Executive Order"),[11] which provides the following directive to the Attorney General and Secretary of Homeland Security:

> Sec. 5. Criminal Enforcement Priorities. The Attorney General, in coordination with the Secretary of State and the Secretary of Homeland Security, shall take all appropriate action to prioritize the prosecution of criminal offenses ***related to*** the unauthorized entry or continued unauthorized presence of aliens in the United States.

*Id.* (emphasis added).  The Immigration Executive Order's directive to prioritize criminal offenses ***related to*** immigration enforcement is broad, and nothing in the directive limits the DOJ or the Department of Homeland Security ("DHS") to prioritizing merely substantive unauthorized entry or continued unauthorized presence cases.

Since then, and as reflected in the multiple press releases and articles referenced by McIver, assaults and threats against DHS officers have increased exponentially.[12]

---

Pardon and were eligible to receive certificates of pardon, and (ii) that any January 6 Defendant was still considered pardoned even if a certificate of pardon was not requested.  Additionally, the Deputy Pardon Attorney provided examples of certificates of pardon issued for January 6 Defendants with previously pending cases who requested a certificate.

[11] *See* Protecting the American People Against Invasion, Exec. Order No. 14159, 90 Fed. Reg. 8443 (Jan. 29, 2025), *available at* https://www.govinfo.gov/content/pkg/FR-2025-01-29/pdf/2025-02006.pdf.

[12] *See*, *e.g.*, ECF 20-1, at 13 n.23 (article quoting DHS official that ICE law enforcement officers faced a 413 percent increase in assaults against them at the time), n.25 (DHS

According to DHS, ICE officials faced an 830 percent increase in assaults between January 21 and July 14, 2025, compared with the same period in 2024.[13] Seemingly recognizing the dangers that DHS officers have been uniquely facing, McIver "introduce[ed], as her first bill in Congress, the DHS Better Ballistic Body Armor Act, which would increase the availability of protective body armor designed to fit the bodies of female agents." ECF 20-1, at 8. DHS also introduced a new policy for the protection of law enforcement officers requiring notice for a visit to its facilities, noting that the policy was "made in response to 'a surge in assaults, disruptions and obstructions to enforcement, including by politicians themselves.'"[14] In response to the DHS policy, on July 30, 2025, 12 Members of Congress filed a civil Complaint against ICE objecting to the new policy and seeking injunctive relieve.[15] McIver, who was at Delaney Hall to

---

press release claiming "[a]ttacks and smears against ICE have resulted in officers facing a 413% increase in assaults"), n.26 (DHS press release discussing alleged disclosure of an ICE agent's information by Democratic Congressman Salud Carbajal, and a subsequent alleged assault on that agent during an enforcement action); *see also* n.23 (article discussing incident involving Senator Alex Padilla where U.S. Secret Service purportedly "thought he was an attacker'" during a DHS press conference).

[13] *Id.* at 13 n.27 (Press Release, Department of Homeland Security, DHS Announces ICE Law Enforcement are Now Facing an 830 Percent Increase in Assaults (July 15, 2025) (emphasis omitted), *available at* https://www.dhs.gov/news/2025/07/15/dhs-announces-ice-law-enforcement-are-now-facing-830-percent-increase-assaults).

[14] Michael Gold, *ICE Imposes New Rules on Congressional Visits*, N.Y. Times (June 19, 2025), www.nytimes.com/2025/06/19/us/politics/ice-congress.html; ECF 20-1, at 14 n.28; *see also* Homeland Security (@DHSgov), X (July 11, 2025, at 6:28 PM) (posting on X that "sufficient notice to facilitate a visit . . . is essential to keep staff and detainees safe"), https://x.com/dhsgov/status/1943799482342109463?s=46&t=-VXhB76r-zYF5B-uEUXYkQ.

[15] Complaint, *Neguse v. U.S. Immigration and Customs Enforcement*, 25-CV-02463, ECF. No 1 at 64 (D.D.C. July 30, 2025).

conduct oversight, is neither a named plaintiff nor mentioned in the Complaint.

## The Court Should Deny Defendant's Motion to Dismiss Whether Based on Selective Prosecution, Selective Enforcement or Vindictive Prosecution

**I.     This Court Should Deny McIver's Motion To Dismiss On The Basis Of Alleged Selective Prosecution and Selective Enforcement.**

McIver moves to dismiss the Indictment and seeks broad discovery on the grounds of "selective prosecution" and "selective enforcement." ECF No. 20-1, at 14-30. But her claims ignore the controlling law, overlook inconvenient statements and facts, and fall well short of the minimum evidence required for asserting a *prima facie* case.  This Court, therefore, should deny the motion.

**A.     Defendant Bears the Burden of Proving Selective Prosecution and Selective Enforcement by Providing Clear Evidence of Discriminatory Effect and Discriminatory Purpose**

The Executive Branch, led by the President, is vested with the exclusive authority to prosecute cases. *See United States v. Nixon*, 418 U.S. 683, 693 (1974). "In our criminal justice system, the Government retains 'broad discretion' as to whom to prosecute." *Wayte v. United States*, 470 U.S. 598, 607 (1985) (quoting *United States v. Goodwin*, 457 U.S. 368, 380 n.11 (1982)). So long as probable cause exists, whether or not to prosecute or to present charges to a grand jury is generally committed entirely to the prosecutor's discretion. *See Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978). Prosecutorial decisions are entitled to "[t]he presumption of regularity." *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14-15 (1926).

No doubt, each charging decision must be consistent with and not run afoul of the rights and protections afforded by the Constitution. *See United States v. Batchelder*, 442

10

U.S. 114, 125 (1979) ("Selectivity in the enforcement of criminal laws is, of course, subject to constitutional constraints."). A selective prosecution claim is founded on equal protection principles and constitutes "an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *United States v. Armstrong*, 517 U.S. 456, 463 (1996). But because "[a] selective prosecution claim asks a court to exercise judicial power over a "special province" of the Executive, *id.* (quoting *Heckler v. Chaney*, 470 U.S. 821, 832 (1985)), it faces a daunting legal standard.

To prevent judicial meddling in Executive Branch charging decisions, the Supreme Court set a high burden for selective prosecution claims:

> In order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present clear evidence to the contrary. We explained in *Wayte* why courts are properly hesitant to Examine the decision whether to prosecute. Judicial deference to the decisions of these executive officers rests in part on an assessment of the relative competence of prosecutors and courts. Such actors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake.

*Armstrong*, 517 U.S. at 465 (cleaned up). Precisely because "courts generally lack meaningful standards for assessing the propriety of enforcement choices," they have recognized that "the Executive Branch must prioritize its enforcement efforts [because it] must constantly react and adjust to the ever-shifting public-safety and public-welfare needs of the American people." *United States v. Texas*, 599 U.S. 670, 679-80 (2023).

A defendant asserting a selective prosecution claim bears the burden of proof and must demonstrate with "clear ***evidence***" that the prosecution "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Armstrong*, 517 U.S. at

465 (emphasis added) (quoting *Wayte*, 470 U.S. at 608.)  This "standard is a demanding one." *Id.* at 463.  *First*, to establish "discriminatory effect," the "defendant must provide evidence that similarly situated individuals have not been prosecuted." *Id.* at 465; *United States v. Taylor*, 686 F.3d 182, 197 (3d Cir. 2012) (citing *United States v. Schoolcraft*, 879 F.2d 64, 68 (3d Cir. 1989)).  A similarly situated individual is someone "outside the protected class who has committed roughly the same crime under roughly the same circumstances but against whom the law has not been enforced." *United States v. Lewis*, 517 F.3d 20, 27 (1st Cir. 2008) (citing *Armstrong*, 517 U.S. at 469); *United States v. Biden*, 729 F. Supp. 3d 410, 419 (D. Del. 2024) (same); *see United States v. Washington*, 869 F.3d 193, 214 (3d Cir. 2017) ("Meeting this standard generally requires evidence that similarly situated individuals of a difference [sic] race or classification were not prosecuted, arrested, or otherwise investigated.").

Two classes are considered similarly situated "when they are alike 'in all relevant respects.'" *See Harvard v. Cesnalis*, 973 F.3d 190, 205 (3d Cir. 2020) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)).  Critically, the evidence must identity similarly situated individuals who "**could have been prosecuted** for the offenses for which [the defendant was] charged, **but were not prosecuted**." *United States v. Hedaithy*, 392 F.3d 580, 607 (3d Cir. 2004) (emphasis added) (quoting *Armstrong*, 517 U.S. at 470).  That's because "selective prosecution implies that a selection has taken place." *Armstrong*, 517 U.S. at 469 (cleaned up).

*Second*, to establish "discriminatory purpose," the defendant must provide evidence that "the decision to prosecute was made on the basis of an unjustifiable

12

standard, such as race, religion, or some other arbitrary factor." *Taylor*, 686 F.3d at 197 (citation omitted). Specifically, the evidence must show that when acting with discriminatory purpose or intent, the government was acting "at least in part because of, not merely in spite of," the defendant's protected characteristic. *See Wayte*, 470 U.S. at 610 (citation and internal quotations omitted).[16]

Selective prosecution and selective enforcement claims "are generally evaluated under the same two-part test." *Washington*, 869 F.3d at 214. The Third Circuit has observed that while "selective prosecution" and "selective enforcement" have been used interchangeably, it distinguishes between the claims by noting that "'[p]rosecution' refers to the actions of prosecutors (in their capacity as prosecutors) and 'enforcement' to the actions of law enforcement and those affiliated with law-enforcement personnel." *See id.*; *see also United States v. Washington*, Crim. No. 13-171-2, 2021 WL 120958, at *8 (E.D. Pa. Jan. 13, 2021) (noting on remand that the Third Circuit "found it important to separate the terms from one another").

---

[16] McIver invokes *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122 (D.C. Cir. 2023), a civil case that was subject to "short and plain statement" pleading standard in Fed. R. Civ. P. 8(a) and that did not require proof of discriminatory intent for a selective prosecution claim alleging First Amendment-based discrimination. ECF 20-1, at 14-16. Neither the Third Circuit not or any District Court sitting in the Third Circuit has adopted this standard in a criminal case. Even the Third Circuit case McIver cites for the proposition that "membership in a political party is protected by the First Amendment, and the mere exercise of that right cannot be punished by means of selective prosecution" – the pre-*Armstrong*-case *United States v. Torquato*, 602 F.2d 564, 569 n.9 (3d Cir. 1979) – plainly held that "an element of intentional or purposeful discrimination" must be shown, *id.* at 568, and further rejected the selective prosecution argument based on political party membership. This Court must follow *Armstrong*, not *Frederick Douglass Found., Inc.*

### B. Defendant Does Not Identify Similarly Situated Individuals Who Were Not Prosecuted or Investigated for the Same Conduct

McIver's selective prosecution and enforcement claims flunk the exacting "clear evidence" standard articulated in *Armstrong*. First, McIver cannot show discriminatory effect because she does not identify any similarly situated individuals who could have been prosecuted but were not. Relatedly, she does not provide clear evidence that she was the subject of law enforcement action while similarly situated individuals were not. Second, she fails to provide clear evidence that the purpose of prosecuting or investigating her was based on an unjustifiable standard.

### 1. The January 6 Defendants Are Not Similarly Situated Because They Were Pardoned And Could No Longer Be Prosecuted

McIver defines her protected class as a "Democrat who conducts oversight of Executive Branch immigration policy." ECF 20-1, at 4. A legally viable selective prosecution claim would identify one or more Republicans who conduct oversight of Executive Branch immigration policy. Unable to find a proper comparator, McIver instead claims she was selectively prosecuted under 18 U.S.C. § 111(a) while alleged similarly situated individuals – namely, the January 6 Defendants (apparently regardless of their political affiliation and not conducting oversight of Executive Branch immigration policy) with pending § 111(a) charges, but whose cases were dismissed after the Pardon was issued – were not. *Id*. at 17.

McIver's claim faces a threshold, insurmountable defect: the January 6 Defendants cannot be considered similarly situated because they all were pardoned. As a consequence, their ongoing prosecutions had to be dismissed without regard to the

14

exercise of prosecutorial discretion, and they could not be prosecuted for January 6th related crimes thereafter. Because a similarly situated individual is someone that "could have been prosecuted for the offenses for which [the defendant was] charged, but were not prosecuted," and the January 6 Defendants on their face do not meet those basic criteria, McIver's motion must fail. *See Hedaithy*, 392 F.3d at 607 (quoting *Armstrong*, 517 U.S. at 470); *see also Armstrong*, 517 U.S. at 469.

Ironically, McIver asserts that her selective prosecution claim "does not rely on defendants who received pardons or commutations and thus does not implicate any issues associated with the President's constitutional authority to 'grant Reprieves and Pardons for Offences against the United States.' U.S. Const. art. II, § 2, cl. 1." *See* Def. Mot. 6 n.12. McIver's desire to excise those who received pardons from the class of similarly situated defendants upon which her motion relies is understandable. Clearly, those who had been prosecuted but subsequently pardoned cannot in any meaningful way be said to be similarly situated to the Defendant. After all, the President's power to pardon is absolute and may not be challenged or constrained other than in the most limited circumstances. *See United States v. Flynn*, 507 F. Supp. 3d 116, 135-36 (D.D.C. 2020) (collecting and reviewing cases on the scope of presidential pardons).

Yet, despite claiming that her motion does not rely on January 6 Defendants who received a pardon, McIver's motion does exactly that whether she realizes it or not. In fact, McIver's entire argument fundamentally misunderstands President Trump's January 20, 2025 Pardon. As discussed above in Background, Sec. B, *supra,* at 4-7, with the exception of the approximately fourteen January 6 Defendants who received

clemency, President Trump's Pardon applied equally to *all* January 6 Defendants under the President's pardon authority in Article II, Section 2, of the Constitution.  The Office of the Pardon Attorney further confirmed that the January 6 Defendants whose cases were pending as of the issuance date of the Pardon are included in the universe of defendants who received pardons as a result, and the Pardon Office has issued certificates of pardon to those defendants upon request. *Id.* at 7; *see also* ECF 20-1, at 19 n.30 (citing NPR article providing granular analysis of the January 6 Defendant cases and dismissals, stating that "[n]early every defendant, including those who assaulted police and conspired to plan the attack, received a pardon.").  Moreover, logic dictates that every January 6 Defendant was pardoned – not just those whose convictions were final – when one considers the Pardon's title ("Granting Pardons and Commutation of Sentences for Certain Offenses Relating to the Events at or Near the United Stats Capitol on January 6, 2021"), its stated rationale, and Constitutional basis.  To believe otherwise would mean that the Pardon was designed to provide no benefit for defendants whose prosecutions had taken longer to proceed through the justice system, which runs contrary to its stated rationale.

