UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>LaMONICA McIVER. | Hon. Jamel K. Semper<br><br>Crim. No. 2:25-cr-00388-JKS |

**SUPPLEMENTAL BRIEF IN SUPPORT OF CONGRESSWOMAN McIVER'S
MOTION TO DISMISS COUNT TWO BASED ON LEGISLATIVE IMMUNITY**

December 9, 2025

ARNOLD & PORTER KAYE SCHOLER LLP
One Gateway Center
Suite 1025
Newark, NJ 07102

*Counsel for Congresswoman LaMonica McIver*

On the Memorandum:

Paul J. Fishman
Lee M. Cortes, Jr.
John M. Fietkiewicz
Samuel F. Callahan
Orion de Nevers
Amanda J. Raines

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................... 1

ARGUMENT .................................................................................................................................. 2

    A.    Entering a DHS Facility to Conduct Oversight is a Legislative Act ......................... 3

    B.    Count Two Charges Congresswoman McIver's Entering Delaney Hall to Conduct Oversight ............................................................................................................. 6

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Eastland v. U.S. Servicemen's Fund*,
　421 U.S. 491 (1975)..........................................................................................5, 6

*McGrain v. Daugherty*,
　273 U.S. 135 (1927)................................................................................................3

*Tenney v. Brandhove*,
　341 U.S. 367 (1951)................................................................................................6

*United States v. McDade*,
　28 F.3d 283 (3d Cir. 1994)..................................................................................3, 5

*United States v. Menendez*,
　831 F.3d 155 (3d Cir. 2016)....................................................................................5

*Washington v. Davis*,
　426 U.S. 229 (1976)................................................................................................6

**Statutes**

Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, div. A, Title V, § 532,
　133 Stat. 13, 42 (Feb. 15, 2019)..............................................................................4

Consolidated Appropriations Act, 2020, Pub. L. No. 116–93, div. D, Title V, §
　532(a), 133 Stat. 2317, 2530 (Dec. 20, 2019).........................................................5

Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-
　4, §§ 1101(a)(6), 1105, 139 Stat. 9, 11 (Mar. 15, 2025).........................................5

FY2024 Appropriations Act, div. C, Title V, § 527, Pub. L. No. 118-47, 138 Stat.
　460, 619 (Mar. 23, 2024) .....................................................................................3, 4

**Legislative Materials**

H.R. Rep. No. 116-163 (2019).........................................................................................4

**Other Authorities**

Brett Samuels, *Dem lawmakers make surprise visit to ICE detention center*, The
　Hill (June 17, 2018) .................................................................................................4

NJ Spotlight News, *Watch: Newark mayor arrested outside Delaney Hall in ICE protest* (YouTube, May 9, 2025),
https://www.youtube.com/watch?v=IYF0wTbG9Ug .................................................8, 9, 10, 11

Rep. LaMonica McIver (@RepLaMonica), X (May 9, 2025, at 1:44 ET),
https://x.com/RepLaMonica/status/1920897700091851210 ......................................................7

**INTRODUCTION**

In its November 13, 2025, opinion, the Court explained that Congresswoman McIver's motion to dismiss Count Two of the indictment on the basis of legislative immunity turns on her "motive in reentering the facility in Count Two, and whether her intent was related to her oversight duties." Op.24, ECF No. 44. The Court reserved its decision on that question, reasoning that the Congresswoman's "predominant purpose" in reentering Delaney Hall could "only be established by facts that the parties [had] not yet put before the Court," and waiting to resolve it "until the factual record" could be "developed further." Op.24. At a subsequent status conference held on November 17, 2025, the Court emphasized that its analysis of Count Two would be informed in particular by the "interplay" between "the alleged charged conduct in Count Two," which took place as Congresswoman McIver "was trying to enter into the facility," and the Congresswoman's corresponding authorization to enter and inspect DHS detention centers under § 527 of the Further Consolidated Appropriations Act of 2024. Status Conf. Tr. 17:8-13.

