# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Jamel K. Semper |
| | : | |
| v. | : | Crim. No. 25-00388 (JKS) |
| | : | |
| LaMONICA McIVER | : | |

_____

**SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANT'S MOTION TO DISMISS COUNT TWO OF THE INDICTMENT ON THE BASIS OF CONGRESSIONAL IMMUNITY STEMMING FROM THE SPEECH OR DEBATE CLAUSE OF THE UNITED STATES CONSTITUTION**
_____

                                                                          TODD BLANCHE
                                                                          U.S. Deputy Attorney General

                                                                          PHILIP LAMPARELLO
                                                                          Senior Counsel
                                                                          970 Broad Street
                                                                          Newark, New Jersey 07102
                                                                          (973) 645-2700

On the Brief:

Mark J. McCarren
Benjamin D. Bleiberg
Assistant U.S. Attorneys

## PRELIMINARY STATEMENT

On June 10, 2025, a grand jury sitting in Newark, New Jersey returned a three-count Indictment against Representative LaMonica McIver ("Defendant" or "Defendant McIver"), charging her with three counts of assaulting, resisting, opposing, impeding intimidating and interfering with a federal officer, in violation 18 U.S.C. § 111(a)(1).  On August 15, 2025, Defendant filed four separate pretrial motions seeking to (1) dismiss the Indictment on the basis of selective prosecution, selective enforcement and vindictive prosecution; (2) dismiss the Indictment on the basis that she is immune from prosecution pursuant to the Speech or Debate Clause of Article I of the United States Constitution; (3) have the Court order additional enumerated discovery pursuant to Federal Rule of Criminal Procedure 16; and (4) restrain the Government's extrajudicial statements.  *See* ECF Nos. 19-22.

The Court conducted oral argument as to these motions on or about October 21, 2025.  On November 13, 2025, the Court issued its Opinion and Order as to the motions. Of relevance to the instant submission, the Court denied Defendant's motion to dismiss on the basis of an immunity claim premised on the protections of the Speech or Debate Clause as to Counts One and Three.  As to Count Two, involving Victim 2 ("V-2"), the Court reserved judgment noting that the "factual record is not ripe to determine the applicability of the Speech or Debate Clause . . ." Opinion, at 24.

At the status conference held by the Court on November 17, 2025, the Court directed the parties to submit further briefing as to Count Two to enable the Court to render a ruling as to that count.  The United States accordingly submits this brief in

further support of its motion to deny the motion to dismiss on the basis of the Speech or Debate Clause as to Count Two.

## FACTUAL BACKGROUND

In its initial Memorandum of Law in Opposition to the Defendant's omnibus motions to dismiss the Indictment, the United States included an extensive Factual Background section which does not bear repeating here but is realleged and incorporated hereto. Of significance to the instant inquiry, however, is that V-2 is not the DHS officer on whom the Court based its analysis of Count Two in the November 13, 2025 Opinion (the "Opinion"). The video footage that was available to the Court for purposes of its analysis was limited to certain clips of overhead surveillance video and of body worn cameras with which DHS and ICE agents and officers were equipped on May 9, 2025 and which were posted by the Defendant as exhibits in support of her omnibus motions to dismiss. However, those videos did not include all of the body worn camera footage previously provided by the Government in discovery. Most notably, the Defendant had not included among her exhibits the video footage that most clearly depicted the events described in Count Two. A copy of the video that best captured the conduct encompassed by Count Two was provided by the Government to the Court at the conclusion of the November 17, 2025 status conference, and is referred to herein as Government's Exhibit 1.

## DISCUSSION

As previously mentioned, the Court's analysis of Count Two was premised on Defendant's interaction with a Deportation Officer as the Defendant attempted to pass through the main Security Gate to Delaney Hall immediately after the Mayor of Newark

2

("Mayor") had been brought through that gate. In its analysis, the Court noted that it must "examine the predominant purpose of the acts alleged in Count Two . . . [because] *Menendez*, [831 F.3d 155 (3d Cir. 2016)], requires the Court to assess Defendant's predominant purpose to determine the applicability of the Speech or Debate Clause." Opinion, at 23-24. With the materials available for its review, the Court focused on the events that took place as Defendant began to reenter through the gate, got pushed back toward the exterior parking lot, and then pulled back through into the interior of the gated perimeter:

> V-2, one of the ICE agents standing guard at the Security Gate, was attempting to prevent protestors in the crowd from entering the Security Gate. (*Id.*) As Defendant attempted to reenter the facility through the Security Gate, V-2 forcibly pushed Defendant back into the public parking lot before Defendant pushed V-2 in response. . . Defendant successfully reentered the facility after Representative-2 wrapped his arms around her and pulled her through the Security Gate.

