# Arnold & Porter

**Lee M. Cortes, Jr.**
+1 212.836.7553 Direct
Lee.Cortes@arnoldporter.com

December 23, 2025

<u>**VIA ECF**</u>

Hon. Jamel K. Semper
United States District Judge
Frank R. Lautenberg Post Office
    & U.S. Courthouse
2 Federal Square
Newark, New Jersey 07102

      Re:    *United States v. LaMonica McIver*, Crim. No. 25-388

Dear Judge Semper:

      On behalf of Congresswoman McIver, we write because the government still has still failed to fulfill its obligation to identify, collect, and produce communications among ICE personnel who were present at Delaney Hall on May 9, 2025. Indeed, despite numerous examples of those agents and officers having exchanged messages related to the events of that day, the government has not: (a) ascertained whether relevant messages exist on their personal devices; (b) taken affirmative steps to preserve that information; (c) collected and reviewed any of that material; or (d) preserved information on the government devices issued to three of those individuals.

      Accordingly, we respectfully request that the Court order the government to investigate the existence of responsive and *Brady* materials on personal devices; to collect and produce these materials immediately; and to explain in writing their preservation efforts and why information is missing.[1]

      This remedy is necessary because the government in this instance has not undertaken appropriate and diligent steps to identify discoverable

---

[1] Separately, Congresswoman McIver has once again raised with the government that ICE may not have produced all surveillance videos from Delaney Hall on May 9 as ordered by the Court. The government has represented that it would contact DHS agents regarding the particular videos that the defense has identified, but the government has not provided a timeline for a response.

# Arnold&Porter

Hon. Jamel K. Semper
December 23, 2025
Page 2

material. Also, in a FOIA case pending in the District of Columbia, the U.S. Department of Homeland Security recently filed affidavits admitting that DHS has stopped using software that automatically preserves text messages, as required by Federal records laws. *See, e.g.*, *American Oversight v. DHS,* 25-cv-03699 (D.D.C.), ECF No. 14.

## I.    The government must collect and produce materials on personal devices.

On August 15, 2025, Congresswoman McIver moved to compel discovery pursuant to Federal Rule of Criminal Procedure 16, *Brady v. Maryland*, 373 U.S. 83 (1963), and New Jersey Rule of Professional Conduct 3.8(d). *See* ECF 22. Among other things, the Congresswoman's motion sought written communications between and among personnel present at Delaney Hall on May 9, as well as those individuals' communications with other colleagues at their respective agencies. The Court held a hearing on that and other motions on October 21, 2025, and ultimately ordered the government to produce messages "between agents on agency issued phones discussing this incident on the day in question." 10/21 Hr'g Tr. 32:18–21.

Following the October 21 hearing, the government produced merely 54 messages from fewer than half of the 23 individuals who were present at Delaney Hall on May 9. That paltry production consisted entirely of screenshots; the government provided no metadata or any attachments that DHS employees are required to preserve under federal law. *See* 36 C.F.R. § 1222.26; *see* 44 U.S.C. §§ 3101-3107.

Even that minimal production confirmed that the prosecution team had been in possession of text messages and similar communications that are material and favorable to Congresswoman McIver's defense, and that the government had timely failed to identify, collect, or produce that material on its own. For example, the government's production shows:

- On May 10, an ICE officer sent a message, in a Signal group chat to other ICE officers, expressing doubt that any of the Members would be arrested because the conduct "wasn't enough like a swing or anything." *See* USA-0000014, Ex. 1. The relevance of that message is obvious on its face: the author, who was present

**Arnold&Porter**

Hon. Jamel K. Semper
December 23, 2025
Page 3

at the scene, perceived that any physical contact by the Members was minimal.[2] Even more important, Victim-2 was a party to the dialogue and never contradicted his colleague's observation and perception. That reaction is material and exculpatory, and the government should have looked for and produced it in July.