Consequently, after the Pardon was issued, courts hearing the pending January 6 cases granted, in some cases reluctantly, requests to dismiss the remaining cases based on the defendants' pardons.  For example, one such court stated:

> The Government's only stated reason for pursuing dismissal with prejudice is that ***the President, in addition to pardoning the Defendant, has ordered the Attorney General to do so***. . . . Indeed, while ***a pardon*** exercises the Executive's "exclusive authority and absolute discretion to decide whether to prosecute a case," it "does not necessarily render 'innocent' a defendant of any alleged violation of the law[.]"

More broadly, no **_pardon_** can change the tragic truth of what happened on January 6, 2021.

*United States v. Banuelos*, 763 F. Supp. 3d 1, 1–2 (D.D.C. 2025) (cleaned up) (dismissing case without prejudice) (emphasis added). Similarly, in one of the exemplar January 6 cases McIver cites, the district court acknowledged that the defendant received a pardon and reluctantly dismissed the indictment without prejudice. *See United States v. Warnagiris*, Crim. No. 21-0382 (PLF), 2025 WL 341990, at *4–5 (D.D.C. Jan. 30, 2025) ("On January 20, 2025, President Trump issued a sweeping proclamation **_pardoning individuals charged for their conduct_** at the Capitol on January 6, 2021.") (emphasis added) (cited at ECF 20-1, at 21).[17] The defendant in *Warnagiris* requested and received a certificate of pardon, *see* Gov. Ex. A, at 2, as did others, *see* Gov. Ex. B.

In sum, the pardons required the dismissal of the then-ongoing January 6 prosecutions without any inquiry into the exercise of prosecutorial discretion. That makes the January 6 Defendants not similarly situated to McIver. McIver's selective prosecution claim fails for this reason alone.

### 2. Regardless, the January 6 Defendants Are Not Similarly Situated and There is No Discriminatory Effect

The fact that the January 6 Defendants all were pardoned, unlike McIver, should be fatal to her motion. But even if the January 6 Defendants with pending cases prior to the issuance of the Pardon could nevertheless be considered in discriminatory effect

---

[17] One court reluctantly granted dismissals without prejudice citing "a policy assertion made in the presidential proclamation" but was silent as to the issue of pardons. *See, e.g.*, *United States v. Giusini*, No. CR 24-318 (BAH), 2025 WL 275683, at *3 (D.D.C. Jan. 23, 2025).

analysis, McIver still fails to provide clear *evidence* that they are similarly situated in *any* relevant respects, let alone the requisite "all relevant respects." *See Harvard*, 973 F.3d at 205; *Nordlinger*, 505 U.S. at 10. McIver provides no evidence at all to demonstrate how she and the January 6 Defendants are similarly situated, other than that they were both prosecuted under 18 U.S.C. § 111(a).

In fact, McIver goes to great length to explain how she and the January 6 Defendants are not at all alike. After first referencing the January 6 Defendants' applicable charges, she explicitly admits that "[t]his case charges Congresswoman LaMonica McIver, a sitting Democratic Member of Congress, with violating the same federal assault statute. ***But the similarity ends there***." ECF 20-1, at 1 (emphasis added). And when contrasting the events of January 6, 2021, and May 9, 2025, she emphasizes the "palpable difference between the actions of those at the Capitol and January 6 and Congresswoman McIver's conduct," *id.*, that "January 6 was entirely different," *id.* at 2, and that "McIver's case stands in remarkable contrast to those January 6 cases dismissed by the government," *id.* at 19.

McIver is correct insofar as she and the January 6 Defendants are not similarly situated. In defining herself, McIver states that she is a "Democrat who conducts oversight of Executive Branch immigration policy," *id.* at 4, and a sitting Democratic Member of Congress, *id.* at 1. She also emphasizes that at the time described in the indictment, she was performing her job as an elected Representative, exercising her immigration policy oversight responsibility at a privately run immigration facility where, in her words, "she had every right to be." *Id.* But she fails to mention, however,

that she: (1) deviated from her oversight responsibilities by leaving the grounds of the facility where she was waiting for her tour; and (2) proceeded to become entangled with law enforcement as they were trying to effect an arrest and, as alleged in the Indictment, made forcible contact with two law enforcement officers in the process.  *See supra*, at 3-4.

Conversely, according to the motion, the January 6 Defendants were "rioters who were trying to overrun the Capitol to intimidate the legislators inside in hopes of overriding a national election," ECF No. 20-1 at 2, who assaulted police officers "in an effort to overturn 2020 presidential election," *id*. at 2, and who did not have the right to be at the Capitol at the time, *see id*. at 1.  The motion further states some combination of the January 6 Defendants used weapons of various kinds against officers, caused serious injuries, and committed assaultive conduct for hours. *See id*. at 5, 18. So understood, McIver's selective prosecution motion is little more than "whataboutism."

Indeed, several January 6 Defendants attempted to make the same type of selective prosecution arguments McIver makes here. But those motions all were denied because no court found that the defendants had properly identified other groups or classes who were not prosecuted and who could be said to have been similarly situated. *See, e.g.*, *United States v. Young*, No. 23-CR-241 (GMH) 2024 WL 3030656, at *6 (D.D.C. June 17, 2024) (Justice Kavanaugh confirmation hearings protests, George Floyd protests, and pro-Palestinian protests not similarly situated); *United States v. Rhodes*, Crim. No. 22-cr-15 (APM), 2022 WL 3042200, at *5 (D.D.C. Aug. 2, 2022) (Portland protestors not "engaged in comparable conduct" where defendant did not identify an

"official proceeding" they obstructed); *United States v. Judd*, 579 F. Supp. 3d 1, 7–8 (D.D.C. 2021) (same).

*Judd* is particularly instructive.  Judd asserted that he had been selectively prosecuted for assaulting law enforcement officers while certain rioters in Portland were selectively overlooked for prosecution.  In noting that several of the Portland defendants against whom the government had dropped charges had committed similar or more severe assaultive conduct in comparison to that allegedly committed by Judd, the court remarked that "[r]arely has the Government shown so little interest in vigorously prosecuting those who attack federal officers." 579 F. Supp. 3d at 7.  The Court also remarked that the dismissal of felony assault charges was "downright rare and potentially suspicious." *Id.*  Yet despite the "discrepancies" between the cases and the court's voiced suspicion concerning the government's non-prosecution decisions, the *Judd* court still denied the defendant's motion. *Id.*  Noting that the "unique context of January 6 render few defendants similarly situated" to Judd, the court narrowly reasoned that "[t]the action in Portland, though destructive and ominous, caused no similar threat to civilians," and found that the January 6 defendant before the court and the Portland rioters were not similarly situated. *Id.* at 8.

Likewise, McIver and the January 6 Defendants cannot be said to be similarly situated.[18]  There are many obvious differences between McIver and the January 6

---

[18] McIver also generally claims that she has "disfavored policy views," *id*. at 3, which she immediately links to her class as a Democrat who conducts oversight of Executive Branch immigration policy, *id*. at 4.  From this, she summarily concludes that the January 6 Defendants are "those whose views [the Justice Department] share," *id*. at 4. The Defendant, however, provides no evidence whatsoever to support her blanket

Defendants including (1) the origin and impetus for the conduct which led to their respective charges, (2) the location of the conduct, the risks posed to different individuals, (3) the ability of any of the specific perpetrators to de-escalate the respective situation and (4) the official duties being performed by the law enforcement officers involved. McIver, as a Member of Congress, was perhaps better situated than most to de-escalate the situation given her powerful position, but instead chose to heed the unidentified male who goaded the crowd to "circle the mayor," ECF 20-1, at 11, in an obvious call to impede the Mayor's arrest.  The government maintains an "interest in vigorously prosecuting those who attack federal officers," *Judd*, 579 F. Supp. 3d at 7, which is no less true when the perpetrator is a Member of Congress.  And while McIver tries to avoid her rigorous burden of proof by arguing that "her alleged conduct was manifestly less egregious" than the January 6 Defendants' unique conduct, ECF 20-1, at 20, the applicable standard focuses on whether the defendants are similarly situated, not the relative severity of their respective misconduct. *See, e.g., Judd*, 579 F. Supp. 3d at 7.

In sum, McIver's selective prosecution claim must fail even if this Court ignores the reality that the subset of January 6 Defendants on which McIver relies received pardons every bit as much as did the January 6 Defendants whose convictions were final – and whom Defendant admits were not similarly situated.

---

statement that any of the January 6 Defendants, including the 6 exemplar defendants she references in her motion, had any particular views on the administration's immigration policy.  In short, McIver's assertions in this regard compares apples to oranges.

### 3.    The Defendant's Selective Enforcement Allegations Against DHS Fail for Similar Reasons

For most of her brief, McIver makes little distinction between selective prosecution and selective enforcement. But the concepts, though similar, are not identical.[19]  Regardless, McIver's motion must fail to the extent it is based on selective enforcement for many of the same reasons that her selective prosecution argument fails. Specifically, the January 6 Defendants on which she relies are not similarly situated defendants for all the same reasons previously stated.

Selective enforcement are distinct legal claims.  In *United States v. Washington*, 869 F.3d 193, 214 (3d Cir. 2017), the defendant challenged the ATF's use of reverse stings as racially motivated. The Third Circuit acknowledged that "selective prosecution" and "selective enforcement" have often been used interchangeably.   Nevertheless, the *Washington* Court clarified that "'[p]rosecution' refers to the actions of prosecutors (in their capacity as prosecutors) and 'enforcement' to the actions of law enforcement and those affiliated with law-enforcement personnel."   In short, selective prosecution revolves around the charging decisions made by prosecutors while selective enforcement focuses on the decisions of law enforcement agents as to which targets to investigate and

---

[19] McIver does rely on the distinction between selective prosecution and selective enforcement in seeking discovery, in an effort to take advantage of the less exacting standard for the latter announced in *United States v. Washington*, 869 F.3d 193, 219-220 (3d Cir. 2017). *See* ECF 20-1, at 28-29; *see infra* Point IV.  The Government recognizes this Court is bound by *Washington*, *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Platkin*, 742 F. Supp. 3d 421, 453 (D.N.J. 2024), but it respectfully preserves for any further review that may be necessary its claim that *Washington* was wrongly decided, *e.g.*, *United States v. Brown*, 740 F.3d 145, 148 n.6 (3d Cir. 2014) ("Brown … concedes that our decision in [*Shenandoah*] forecloses those arguments. He raises them only to preserve them for further review.") (cleaned up).

how those investigations are pursued.  But just as with selective prosecution claims, to make out a selective enforcement claim, a defendant must show that an enforcement action was brought against him or her while identifying a similarly situated group or class of individuals against whom no enforcement or investigative action was taken.

As to this task, McIver fails by any measure.  By her own admission, the law enforcement efforts in the wake of January 6th represented "the largest criminal investigation in U.S. history." *See* ECF 20-1, at 6, 19 (citing *The Cases Behind the Biggest Criminal Investigation in U.S. History*, NPR (Mar. 14, 2025), https://www.npr.org/2021/02/09/965472049/the-capitol-siege-the-arrested-and-their-stories).[20]  And there can be little doubt that the investigations of the January 6 Defendants involved the dedication of huge amounts of resources both in terms of manpower and finances.  The idea that McIver's chosen class of defendants – i.e., the January 6 Defendants who were charged but against whom charges were dropped prior to trial and/or sentencing as a result of the Pardon – were ignored or that in any meaningful way were not subjected to enforcement actions is nonsensical.

By way of comparison, the enforcement action against Defendant was quite limited.  To begin with, there was no enforcement action whatsoever until after the events of May 9, 2025, had unfolded at Delaney Hall.  To the extent that there can even

---

[20] Former Attorney General Merrick Garland himself noted that "[o]ver the past four years, our prosecutors, FBI agents, investigators, and analysts have conducted one of the most complex, and most resource-intensive investigations in the Justice Department's history."  Press Release, Dep't of Justice, Attorney General Merrick B. Garland Statement on the Fourth Anniversary of the January 6 Attack on the Capitol (Jan 6, 2025), https://www.justice.gov/archives/opa/pr/attorney-general-merrick-b-garland-statement-fourth-anniversary-january-6-attack-capitol.

be said to have been an enforcement action at all, it consisted largely of downloading the video footage of the body-worn cameras of ICE officers who assisted in the arrest of the Mayor as well as obtaining surveillance footage from Delaney Hall's cameras near the gate to the facility and subsequently reviewing that video. That footage was then provided to members of the U.S. Attorney's Office for review.

A comparison between the very limited enforcement action involving McIver and the massive investigatory action brought against the January 6 Defendants entirely undermines any claim that the January 6 Defendants can be said to be similarly situated for enforcement purposes, where much time and energy was committed to identifying the January 6 Defendants after the events of January 6th. But more fundamentally, the January 6 Defendants are the antithesis of a group or class to which McIver must point if she is to make out the basis of a selective enforcement claim, namely, a group or class against whom **no** enforcement action has been brought. Clearly, any notion that the January 6 Defendants were not subject to a wide-ranging and intensive enforcement action does not comport with reality. Accordingly, McIver's selective enforcement claim is baseless and should be denied.