Inexplicable delays in the government's discovery productions mean that the record continues to be developed.[1] But the evidence now available shows that Congresswoman McIver's "motive in reentering the facility" was crystal clear: her purpose for reentering Delaney Hall's secured area was to complete her § 527 oversight inspection. Op.24. Indeed, the evidence is unequivocal that Congresswoman McIver diligently pursued that objective throughout the afternoon of May 9 despite ICE's repeated attempts to impair her ability to carry out that congressional responsibility; that the momentary contact alleged in Count Two took place when the Congresswoman was trying to reenter the facility; that Congresswoman McIver set out to conduct her oversight inspection *less than 90 seconds* after reentering the secured area; and that

---

[1] Congresswoman McIver will detail these shortcomings in a forthcoming letter to the Court.

the Congresswoman completed her task as soon as agents finally permitted it. In fact, the video evidence confirms that the conduct alleged in Count Two would *never have happened* if ICE agents had not deployed physical force to unlawfully prevent the Congresswoman from reentering Delaney Hall to fulfill her oversight responsibilities.

All that evidence makes unmistakably clear that Congresswoman McIver was engaged in a legislative act when she encountered V-2 as she "reenter[ed] the facility in Count Two." Op.24. Because that "charge cannot be proven without evidence of [her] legislative act," the Count "must be dismissed." *Id.* at 14.[2]

## ARGUMENT

The Court's previous opinion explained that the Speech or Debate Clause "must be read 'broadly' to" shield Members of Congress from liability for "legislative acts," and that it forbids "inquiry" into a legislator's "performance" of legislative acts and "the motivation for those acts." *Id.* at 9-10 (citations omitted). The "Supreme Court has left 'no doubt that evidence of a legislative act of a Member may not be introduced by the Government in a prosecution'—indeed, the Government's evidence may not even 'mention a legislative act.'" *Id.* at 11 (cleaned up). "If a charge cannot be proven without evidence of a legislative act, it must be dismissed." *Id.* at 14. Nevertheless, Count Two here charges Congresswoman McIver for her efforts to enter a DHS facility for the purpose of conducting oversight—a core, statutorily protected legislative act at the very heart of her legislative responsibilities and agenda. That runs headlong into the protection of the Speech or Debate Clause.

---

[2] At the Court's direction, Congresswoman McIver's supplemental brief addresses only "the interplay with 527 and the alleged charged conduct in Count Two." Status Conf. Tr. 17:8-13. Congresswoman McIver incorporates her prior brief by reference and respectfully maintains that she was engaged in legislative acts throughout the time she was present at Delaney Hall on May 9, 2025.

2

### A. Entering a DHS Facility to Conduct Oversight is a Legislative Act

The Court's prior ruling recognized as "axiomatic" that Members of Congress have a right to "enter and inspect" DHS detention facilities, and that doing so is a core legislative act protected by the Constitution's Speech or Debate Clause. Op.23 n.25. As the Court explained, the Clause "provides legislators with immunity when they are engaging in 'fact-finding, information gathering, and investigative activities,'" including when they are conducting "true legislative oversight," the hallmark of which is a formal grant of investigative authority. *Id.* at 12-13 (citations omitted); *see United States v. McDade*, 28 F.3d 283, 299-300 (3d Cir. 1994). Thus, when the "primary purpose" of a legislator's conduct is to "engage in policy-based oversight," that conduct is "protected by the Speech or Debate privilege." Op.12.

Consistent with these principles, Congresswoman McIver indisputably had a formal legislative prerogative "to enter and inspect" Delaney Hall. *Id.* at 15 n.16. The Congresswoman's authority stems from her position as a Member of Congress under Article I; from her role on the House Committee on Homeland Security under House rules; and, most specifically, from § 527 of the Appropriations Act, which expressly authorizes her to conduct unannounced oversight inspections of DHS detention centers. *See McGrain v. Daugherty*, 273 U.S. 135, 160-61, 174-75 (1927); Op.2 n.2; Further Consolidated Appropriations Act, Pub. Law No. 118-47, § 527, 138 Stat. 460, 619 (Mar. 23, 2024).