Opinion, at 23. The Court viewed the physical interaction with the Deportation Officer at the Security Gate as at least potentially ambiguous as to motive because: (i) the Defendant had traveled to Delaney Hall in the first place for the purpose of conducting an oversight inspection, and (ii) reentering through the Security Gate, after she had initially left the facility to involve herself with the Mayor's arrest, would be necessary to undertake that inspection tour. Thus, the Court opined that "[t]he facts surrounding that inspection are relevant to Defendant's motive in reentering the facility in Count Two, and whether her intent was related to her oversight duties." Opinion, at 24.

However, those ambiguities wholly dissipate when focus is placed on the fact that the actual conduct encompassed by Count Two occurred at or around the time that the

3

Mayor was arrested, and before the interaction on which the Court focused and on which it based its November 13, 2025 Opinion.

The conduct described in Count Two was initiated by the Defendant when she pushed her forearm into V-2 who was partially turned away from the Defendant at the moment of contact. *See* Government's Exhibit 1, at 0:51 to 0:54. In contrast to the conduct at the Security Gate analyzed by the Court in reviewing Count Two, V-2 does not in any sense reciprocate the push by the Defendant. Rather, V-2 simply attempts to brace himself as Defendant barrels past V-2. As depicted in Government Exhibit 1, (which is slowed down for clarity), the Defendant can be seen pushing V-2 at least twice with her forearm as she attempts to get around V-2. V-2 can be seen temporarily losing his balance as a result of the Defendant's push, before straightening up as the Defendant pushes past V-2.

Of greater significance for the Court's analysis, however, is that this conduct, which occurs moments after the conduct encompassed in Count One, takes place before the Defendant attempts to reenter the interior of the Delaney Hall grounds. In analyzing the conduct of the Defendant as alleged in Count One, the Court emphasized the lack of connection between the Defendant's goal of undertaking an inspection tour with her behavior outside the Security Gate as the victim at issue in Count One ("V-1") arrested the Mayor:

> Here, the predominant purpose of Defendant's acts alleged in
> Count One was not to engage in fact-finding in connection
> with the oversight of the facility. After DHS officials announced
> they were arresting the Mayor, Defendant left the secured area
> of the facility and opposed the arrest outside the facility. . . Defendant

> was not acting pursuant to her congressional oversight authority when she exited the Security Gate and made herself an active participant in a 'scrum. . . in a public parking lot.' . . . Impeding an arrest, whether lawful or unlawful, goes beyond the reasonable definition of oversight and, accordingly, exceeds the safe harbor of legislative immunity.

Opinion, at 18-19.  The Defendant's actions as alleged in Count Two were simply the continuation of her actions in Count One, albeit with a different individual being subject to her ongoing efforts to interfere with the Mayor's arrest.  A review of the overhead surveillance tape of the event (which Defendant appended as Exhibit A in her original motion, ECF No. 34) demonstrates that the assaultive conduct in Count One and Count Two were part of the same ongoing efforts by the Defendant to oppose and interfere with the Mayor's arrest.  In that video clip, at approximately the 1:27:00 mark, a circle which includes the Defendant begins forming around the Mayor as he stands in the parking lot outside of the Security Gate.  At approximately 1:27:40, it is evident that shoving within that circle has begun as V-1 attempts to handcuff the Mayor, after which V-1 starts guiding the Mayor toward Delaney Hall approximately ten seconds later.  As V-1 is moving along the outside of the Security Gate and towards Delaney Hall, the Defendant can be seen vigorously moving her arms and hands in the direction of V-1 at the 1:27:57 to 1:28:00 mark, and it is these actions which form the core of the allegations in Count One.