- On the morning of May 9, the ICE officer who later that day shoved Congresswoman McIver as she attempted to re-enter the gate, sent a message in a group chat in which he used a racial slur referring to African-Americans. Other officers responded with amusement, and one officer joked that another of their colleagues – an African-American officer included in the group text – "is having a stroke right now." At least two of the ICE personnel in the group then responded with laughing emojis. USA-0000028–30, Ex. 2. That type of behavior is material impeachment evidence for any of the officers who participated in the Signal group, particularly given the group's later aggressive treatment of Mayor Baraka and Congresswoman McIver.

These are just two examples of messages material to Congresswoman McIver's defense that the government produced after the Court's direction on October 21. But absent the defense's insistence that the government was not honoring its discovery obligations – and the Court's agreement – the government would never have searched for or produced them.

For that reason, we again raised the government's deficient production of messages at the November 17 status hearing. And again, the Court agreed that the government's "piecemeal" production of relevant materials was insufficient. Accordingly, the Court directed the government to produce ***all*** communications sent or received between noon and 5:00 pm on May 9 by those present at Delaney Hall during that time period. 11/17 Hr'g 12:5–14:16. When the government stated that such a production might include discussions raising "security concerns," the Court agreed to review *in camera* any such messages that the government would seek to withhold on that basis. But the Court also was clear: "short of that, [Congresswoman McIver and counsel]

---

[2] It is of no moment at this juncture if the government would call that officer at trial or if his observation would be admissible.

**Arnold&Porter**

Hon. Jamel K. Semper
December 23, 2025
Page 4

should have it." *Id.* at 13:9–25. As for communications beyond that five-hour period on May 9, the Court agreed that the government had an obligation to search for and identify discoverable materials via the use of search terms. *Id.* at 14:17–15:20.[3]

On November 26, 2025, in response to the Court's direction at the November 17 hearing, the government produced materials categorized as "Custodian Emails," "Custodian Teams Messages," and "Custodian Device Communications." The government's production further demonstrated that the government had been withholding communications that are both material and favorable to Congresswoman McIver's defense. For example:

- On May 9 at 1:36 p.m. (just after the three Members of Congress had entered the interior waiting area at Delaney Hall), an unidentified person – who appears from the context to have been present and working at Delaney Hall – sent a message to an ICE officer regarding Congressman Menendez: "I hate that whole family. Corrupt." The ICE officer reacted to that message with a "heart" emoji. *See* message chain produced within the folder USA-0000339, Ex. 3 at 5. This message shows bias and is therefore material to the Congresswoman's defense.

- At 1:50 p.m. on May 9, an ICE officer turned on his BWC to record Mayor Baraka as he accepted the invitation of the GEO security guard to enter Delaney Hall's secure perimeter. *See* Cortes Decl. Ex. E.[4] Shortly thereafter, a participant in a Signal group chat among ICE officers asked whether "they let [the Mayor] in or he walked in?" The officer who had recorded and observed the mayor's entry responded, "he walked in." Another officer then chimed in with a clarification: "security let him in." *See* message

---

[3] The government has not yet supplemented its prior production of the few screen-shotted messages discussed during the November 17 court conference, that pre- and post-date May 9. Counsel for Congresswoman McIver are preparing proposed search terms for consideration by the government and reserves the right to raise this issue with the Court if necessary.

[4] This exhibit is available at https://www.njd.uscourts.gov/content/mciver-defense-exhibits-mtd.

**Arnold&Porter**

Hon. Jamel K. Semper
December 23, 2025
Page 5

chain produced within the folder USA-0000333. Ex. 4 at 10. Those messages confirm ICE's knowledge that the Mayor had not trespassed, and that his arrest was pretextual. The materiality of that information is crystal clear: it is further proof that ICE was deliberately impairing the oversight inspection to which Congresswoman McIver and her colleagues were entitled. The government should have identified, collected, and produced that message without the defense's repeated requests. But the government did not do so because it did not timely take the most rudimentary steps to determine whether such messages might exist. Indeed, the U.S. Attorney's Office has apparently outsourced that task to ICE, which apparently did nothing to fulfill it.