### C.    Defendant Fails to Show "Clear Evidence" of Discriminatory Purpose

McIver's failure to offer proof that others similarly situated to her could have been, but were not, prosecuted alone requires this Court to deny her motion. *See United States v. Bass*, 536 U.S. 862, 863 (2002) ("We need go no further in the present case than consideration of the evidence supporting discriminatory effect."). But even were this

Court to proceed to *Armstrong*'s second requirement – proof of discriminatory intent – McIver fails to satisfy her burden here as well.

As set forth above, proof of discriminatory intent requires clear evidence that the government acted because of, not merely in spite of, the protected characteristic of the defendant. *See Wayte*, 470 U.S. at 610 *see also Lewis*, 517 F.3d at 25-26.  But Defendant fails to offer any actual proof that she was targeted for prosecution because of, not merely in spite of her being a "Democrat who conducts oversight of Executive Branch immigration policy."[21]  This is hardly surprising because her claims are unsupported and untrue.

In the absence of "clear evidence," McIver relies primarily upon a mistaken understanding of DOJ policy, as well as out-of-context statements concerning the Administration's well-publicized law enforcement policies and priorities.  In the process, McIver omits mention of evidence contradicting her claims from the very sources upon which she relies for her supposed evidence of "discriminatory intent."  Her claim that there is "clear evidence" of discriminatory intent fails.

### 1.    Defendant's Claim that the U.S. Attorney's Office's Failed to Adhere to DOJ Policy is Meritless.

McIver argues that the failure of the U.S. Attorney's Office to follow internal consultation guidelines before filing charges against her was "irregular[]" and evidence

---

[21] The Defendant separately issued a press release claiming "[t]he charges against me are purely political—they mischaracterize and distort my actions, and are meant to criminalize and deter legislative oversight." Press Release, LaMonica McIver, McIver Issues Statement on Charges (May 19, 2025), https://mciver.house.gov/media/press-releases/mciver-issues-statement-charges.

of discriminatory purpose.[22]  First, McIver claims that the U.S. Attorney's Office was required to consult with and/or obtain approval from the DOJ's Public Integrity Section ("PIN") pursuant to a mandatory DOJ policy (the "PIN Consultation and Approval Policy") before charging her, and that the "U.S. Attorney's Office reportedly ignored these procedures entirely."  According to McIver, this amounts to an "unexplained departure from 'normal prosecutorial procedures'" which (she claims) demonstrates "clear evidence" of discriminatory purpose. ECF 20-1, at 24-26.

Remarkably, the very article McIver cites as evidence that the U.S. Attorney's Office supposedly ignored the PIN Consultation and Approval Policy states that the policy had been suspended before she was charged:

> Reuters reviewed the Public Integrity Section's cases and internal memos, and conducted more than 15 interviews. . . . Among the most significant changes is the ***suspension*** of a longstanding Justice Department requirement that federal prosecutors seek [PIN]'s approval before bringing charges against members of Congress. . . . ***The suspension of that rule in early May*** hasn't been previously reported. It frees political appointees in the Justice Department to prosecute public officials ***without going through a review***. . . .

---

[22] Her argument that "government's failure to follow its normal prosecutorial procedures mandates stricter judicial scrutiny of the prosecution," should be rejected too. ECF 20-1, at 24 (*citing United States v. Haggerty*, 528 F. Supp. 1286 (D. Colo. 1981)).  The Government has located no Third Circuit precedent altering the "demanding" *Amstrong* standard of review, 517 U.S. at 465, and the Court should decline to adopt the holding in *Haggerty* which pre-dates *Armstrong*.  However, given that Defendant's claim about DOJ consultation/approval requirements is inaccurate for the reasons set forth below, the applicability *vel non* of *Haggerty* is academic.

*Id.* at 25, n.43.[23]  What's more, the article details how the timing of that suspension correlated to McIver's own case:

> **[Then Interim U.S. Attorney] Habba didn't consult with or seek approval from the Public Integrity Section before filing her case in federal court**. . . . The Washington Post reported on May 17 that the department was considering whether to end the consultation requirement. **But the suspension had been implemented for about a week by then**, the people who spoke with Reuters said. Habba . . . told Reuters that she **"coordinated closely with (Justice) Department leadership** every step of the way."

*Id.* (emphasis added).  Thus, the same article McIver cites as evidence to accuse the U.S. Attorney's Office of discriminatory intent by circumventing its own consultation and approval requirements also documents that this policy no longer applied when charges were filed against her.  Plainly, the U.S. Attorney's Office cannot be faulted for failing to adhere to a suspended policy.  Even despite the suspension of the PIN Consultation and Approval Policy, the U.S. Attorney's Office nevertheless "coordinated closely" with the DOJ.[24]

---

[23] Citing Sarah N. Lynch et al., *How Trump Defanged the Justice Department's Political Corruption watchdogs*, Reuters (June 9, 2025) (emphasis added), *available at* https://www.reuters.com/investigations/how-trump-defanged-justice-departments-political-corruption-watchdogs-2025-06-09/.

[24] While the suspension of the PIN Consultation and Approval Policy is clearly fatal to Defendant's argument here, the government nevertheless represents that on May 9, 2025, the U.S. Attorney's Office contacted PIN for a consultation concerning an investigation unrelated to that day's events at Delaney Hall involving the Defendant.  It was at that time informed by a Deputy Director that PIN could no longer provide the requested consultation while the Justice Manual's consultations requirements were being reworked.  The Deputy Director of PIN further suggested that while consultations were suspended, the U.S. Attorney's Office could speak with the Office of the Deputy Attorney ("ODAG"), which directly oversees PIN, but did not state that doing so was a requirement.  Despite the change in policy, prosecutors from the U.S. Attorney's Office

The Defendant also perfunctorily argues that "the timing of the charges . . . particularly when announced in connection with dropping [the] charge against Mayor Baraka" the same day is further evidence of discriminatory purpose, merely speculating there was a "perceived need" to charge "*some* Democratic politician." ECF 20-1, at 26 (emphasis in original).  The timing of the charges should certainly not come as a surprise to McIver.  For days leading up to their filing, McIver (through counsel) was engaged in negotiations with the Government in an effort to reach a negotiated resolution.  Because the actions that led to the charges were inextricably linked to the Mayor's arrest, there is nothing untoward about the fact that plea negotiations and charges related to McIver took place at around the time that the Mayor's case was being resolved.  But the press releases issued by *both* the U.S. Attorney Office and the Mayor that day show that her prosecution was not motivated by the Defendant's asserted class. The Democratic Mayor's press release stated:

> I plan to speak with the current U.S. Attorney about issues on which we can cooperate. As to Delaney Hall, I will continue to advocate for the humane treatment of detainees, and I will continue to press the facility to ensure that it is compliant with City of Newark codes and regulations.[25]

Acting U.S. Attorney Habba echoed a similar sentiment, stating:

> In the spirit of public interest, I have invited the mayor to tour Delany Hall. The government has nothing to hide at this facility, and I will personally accompany the mayor so he can see that firsthand. The citizens of New Jersey deserve unified leadership so we can get to work to keep our state safe.

did in fact consult with ODAG about the Defendant's case.  The substance of that consultation is, of course, privileged.

[25] Press Release, City of Newark, Mayor Ras J. Baraka Statement on Dismissal of Delany Hall Trespassing Charge (May 19, 2025), *available at* www.newarknj.gov/news/mayor-ras-j-baraka-statement-on-dismissal-of-delaney-hall-trespassing-charge

*See* ECF 20-1, at 12 n.22.[26]  Then turning to the charges against McIver, Acting U.S. Attorney Habba added: "Congressional oversight is an important constitution function and one that I fully support. However, that is not at issue in this case . . . No one is above the law – politicians or otherwise. It is the job of this office to uphold justice impartially, regardless of who you are." *Id.* Nothing about what the U.S. Attorney's Office did or said is evidence of discretionary purpose.

### 2.    None of the Statements Made by the U.S. Attorney Provide Clear Evidence of Discriminatory Purpose

McIver next claims that two out-of-context soundbites from longer interviews of the Acting U.S. Attorney prove discriminatory intent as to McIver even though she was not the subject of either interview.  But even a cursory review of these statements taken in their full context undermines McIver's spin on them.  Rather, the full context of those statements demonstrates Acting U.S. Attorney Habba's stated intention was to vigorously prosecute all types crime, to protect and support law enforcement, and to execute the Immigration Executive Order's enforcement priorities – without regard to politics.

McIver first points to a podcast from March 27, 2025, where the Acting U.S. Attorney used the phrase, "[w]e could turn New Jersey red."  Defendant cites this as evidence that the Acting U.S. Attorney intended to target Democrats like McIver for prosecution because of her congressional role in immigration matters. *See* ECF 20-1, at 23 n.35.  But this takes the Acting U.S. Attorney's comment entirely out of context as

---

[26] *Citing* US Attorney Habba (@USAttyHabba), X (May 19, 2025, at 7:56 PM), x.com/USAttyHabba/status/1924615111198576645/photo/1.

she was responding to a question premised on the notion that "good governance" could continue a voting trend that was potentially favorable to Republicans. In response, Ms. Habba essentially agreed that effective law enforcement through the implementation of the Administration's policies would likely inure to the benefit of Republicans, a notion that makes logical sense. At no point did she advocate for the targeting of Democrats, and she limited her discussion to priorities in law enforcement that were not political in nature. For example, the priorities Ms. Habba listed in the podcast, which McIver omits from her brief, included the following:

- "There was a Newark cop that was killed a few weeks ago. Paying attention to those people. And strengthening the men and women that are wearing uniforms. We have to give them their power back and I think that they lost it for a period of time in this country. So, I can't wait to invigorate them and really have their backs." *Id.* at 9:16-9:31 (which begins immediately after the excerpts from the interview quoted in footnote 35 of Defendant's Brief).

- "We need to get crime out. We need to start prosecuting criminals. And that is what I plan to do." *Id.* at 2:19-2:25.

- "I'm going to be going after every single thing in the President's directive. Violent crime is first. The president has made it clear, illegal immigration is important to us. We need to clean up our borders. We need to clean up our cities. But safety and security and whatever my job covers I will make sure to just crush it. I'm not going to be weak as anybody can imagine. I will be really hard on crime." *Id.* at 5:02-5:32.

None of this is evidence of a discriminatory purpose to prosecute Democratic politicians, let alone any Democrat conducting immigration policy oversight. In fact, McIver is never mentioned during the podcast.

The second interview offered by McIver is similarly unavailing. She asserts that "within days of her appointment Ms. Habba . . . announce[d] investigations into high-ranking Democratic state officials" including New Jersey Governor Phil Murphy. *See*

ECF 20-1, at 23, n. 36. Although Defendant does not elaborate on the content of this interview, a review of the full interview reveals the actual prosecutorial purpose, which had nothing to do with Democratic politicians generally or McIver specifically. Rather, it concerned the status of the State of New Jersey as a "sanctuary state" and the potential obstacles that sanctuary state policies posed for the enforcement of the Administration's immigration priorities:

> "[The Attorney General] has made it clear and so has our President that we are to take all criminals and violent criminals out of this country, to completely enforce federal law, and anybody who does get in that way, in the way of what we are doing, which is not political, it's simply against crime, will be charged in the state of New Jersey for obstruction, for concealment, and I will come after them hard."

See id.[27] And again, nowhere did the U.S. Attorney indicate that the focus of any investigation into the Sanctuary State policies is due to the party affiliation of the Governor. Rather, she explicitly states the investigation "is not political," but is designed to further the goals of removing violent criminals from the country. And once again, neither McIver nor Congressional oversight was mentioned.[28]

---

[27] AlinaHabba (@AlinaHabba), X (Apr. 10, 2025 at 10:06 PM), x.com/AlinaHabba/status/1910514829674131833.

[28] In fact, after announcing an investigation into Democratic Governor Murphy, the Acting U.S. Attorney posted on X: "Great to join @FIFAcom and Governor Murphy at Metlife today as we prepare to welcome the world to New Jersey for the Club Cup Finals and World Cup. Together — across parties, across sectors — we must be committed to keeping our state safe, secure, and ready for the global stage." US Attorney Habba, (@USAttyHabba), X (July 9, 2025, at 6:25 PM), https://x.com/USAttyHabba/status/1943073774632604060 (posting two pictures including one of the U.S. Attorney posing with Governor Murphy, and a second of Government Murphy's family. The post and both pictures were reposted on Governor Murphy's official X account. See id. (reposted at Governor Phil Murphy (@GovMurphy)).

### 3.    Statements Made by President Trump Provide No Evidence of Discriminatory Intent

Finally, McIver invokes a response by President Trump to a reporter's questions the day after she was charged via complaint for her actions outside of Delaney Hall as alleged evidence in support of her claim that she was victimized by "discriminatory intent." The full exchange between the reporter and the President went as follows:

> *Reporter*: "Mr. President, what's your response to those that say your DOJ is weaponizing with the arrest of a congresswoman, a Democratic congresswoman?"
>
> *President Trump*: "Oh give me a break. Did you see her? She was out of control. [Crosstalk.] You know those days are over. The days of woke, the days of woke."
>
> *Reporter*: "Did you tell [inaudible] to do that?"
>
> *President Trump*: "No, I didn't. The days of woke are over. That woman, I don't, I have no idea who she is. That woman was out of control. She was shoving federal agents. She was out of control. The days of that crap are over in this country. We're going to have law and order."

ECF 20-1, at 24, n.37.[29]  A fair reading of this exchange reveals that, although President Trump was aware of the arrest, he explicitly denied that charging Defendant was a result of the "weaponizing" of the DOJ, and indicates that he had seen video footage of the Delaney Hall incident showing that McIver "was out of control."  Further, when apparently pressed about whether he had anything to do with the charges being brought, he replies "[n]o, I didn't," and adds that "I have no idea who she is."  Rather than evidence of discriminatory intent on the part of the President, this exchange shows that the

---

[29] Video of the statement can be found at *Trump on McIver charges: 'The days of woke are over,'* Wash. Post (May 20, 2025), www.washingtonpost.com/video/politics/trump-on-mciver-charges-the-days-of-woke-are-over/2025/05/20/68660a86-b6e2-4ac7-9641-17bf5289e5f1_video.html.