This Court has recognized that this final source of oversight power, § 527, is particularly relevant here because that is the authority Congresswoman McIver invoked to enter Delaney Hall, and it speaks directly to the act of entering DHS detention centers. The nature and language of the provision is remarkably specific. The law licenses Members of Congress to "*enter[]*, for the purpose of conducting oversight, any facility operated by or for the Department of Homeland Security used to" house detainees, and simultaneously prohibits DHS from using the congressional

3

appropriations that fund it to "*prevent*" a Member from doing so. *Id.* § 527(a) (emphases added). The language of § 527 thus confers a specific right on Members of Congress to enter DHS facilities to carry out oversight investigations, and imposes a corollary duty on DHS agents to admit Members to those facilities without impeding or interfering with their ability to do so, even absent advance "notice." *Id.* § 527(a)-(b). Indeed, the Act goes a step further, banning DHS from making "any temporary modification … that in any way alters what is observed by a visiting Member of Congress." *Id.* § 527(a). The Court's previous opinion aptly summarized the significance of this provision: A Member of Congress's "statutory right to enter and inspect" DHS detention facilities may "not be infringed, even if mistakenly." Op.23 n.25.

     Section 527 uses specific language for a specific reason. Congress adopted the provision to codify its oversight authority after ICE routinely frustrated the efforts of legislators seeking to inspect ICE detention facilities as part of their investigation of the family separation crisis in 2018, often denying Members' entry altogether.[3] Congress swiftly responded to this interference by enacting the Consolidated Appropriations Act of 2019, which prohibited agents from "prevent[ing] a Member of Congress from entering, for the purpose of conducting oversight, any" DHS facility used to house minor detainees. Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, § 532, 133 Stat. 13, 42 (Feb. 15, 2019). That statutory formulation squarely targeted the gatekeeping function DHS had been abusing: the practical ability to turn Members away at the door and thereby thwart real-time, on-the-ground legislative oversight. Since then, Congress has expanded or

---

[3] Homeland Security Improvement Act, H.R. Rep. No. 116-163, 116th Cong., at 17 (2019); *see, e.g.*, Brett Samuels, *Dem lawmakers make surprise visit to ICE detention center*, The Hill (June 17, 2018), https://perma.cc/DPE8-9PZA.

maintained the provision's scope in every DHS appropriations bill since, including one that was passed just months before Congresswoman McIver's inspection.[4]

The formal grant of authority in § 527 makes clear that entering a DHS facility to conduct oversight is a legislative act. The Supreme Court's decision in *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491 (1975) illustrates the point. There, the Court held that Members of Congress had "absolute" legislative immunity for issuing a congressional subpoena pursuant to a Senate subcommittee investigation. *Eastland*, 421 U.S. at 493-94, 509-10. The Court explained that Members of Congress would have been immunized for the antecedent act of *authorizing* the investigation, so they must also be immunized for subsequent acts *effectuating* the investigation; otherwise, the baseline immunity for licensing the investigation "would be meaningless." *Id.* at 505. And because that congressional "grant of authority [was] sufficient to show that the investigation … concerned a subject on which legislation could be had," the subpoena in furtherance of that investigation was an immunized legislative act. *Id.* at 506 (cleaned up). The same is true here: § 527 explicitly authorizes Members of Congress to enter and inspect DHS facilities for oversight purposes, and that "grant of authority" is "sufficient to show" that entering a detention center under § 527 is a formal act of oversight well within the Speech or Debate Clause's protection. *Id.*; *see McDade*, 28 F.3d at 299.

Still, none of this is to say that a Member of Congress may enter a DHS facility for *any* reason or resort to *any* conceivable measure in doing so. Importantly, § 527 applies only to a Member who enters a detention center "for the purpose of conducting oversight." And the Third

---

[4] Consolidated Appropriations Act, 2020, Pub. L. No. 116–93, div. D, title V, § 532(a), 133 Stat. 2317, 2530 (Dec. 20, 2019); Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, §§ 1101(a)(6), 1105, 139 Stat. 9, 11 (Mar. 15, 2025). The 2020 bill expanded the provision to reach all DHS detention facilities (not just those detaining minors) and to cover congressional staff (not just Members themselves).

Circuit's "predominant purpose" test imposes a similar limitation. *United States v. Menendez*, 831 F.3d 155, 173 (3d Cir. 2016). A member who entered a facility for the purpose of "smuggl[ing] in contraband" could satisfy neither test; nor could anyone engaged in pretextual conduct or premeditated wrongdoing. *See* Opp.62, ECF No. 27. Similarly, there may be circumstances in which a Member's conduct entering a facility would foreclose the Member from credibly claiming that their predominant purpose in undertaking that conduct was entering the facility to conduct oversight. But the Court need not identify such hypothetical circumstances to resolve Congresswoman McIver's motion because her actions in reentering Delaney Hall were clearly in furtherance of her oversight agenda. These purpose-bound tests curtail any "potential for abuse," which, in any event, the framers "conscious[ly]" channeled to the political processes. *Eastland*, 421 U.S. at 510-11; *see Tenney v. Brandhove*, 341 U.S. 367, 377-78 (1951).