Over the next several seconds, the Defendant follows V-1 and the Mayor along the outside of the Security Gate with her attention keenly focused on V-1.  At the 1:28:07 mark, the Defendant barrels into V-2 who is outside the Security Gate and attempting to clear a path for V-1 to effect the arrest of the Mayor.  At the time that

the Defendant pushes into V-2, V-2 is positioned between the Defendant and V-1, as V-1 enters through the Security Gate to secure the arrestee.

It was not until thereafter that the Defendant enters through the Security Gate, albeit backwards, as the surge of the crowd appears to push her through the Gate.[1] At the 1:28:15 mark, a Deportation Officer (whom the Court mistakenly identified as V-2) pushes the Defendant back through the Security Gate and into the parking lot area. The Defendant then appears to push back on this Deportation Officer in an effort to enter into the interior Delaney Hall's grounds as she is assisted by another member of the Congressional delegation who helps pull her inside.

The conduct at the center of Count Two is of like kind to the allegations set forth in Count One. The forcible contact described in Count One was directed at V-1 because V-1 was in the process of arresting the Mayor, an action to which the Defendant strenuously objected and with which she forcibly interfered. The Defendant's actions toward V-1 occurred as she trailed V-1 and the Mayor as they moved from the parking lot on the exterior of the Security Gate and toward Delaney Hall. The conduct in Count Two resulted from the Defendant's continued efforts to trail V-1 and the Mayor and oppose that arrest. When V-2 interposed himself between V-1 and the Defendant to help V-1 safely execute the arrest, the Defendant used her forearms to strike V-2 similarly as she had done with V-1. The actions in both Count One and Count Two did not occur while the Defendant was attempting to conduct legislative oversight and did

---

[1] It is not clear whether the Defendant intended to enter through the Security Gate at this time or whether the force of the surging crowd was effectively forcing her in toward the interior of the Security Gate.

not involve entering the interior of Delaney Hall in the hopes of commencing a congressional inspection tour. Rather, the predominant purpose of these actions was for the Defendant to oppose and interfere with the arrest of the Mayor and to manifest her anger at V-1.

As the Third Circuit set forth in *Menendez*,

> "[s]ome acts are 'so clearly legislative in nature that no further examination has to be made to determine their appropriate status.'" 831 F.3d at 166 (quoting *Gov't of the V.I. v. Lee*, 775 F.2d 514, 522 (3d Cir. 1985)). . . On the other side of the spectrum, some acts are so clearly non-legislative that no inquiry into their content or underlying motivation or purpose is needed to classify them. Examples include . . ., of course, illegitimate activities such as accepting bribes . . .

831 F.3d at 167. The Government respectfully asserts that any assault upon a federal officer should qualify as an act that is "clearly non-legislative" given that such an act is clearly an "illegitimate activity." And it would be clearly non-legislative whether the arrest that triggered the assault took place outside the Security Gate or inside of Delaney Hall. Nevertheless, even if one were to view Defendant's actions as alleged in Count Two to be "neither manifestly legislative nor clearly non-legislative" *id.,* at 166, the predominant purpose of those actions in this instance were not legislative in nature and were instead intended to thwart the arrest of the Mayor. As this Court aptly noted with regard to Count One, "Defendant was not acting pursuant to her congressional oversight authority when she exited the Security Gate and made herself an active participant in a 'scrum . . . in a public parking lot." Opinion, at 18 (citing Mot. I, at 3). The Court also held unsurprisingly that "[i]mpeding an arrest, whether lawful or unlawful, goes beyond any reasonable definition of oversight, and, accordingly, exceeds

7

the safe harbor of legislative immunity." *Id.* The actions in both Count One and Count Two are part of the same course of conduct and both involved efforts by the Defendant to impede and oppose an arrest. Thus, these actions go beyond any reasonable definition of oversight, and these actions cannot be afforded the safe harbor of legislative immunity.

## CONCLUSION

For the foregoing reasons, this Court should deny Defendant McIver's Motion to Dismiss Count Two of the Indictment on the basis of the Speech or Debate Clause for the same reason the Court denied this motion to dismiss as to Counts One and Three.

Respectfully submitted,

TODD BLANCHE
U.S. Deputy Attorney General

PHILIP LAMPARELLO
Senior Counsel

By:  s/Mark J. McCarren
Mark J. McCarren
Benjamin D. Bleiberg
Assistant United States Attorneys

Dated: December 9, 2025
Newark, New Jersey