- Also on May 9 at 1:36 p.m., an HSI special agent sent a Signal message stating that Congressmembers "still need to schedule the inspection, [even] if they are [ ] authorized" to inspect the facility. *See* message chain produced within the folder USA-0000353, Ex. 5 at 5. The fact that ICE officials believed – even if mistakenly – that Congresswoman McIver and her colleagues were not entitled to an unscheduled inspection further illuminates that ICE's actions were part of an intentional effort to delay and impair the Members' oversight. Such communications are thus clearly material and favorable to the Congresswoman's defense, and there may well be more such material.

In short, these messages make clear that the government must review ***all*** communications between and among personnel who were on the ground on May 9, regardless of when those communications took place.

It is also clear that the review should not be limited to official devices. On May 9, at approximately 3:37 p.m., an unidentified individual texted the official device of one ICE officer and asked: "You guys arrest the mayor?" That officer responded at approximately 4:05 p.m.: "Call me [sic] *personal* I'll fill you in." *See* message chain produced within the folder USA-0000342, Ex. 6 at 2 (emphasis added).

**Arnold&Porter**

Hon. Jamel K. Semper
December 23, 2025
Page 6

In other words, barely an hour after the events at Delaney Hall had concluded, an ICE officer explicitly diverted a conversation about an official ICE operation from his government-furnished equipment to his personal phone. Such a practice, of course, is a violation of law enforcement rules and protocol. And, in this instance, it reflects that there may well be additional, written communications on the personal device of that officer, as well as those of his colleagues.

Such a practice is hardly unusual or surprising. Indeed, while it may be that agents are more likely to use their government-issued devices while they are on duty during a law enforcement operation, it is often true that they – like other people in their own and in other professions – are often not so careful or discriminating.

Notwithstanding that obvious point, and the clear import of the May 9 text, the government explained in a call on December 4, 2025, that its November 26th production of material sent or received between noon and 5:00 p.m. on May 9 included *only* communications made or stored on government-issued devices. In addition, the government advised that it has not collected or reviewed *any* information on the *personal devices* used by those same officers. Even more troubling, the government was not sure whether the case agents had even *asked* the other law enforcement personnel who were present at Delaney Hall whether they had used their personal devices to communicate about the events of May 9 at Delaney Hall or Congresswoman McIver. And despite our request that they do so and promptly get back to us, there has still been no response.

We respectfully suggest that it is, once again, necessary for the Court to intervene. The Court's November 17 instructions to the government did not limit the scope of what must be produced to government-issued devices *only*. Nor was Congresswoman McIver's discovery motion limited only to government-furnished equipment. And for good reason—the government's discovery obligations under Rule 16, *Brady*, and *Giglio* turn on the *substance* of the information in the government's possession, not the particular device on which it is stored or the method of communication that the agents decided to use.

**Arnold&Porter**

Hon. Jamel K. Semper
December 23, 2025
Page 7

Indeed, it is well-understood that communications by government actors on personal devices may qualify as a record of a government agency. In the FOIA context, for example, when there is evidence that a personal account was used to discuss official business, the agency may be responsible for collecting and producing those communications, just as it does for government-furnished equipment. *See Brennan Ctr. for Just. at New York Univ. Sch. of L. v. U.S. Dep't of Just.*, 377 F. Supp. 3d 428, 435 (S.D.N.Y. 2019) Indeed, the court in that case held that "official custodians must ask relevant employees if they used private email accounts relating to the Commission's business and, if so, to produce the documents." *Id.* at 435–36. *See also Judicial Watch, Inc. v. Department of Justice*, 319 F. Supp. 3d 431, 438 (D.D.C. 2018).