President had no involvement in the charging decision and perhaps no idea about McIver's political affiliation until the reporter disclosed it.  Accordingly, it offers nothing to support McIver's claim that she was subjected to "discriminatory intent" as part of a selective prosecution claim.

### 4. Defendant Offers No Clear Evidence That DHS's Investigation Was Motivated By A Discriminatory Purpose

As with Defendant's selective prosecution claim, the Court does not need to reach the question whether McIver has offered "clear evidence" of discriminatory intent to support her selective enforcement claim. That's because she has failed to identify similarly situated individuals who were not investigated for the same or similar conduct. *See supra* Point I.B.3. But even if this fatal shortcoming can be overlooked, McIver has failed to provide "clear evidence" of discriminatory intent on the part of law enforcement as required by the second part of the two-part test laid out in *Armstrong*.

To claim there is "clear evidence" of discriminatory intent supporting her selective enforcement claim, McIver points to three areas:  1) press statements issued by DHS that are sharply critical of her conduct on the day she arrived at Delaney Hall to conduct an unscheduled inspection tour; 2) the implementation of a new DHS policy *after* the charges were against her were filed that applies to *all* Members of Congress requiring them to give seven days prior notice of an oversight inspection tour of certain immigration facilities; and 3) the detention/interaction by law enforcement with three Democratic politicians including Defendant within the space of approximately one month. *See* ECF 20-1, at 13-15, 22-23.

None of this establishes that any law enforcement action taken against her was motivated by her Congressional oversight role or her policy views on immigration. But before addressing each of these enumerated claims, however, any "enforcement action" taken against McIver was quite limited, consisting of capturing video footage of her actions via body worn cameras, reviewing that footage and making it available to the U.S. Attorney's Office for review regarding prosecutorial decisions. The most important of these "enforcement actions" was, of course, the decision to capture the footage depicting McIver's actions on May 9, 2025. Most of the actions taken thereafter essentially involved reviewing that footage and interviewing prospective witnesses.

Significantly, the DHS agents' decision to make the body-worn video recordings, which contained the core evidence against McIver, had nothing to do with an "enforcement action" directed *at her*. Rather, their purpose was to document the arrest of the Mayor. That these recordings captured the illegal actions allegedly committed by McIver was purely serendipitous from law enforcement's perspective. When DHS officers turned on their body-worn cameras, no one knew that Defendant would barge out of the gate of Delaney Hall and attempt to forcibly interfere with and impede the arrest of the Mayor, for yet a second time, as described in the Indictment. In short, the video documentation of McIver's allegedly criminal behavior was gathered inadvertently because of her unanticipated and surprising actions, and not because of some illicit motive on the part of DHS agents. That alone defeats her selective enforcement claim, because McIver cannot show "clear evidence" of discriminatory purpose towards her in the agents' decision to document the Mayor's arrest. *Cf. Washington*, 869 F.3d at 225

(McKee, J., concurring) ("Here, the Government created a criminal scheme that would not have otherwise existed.").

Despite the indisputable fact that McIver had undertaken all the illegal actions alleged in the Indictment before any "enforcement action" had been taken against her, she points to several press releases that, she asserts, unfairly characterize her actions on May 9, 2025.  ECF No. 20-1, at 22-23. Whether the tone of these press releases was advisable or not, they were released *after* McIver had committed acts that were sufficient to result in a criminal Indictment being returned against her.  That DHS was critical of her behavior after she had allegedly assaulted officers and interfered with their efforts to effect an arrest is hardly surprising.  Moreover, her actions occurred during a period when rising violence and threats were being directed at DHS officials.  Despite the events of May 9, 2025 at Delaney Hall – and it should be noted that DHS officials *did* provide a tour of the facility to McIver as well as Representatives Betsy Watson Coleman and Robert Menendez, Jr. immediately after the arrest of the Mayor – DHS made clear shortly thereafter that they would continue to work with Members of Congress in fulfilling their oversight duties.  For instance, approximately one week later, a DHS spokeswoman noted that while "'Members of Congress cannot break the law in the name of 'oversight,' [DHS] Secretary Noem respects congresses oversight authority and is always willing to accommodate Members seeking to visit ICE detention facilities.'"[30]  And when McIver was charged by Complaint, DHS Secretary Noem stated:

---

[30] Press Release, U.S. Department of Homeland Security, DHS Reminds Congressional Members of ICE's Guidelines to Schedule Tours of ICE Detention Facilities (May 14,

> After a thorough review of the video footage of Delaney Hall and a full investigation from HSI, the U.S. Attorney for the District of New Jersey has made the determination to charge Congresswoman LaMonica McIver for assaulting, resisting, and impeding law enforcement officers.  No one is above the law. If any person, regardless of political party, influence or status, assaults a law enforcement officer as we witnessed Congresswoman McIver do, you will be prosecuted to the fullest extent of the law.[31]

Relatedly, Defendant points to the DHS policy enacted after the events at Delaney Hall on May 9, 2025, requiring Members of Congress to give at least seven days' notice in advance of conducting an oversight inspection tour of an immigration detention facility.  Defendant believes this is somehow evidence of discriminatory intent in conducting an "enforcement action" against her even though the policy was enacted after McIver had been charged.  The logic of this claim is elusive, especially when the policy, at least in part, furthers the legitimate purpose of avoiding situations like that which occurred on May 9, 2025, by ensuring that appropriate security measures may be taken in advance of such an oversight visit.

Finally, McIver utterly fails to explain how the involvement of three Democratic politicians in altercations with law enforcement relating to immigration within the space of approximately one month is evidence of discriminatory purpose in initiating any law enforcement action against McIver, whose arrest occurred first.  ECF No. 20-1, at 13. McIver certainly points to no Republican Representatives who broke the law while

---

2025), *available at* https://www.dhs.gov/news/2025/05/14/dhs-reminds-congressional-members-ices-guidelines-schedule-tours-ice-detention.

[31] Secretary Kristi Noem (@Sec_Noem), X (May 19, 2025, at 8:05 PM), https://x.com/Sec_Noem/status/1924617499384930494.

protesting immigration policy but who were not prosecuted—the only true apples-to-apples comparison.  At any rate, McIver's argument fails.

First, the "enforcement actions" directed at McIver had already been completed, culminating in the Indictment against her, before the other two incidents involving New York City Mayoral candidate Brad Lander and Senator Alex Padilla (cited in ECF 20-1, at 13 n.23) had even occurred.  Second, the other two incidents were initiated by Lander and Senator Padilla, respectively, with Lander attempting to escort an individual out of an immigration court and Padilla shouting at DHS Secretary Kristi Noem during a press conference she was conducting.  Third, both Lander's and Senator Padilla's actions hardly qualify as incidents where officials were "investigating [DHS's] activities."  How these incidents involving Lander and Senator Padilla bear any relation to DHS' enforcement actions regarding McIver, who physically interfered with a DHS agent's arrest, is a mystery.

In sum, as McIver has failed to show any evidence of "discriminatory intent" on the part of DHS in bringing any "enforcement action" against her, her selective enforcement claim fails, as does her selective prosecution claim.

## II.  This Court Should Deny McIver's Motion To Dismiss On The Basis Of Vindictive Prosecution

McIver next argues that she is the subject of vindictive prosecution and the case against her should accordingly be dismissed.  ECF No. 20-1, at 26-28.  As McIver has presented no evidence of "actual vindictiveness" motivating her prosecution, nor any basis for the Court to apply a "presumption of vindictiveness," this Court must reject her claim.

### A. Defendant Bears the Burden of Proving Evidence of Actual Vindictiveness or Sufficient Facts Giving Rise to a Presumption of Vindictiveness

As explained in Point I.A. above, prosecutors enjoy broad discretion in making charging decisions. The decision to prosecute nonetheless may violate due process if it is vindictive—that is, when it is brought in retaliation for the defendant's exercise of a protected statutory or constitutional right. *Goodwin*, 457 U.S. at 372; *Bordenkircher*, 434 U.S. at 363; *Blackledge v. Perry*, 417 U.S. 21, 26-27 (1974); *United States v. Oliver*, 787 F.2d 124, 125 (3d Cir. 1986). The defendant bears the initial burden of proof in a vindictive prosecution claim. *United States v. Schoolcraft*, 879 F.2d 64, 68 (3d Cir. 1989). This threshold represents a high bar:

> To establish an actual vindictive motive, a defendant must prove objectively that the prosecutor's charging decision was a 'direct and unjustifiable penalty' *United States v. Goodwin*, 457 U.S. 368, 384 & n. 19, 102 [citations omitted] (1982), that resulted 'solely from the defendant's exercise of a protected legal right,' *id. at 380 n.11*.

*United States v. Sanders*, 211 F.3d 711, 716-17 (2d Cir. 2000).

There are two ways in which a defendant can prove a claim of vindictiveness. First, the defendant may prove the prosecution's actual vindictiveness towards the defendant. *United States v. Paramo*, 998 F.2d 1212, 1220 (citing *Goodwin*, 457 U.S. at 380 n.12, 384); "To prevail on this theory, Defendant must show [] actual animus on the part of the prosecutor." *Biden*, 729 F. Supp. 3d at 424 (citing *Paramo*, 998 F.2d at 1220); *see United States v. Esposito*, 968 F.2d 300, 303 (3d Cir. 1992) (the defendant must show that the prosecution "harbor[ed] a personal vindictiveness towards him"). "[A] defendant may use evidence of a prosecutor's retaliatory motive to prove actual vindictiveness."

*Paramo*, 998 F.2d at 1220 (citing *Goodwin*, 457 U.S. at 380 n.12, 384).  Establishing proof of actual vindictiveness is "exceedingly difficult." *Paramo*, 998 F.2d at 1221 (citation and quotation omitted).

"Second, in certain circumstances, a defendant may show facts sufficient to give rise to a presumption of vindictiveness." *Paramo*, 998 F.2d at 1220 (citing *Goodwin*, 457 U.S. at 380 n.12, 384) (internal citations omitted).  However, as the Third Circuit has cautioned in *Esposito*, "a presumption of vindictiveness . . . may block a legitimate response to criminal conduct." 968 F.2d at 303 (quoting *Goodwin*, 457 U.S. at 380). Accordingly, "[s]ince a presumption may produce harsh results for which society ultimately bears the burden, courts must be cautious in adopting it." *Esposito*, 968 F.2d at 303.  Further, "[a] presumption does not arise just because action detrimental to the defendant was taken after the exercise of the defendant's legal rights; the context must also present a reasonable likelihood of vindictiveness." *United States v. Campbell*, 410 F.3d 456, 462 (8th Cir. 2005) (cleaned up); *Esposito*, 968 F.2d at 303 ("[w]e will adopt such a presumption only in cases in which a reasonable likelihood of vindictiveness exists"); *see Blackledge*, 417 U.S. at 27 (courts apply a presumption of vindictiveness where the defendant can show "a realistic likelihood of vindictiveness.")  Even if a defendant succeeds in establishing a reasonable likelihood of vindictiveness, the Government can defeat a presumption by proffering "legitimate, objective reasons for its conduct." *Paramo*, 998 F.2d at 1220. However, "[w]here there is no reasonable likelihood [that vindictiveness exists], the burden is on the defendant to prove actual vindictiveness."  *Esposito*, 968 F.2d at 303.

**B.      Defendant Has Fallen Well Short of Meeting Her Initial Burden of Showing Vindictiveness, and In Any Event, the Government Has Proffered Legitimate, Objective Reasons For Charging Her.**

McIver has failed to meet her burden in proving either actual vindictiveness or by showing that a presumption of vindictiveness is warranted under the "reasonable likelihood" standard.   First, she has not alleged any facts that the prosecution has harbored personal vindictiveness or actual animus towards her.   And nothing she has offered shows that the prosecution was acting in retaliation to her exercise of a protected right. *Goodwin*, 457 U.S. at 372.

McIver admits that "[t]he evidence supporting a showing of vindictive prosecution in large part overlaps with the evidence that establishes selective prosecution," but then cites to three areas which she asserts "bear[] particular emphasis." ECF 20-1, at 27. However, these categories, like the rest of her evidence, fail to show actual vindictiveness nor entitle her to a presumption of vindictiveness.   Indeed, McIver construes the term "prosecution" quite broadly, to include actions by DHS agents when the focus of vindictiveness claims is ordinarily on the actions of the prosecutor, and not law enforcement. *See United States v. Koh*, 199 F.3d 632, 640 (2d Cir. 1996).[32]

Regardless, as to the actual prosecutors involved in the charges brought against her, McIver points to only one piece of alleged evidence that she claims demonstrates vindictiveness, namely that the U.S. Attorney's Office "circumvented DOJ's mandatory

---

[32] As phrased by the *Koh* Court, the defendant must show that '(1) the prosecutor harbored genuine animus toward the defendant, or was prevailed upon to bring the charges by another with animus such that the prosecutor could be considered a 'stalking horse,' and (2) [the defendant] would not have been prosecuted except for the animus. 199 F.3d at 640.  Mciver has not suggested nor provided any evidence that any member of the U.S. Attorney's Office served as DHS' 'stalking horse.'

approval procedures," ECF 20-1, at 27, by failing to consult with PIN in adherence with the PIN Consultation and Approval Policy. As detailed previously, *see supra*, at 26-27, that Policy had been suspended in early May of 2025, and, in any event, members of the U.S. Attorney's Office consulted with members of ODAG. Accordingly, Defendant's only evidence that "bears particular emphasis" supporting her claim that the U.S. Attorney's Office engaged in a vindictive prosecution is non-existent.