Ultimately, the scope of a legislative act for a Member of Congress who is conducting a congressional oversight inspection of a DHS detention facility under § 527 is strikingly clear: A Member undertakes a legislative act when she exercises her right to "enter and inspect" an ICE facility and her "predominant purpose" in doing so is "related to her oversight duties." Op.23-25 & n.25. Count Two of the indictment charges Congresswoman McIver for her conduct doing precisely that.

### B. Count Two Charges Congresswoman McIver's Entering Delaney Hall to Conduct Oversight

When a constitutional question requires showing intent, the "most probative evidence … will be objective evidence of what actually happened." *Washington v. Davis*, 426 U.S. 229, 253 (1976) (Stevens, J., concurring). That evidence all points the same way here: Congresswoman McIver's predominant purpose "in reentering" Delaney Hall "in Count Two" was completing "her oversight duties." Op.24. Congresswoman McIver's conduct throughout the

6

period preceding the conduct charged in Count Two, her behavior during the few seconds that comprise the alleged contact for that Count, and her course of action upon returning to the secured area all show that the Congresswoman's sole "motive in reentering the facility" was to complete her oversight inspection. Op.24.

*First,* the context for Congresswoman McIver's presence at Delaney Hall, and her conduct there before exiting the secured area, place a heavy thumb on the scale in favor of concluding that any effort she made to reenter the facility was for the purpose of conducting oversight. The Court has already found, and there is no dispute, that Congresswoman McIver was at Delaney Hall on May 9 to "conduct[] an unannounced congressional oversight inspection," and that she was "statutorily permitted" to do so. *Id.* at 2. That is the *only* reason she came to the facility that day. Video evidence confirms that, upon arriving at Delaney Hall, Congresswoman McIver and her colleagues informed GEO guards and ICE officials that they had come to conduct congressional oversight. Mot. Ex. B at 1:34-3:20; Rep. LaMonica McIver (@RepLaMonica), X (May 9, 2025, at 1:44 ET), https://x.com/RepLaMonica/status/1920897700091851210; *see also* Ex. X at 5. The Members were then "directed to the administrative office, where they" were delayed "for over an hour." Op.3. Nevertheless, throughout that delay, the Members waited "to conduct their inspection," *id.*, and body camera footage shows them executing that oversight mission even during the delay, probing officials about the facility's operations as they waited, Mot. Ex. B at 6:40-15:35, 16:00-17:23.

Congresswoman McIver and the other Members stayed focused on that oversight mission even as the first indication that ICE might attempt to unlawfully arrest Mayor Baraka materialized. When it became evident that ICE was contemplating arresting the Mayor, the Members "exited the administrative office" to assess the situation. Op.4. Outside, they "advised V-1 that they had

7

been waiting for over an hour to exercise their congressional oversight, and that they believed DHS officials had delayed their inspection." *Id.* This standoff resulted in ICE's directing the "Mayor and his detail … outside the Security Gate" rather than arresting him. *Id.* Following that resolution, Congresswoman McIver walked promptly back "toward the administrative office with several DHS agents," where she and the other Members *again* resumed waiting for their oversight tour despite the "questionable" ICE initiative that seemed to be brewing. Op.4, 15; Ex. Z at 2:44:00-2:46:39; Ex. AA at 2:42:20-2:45:30; Ex. BB at 4:07:59-4:12:08. The surveillance footage shows Congresswoman McIver patiently awaiting her tour during this period, again calmly standing by for ICE to facilitate the visit. Ex. Z at 2:44:00-2:46:39.

These initial touchpoints provide critical context for Congresswoman McIver's efforts to "reenter[] the facility in Count Two." Op.24. At every turn, the Congresswoman was intent on completing her oversight visit: it was the objective she announced upon arriving at the facility, and it was her first order of business after ICE's initial encounter with the Mayor subsided. Against that backdrop, it is no surprise that in reentering the secured area following the Mayor's arrest, she was pursuing that same oversight goal for the third time that day.