The reason for that holding is obvious: restricting the government's discovery obligations to government devices would allow, enable, and even encourage government officials to evade criminal discovery obligations and record-keeping responsibilities by using their personal devices. Federal law requires otherwise.

To be clear, Congresswoman McIver is not suggesting that the Court order all of the agents and officers who were at Delaney Hall to turn over all personal devices and messages wholesale to the defense. Rather, the Court should require the Assistant U.S. Attorneys assigned to this case to interview all of those law enforcement personnel; to inquire whether they ever used their personal devices to communicate about the May 9 events; to direct that they search their on their personal devices for any communications (regardless of when those communications took place), concerning or referring in any way to: (a) Congresswoman McIver, Mayor Baraka, Congressman Menendez, or Congresswoman Watson Coleman; or (b) the events of May 9; and to find out whether the agents and officers deleted any such communications. The Court should also require that those law enforcement personnel each submit a sworn statement memorializing the results of their review.

Similarly, as the Court has already ordered regarding communications that occurred outside that five-hour timeframe on May 9, the government should use search terms – prepared in collaboration with Congresswoman McIver's counsel – to identify other responsive information from the official devices of law enforcement personnel. And any further productions should

**Arnold&Porter**

Hon. Jamel K. Semper
December 23, 2025
Page 8

include forensic reports that capture metadata, attachments, chat preview reports, and other native data. Screen shots are simply insufficient.

## II.    The government has failed to preserve discoverable materials.

Separately, and relatedly, it is now apparent that the government has failed to take adequate steps to preserve all potentially discoverable material. In its November 26, 2025, discovery production letter, the government noted that it was "unable to obtain communications for production from the devices of" three custodians – that is three officers or agents who were present at Delaney Hall on May 9, one of whom was a senior official. The government's letter provided no explanation for that deficiency.

In a subsequent meeting and conference by telephone on December 4, the government explained that the senior official's government device had been wiped when he left government service – *months* after May 9 and months after the government had supposedly instituted a preservation hold.

During the same telephone call, the government further represented that it had *no* explanation why the second officer's phone contained no data. Finally, the government explained that it was still investigating the status of the third custodian's phone data. There has been no update since that call.

Notably, other government custodians received messages on May 9 between 12 p.m. and 5 p.m. from at least one officer from whom the government has not been able to collect data. Therefore, discoverable communications either still existed on that device, or have since been deleted.

The government's failure to preserve these materials is unacceptable, as is their explanation for the failure. From the outset of this matter on May 9 – particularly given the commencement that very day of criminal proceedings against Mayor Baraka – the U.S. Attorney's Office had an obligation to direct every member of the prosecution team to guard against the destruction, disappearance, or spoliation of all potentially relevant or material evidence, particularly anything that might be exculpatory. "[F]ederal prosecutors do not discharge their duty simply hoping prosecution team members understand their duties, preserve the required information, and then self-identify discoverable items." *United States v. Vaughn*, Crim. No. 14-23, 2015 WL 6948577, at \*16 (D.N.J. Nov. 10, 2015); *see also United States v. Suarez*, Crim.

# Arnold&Porter

Hon. Jamel K. Semper
December 23, 2025
Page 9

No. 09-932, 2010 WL 4226524, at *4-6 (D.N.J. Oct. 21, 2010) (discussing the government's duty to affirmatively preserve text messages); Justice Manual §§ 9-5.001 (B)(2); 9-5.004.

The government has represented that it gave such instructions. But the government has not produced any information about the form of those instructions, how they were distributed, and who received them. And we now know that those warnings were either inadequate, unheeded, or deliberately ignored – at least with respect to the official devices of three individuals present at Delaney Hall on May 9 (including a senior official).[5] Accordingly, the Court should direct the government to provide a sworn representation about the nature and extent of the preservation instructions it used with respect to the prosecutions of Mayor Baraka and Congresswoman McIver.