The remaining evidence that "bears particular emphasis" does not involve anyone making prosecutorial decisions and is thus not a proper consideration for a vindictive prosecution motion. For example, McIver first points to "DHS's statements and actions beginning the day of the Delaney Hall inspection" *id.*, which has already been addressed under the "selective enforcement" section of this brief, *see supra*, at 32-37. Not only is that "evidence" insufficient to show "selective enforcement," it is particularly inapposite here because McIver's grievances about press releases are entirely about *DHS and law enforcement*, and not the *prosecution. Id.* As the Third Circuit has made clear, law enforcement is not the same thing as prosecution. *See Washington*, 869 F.3d at 214 ("'[p]rosecution' refers to the actions of prosecutors (in their capacity as prosecutors) and 'enforcement' to the actions of law enforcement and those affiliated with law-enforcement personnel.") Even if the proffered DHS statements could be construed as evidence of vindictiveness on the part of DHS agents (and it cannot), McIver has failed to offer proof or, even assert that, they supply evidence of vindictiveness on the part of those who brought the prosecution. There is no evidence nor even an allegation that DHS dictated that the U.S. Attorney's Office bring charges, and McIver should know that a federal law enforcement agency does not dictate the prosecution's decisions. Indeed, as the Third Circuit explained

in *Esposito*, "[t]he evil that a presumption of vindictiveness seeks to eradicate is the threat of retaliation when an accused exercises a right in the course of the prosecution." 968 F.2d at 303.   DHS did not and never will control the prosecution of McIver nor make any prosecutorial decisions in the course of that prosecution.   McIver has utterly failed to point to any retaliatory action by the prosecution for her exercise of any legal right.   Under the law, McIver's declaration that DHS is unhappy with her actions and her commitment to exercising oversight responsibility over DHS practices and policies is, for all intents and purposes, a non-sequitur.   If DHS is unhappy, it is because McIver attempted to interfere with an arrest—conduct that violated the law.

McIver summarizes her final item of evidence of alleged vindictiveness which "bears particular emphasis" in the following terms:   "instead of permitting Members of Congress to conduct what should have been a routine oversight visit, Executive Branch officials took deliberate and reckless steps to drive the visit into chaos" and that the government "has insisted on criminal prosecution as retribution for [her] participation in these events." ECF 20-1, at 28. She adds that "[c]learly, the Executive Branch does not like scrutiny of its immigration policies and practices [b]ut due process does not permit prosecutions as a form of retaliation when such scrutiny *lawfully* occurs." *Id.* (emphasis added). Thus, McIver blames DHS' actions on May 9, 2025, for her own actions, which she euphemistically categorizes as "[h]er participation in these events" as "lawful[]."

To the extent McIver suggests that DHS somehow forced or entrapped her into bolting through the Delaney Hall gate to interfere with and impede the arrest of the Mayor, and that prosecuting her over her reaction (however illegal) would be retaliatory,

42

that suggestion has no basis in law or logic.  To the extent McIver claims that this prosecution retaliates against her because DHS officials resented her "scrutiny of [] immigration policies and practices" and sought to obstruct her exercise of those rights, her argument similarly fails.  Again, a prosecutorial vindictiveness claims focuses on the actions of the prosecutors, and evidence of animus on the part of DHS officials is irrelevant.  At any rate, McIver's claim is also belied by the fact that immediately following her efforts to impede and interfere with the arrest of the Mayor, she was provided a tour of the facility.

McIver's theory of retribution is also flawed because the other two Members of Congress with her at Delaney Hall were also outspoken in their opposition to President Trump's immigration policies and practices, and like McIver, were seeking to conduct an oversight inspection of Delaney Hall on May 9, 2025.  And as noted above, when the first attempt to arrest the Mayor was made in the secured area of Delaney Hall, the other two Members of Congress, like McIver, surrounded the Mayor and prevented federal officials from placing the Mayor in handcuffs.  Yet, they have not been prosecuted.  This further shows that the prosecution has not been vindictive but has instead been focused on those material facts that distinguished McIver from her colleagues on May 9, 2025.

As previously stated, the claim that the DHS press releases represent evidence of vindictiveness on the part of DHS fails to show vindictiveness on the part of the prosecutors who brought the charges against McIver.  Her convoluted theory that DHS retaliated against her after forcing her to impede with the Mayor's arrest in order to obstruct her efforts to conduct an oversight inspection suffers from the very same defect.

It does not implicate the motives of the prosecutors who actually filed the Complaint against her and then sought an Indictment.

In short, McIver has offered no meaningful evidence to show actual vindictiveness on the part of the prosecution nor has her purported evidence, including the three areas "bear[ing] particular emphasis" come close to showing that there is a "reasonable likelihood of vindictiveness" justifying a presumption of vindictiveness. *See Paramo*, 998 F.2d at 1220. Moreover, there were obviously "legitimate, objective reasons" for bringing the prosecution, and the Grand Jury, upon considering the evidence in the case, found probable cause to believe that she had committed the offenses set forth in the indictment. *See Paramo*, 998 F.2d at 1220. Accordingly, this Court should deny McIver's motion to dismiss on vindictive prosecution grounds.

## III.    This Court Should Deny McIver's Request For Discovery And An Evidentiary Hearing

McIver finally claims that "[e]ven if the Court were to conclude that dismissal is not yet warranted, the information that is already available would at least cry out for additional discovery regarding Congresswoman McIver's claims of selective and vindictive prosecution." ECF 20-1, at 28. Pursuant to the Court's directive, Defendant has supplemented this request with a letter dated September 3, 2025, in which she catalogs the extensive areas of discovery which she seeks, including far-ranging communications involving virtually every conceivable member of the prosecution team throughout the Department of Justice up to and including the Attorney General of the United States. She also seeks a similar wide-ranging swath of communications throughout DHS up to and including the DHS Secretary. McIver characterizes her

44

requests as "narrowly tailored," but they are anything but.  They seek a judicially sanctioned fishing expedition through the files of agents and prosecutors, including for privileged communications, that would not ordinarily discoverable under any theory.  As set for the below, McIver falls far short of the necessary showing to demonstrate that she is entitled to any of the discovery she seeks, all of which falls outside the scope of the Government's Rule 16 obligations.

### A.    Defendant Cannot Show That She Is Entitled To Discovery To Support Her Selective Prosecution Claim.

In *Armstrong*, the Supreme Court established that for a selective prosecution claim, a defendant must present "clear and convincing evidence" to overcome the presumption that the prosecutor has acted properly in discharging "their official duties." 517 U.S. at 464 (quoting *Chemical Foundation*, 272 U.S. at 14-15.))  In so doing, the *Armstrong* Court held that "[o]ur cases delineating the necessary elements to prove a claim of selective prosecution have taken great pains to explain that the standard is a demanding one." 517 U.S. at 463.

As to discovery, the Supreme Court wrote in *Armstrong* that "the justifications for a rigorous standard of proof for the elements [for a selective prosecution claim] require a correspondingly rigorous standard for discovery in aid of it." 517 U.S. at 457.  Thus, the Supreme Court held that in order to establish entitlement to such discovery, a defendant must show some evidence of both discriminatory effect and discriminatory intent. *Id*.; *see Hedaithy*, 392 F.3d at 607 (denying discovery where defendant "did not present sufficient credible evidence of discriminatory effect").  In fact, the "some evidence" standard is so rigorous that, as of 2017, "neither the Supreme Court nor [the

45

Third Circuit] has ever found sufficient evidence to permit discovery of a prosecutor's decision-making policies and practices." *Washington*, 869 F.3d at 215.

Given the demanding "some evidence" standard, it is unsurprising that McIver cannot meet it. As previously discussed under the rubric of the "clear evidence" standard, McIver cannot satisfy either prong of the two-step test under *Armstrong*. She has failed to identify a similarly situated class of defendants who could have been prosecuted for similar crimes but were not. *See Washington*, 869 F.3d at 214-15 ("a successful discovery motion can rest on 'some evidence.' 'Some evidence' must still include a showing that similarly situated persons were not prosecuted.") Her invocation of the January 6 Defendants, as previously discussed, fails because they are not similarly situated in that they all received pardons – not just the January 6th Defendants whose convictions were final and whom Defendant concedes are not similarly situated. Moreover, Defendant cannot satisfy the second step of the *Armstrong* test under the "some evidence" standard for the reasons previously set forth in detail, including the inaccuracy of her claim that the U.S. Attorney's Office failed to adhere to the PIN Consultation Policy. Accordingly, Defendant cannot muster the necessary showing to warrant discovery in support of her selective prosecution claim.

**B.    Defendant Cannot Show That She Is Entitled To Discovery In Support Of Her Selective Enforcement Claim.**

Nor is McIver entitled to discovery in support of her selective enforcement claim.

Under Third Circuit precedent, motions for discovery for selective enforcement claims "are not governed by strict application of the *Armstrong/Bass* framework," and "the standard governing the district court's discretion is different." *Washington*, 869 F.3d at 220.   This does not alter the fact that for substantive claims of both selective prosecution and selective enforcement – which a related discovery request is designed to support – the standard "generally requires evidence that similarly situated individuals of a different race or classification were *not* prosecuted, arrested, or otherwise investigated." *Id.*

In crafting its standard for discovery, the *Washington* Court noted that:

> "[w]hile *Armstong/Bass* remains the lodestar, a district court retains the discretion to conduct a limited pretrial inquiry into the challenged law-enforcement practice on a proffer that shows "some evidence" of discriminatory effect. . . . a defendant need not, at the initial stage, provide "some evidence" of discriminatory intent, or show that (on the effect prong) similarly situated persons of a different race or equal protection classification were not arrested or investigated by law enforcement.  However, the proffer must be strong enough to support a reasonable inference of discriminatory intent and non-enforcement.

*Id.* at 220-21; *see United States v. Foster*, No. 24-1538, 2025 WL 985387, at *2 (3d Cir. Apr. 2, 2025) (nonprecedential) ("A district court may permit limited discovery on a selective enforcement claim if shown evidence of discriminatory effect through reliable statistical evidence, or its equivalent, that is 'strong enough to support a reasonable inference of discriminatory intent.") (cleaned up).  However, courts "must still be guided

47

by the spirit of *Armstrong*/*Bass*, which incorporates the demands placed on the underlying substantive claims: not just 'some evidence,' but the heightened 'clear evidence' standard." *Washington*, 869 F.3d at 220.

As with McIver's motion to dismiss on the basis of selective enforcement, the motion for discovery in support of her motion must fail as well. First, as previously discussed, Defendant has not even identified another class of persons who were not subject to a similar enforcement action. The January 6 Defendants to whom she points were subject to the most extensive law enforcement investigation in U.S. history. They hardly qualify as a group that was *not* subjected to law enforcement action. Second, the key enforcement action to which she was subjected – the recording of the conduct for which she stands indicted – was not even directed at her. In other words, DHS agents did not "select" her for the key enforcement action which undergirds her selective enforcement claim. Since she has no viable way of making out a selective enforcement claim under the circumstances, she cannot possibly meet the "some evidence" of discriminatory effect standard that would justify her request for discovery.

### C.     Defendant Cannot Show That She is Entitled to Discovery in Support of Her Vindictive Prosecution Claim.

Finally, McIver also seeks discovery to support her vindictive prosecution claim. Her request should likewise be denied.

Although the Third Circuit has not weighed in on the appropriate standard to be applied to a motion seeking discovery in support of a vindictive prosecution claim, a recent district court within the Third Circuit adopted the same standard that applies to selective prosecution claims. *See Biden*, 729 F. Supp. 3d at 418 ("Although the Third

Circuit has not squarely addressed the standard to obtain discovery for a vindictive-prosecution claim, it appears to be the same as for selective prosecution.")  Accordingly, "discovery may nevertheless be appropriate if the defendant comes forward with some evidence of the underlying selective- or vindictive-prosecution claim." *Id.* In so doing, the *Biden* Court followed the lead of the Second Circuit. *See Sanders*, 211 F.3d at 717 ("We see no reason to apply a different standard to obtain discovery on a claim of vindictive prosecution."); *see United States v. Bucci*, 582 F.3d 108, 113 (1st Cir. 2009); *United States v. Wilson*, 262 F.3d 305, 315-16 (4th Cir. 2001).  Accordingly, the "some evidence" standard, which the *Washington* Court described as a "demanding gatekeeper," 869 F.3d at 215, should apply to McIver's motions for discovery supporting her vindictive prosecution claim.

Under the heightened "some evidence" standard applicable to prosecutorial vindictiveness claims, McIver falls woefully short of making the type of showing that would warrant granting her discovery request.  As explained previously, the only aspect of her claim that involves *prosecutorial* conduct is the alleged failure to adhere to the PIN Consultation and Approval Policy.  But as has been set forth repeatedly, that assertion ignores the suspension of that consultation and approval requirement prior to the filing of charges against McIver.  In sum, McIver offers virtually nothing to justify her request for discovery supporting her moribund vindictive prosecution motion.

49

**<u>This Court Should Deny Defendant's Motion to Dismiss on the Basis of Immunity Conferred by the Speech and Debate Clause.</u>**

McIver used her forearms to forcibly strike a federal Agent who was attempting to arrest someone outside the gate to Delaney Hall, and she used her hands to forcibly grab and pull at that agent's jacket. Although she was not engaging in what could be properly termed a legislative or official act, she nonetheless seeks dismissal under the Speech or Debate Clause of Article I of the United States Constitution and separation-of-powers principles. ECF N0. 19-1. This Court should deny her motion. The indictment does not charge McIver for her conduct in performing a core legislative function, namely, "conducting congressional oversight." ECF 19-1 at 24. Rather, McIver stands charged for conduct that is inherently non-legislative – and is, in fact, inherently criminal, namely, assault upon a federal law enforcement officer and impeding and interfering with federal law enforcement officials while performing their official duties. The Constitutional provisions that McIver cites do not immunize assaults on federal officers.

## I.    The Speech or Debate Clause

> Article I, Section 6, clause 1 of the Constitution provides in pertinent part: The Senators and Representatives . . . shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their respective Houses, and in going to and returning from the same; and for any Speech or Debate in either House, they shall not be questioned in any other Place.

As noted by the Supreme Court in *Gravel v. United States*, 408 U.S. 606 (1972), the Speech or Debate Clause protects "speech or debate in either House," as well as "other matters" that are "an *integral* part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to consideration and passage or rejection of proposed legislation or with respect to other

matters which the Constitution places within the jurisdiction of either House." *United States v. James*, 888 F.3d 42, 46 (3d Cir. 2018) (quoting *Gravel*, at 625).