**Second,** the video footage of Congresswoman McIver's encounter with V-2 reaffirms that throughout that interaction, she was intent on reentering Delaney Hall to conduct the inspection for which she had come—even as ICE agents attempted to unlawfully prevent her from doing so. In particular, after the fracas involving the agents' attempt to arrest the Mayor had subsided, V-1 led the Mayor back inside the Delaney Hall gate. Mot. Ex. A at 1:27:59-1:28:24. Meanwhile, Congresswoman McIver and Congressman Menendez separately moved toward the same gate to reenter the secured area themselves. NJ Spotlight News, *Watch: Newark mayor arrested outside Delaney Hall in ICE protest*, at 0:54-1:00 (YouTube, May 9, 2025),

8

https://www.youtube.com/watch?v=IYF0wTbG9Ug. Video evidence shows that their progress was unimpeded and relatively uneventful for the first few seconds—and it is evident that they would have reentered the facility without incident had they not been physically prevented from doing so. *Id.*[5]

As Congresswoman McIver approached the gate, however, V-2—the officer in camouflage hat and black mask depicted below—retreated from a position near the center of the crowd to a post on the near side of the gate, arriving before the Congresswoman and blocking her path. *Id.* at 0:55-1:00. When V-2 reached the fence in front of Congresswoman McIver, he placed himself squarely between the Congresswoman and the entry. He maintained that position as Congresswoman McIver continued her approach toward the gate, matching her stride step-for-step and deliberately keeping himself between the Congresswoman and the entryway. Thus, the contact alleged in Count Two *never would have occurred* absent V-2's interference.



*V-2 tracks Congresswoman McIver toward the entrance gate, preventing her from reentering the facility.*

---

[5] The Spotlight News video came to light during the course of supplemental briefing only because it was referenced in a May 9, 2025, text message that the government finally turned over on November 26, 2025. HSI special agents exchanged the video in that May 9 conversation, where the agents also acknowledged that the evidence in the video was "bad." Ex. Y at 2-3. The prosecution team therefore clearly knew about the text messages (and thus the video) when disclosures were due in July.

The video also confirms that Congresswoman McIver's conduct during the split-second interaction underlying Count Two is entirely consistent with her motivation to reenter the facility. Indeed, it is *V-2* who *initiated contact with Congresswoman McIver* as she reached the facility's entrance, driving his shoulder into the Congresswoman's chest to block her progress. *Id.* at 0:59; *see also* Ex. CC at 0:52. The video shows that the Congresswoman reacted to V-2's force by reflexively moving him away from her. NJ Spotlight News, *supra* at 0:59-1:00. She drew her arms in protectively around her torso as this happened, and as a result contacted V-2 only with the outside of her forearms as she moved his body away from hers and attempted to work her way around him toward the facility gate. *Id.* at 0:59-1:01. That video confirms that the contact alleged in Count Two was clearly incidental to the Congresswoman's core purpose of reentering the facility and her effort to achieve that goal in response to V-2's physical and unlawful "infring[ment] of her "right" to do so. Op.23 n.25.

 

*V-2 initiates contact with Congresswoman McIver.*     *Congresswoman McIver's forearm contacts V-2.*

10

The next few seconds confirm the Congresswoman's animating purpose in reentering the facility. After her initial contact with V-2, Congresswoman McIver moved left to continue toward the facility gate. NJ Spotlight News, *supra*, at 0:59-1:01. V-2 shifted with her, turning his back toward the Congresswoman and bending his knees for leverage as he attempted to screen her from returning through the gate. *Id.* A second officer joined V-2 to redouble the effort of denying Congresswoman McIver's entry, while Congressman Menendez followed close behind her. *Id.* at 1:01-1:04. This second officer "forcibly pushe[d]" the Congresswoman "back into the public parking lot" to keep her outside the gate. Op.23 & n.25; NJ Spotlight News, *supra* at 1:05-1:07. Congressman Menendez interceded at that point, placed himself between Congresswoman McIver and the agent who had just shoved her, and helped to finally pull her through the gate as yet another officer grabbed the Congresswoman's arm in a last-ditch effort to keep her out. NJ Spotlight News, *supra*, at 1:05-1:16.