Such an inquiry is particularly warranted in light of recent disclosures in other Districts involving ICE's current recordkeeping practices. Separate and apart from the government's discovery obligations in criminal cases, the Federal Records Act (FRA) and its implementing regulations require federal agencies to "capture, manage, and preserve electronic records with appropriate metadata," and mandates that those agencies "be able to access and retrieve electronic records, including electronic messages, through electronic searches." 36 C.F.R. § 1222.26; *see* 44 U.S.C. §§ 3101-3107.

Recent disclosures by the Department of Justice in unrelated federal litigation show that DHS and ICE are not complying with those legal requirements. In fact, in a Freedom of Information Act lawsuit currently pending in the District of Columbia, affidavits filed by the United States have admitted that DHS has stopped using software that automatically captures text messages and the saved trails of communication between and among its officials. According to Michael Weissman, DHS's Chief Data Officer, DHS's new process for record preservation involves employees' "saving screenshots of messages, emailing them to a government account, and archiving them in a

---

[5] There is other evidence that the production is incomplete or that messages have been deleted. For example, there are instances where messages received by one custodian are missing from the sender's production. The defense is entitled to an explanation for such discrepancies, but the government has apparently not attempted to determine the cause.

**Arnold&Porter**

Hon. Jamel K. Semper
December 23, 2025
Page 10

shared drive folder." Weissman Decl. ¶ 9, *American Oversight v. DHS*, 25-cv-03699 (D.D.C. Nov. 5, 2025), ECF No. 14-3. As Mr. Weissman's declaration acknowledges, this process requires DHS "employees to manually screenshot and archive each message." *Id.* ¶ 15. This new policy is contrary to federal records preservation laws.

DHS's new policy of manual screenshotting by custodians – rather than systematic preservation of full electronic records as the FRA requires – raises serious concerns whether DHS has complied with its discovery obligations in this prosecution and whether it can do so. Accordingly, the Court should require the government to certify what procedures DHS and, in particular, ICE has implemented for the preservation of all electronic communications related to the events of May 9, and the policies relating to congressional oversight, BWCs, use of force, and firearms that already have been the subject of motion practice in this proceeding.

*    *    *    *    *

In summary, we respectfully request the Court order that:

1. The AUSAs – not the case agents or another ICE employee – must interview individually each law enforcement officer or agent who was present at Delaney Hall on May 9:

   a. to inquire whether these individuals have used their personal devices to communicate about:

      i. Congresswoman McIver, Mayor Baraka, Congresswoman Watson Coleman, or Congressman Menendez; and

      ii. the events of May 9 at Delaney Hall.

   b. to direct those individuals to search those devices for any emails, texts, or chats, or other communications related in any way to those topics.

# Arnold&Porter

Hon. Jamel K. Semper
December 23, 2025
Page 11

  c.  to collect all such communications and produce them promptly to Congresswoman McIver and her counsel.[6]

  d.  to obtain from each officer or agent and produce to Congresswoman McIver and her counsel a sworn statement memorializing the results of their review of their personal devices; to identify if any communications are no longer contained on their personal devices; and to describe the circumstances under which they were deleted.

2. The AUSAs must meet and confer with counsel for Congresswoman McIver to agree upon terms for searching the official devices of those same law enforcement personnel for discoverable communications that were sent or received other than between noon and 5:00 p.m. on May 9.

3. The government must provide a sworn, detailed explanation of the steps it has taken to preserve all Rule 16 and *Brady* material – whether on government-issued or personal devices, with respect to the prosecutions of Mayor Baraka and Congresswoman McIver.

Respectfully submitted,

Lee M. Cortes, Jr.

cc:   Paul J. Fishman
      Amanda J. Raines
      AUSA Mark J. McCarren
      AUSA Benjamin D. Bleiberg

---

[6] To the extent that the government intends to redact or withhold any of these communications based on security, privacy, or similar concerns, the Court should require that the government provide Congresswoman McIver with the equivalent of a privilege log.