While "'[t]he heart of the Clause is speech or debate in either House,' the legislative sphere extends beyond this heartland to include other 'legislative acts." *United States v. Menendez*, 720 F. Supp. 3d 301, 307 (S.D.N.Y. 2024) (quoting *Gravel*, at 625.) Further, "[a] legislative act has consistently been defined as an act generally done in Congress in relation to the business before it." *United States v. Brewster*, 408 U.S. 501, 512 (1972). Examples of typical matters that "constitute legislative acts – and which are therefore immune from being questioned by virtue of the Speech or Debate Clause – include voting by Members, the production and use of committee reports, and the conduct of Members at legislative hearings." *Menendez*, 720 F. Supp. 3d at 307 (citing *Gravel*, 408 U.S. at 624).

As McIver correctly points out, however, legislative acts covered by the Speech or Debate Clause "also include legislative factfinding and information gathering 'whether by issuance of subpoenas or field work by a Senator or his staff,' because acquiring such knowledge 'is essential to informed deliberation over proposed legislation.'" *Menendez*, 720 F. Supp. 3d at 308 (quoting *United States v. Biaggi,* 853 F.2d 89, 103 (2d Cir. 1988) (citations omitted)).

The Third Circuit addressed what constitutes a "legislative act" falling within the ambit of the Speech or Debate Clause in *United States v. Menendez*, 831 F.3d 155 (3d Cir. 2016). There, former U.S. Senator Robert Menendez attempted to invoke the Speech or Debate Clause to put various alleged actions he had undertaken, including efforts to

51

influence the Executive Branch, beyond the reach of prosecutors.  Before setting forth the appropriate standard for evaluating such immunity claims, the Third Circuit first noted that "'the Speech or Debate Clause must be read broadly to effect its purpose of protecting the independence of the Legislative Branch," but not to the extent as "'to make Members of Congress super-citizens, immune from criminal responsibility.'" 831 F.3d at 165 (quoting *Brewster*, 408 U.S. at 516).  The *Menendez* Court also made clear that "[a] Member seeking to invoke the Clause's protections bears 'the burden of establishing the applicability of legislative immunity . . . by a preponderance of the evidence.'" 831 F.3d at 165 (quoting *Gov't of the V.I. v. Lee*, 775 F.2d 514, 524 (3d Cir. 1985)).

Turning to what constitutes a "legislative act" encompassed by the Speech or Debate Clause, the *Menendez* Court first noted that such acts "do not include all things in any way related to the legislative process,'" *Id.* (quoting *Brewster*, 408 U.S. at 516), and clarified that "[t]he takeaway is that '[t]he Speech or Debate Clause does not immunize every official act performed by a member of Congress.'" *Id.* (quoting *United States v. McDade*, 28 F.3d 283, 295 (3d Cir. 1994)).

The *Menendez* Court then set forth the test for determining "legislative acts," explaining the first step in that process as follows:

> This plays out in a two-step framework for identifying legislative acts protected by the Speech or Debate Clause. First, we look to the form of the act to determine whether it is inherently legislative or non-legislative.  Some acts are 'so clearly legislative in nature that no further examination has to be made to determine their appropriate status.' *Lee*, 775 F.2d at 522.  Examples of 'manifestly legislative acts' include introducing and voting on proposed resolutions and legislation, introducing evidence, and interrogating witnesses during committee hearings, subpoenaing records for committee

> hearings, inserting material into the Congressional Record, and delivering a speech in Congress. [citations omitted]. And even though 'such manifestly legislative acts may have been pursued for illegitimate purposes, such as personal gain, the acts themselves [are] obviously legislative in nature.' *Id.* Thus "an unworthy purpose" does not eliminate Speech or Debate Protection. [*United States v.*] *Johnson*, 383 U.S. [169, 180 (1966)]. . . . . On the other side of the spectrum, some acts are so clearly non-legislative that no inquiry into their content or underlying motivation or purpose is needed to classify them. Examples include legitimate constituent services . . . and, of course, illegitimate activities such as accepting bribes in exchange for taking official action, [*Brewster*, 408 U.S.] at 526.

831 F.3d at 166. The *Menendez* Court next explained that the second step in the process of determining whether specific conduct constitutes a "legislative act" is reached only "[i]f an act is neither manifestly legislative nor clearly non-legislative." *Id.* If this step is reached, the district court may "consider the content, purpose, and motive of the act to assess its legislative or non-legislative character." *Id.* (citing *Lee*, 775 F.2d at 522-24.) Further, "[a]mbiguously legislative acts – including trips by legislators and informal contacts with the Executive Branch – will be protected or unprotected based on their particular circumstances." *Id.* (citing *Lee*, 775 F.2d at 524).

In *Menendez*, for example, the Third Circuit focused on former Senator Menendez's informal contacts with Executive Branch officials, specifically conversations with high-level officials with the Centers for Medicare and Medicaid Services ("CMS") relating to alleged overbilling of Medicare by Menendez's friend and future co-defendant Dr. Salomon Melgen. Menendez urged the Court to hold that all informal efforts to influence the Executive Branch be deemed "legislative acts" entitled to the immunity afforded by the Speech or Debate Clause. The Court rejected this "blanket approach" as

"much too broad, as it would immunize many illegal acts that have only dubious ties to the legislative process." *Id.* at 168.

In contrast, the Government urged the Court to hold that Speech or Debate Clause immunity could never extend to a Member's informal contacts to influence the Executive Branch. The Court likewise rejected this position, holding that "informal efforts to influence the Executive Branch are ambiguously legislative in nature and therefore may (or may not) be protected legislative acts depending on their content, purpose, and motive." *Id.* Thus, given the ambiguously legislative nature of the act of attempting to influence the Executive Branch, the *Menendez* Court reached the second step of the analysis. Ultimately, given the circumstances of that contact – namely, that it was primarily undertaken on behalf of an individual rather than to address broader policy questions – the *Menendez* Court found that the District Court's factual findings to this effect were not clearly erroneous. Accordingly, the *Menendez* Court concluded that there was a "sufficient basis for the District Court's conclusion that the predominant purpose of the challenged acts was to pursue a political resolution for Dr. Melgen's disputes and not to discuss broader issues of policy." *Id.* at 173. It therefore affirmed the District Court's conclusion that the Speech or Debate Clause did not provide the immunity from prosecution that the former Senator sought.

The ruling of the District Court in the more recent prosecution of former Senator Menendez is also instructive. *See Menendez*, 720 F. Supp. 3d at 301. There, the District Court examined two purported legislative acts: the vetting of a potential candidate for the position of United States Attorney and the approval or disapproval of foreign aid,

including placing a hold on such foreign aid, to Egypt. As to the former, the District Court held that while voting on a candidate's nomination for U.S. Attorney was clearly a "legislative act," the pre-screening of a candidate was not, as it did not constitute the provision of "Advice and Consent" called for under the Constitution. 720 F. Supp. 3d at 311. As to the latter, the District Court held that actions taken by a Senator in deciding whether or not to place a hold on foreign aid would constitute a "legislative act" although promising to take such action in advance of doing so in the future does not qualify as a legislative act. *Id.* at 312.

Nevertheless, the District Court pointed out that "'[w]hile the Speech or Debate Clause recognizes speech, voting, and other legislative acts as exempt from liability that might otherwise attach, *it does not privilege either Senator or aide to violate an otherwise valid criminal law in preparing for or implementing legislative acts.'" Id.* (quoting *United States v. Renzi*, 651 F.3d 1012, 1026 (9th Cir. 2011) (quoting *Gravel*, 408 U.S. at 626)). Given that Menendez was charged with agreeing to accept bribes in connection with the legislative acts he undertook relating to the foreign aid to be provided to Egypt, the District Court had little difficulty finding that "the alleged meetings with Egyptian officials are not legislative acts, but rather constitute the "violat[ion of] an otherwise valid criminal law in preparing for or implementing legislative acts." 720 F. Supp. 3d at 313 (quoting *Renzi*, 651 F.3d at 1026).

The alleged legislative acts in *James* bear greater similarity to those at issue here. In *James*, the defendant claimed he had been engaged in legislative fact-finding to obtain documents from abroad, actions that formed a core aspect of the charges filed against

him.[33]  888 F.3d at 44. Although the *James* Court "affirm[ed] this Court's previous conclusion that 'as a general matter, legislative fact-finding is entitled to the protection of legislative immunity,'" the Court emphasized that "the second step in *Menendez* requires us to 'consider the content, purpose, and motive of the act to assess its legislative or non-legislative character.'" *Id.* at 48 (quoting *Menendez*, 831 F.3d at 166).  The *James* Court added that "[o]ur 'dispositive holding' in *Lee* was therefore 'that it is proper to look into a purported legislative act of fact-finding in order to determine if it is, indeed, a legislative act which is privileged, or whether it is an act which falls outside of any legislative immunity.'"  *Id.* (quoting *Lee*, 775 F.2d at 526).  Examining the facts alleged in the indictment, the Court had little difficulty in concluding that "the conduct for which James has been charged is inherently non-legislative," and that the "alleged conversion of [the] funds falls squarely within the category of 'illegitimate' and such actions are inherently non-legislative." *Id.* at 46.  In so doing, the Court not only quoted *Lee*, but underscored that "*Lee* can be fairly read to not only encompass 'formal' fact-finding efforts – such as legislative hearings or subpoenas – but also so-called 'informal' fact-finding efforts" such as the informal trips to New York and Washington, D.C. at issue in that case. *Id.* at 47 & n.6 (citing *Lee*, 775 F.2d at 517, 521).

---

[33] Although *James* involved the analysis of the Organic Act of the Virgin Islands rather than the Speech or Debate Clause, the Third Circuit noted that the Virgin Islands statute contained "language similar to the Speech or Debate Clause", and further noted that "'the interpretation given to the Speech or Debate Clause of the Federal Constitution, while not dispositive as to the meaning of the legislative immunity provision for the Virgin Islands, is, nevertheless, highly instructive.'" 888 F.3d 42, 45-46 (quoting *Lee*, 775 F.2d 520).

II.  **Defendant's Actions As Alleged in the Indictment are not Immunized by the Speech or Debate Clause.**

McIver's Brief spends almost thirty pages focusing on her actions relating to oversight responsibilities and efforts in the area of immigration legislation. But it is nearly silent about the actual conduct that led to the charges against her.  In McIver's view, "[t]he indictment charges a sitting Member of Congress, Congresswoman LaMonica McIver, for a congressionally authorized oversight inspection she conducted with two of her colleagues at Newark's Delaney Hall, a privately run inspection detention center in her District, on May 9, 2025."  ECF No. 19-1 at 2.  That fundamentally misreads the indictment and ignores both the actual charges brought against her and the actual conduct that forms the basis of those charges.

As a preliminary matter, the Government does not take issue with McIver's characterization of the inspection of Delaney Hall with her fellow Members as a "legislative act."  As referred to above, the *James* Court affirmed the lower court's finding that "as a general matter, legislative fact-finding is entitled to the protection of legislative immunity," to include informal trips in pursuit of that goal. 888 F.3d at 47 & n.6.  And consistent with that view, Immigration and Customs Enforcement ("ICE") officials ultimately allowed McIver and the two other U.S. Representatives who accompanied her to Delaney Hall on May 9, 20205 to inspect the facility that very same day, even after the defendant forcibly impeded and interfered with the arrest of the Mayor of Newark.  But the legislative activities that brought her to Delaney Hall to inspect the facility, although protected, is separate and distinct from the conduct gave rise to the charges in the indictment.

Perhaps recognizing that forcibly interfering and impeding with the arrest of the Mayor cannot be characterized as a "legislative act," McIver claims that charging her for her "reaction" to that arrest "rel[ies] upon protected legislative acts" and that "Congresswoman McIver's acts of legislative oversight would be at the core of any trial in this case." ECF No. 19-1 at 3. She contends that "[t]he jury would necessarily hear about her focus on immigration policy, and her history of congressional oversight in the area," including "her February 2025 visit to another immigration detention facility in Elizabeth, and her meeting the following month with Immigration and Customs Enforcement ("ICE") regional officials to discuss such inspections at ICE's office in Newark." *Id.*

To the contrary, the jury will hear such details only if McIver introduces them over the Government's Rule 401/403/jury nullification objections. But even if those objections are overruled, the speech or debate analysis focuses on what *the Government* has alleged (and, thus, how *the Government* will prove it), not on how the defendant hopes to defend herself. Here, to prove beyond a reasonable doubt that McIver violated 18 U.S.C. § 111(a)(1), the Government will prove that on May 9, 2025, she used her forearms to forcibly strike a federal Agent who was attempting to arrest someone outside the gate to Delaney Hall, and she used her hands to forcibly grab and pull at that agent's jacket. ECF No. 1 at 5, ¶¶ 13,14 and 16. Nothing about that touches on oversight activities.

Indeed, the indictment is silent above McIver's February 2025 visit to the immigration detention facility in Elizabeth and makes no mention of her meeting the

following month with ICE officials.  The reason for this should be obvious:  those details are irrelevant to the proofs that the Government must adduce.  Perhaps McIver may attempt to introduce these matters into evidence, but the Government has no intention to do so for the simple reason that those details do not tend to make it more likely that she committed the charged offenses.  Fed. R. Evid. 401(b). And, of course, McIver may not rewrite the Government's indictment to suit her litigation position.  *See United States v. Perez-Otero*, No. CR 21-474 (ADC), 2023 WL 2351900, at *6 (D.P.R. Mar. 3, 2023) ("The Court declines Pérez-Otero's invitation to rewrite the indictment and read something into it that is simply not there.").

McIver further contends that "the trial would place [her] legislative acts squarely at issue, asking the jury to evaluate her motives and purposes in undertaking those acts." ECF No. 19-1 at 4.  She also claims that the jury would be required to "pass judgment on Congresswoman's reasonable understanding of the scope and applicability of her legislative authority . . ." *Id.*  This is also incorrect.  First, the Government does not contest that McIver had the authority to conduct an inspection of Delaney Hall, and her authority to do so should not be an issue at trial.  Second, the jury will not be asked to evaluate her motives and purposes in conducting the inspection on May 9, 2025, because those motives are irrelevant to whether she violated § 111 when she interfered with and impeded the arrest of the Mayor.