At each step of this sequence, Congresswoman McIver moved away from the officers, moved farther from Mayor Baraka and V-1, and at all times moved toward the facility's entrance so that she could complete her oversight tour. Everything she did over the course of these few seconds is consistent with her overriding interest in entering the secured area. Indeed, no other explanation makes sense.



*Congresswoman McIver tries to reenter the facility while V-2 and other officers prevent her doing so.*

**Third,** Congresswoman McIver's conduct after she reached the secured area puts her motive for reentering the facility beyond doubt. As soon as the Congresswoman returned through the gate, she made her way *not* toward the Mayor, but instead toward the other Members of Congress with whom she had come to conduct the inspection. In particular, the surveillance footage shows Congresswoman McIver entering the secured area and then briefly huddling with Congressman Menendez. Mot. Ex. A at 1:28:23-1:29:08. She then turned almost instantly back toward the gate—and away from the Mayor—to search for Congresswoman Watson-Coleman. *Id.* The body camera recording of these moments captured Congresswoman McIver checking on Congresswoman Watson-Coleman, asking, "are you okay Bonnie" as the three Members reconvened. Ex. CC at 1:49-1:51.

12

Congresswoman McIver and her delegation then promptly turned toward the tour that had brought them to Delaney Hall two hours earlier. The surveillance footage shows the Members setting off for the administrative office *less than ninety seconds* after Congresswoman McIver reentered the secured area. Mot. Ex. A at 1:28:24-1:29:48. Along the way, Congresswoman McIver stopped briefly to inform an Assistant Field Office Director that ICE agents had assaulted her on her way back into the secured area, an affront that visibly distressed the Congresswoman. Op.23 & n.25; Ex. CC at 2:24-2:34. Yet, despite that attack and her interest in reporting it, Congresswoman McIver quickly moved on to the administrative office for the oversight tour to begin. She arrived there within two minutes of reentering the secured area, at approximately 2:45 p.m. Ex. DD at 4:07; Ex. Z at 02:50:46-2:51:05.

Once there, Congresswoman McIver and the other Members dutifully waited as ICE continued to impose "inexplicable delay," before finally receiving a tour of the facility. Op.15. The video evidence shows the Members waiting patiently for their tour for at least twenty minutes before being permitted entry. Ex. BB at 4:19:00-4:44:07; *see generally* Ex. EE; Ex. FF; Ex. GG. Finally, ICE allowed the Members to enter the interior of the building and facilitated what the government agrees was "protected fact-finding related to federal immigration policy." Op.19; Opp.61; *see* Ex. Z at 03:10:09-3:11:28. The surveillance footage of that tour shows Congresswoman McIver actively engaged in inspecting the facility's conditions, consistent with her stated oversight objectives. *See, e.g.*, Ex. HH at 4:33:56-4:35:10; Ex. II at 4:33:56-4:35:10. The tour concluded around 3:45 p.m., at which point Congresswoman McIver and her colleagues promptly departed from Delaney Hall, having finally fulfilled their objective there. Ex. Z at 03:49:48-3:50:31; Ex. AA at 3:49:32-3:50:46.

## CONCLUSION

From all this evidence, the simplest explanation for Congresswoman McIver's motive in reentering the facility is also the correct one: she returned to the secured area of Delaney Hall to complete the oversight tour that brought her to the facility in the first place. Whatever contact occurred between the Congresswoman and V-2 was the result of V-2's overt efforts to prevent that from happening. Count Two thus "cannot be proven without evidence of [Congresswoman McIver's] legislative act" of reentering the facility for the purpose of conducting oversight, and "it must be dismissed." Op.14.

Dated: December 9, 2025

                                           ARNOLD & PORTER KAYE SCHOLER LLP

                                           By: _/s/ Paul J. Fishman_____
                                                    Paul J. Fishman
                                                    Lee M. Cortes, Jr.
                                                    One Gateway Center | Suite 1025
                                                    Newark, NJ 07102
                                                    Telephone: 973-776-1901
                                                    Paul.Fishman@arnoldporter.com
                                                    Lee.Cortes@arnoldporter.com
                                                    *Counsel for*
                                                    *Congresswoman LaMonica McIver*

**CERTIFICATE OF SERVICE**

I certify that true and accurate copies of the foregoing document were sent by ECF service to all parties in this matter on December 9, 2025.

                                                 Lee M. Cortes

15