Returning to first principles, the first step of the two-step test described in both *James* and *Menendez* "is to 'look to the form of ***the act*** to determine whether it is inherently legislative or non-legislative.'" *James*, 888 F.3d at 44 (emphasis added)

(quoting *Menendez*, 831 F.3d at 166). "[S]ome acts are so clearly non-legislative that no inquiry into their content of underlying motivation or purpose is needed to classify them . . . and, of course, illegitimate activities such as accepting bribes in exchange for official action," constitute obvious non-legislative acts. *Menendez*, 831 F.3d at 166; *accord James*, 888 F.3d at 46 (rejecting Speech or Debate Clause immunity because "[t]he actions complained of in the indictment are not James' informal fact-finding actions, but are instead illicit activities that are at most tangential to such informal fact-finding.").

Here, McIver *never argues* that her legislative authority entitles her to engage in assaultive conduct, and for good reason.[34] The allegations in the indictment are similar to those in *James* in that "the actions complained of" – in this case, McIver's efforts to interfere and impede the arrest of the Mayor – "are not [defendant McIver's] informal fact-finding actions, but are instead illicit activities that are at most tangential to such informal fact-finding." *James*, 888 F.3d at 46. In short, McIver has been indicted for the "non-legislative act" of assault. This Court, in applying the Third Circuit's directive in *Menendez*, need not go beyond the first step to deny the motion. Impeding and assaulting federal Agents who are engaged in an arrest is inherently non-legislative.

---

[34] South Carolina Representative Preston Brooks brutally beat Massachusetts Senator Charles Sumner with a cane in the Senate Chamber on May 22, 1856 after Sumner had delivered an anti-slavery speech criticizing another Senator related to Representative Brooks. While the setting of this vicious attack was literally within the legislature and directly related to a legislative act by Senator Sumner, and any speech delivered by Representative Brooks would qualify as a "legislative act," Brooks was prosecuted and fined for assault, something that would have been impossible had McIver's view of speech or debate immunity prevailed. *See* Anastaplo, George, "*Abraham Lincoln, Lawyers, and the Civil War: Bicentennial Explorations,*" 35 Okla. City L.Rev. 1,20-21 (Spring 2010); *Groppi v. Leslie*, 436 F.3d 331, 333, n.5 (7th Cir. 1971).

Much of McIver's brief attempts to blur the distinction between the clearly legislative act of conducting an inspection of Delaney Hall and the non-legislative act of interfering and impeding with the arrest of the Mayor.  She devotes almost four pages of her brief to reciting the various allegations set forth in the indictment and the evidence supporting each such allegation for the proposition that "its allegations categorically describe conduct that took place in the course of a federally authorized oversight inspection . . ."  ECF No. 19-1 at 8.  But a review of the allegations listed by McIver reveals that most of those allegations are clearly non-legislative, including: (i) the Mayor's arrival and initial denial of entry into the facility, (ii) Victim-1's explanation to the Mayor that he was not authorized to be on Delaney Hall's grounds; (iii) Victim-1's announcement that he was going to arrest the Mayor; (iv) the Mayor's departure through the gate, and his subsequent arrest; and (v) McIver's striking Victim-1 with her forearm during the arrest, the use of her forearms to push past another agent, as federal Agents were attempting to arrest the Mayor. *See* ECF No. 19-1 at 9-11.  It is hard to fathom how any of these actions described in the indictment can be deemed "legislative acts."  They occurred outside the facility.  They involve the arrest of an individual who was not authorized to conduct an oversight inspection at the Delaney Hall facility.  And after these obstructive actions took place and the Mayor's arrested had been effected, McIver and her fellow Representatives turned back to what were indeed actual legislative acts, namely their inspection the Delaney Hall facility.

Nevertheless, McIver asserts that "every single allegation in the indictment occurred *during* a few moments" of an authorized inspection of Delaney Hall. *Id.* at 11

(emphasis added).  In short, she appears to premise her claim for immunity under the Speech or Debate Clause not on the content of her actions but upon their timing.  In other words, under McIver's theory of immunity, once she had commenced undertaking a legislative act – in this case the fact-finding inspection of Delaney Hall – the Speech or Debate Clause afforded her immunity for any action she might undertake during the pendency of that inspection regardless of the content of any such action.

But this view of the Speech or Debate Clause runs contrary to both common sense as well as case law.  A hypothetical amply illustrates the untenable nature of this view. Imagine, for example, that McIver, while touring Delaney Hall, smuggled in contraband that she surreptitiously slipped to a detainee.  Such conduct would violate a number of federal and state statutes, and it would certainly have no legitimate legislative purpose. But under McIver's theory of immunity, she would be immune from prosecution because it occurred *during* an otherwise legitimate legislative act that in and of itself would be protected under the Speech or Debate Clause, and prosecutors would not be able to present the case to a jury without speaking about the otherwise legitimate legislative acts that occurred prior to and after the smuggled contraband was handed to the detainee.  It defies logic to believe that the Founders envisioned the immunity conferred by the Speech or Debate Clause sweeps so broadly.  And case law makes it clear that this theory of wide-ranging immunity is untenable.  In *James*, the Third Circuit noted that "[i]n providing examples of inherently non-legislative actions, *Menendez* explicitly mentioned 'illegitimate activities such as accepting bribes. . .'" 888 F.3d at 46; *see also*

*Brewster*, 408 U.S. at 526 ("[T]aking a bribe is, obviously, no part of the legislative process or function; it is not a legislative act.").

In short, McIver's efforts to seek safe harbor in the immunity provisions of the Speech or Debate Clause fail because that Constitutional provision does not afford protection for illegal actions that do not constitute "legislative acts." Moreover, the proximity in time of non-legislative – and in fact illegal – acts to a bona fide legislative act do not serve to convert those alleged criminal acts into "legislative acts" entitled to the protection of the Speech or Debate Clause. Accordingly, this Court should deny McIver's motion to dismiss the indictment based on the Speech or Debate Clause.

### III. This Court Should Not Invoke *Trump v. United States* to Invent A New Form Of Immunity for Members of Congress Beyond What is Already Afforded Under the Speech or Debate Clause.

In addition to relying on the Speech or Debate Clause, McIver invites this Court to craft a form of immunity for Members of Congress that is even broader in scope. ECF No. 19-1 at 27-30. She relies on *Trump v. United States*, 603 U.S. 593 (2024), a decision that invoked separation of powers principles in establishing the boundaries of presidential immunity. For a number of reasons, this Court should reject McIver's invitation and should deny her motion to dismiss the indictment on this alternate basis.

To begin with, the Founders explicitly wrote a form of legislative immunity in Article I of the Constitution for Members of Congress. No such explicit immunity is set forth in Article II. Nevertheless, the Supreme Court has found that the Constitution grants immunity to Presidents by necessary implication in Article II. While legislative immunity is rooted in the Constitution's Speech or Debate Clause, there is no textually

based Presidential immunity doctrine explicitly spelled out in Article II of the Constitution. The Courts have long recognized, however, that the need for some degree of Presidential immunity is as compelling as the need for legislative immunity. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952)*; see also* Nixon *v. Fitzgerald*, 457 U.S. 731 (1982). However, the prosecution that culminated in the *Trump v. United States* decision represented the first time a former President had ever been prosecuted for official acts undertaken while in office. While prosecutions of numerous Senators and Representatives had previously helped flesh out the contours of the reach of the Speech or Debate Clause, the Supreme Court in *Trump* tackled questions of Presidential immunity that the Judiciary had never previously addressed.

McIver correctly notes that *Trump* conferred "absolute immun[ity] from criminal prosecution for . . . acts within his exclusive sphere of constitutional authority," and "presumptive immunity from criminal prosecution for . . . acts within the outer perimeter of his official responsibility." ECF No. 19-1 at 27 (quoting *Trump*, 603 U.S. at 609, 614). The *Trump* Court premised its holding on the conclusion "that under our constitutional structure of separated powers, the nature of Presidential power requires that a former President have some immunity from criminal prosecution for official acts during his tenure in office." *Trump*, 603 U.S. at 606. McIver then argues that the "reasoning [of *Trump*] applies with at least as much force in the context of legislative immunity, where courts have for centuries recognized the imperative of 'insuring the independence of individual legislators.'" ECF No. 19-1 at 2 (quoting *Brewster*, 408 U.S. at 507).

64

In support of her argument, McIver quotes from a variety of cases explaining the importance of immunity for legislators.  For example, she quotes *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 503 (1975), for the proposition that "a Member facing criminal charges would 'divert their time, energy, and attention from their legislative tasks,'" *id.* at 28, as a justification for the expanded immunity she seeks.  Similarly, she cites to *Kilbourn v. Thompson*, 103 U.S. 168 (1880), where the Supreme Court echoed the words of the Massachusetts Supreme Court which, while discussing an analogous immunity provision for Massachusetts legislators, stated "[t]hese privileges are thus secured, not with the intention of protecting the members against prosecutions for their own benefit, but to support the rights of the people, by enabling their representatives to execute the functions of their office without fear of prosecutions, civil or criminal.'" (quoting *Coffin v. Coffin*, 4 Mass. 1 (1808)).

*Eastland, Brewster, Kilbourn* and *Coffin* certainly provide ample rationale for shielding Members of Congress from prosecution for "legislative acts."  But the Founders did just that by placing the Speech or Debate Clause in the text of the Constitution, which obviated the need for the Judiciary to create an immunity based on the structure of the Constitution.[35]  In short, these cases interpreted the reach of the Speech or Debate

---

[35] *Coffin* itself actually dealt with a provision of the Constitution of the State of Massachusetts of 1780, but the *Kilbourn* Court invoked it because "[w]e have been unable to find any decision of a Federal court on this clause of section 6, article 1 [the Speech or Debate Clause]" and believed that the Massachusetts provision regarding immunity for legislators "must have been in the minds of the members of the constitutional convention." 103 U.S. at 202-204.  Thus, the *Kilbourn* Court was looking to the Massachusetts provision to aid its analysis of the Speech or Debate Clause for which they could find no federal court precedent analyzing the provision.

Clause but did not create a separate basis for legislative immunity. With respect to Presidential immunity, however, the Supreme Court in *Trump* had to rely on the structure of the Constitution to recognize a form of Presidential immunity similar to the one legislators already enjoyed.

Moreover, unlike the Members of Congress, the President, as the head of the Executive Branch, does not engage in "legislative acts." Rather, as discussed in *Trump*, the President engages in "official action" when he acts pursuant to "constitutional and statutory authority," 603 U.S. at 617 (quoting *Nixon*, 457 U.S. at 757). The *Trump* Court further explained that "[c]ritical threshold issues in this case are how to differentiate between a President's official and unofficial actions." 603 U.S. at 617.

The *Trump* decision sets forth a framework for determining what qualifies as an official act within the President's "conclusive and preclusive" authority entitled to absolute immunity, and what qualifies as an unofficial act which is not entitled to immunity and for which prosecution is not barred. The *Trump* Court also held that there is at least a "presumptive immunity" that applies to a President's acts within the "outer perimeter of the President's official responsibilities." *Id.* at 618 (citations omitted).

McIver, unsatisfied with the protections afforded her by the Speech or Debate Clause, asks this Court to graft the *Trump* framework onto the immunity already enjoyed by Member of Congress because "*Trump's* reasoning applies with equal, if not greater, force to legislators." Doc. No. 19-1 at 28. McIver's argument ignores the particular evolution of judicially created immunity pertaining to the Office of the

President. It also ignores, as *Trump* and other cases have emphasized, the unique considerations of immunity that apply to the Presidency:

> The President 'occupies a unique position in the constitutional scheme', *Fitzgerald*, 457 U.S. at 749, [citations omitted], as 'the only person who alone composes a branch of government.' *Trump v. Mazars USA, LLP*, 591 U.S. 848, 868, (citations omitted) (2020). The Framers 'sought to encourage energetic, vigorous, decisive, and speedy execution of the laws by placing in the hands of a single, constitutionally indispensable, individual the ultimate authority that, in respect to the other branches, the Constitution divides among many.' *Clinton v. Jones*, 520 U.S. 681 (citations omitted)(1997) (Breyer, J., concurring in the judgment).

603 U.S. at 610. Furthermore, the *Trump* Court noted that "[t]he Framers accordingly vested the President with 'supervisory and policy responsibilities of utmost discretion and sensitivity,'" who must make 'the most sensitive and far-reaching decisions entrusted to any official under our constitutional system.'" *Id.* at 610-11 (quoting *Fitzgerald*, 457 U.S. at 750, 752). *Fitzgerald* also "recognized that as 'a functionally mandated incident of [his] unique office, a former President 'is entitled to absolute immunity from damages liability predicated on his official acts,'" in part because the President's duties implicate 'matters likely to 'arouse the most intense feelings,' coupled with the sheer prominence of the office." *Trump*, 603 U.S. at 611 (quoting *Fitzgerald*, 457 U.S. at 751-53.) Thus, it is clear from *Trump* and *Fitzgerald* that the unique concerns attending the Office of the Presidency create a heightened need for a broad concept of immunity. While these concerns may apply to a lesser albeit not insignificant degree to Members of Congress, the acute and unique need for broad Presidential immunity does

not apply equally to legislators who, in any event, are amply protected by the explicit language of the Speech or Debate Clause. Indeed, precisely because the Framers included a Speech or Debate Clause in the Constitution, courts should not expand the scope of the immunity our Framers chose. *See generally* Charles W. Johnson IV, Comment, *The Doctrine of Official Immunity: An Unnecessary Intrusion into Speech or Debate Clause Jurisprudence*, 43 Cath. U. L. Rev. 535, 573-76 (1994).

Finally, even if McIver could convince this court to apply the *Trump* framework to expand legislative immunity beyond that which she enjoys under the Speech or Debate Clause, she would face the same dilemma: the violations of Section 111(a)(1) set forth in the indictment no more qualify as "official acts" than they do as "legislative acts." Accordingly, the separation of powers argument premised on *Trump v. United States* should be likewise rejected as a basis for dismissing the indictment.

## <u>Defendant's Motion For Additional Discovery Pursuant to Rule 16 Should Be Denied.</u>

Defendant has filed a motion seeking additional discovery to which she believes she is entitled under Rule 16 of the Federal Rules of Criminal Procedure. These items are in addition to the discovery she seeks in support of her motion for dismissal on the basis of alleged selective prosecution and enforcement as well as for alleged vindictive prosecution. Defendant's motion for expanded Rule 16 discovery should be denied as it is either: (1) moot because the Government has agreed to provide her with what she seeks; (2) asks for evidence that doesn't exist; or (3) seeks material that is not discoverable under Rule 16.

## I.    <u>Surveillance and Other Video Requests</u>

Defendant requests a variety of video surveillance materials to which she believes she is entitled pursuant to Rule 16. Because these items will either be provided to Defendant or do not exist, the Defendant's request in this regard should be denied as moot.

### a.    <u>Internal Video From Delaney Hall Relating to Defendant's Tour of the Facility</u>.

Defendant seeks video footage from within the Delaney Hall facility which captured her inspection tour of the detention center on May 9, 2025. On that tour, which immediately followed the Mayor's arrest, she was accompanied by Representatives Watson Coleman and Menendez. Defendant contends that this footage is "relevant to the defense" in part because the "footage is probative of Congresswoman McIver's state

of mind, as well as the state of mind of the alleged victims and their colleagues." ECF 22-1, at 8.

The Government does not agree with Defendant's assertion that this video footage falls within the reach of Rule 16.  To begin with, it is uncontested that this tour occurred.  In addition, it occurred after the relevant events that are discussed in the Indictment, and it is difficult to conceive how it would be admissible at trial as it is immaterial to the charges.  Further, the Government is at a loss to understand how it is probative of Defendant's state of mind let alone the states of mind of the victims who were not part of this tour.

Nevertheless, the Government, which has long represented that these videos would be collected and provided to the Defendant, will indeed produce them as discovery even though the Government does not believe it is under any obligation to do so.[36]  ICE is currently reviewing the footage requested by Defendant to excise hours of video during the relevant timeframe which does not capture the Congressional tour.

>    b.  <u>All Body Worn Camera Footage that was Captured
>        has been Provided to Defendant.</u>

Defendant asserts that the Government has produced body worn camera ("BWC") footage from 11 ICE officers who were present at the time of the Mayor's arrest but points out – correctly – that the number of officers and ICE personnel exceeded this total.  Defendant insinuates that the Government's failure to produce BWC footage from all personnel present means that either the Government has yet to provide her all of the

---

[36] Given that these tapes are likely irrelevant to the charges faced by Defendant, the Government reserves its right to challenge their admissibility at trial.

existing BWC video from that day or that some officers did not adhere to procedures by failing to activate their BWCs when instructed to do so and in accordance with ICE policy.

While Defendant is correct that the number of ICE and DHS personnel present at the location of the arrest exceeded the number of officers whose BWCs captured footage that day, she is incorrect in speculating that there is either additional footage to be produced or a failure to activate BWCs on the part of ICE personnel. During May of 2025, ICE New Jersey was in the process of distributing BWCs to certain personnel as part of a pilot program undertaken by ICE nationwide. Before an individual officer was equipped with a BWC, he or she needed to be trained in the proper use of the equipment. As of May 9, 2025, numerous officers who were eligible to wear BWCs had, in fact, received the required training, including the 11 officers whose BWC footage has been produced to Defendant.

However, four of the officers who were present at Delaney Hall on May 9, 2025, had not yet received the required training and therefore were not equipped with BWCs, including the officer who is identified as Victim-2 in Count 2 of the Indictment. One other officer who was present that day had received the training did not have his BWC with him when he arrived at Delaney Hall and accordingly did not produce any recording. In addition, DHS employees who are members of management, including Victim-1, are not equipped with BWCs.

Accordingly, all BWC footage captured on May 9, 2025, has been provided in discovery, and no officer ignored applicable regulations by failing to activate his or her

BWC on that date.  As represented in the Government's letter of August 11, 2025, *see* Cortes Decl. Exhibit M (the "August 11 Letter"), written in response to Defendant's additional discovery requests set forth in Defendant's letter dated July 30, 2025, *see* Cortes Decl. Exhibit K, the Government will provide the names and ranks of the ICE officers and personnel present on May 9, 2025 and will identify which of these individuals was equipped with a BWC on the date in question – upon the execution of a protective order that would limit the dissemination of this information to the members of the defense team only.  This should be accomplished by the end of September.

Finally, in the August 11 Letter, the Government agreed to provide any video footage that had been captured relevant to the events set forth in the Indictment which had been recorded by cameras located in the ICE vehicles that were parked in the immediate vicinity of the Delaney Hall gate on May 9, 2025.  Since that date, agents have confirmed that the relevant vehicles were not equipped with video cameras that captured video footage of the events in question.  Thus, there is no such video material to produce in discovery.

## II.    Defendant's Requests for Written or Digital Communications

Defendant also contends that under *Brady v. Maryland*, 373 U.S. 83 (1963), she is entitled to "any and all government communications that indicate or show a *lack* of fear, harm, or intimidation on the part of every officer and agent who was present on the scene- especially, but not only, those whom the indictment identifies as victims in all three counts."  ECF 22-1, at 3.  Defendant also asserts that the Government "must preserve, collect, and then review all of the officers' and agents' contemporary communications, throughout the entire episode at Delaney Hall and afterwards, across

all communications platforms (text, voice, instant, chat or email . . ." *Id.* Defendant further elaborates that the Court should order the Government to produce all communications of any Government personnel present at Delaney Hall on May 9, 2025, reflecting or implying that the employee "did not experience or report harm, injury, danger, or fear as a result of Congresswoman McIver's actions." *Id.* at 10.

Defendant's request, to say the very least, is overbroad. To begin with, communications regarding a "lack of harm" or "injury" are irrelevant to the charges which Defendant faces. The Government does not need to show harm or injury to satisfy the elements of the offenses charged, and therefore any communications indicating that no persons, whether Government employees or otherwise, were harmed or injured as a result of Defendant's actions are irrelevant to the charges and cannot be characterized as *Brady* material.

This leaves statements by officers demonstrating a "lack of fear" stemming from McIver's conduct as the only remaining basis for Defendant's contention that their statements might be exculpatory and should be turned over as *Brady* material. However, "[n]either bodily harm nor the creation of apprehension is a requirement for an 'all other cases' assault under 18 U.S.C. § 111."[37] *United States v. Ramirez*, 233 F.3d 318, 322 (2000), *rev'd on other grounds, United States v. Cotton*, 535 U.S. 625, 629-31 (2002). Moreover, the statute may be violated in one of six ways, namely by assaulting,

---

[37] The phrase "all other cases" refers to the violations of 18 U.S.C. § 111(a) which do not involve a deadly weapon or bodily injury. As stated, there is no allegation that Defendant used a deadly weapon or inflicted any bodily injury. Thus, the charges against her fall within the "all other cases" category.

resisting, opposing, impeding, intimidating or interfering with a federal officer, all of which require forcible conduct. The only one of these actions that arguably carries with it any concept of "fear" is intimidation, and even there the focus is on the actions and intent of the accused. Clearly, the concept of impeding or interfering with a law enforcement officer in the performance of his official duties – the listed actions that most closely track Defendant's actions - does not require that the officer being impeded or interfered with experienced fear.

That being said, the officers involved have been directed to retain their communications relating to their actions on May 9, 2025 at Delaney Hall. The Government is aware of its *Brady* obligations and will turn over any communications that could be reasonably deemed exculpatory.

### III. Defendant is not Entitled to Internal Policies of DHS and ICE Relating to Crowd Escalation or Conducting Arrests.

Defendant's final expanded discovery request seeks all policies, manuals and training materials of DHS, ICE, HSI and any other federal agency involved in the events of Delaney Hall on May 9, 2025, including those involving crowd control and de-escalations, effectuating arrests, safety considerations and the use of force in law enforcement operations, deployment of vehicles for crowd control and for visits to ICE detention and other facilities by Members of Congress. In addition, Defendant seeks all records concerning the training of every federal officer and agent present at Delaney Hall on May 9, 2025.

Defendant's request is breathtaking in its scope, and she offers little to justify its breadth. Her request is also irrelevant for any defense that she might mount for one

simple reason:  if law enforcement failed to adhere to policies or guidelines set forth in DHS, ICE or HSI manuals, that offers no defense to the charges brought against Defendant.  Simply put, Defendant was not entitled to assault, interfere with or impede law enforcement officers in the performance of their official duties even if their actions ran counter to written policies especially given that she was not the subject of the arrest. Nothing required Defendant to interject herself into the middle of law enforcement's efforts to arrest the Mayor.  Defendant could have remained within Delaney Hall's fence while the ICE agents proceeded outside to effect the arrest.  She chose, of her own free will, to move rapidly through the fence, surround the Mayor, and make forceful contact with at least two law enforcement officers as she attempted to thwart their efforts. Whether the officers were following each regulation or policy regarding the way in which an arrest was to be made or how crowd control is to be best achieved does not negate any of the elements of the offense which the Government must prove to secure a conviction.

Defendant contends that she is "entitled to know whether the law enforcement personnel on site did not follow their own agency's policies or regulations, or if their training was insufficient or not up to date, or the supervisors on site failed to enforce their requirements."  ECF 22-1, at 12.  Defendant offers little explanation as to why she is so entitled, other than the conclusory claim that they "are material to the defense." *Id.* But she does not explain how those items may be material to her defense other than claiming that failures to adhere to those policies "may well have contributed to the outcome of the day's events." *Id.*  Defendant provides no example of a court that has ordered such wide-ranging discovery and cites no case law to support her request.

But "[m]ateriality means more than that the evidence in question bears some abstract relationship to the issue in the case. There must be some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor." *United States v. Maniktala*, 934 F.2d 25, 28 (2d Cir. 1991) (quoting *United States v. Ross*, 511 F.2d 757, 762-63 (5th Cir. 1975). And a defendant must make a *prima facie* showing of materiality before being entitled to the discovery sought. *United States v. Urena*, 989 F.Supp.2d 253, 261 (S.D.N.Y. 2013). Further, "evidence is material as long as there is a strong indication that it will play an important role in uncovering admissible evidence, aiding in witness preparation, corroborating testimony, or assisting in impeachment or rebuttal." *United States v. Caro*, 597 F.3d 608, 621 (4th Cir. 2010) (quoting *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993).

Here, Defendant does not even attempt to make out a *prima facie* case in support of her claim of materiality. Further, she makes no effort to explain why the materials she seeks would be admissible in evidence. This is hardly surprising since whether, for example, ICE officials followed internal Guidelines on crowd control, the use of deployment of vehicles relating thereto, or any guidelines regarding general safety considerations would be irrelevant and inadmissible at trial. Again, whether agents failed to adhere to any of these policies or training directives is immaterial to whether Defendant violated federal law. Defendant does not even attempt to suggest that failure to adhere to such policies entitled her to assault, interfere with, or impede the Mayor's arrest because such a claim would be clearly untenable.

Accordingly, because Defendant does not even attempt to explain how the documents she seeks are material to her defense and cannot do so, this Court should deny this request in its totality.

## Conclusion

For the reasons set forth, Defendant's motion for additional discovery pursuant to Rule 16 should be denied because the evidence she seeks will be produced, does not exist, or seeks material to which she is not entitled.

## **Defendant's Motion to Restrain the Government from Making Extrajudicial Statements Should be Denied as Moot**

Defendant's final motion seeks to have this Court direct DHS to remove certain publicly available press releases referencing Defendant and to direct the Government to refrain from similar conduct in the future. Defendant specifies five public posts by DHS, including four press releases to which she objects as both inaccurate and prejudicial.

As an initial matter, it should be noted that the U.S. Attorney's Office does not exercise authority over DHS even at a local level. Nevertheless, this Office has communicated with DHS to request that DHS remove the postings to which Defendant objects. To the extent that DHS does so, McIver's motion will be moot.

Moreover, any potential prejudice that may have flowed from the press releases can be readily screened for during jury selection should Defendant desire that the Court so inquire. *See United States v. Corbin*, 620 F.Supp.2d 400, 411 (E.D.N.Y. 2009) ("[t]he Court finds that the defendant has not shown that the press release has so permeated the public as to have hindered the ability of the Court, probably some six months or more from now, to impanel a fair and impartial jury in this case, especially in light of the size of the jury pool in this huge district").

As for Defendant's request seeking an order to restrain the Government from making future objectionable communications regarding Defendant, it bears note that she does not cite any objectionable statements or press releases issuing from the U.S. Attorney's Office about her, and it is appropriate for the "Court to presume[] that the Government, its attorneys, agents and investigators are aware of and will comply with their ethical obligations concerning trial publicity." *Corbin*, 620 F.Supp.2d at 412.

Finally, the Court should deny Defendant's request to compel the Government to seek out any additional statements "that DHS or any federal employee has made about this matter" regardless of whether they appeared on a government or private platform as clearly overbroad. ECF 21-1, at 17.  Should Defendant become aware of any such statement that she finds objectionable, she should first bring it to the attention of the Government to see if a satisfactory resolution may be reached, and if not, file an appropriate motion. The Court should decline to impose what would be an onerous obligation on the Government to search out any public statement from any Government source or employee on myriad platforms that the Defendant may find objectionable.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should deny McIver's Motion to Dismiss the

Indictment in all respects and deny her motion for discovery in support of those motions.


Respectfully submitted,

TODD BLANCHE
U.S. Deputy Attorney General

ALINA HABBA
Acting United States Attorney
Special Attorney


By:      /s/ Mark J. McCarren
Mark J. McCarren
Benjamin D. Bleiberg
Assistant United States Attorneys

Dated: September 15, 2025
       Newark, New Jersey