**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*v.*<br><br>LaMONICA McIVER | Hon. Jamel K. Semper<br><br>Crim. No. 2:25-cr-00388-JKS |

# CONGRESSWOMAN McIVER'S BRIEF IN SUPPORT OF HER SUPPLEMENTAL MOTION TO COMPEL DISCOVERY

ARNOLD & PORTER KAYE SCHOLER LLP
One Gateway Center
Suite 1025
Newark, NJ 07102

*Counsel for Congresswoman LaMonica McIver*

October 15, 2026

# TABLE OF CONTENTS


PRELIMINARY STATEMENT ........................................................................1

BACKGROUND ........................................................................2

A. Discovery Proceedings Before This Court ........................................2

B. Activity Since Congresswoman McIver's December Letter Motion .......9

ARGUMENT ........................................................................10

I. The Government Must Inquire About, Collect, and Produce Discoverable Materials on Personal Devices ........................................11

II. The Court Should Order the Government to Comply with Its Preservation Obligations and Demonstrate that It Has Done So ........................19

III. The Government Has Not Adequately Searched for Discoverable Material to which Congresswoman McIver Is Entitled ........................................23

A. Information to Which the Defense is Entitled ........................................26

1. State of Mind ........................................................................26

2. Bias ........................................................................29

3. Impeachment Material ........................................................................30

B. The Government Should Expand its Searches and Productions in Order to Comply with its Discovery Obligations ........................................31

1. The Government's Purported Justifications for Refusing to Use Some Search Terms are Baseless ........................................31

2. The Government Should Re-Produce its November 4th Production and Share the Search Terms It Used ........................................35

3. The Government Should Expand the Time-Periods of its Searches.......36

CONCLUSION ........................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Almonte v. Genalo*,
2026 WL 2983349 (E.D.N.Y. Oct. 5, 2026) .......................................21

*Coyoy v. U.S.*,
No. 2:20-CV-02501, 2024 WL 5232086 (D.N.J. Dec. 26, 2024) ......................34

*Dennis v. Sec'y, Pennsylvania Dep't of Corr.*,
834 F.3d 263 (3d Cir. 2016) .......................................10, 16

*Griggs v. Provident Consumer Disc. Co.*,
459 U.S. 56 (1982).......................................1

*Harshman v. Superintendent, State Corr. Inst. at Rockview*,
368 F. Supp. 3d 776 (M.D. Pa. 2019).......................................29

*Kyles v. Whitley*,
514 U.S. 419 (1995).......................................13, 16

*Mercado v. Noem*,
800 F. Supp. 3d 526 (S.D.N.Y. 2025) .......................................21

*Smith v. Secretary of N.M. Dep't of Corrections*,
50 F.3d 801 (10th Cir. 1995) .......................................13

*Strickler v. Greene*,
527 U.S. 263 (1999).......................................16

*U.S. v. Abel*,
469 U.S. 45 (1984).......................................29, 30

*U.S. v. Agurs*,
427 U.S. 97 (1976).......................................39

*U.S. v. Ammar*,
714 F.2d 238 (3d Cir.1983) .......................................12

*U.S. v. Bagley*,
473 U.S. 667 (1985).......................................39

*U.S. v. Boffa*,
513 F. Supp. 444 (D. Del. 1980)....................................................................32

*U.S. v. Brooks*,
966 F.2d 1500 (D.C. Cir. 1992)...........................................................13, 39

*U.S. v. David*,
2026 WL 1880216 (W.D. Va., June 30, 2026)...............................16, 20, 26, 32

*U.S. v. Feola*,
420 U.S. 671 (1975)......................................................................................26

*U.S. v. Goodwin*,
440 F.2d 1152 (3d Cir. 1971) ........................................................................27

*U.S. v. Joseph*,
996 F.2d 36 (3d Cir. 1993) ............................................................................13

*U.S. v. Rabbitt*,
No. CR 23-320 (MAS), 2024 WL 4041912 (D.N.J. Sept. 4, 2024)....................34

*U.S. v. Risha*,
445 F.3d 298 (3d Cir. 2006) ...........................................................13, 14, 15, 16

*U.S. v. Suarez*,
Crim. No. 09-932, 2010 WL 4226524 (D.N.J. Oct. 21, 2010)...........................12

*U.S. v. Tovar-Duran*,
2026 WL 2683739 (9th Cir., Sept. 14, 2026).......................................15, 16, 29

*U.S. v. Vaughn*,
Crim. No. 14-23, 2015 WL 6948577 (D.N.J. Nov. 10, 2015)......................21, 22

*U.S. v. Vella*,
562 F.2d 275 (3d Cir.1977) ............................................................................12

*Wilson v. Beard*,
589 F.3d 651 (3d Cir. 2009) ...........................................................................29

**Statutes**

44 U.S.C.
§ 2911 ....... 8
§ 3101 ....... 2, 21
§ 3102 ....... 2, 21
§ 3103 ....... 2, 21
§ 3104 ....... 2, 21
§ 3105 ....... 2, 21
§ 3106 ....... 2, 21
§ 3107 ....... 21

FCAA § 527, 138 Stat. 460 (2024) ....... 30

**Regulations**

36 C.F.R. § 1222.26 ....... 2

36 C.F.R. § 1222.26(b) ....... 21

**Court Rules**

Fed. R. Crim. P. 16(a)(1)(E) ....... 10

Fed. R. Evid. 401(a) ....... 27, 28

N.J. Rules of Prof'l Conduct 3.8(d) ....... 10

**Other Authorities**

*American Oversight v. DHS*, 25-cv-03699 (D.D.C. Nov. 5, 2025), ECF 14-3 ....... 21

Fox Decl., *Kumar v. Soto*, No. 2:26-cv-0777 (D.N.J., Feb. 13, 2026), ECF 21-1 ....... 21

Justice Manual § 9-5.001(B)(2) ....... 13

Justice Manual § 9-5.002(A) ....... 13

*Perdomo v. Mullin*, 2:25-cv-05605 (C.D. Cal. Aug. 14, 2026) ....... 21

*U.S. v. Garcia*, 5:25-cr-1289 (S.D. Tex. Jan. 12, 2026) ....... 21

*United States v. Trump*, No. 1:23-cr-257-TSC (D.D.C. Dec. 13, 2023), ECF 186 ....................1

*United States of America v. LaMonica McIver*, Nos. 25-3573, 26-1122, Dkt. 72 (3d Cir.)....................1

## PRELIMINARY STATEMENT

Congresswoman LaMonica McIver respectfully submits this brief in support of her supplemental motion for discovery, and as the Court suggested in its August 27, 2026 text order, to advise the Court of the status of discovery.

Throughout this prosecution, the government has resisted providing discovery unless and until the Court has explicitly ordered it to do so. And even after the Court's clear directives, the government still has failed to comply with its obligations. In particular, it has refused to determine whether members of the prosecution team have discoverable *Brady*, *Giglio*, and Rule 16 material stored anywhere except on their government-issued devices. It has failed to adequately preserve discoverable material. After the Court directed the production of email, the government refused to negotiate in good faith concerning appropriate search parameters. Because the government has not corrected these inadequacies, the Court should compel it to do so.[1]

---

[1] Although Congresswoman McIver has filed a Petition for Rehearing *en banc* in the Third Circuit, *United States v. LaMonica McIver*, Nos. 25-3573, 26-1122, Dkt. 72 (3d Cir.), this Court retains jurisdiction to resolve all "aspects of the case" that are not "involved in the appeal." *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982). That includes discovery, *see* ECF 22, 57, and other measures "imposed to safeguard the integrity of these proceedings." Opinion & Order at 2, *United States v. Trump*, No. 1:23-cr-257-TSC (D.D.C. Dec. 13, 2023), ECF 186. As discussed in Part II below, the government's refusal to take adequate steps to preserve discoverable information makes it particularly appropriate for this Court to consider the Congresswoman's motion during the pendency of the appeal.

## BACKGROUND

### A. Discovery Proceedings Before This Court

The government made its initial production on July 1, 2025, in response to the Court's Scheduling Order. ECF 16. Because that production was clearly deficient, Congresswoman McIver moved on August 15, 2025, for an order compelling the government to provide additional discovery. ECF 22, *et. seq.* Among other things, the Congresswoman's motion sought written communications between and among personnel present at Delaney Hall on May 9, as well as communications between those individuals and other colleagues at their respective agencies. That motion was not limited to seeking communications on government-issued devices.

In Congresswoman McIver's reply brief, she raised further issues concerning the government's preservation efforts, as well as its compliance with its *Brady* obligations. ECF 33 at 7-8. On October 21, 2025, the Court ordered the government to produce messages "between agents on agency issued phones discussing this incident on the day in question." 10/21 Hr'g Tr. 32:18–21.

On November 4, 2025, in response to the Court's Order, the government produced 56 screen shots of messages sent between May 9 and May 31, 2025 (the "November 4th Production"). However, those messages came from the phones of only 11 of 23 potential custodians, and omitted metadata and attachments that DHS employees are required to preserve under federal law. *See* 36 C.F.R. § 1222.26; *see also* 44 U.S.C. §§ 3101-3106. The government also omitted context, failed to supply

complete message threads, and did not identify the participants in the conversations – all standard information included in a document production.

Even that minimal production confirmed that the prosecution team had failed to fulfill its independent obligation to identify, collect, and produce all communications that are material and favorable to Congresswoman McIver's defense. For example:

- On May 10, an ICE officer sent a message in a Signal group chat to other ICE officers, expressing doubt about the severity of the Members' conduct: "wasn't enough like a swing or anything." *See* Cortes Decl., Ex. 1; ECF 57 (December 23, 2025 "Letter Motion") at 2-3. The relevance of that message is obvious on its face: the author, who was present at the scene, perceived that any physical contact by the Members was minimal. Moreover, one of the participants in that text chain is the ICE officer that the Indictment describes as Victim-2, but the government did not produce his complete response or the conversation that followed.

- On May 19, an ICE officer wrote – in a group chat that included many of the ICE officers present on May 9 – that the government had "dropped the trespassing charge" against Mayor Baraka; Victim-2 responded, "[w]e kinda knew that would happen." Cortes Decl., Ex. 2. This shows that the ICE officers who were involved in the mayor's arrest *understood* that it was baseless, and may have discussed it. It is also evidence that ICE made the arrest as part of their efforts to disrupt and thwart the Members' inspection.

- On the morning of May 9, an ICE officer who later that day forcefully shoved Congresswoman McIver as she attempted to re-enter the gate used a racial slur about African-Americans in a group chat. Other officers in the group added laughing emojis to the message; some responded with amusement; and one officer joked that another of their colleagues – an officer of color included in the group text – "is having a stroke right now." Cortes Decl., Ex. 3 at 1-3. At least two of the ICE personnel in the group then reacted again with laughing emojis. *Id*. at 3.

Because the exchange was produced as a screen shot, it is not possible to identify which members of the group reacted with emojis. Yet, this exchange and that type of behavior is material evidence of bias on the part of any of the officers who participated in the Signal group, particularly given the group's aggressive treatment of Mayor Baraka and Congresswoman McIver – both persons of color.

- On May 9 at 1:36 p.m. (shortly after the three Members of Congress had entered Delaney Hall), an HSI special agent sent a Signal message stating that Congressmembers "still need to schedule the inspection, [even] if they are [ ] authorized" to inspect the facility. *See* Cortes Decl., Ex. 4. The fact that ICE officials were blatantly ignoring the Members' legal authority to perform an unscheduled inspection further supports that ICE's actions were part of an intentional effort to delay and impair the Members' oversight.

- At 1:50 p.m. on May 9, as a GEO security guard invited Mayor Baraka to enter the Delaney Hall's fenced perimeter, an ICE officer turned on his body worn camera to record the event. *See* ECF 19-7.[2] Shortly thereafter, a participant in a Signal group chat among ICE officers asked whether "they let [the mayor] in or he walked in?" The officer who had observed and recorded the mayor's entry responded, "he walked in." The officer who later shoved Congresswoman McIver chimed in with a clarification: "security let him in." *See* Cortes Decl., Ex. 5. Those messages confirm ICE's knowledge that the mayor had not trespassed, that his arrest was pretextual, and that the allegations against him were false.

These are just a few examples of messages that are material to Congresswoman McIver's defense, but that the government did not produce until the Court ordered it to do so. And they demonstrate two things: first, the government was not honoring its discovery obligations; and second, absent the defendant's

---

[2] ECF 19-7 is Exhibit E to Congresswoman McIver's pretrial motions. Exhibit E is available at https://www.njd.uscourts.gov/content/mciver-defense-exhibits-mtd.

insistence and the Court's direction, the government would never have produced those material and exculpatory messages.

Congresswoman McIver again raised the government's deficient production at the November 17 status hearing. Again, the Court agreed that the government's "piecemeal" production was insufficient,[3] and it directed the government to produce ***all*** communications sent or received between noon and 5:00 p.m. on May 9 by those present at Delaney Hall. 11/17 Hr'g Tr. 12:5–14:16. When the government protested that such a production might include discussions raising "security concerns," the Court agreed to review *in camera* any such messages that the government would seek to withhold on that basis.[4] But the Court also was clear: "short of that, [Congresswoman McIver and counsel] should have it." *Id.* at 13:9–25. As for

---

[3] Counsel also raised objections that the government's November 4th Production was produced in the form of screen shots, with no metadata, attachments, context, or the identification of participants in the group chats. The government has yet to supplement those 56 screen shots. *See* Section III.B.2, below.

[4] On or around December 3, 2025 the government submitted certain materials to the Court for *in camera* inspection. Yet the defense received no notice or information about the type, scope, or volume of those documents; what they were about; what – if any – security concerns these messages raised; and whether any exculpatory material was included in those messages. Without such information, the defense is deprived of its ability to challenge the withholding of those documents, or to understand whether the government proposed producing any of them with redactions. Moreover, it is difficult to imagine what types of security concerns would justify the government's unwillingness to share the material even with defense counsel.

communications beyond that five-hour period on May 9, the Court agreed that the government had an obligation to search for and identify discoverable materials via the use of search terms. *Id.* at 14:17–15:20.

In response to the Court's direction, the government produced on November 26, 2025, additional communications from some custodians' emails and phones (the "November 26th Production").[5] That production further demonstrated that the government had been withholding communications that are both material and favorable to Congresswoman McIver's defense. For example:

- An e-mail sent at 11:26 a.m. on May 9 corroborates that the arrest of Mayor Baraka was pretextual. In that exchange, which took place nearly two hours before the Members or the mayor arrived at Delaney Hall, high ranking DHS Officials– anticipating the Members' imminent arrival – were discussing which "section of 18USC we would have to use to arrest someone," and how they could assure "the element(s) of the crime can be established." Cortes Decl., Ex. 6 at 1. This message shows that DHS was preparing to disrupt the Members statutorily authorized oversight visit and even contemplated arresting them – despite having no reason to believe that there would be a legal basis to do so.

- On May 9 at 1:34 p.m., an unknown person – who appears from the context to have been present and working at Delaney Hall – sent a message to an ICE officer regarding Congressman Menendez, who was accompanying Congresswoman McIver: "I hate that whole family.

[5] The government's November 26th Production excluded materials from the senior-most DHS Official present at Delaney Hall on May 9, and two other officers. When Congresswoman McIver inquired about the omission, the government explained that, despite existing preservation instructions to DHS, the material had been deleted or was otherwise uncollectable. The government has shared little additional information about this data loss.

Corrupt." The ICE officer reacted to that message with a "heart" emoji. *See* Cortes Decl., Ex. 7 at 5. This message shows bias.

- At 2:37 p.m., even before the scrum outside the fence had begun, someone associated with DHS wrote an email to several high ranking members of DHS, including then-spokesperson Tricia McLaughlin, sharing falsehoods about the members having "trespassed beyond the gate at Delaney [Hall] (after two vehicles were let in to enter), and there was a shouting match, and [DHS] stopped them and pushed them back." Cortes Decl., Ex. 8 at 11. This description was fiction, and the DHS and ICE officers on the scene knew it. Nevertheless, the author concluded: "I think we need to proactively hit back. HSI exploring prosecuting them (which I think they should)." *Id*. Coupled with the 11:26 a.m. email discussing potential prosecution even before the Members had arrived, Cortes Decl., Ex. 6, this exchange shows that DHS was willing to use false information to justify arrests to thwart this statutorily authorized oversight visit and discourage future ones.

The government should have identified, collected, and produced all of those messages without the defense's repeated requests. But the government did not do so because it did not take the most rudimentary steps to determine whether they even existed. Indeed, the U.S. Attorney's Office had apparently outsourced that task to ICE, which apparently did nothing to fulfill it.

Additionally, the government's November 26th Production made clear that at least one member of the prosecution team had used a personal device to communicate about the substance of this case. Specifically, on May 9, at approximately 3:37 p.m., one ICE officer received a text from an individual whom the government has not identified. That individual asked: "You guys arrest the

mayor?" The officer responded at approximately 4:05 p.m.: "Call me [sic] *personal* I'll fill you in." Cortes Decl., Ex. 9 at 2 (emphasis added).

In other words, barely an hour after the events at Delaney Hall, an ICE officer explicitly and intentionally diverted a conversation about an official operation from his government equipment to his personal phone. Such a practice, of course, is contrary to law enforcement rules and protocol. *See* 44 U.S.C. § 2911. And here, it indicates that there may well be additional, written communications on that officer's personal device, as well as those of his colleagues.

Despite that clear evidence that at least one ICE officer had used a personal device to communicate about the case, the government stated that its November 26th Production of material sent or received between noon and 5:00 p.m. on May 9 included *only* communications made or stored on government-issued devices.[6] In addition, the government advised that it had not collected or reviewed *any* information from the personal devices used by those same officers, and that it had not even asked the other law enforcement personnel who were present at Delaney Hall whether they had used their personal devices to communicate about the events at Delaney Hall or Congresswoman McIver. Just as troubling, the government

---

[6] This exchange occurred during a telephone conference on December 4, 2025.

explained that ICE case agents themselves had probed for discoverable material maintained by their colleagues on their government devices.

The government's statements prompted Congresswoman McIver to file a Letter Motion on December 23, 2025. *See* ECF 57. That motion raised concerns about the government's failure to inquire about or search personal devices as well as about the government's inadequate preservation. The government never responded to the Letter Motion, which remains pending.

### B. Activity Since Congresswoman McIver's December Letter Motion

Counsel for the Congresswoman again raised various discovery issues in a January 26, 2026 letter to the government, Cortes Decl., Ex. 10, and during telephone conferences on January 15, 2026, and February 24, 2026. In those communications, counsel addressed the government's lackadaisical preservation efforts, as well as the failure to inquire about, much less to search, personal devices. Counsel also requested that the government supplement its prior productions after using the search terms suggested by the defense.

As discussed in more detail below, the government ultimately agreed during the February 24 call to speak to the *one* ICE Officer who had sent the message directing someone to his personal device. But the government disclaimed any affirmative responsibility to probe whether any other members of the prosecution team had discoverable information on their personal devices.

Although promising to follow up, the government has still not confirmed whether it has spoken with that officer. Nor has the government provided any explanation about the inaccessible or deleted devices, or described its preservation efforts. Moreover, the government has not negotiated in good faith about search parameters and has not produced additional messages, as the Court directed on November 17. 11/17 Hr'g Tr. 14:17-15:20.

**ARGUMENT**

The prosecution has affirmative discovery obligations in criminal cases under Rule 16, *Brady*, and *Giglio*. Under Rule 16, the government must produce all evidence that would be "material to preparing the defense" or that it plans to use "in its case-in-chief at trial." Fed. R. Crim. P. 16(a)(1)(E). Under *Brady* and *Giglio*, the government must disclose any evidence "favorable to the accused, either because it is exculpatory, or because it is impeaching." *Dennis v. Sec'y, Pennsylvania Dep't of Corr.*, 834 F.3d 263, 284 (3d Cir. 2016) (en banc) (citations omitted).[7]

Notwithstanding those obligations, the government's disclosures to date, and its actions to preserve, collect, and identify responsive and favorable material, have

---

[7] Additionally, under the New Jersey Rules of Professional Conduct 3.8(d), prosecutors have special responsibilities to "make timely disclosure to the defense of all evidence known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense."

been woefully deficient. Because the government has flatly refused to address and correct these inadequacies, the court should compel the government to do so.

## I. The Government Must Inquire About, Collect, and Produce Discoverable Materials on Personal Devices

From the beginning of this prosecution, Congresswoman McIver has sought discovery from the personal devices of ICE officials who are members of the "prosecution team." Indeed, her original discovery motion was not limited to only government-furnished equipment.[8] And for good reason. Although agents are legally required to use their government-issued devices while they are on duty during a law enforcement operation, experience teaches that they periodically resort to the use of personal devices.

To be clear, Congresswoman McIver's request was merely for the government *to ask* all prosecution team members, including the 23 ICE Officers and DHS Officials present on May 9, whether they had used their personal devices to communicate about the case or the events leading to its inception. *Only* if a custodian confirmed that responsive material might exist did Congresswoman McIver request

[8] "Thus, if it has not done so already (and it should have), the government must preserve, collect, and then review all of the officers' and agents' contemporaneous communications, throughout the entire episode at Delaney Hall and afterwards, across all communication platforms (text, voice, instant, chat or email—sent via either Telegram, Signal, or any other communications method, application, or medium)—***regardless of whether the accounts were official or personal***." ECF 22-1 at 2-3 (emphasis added).

that the government collect, review, and, if discoverable, produce the messages. During the February 24 meeting, the government made its position clear: it would not even inquire whether any discoverable material, including *Brady/Giglio* material, is present on the personal devices of prosecution team members.

After the government articulated its position, counsel for Congresswoman McIver raised a hypothetical based on *United States v. Suarez*, Crim. No. 09-932, 2010 WL 4226524 (D.N.J. Oct. 21, 2010), a case familiar to the government. Following a series of hearings in that case, Judge Linares found that the government had breached its duty to preserve discoverable text messages between FBI agents and a cooperating witness who had been meeting with potential subjects of a political corruption investigation. *Id*. at *1-*4, *5, *6, *8 (citing *United States v. Vella*, 562 F.2d 275, 276 (3d Cir.1977); *United States v. Ammar*, 714 F.2d 238, 259 (3d Cir.1983)). As a result, Judge Linares instructed the jury that it could draw an adverse inference against the government in deciding the case. *Id*. at *9-*10.

During that call, Counsel for Congresswoman McIver proposed altering the *Suarez* facts by suggesting the government assume that the FBI Agents had been using their *personal devices* to communicate with the cooperator and that the communications contained the same discoverable *Jencks/Giglio* material. Even under such circumstances, the AUSA confirmed the government's position: it would have no obligation even to ask the agents whether they had used their personal

devices to communicate with the cooperator or discuss the investigation. The AUSA advised that if the Congresswoman disagreed, she should "file a motion."

The government's position is incompatible with the Constitution, caselaw, and the Justice Department's own policy. "There is no question that the government's duty to disclose under *Brady* reaches beyond evidence in the prosecutor's actual possession." *U.S. v. Risha*, 445 F.3d 298, 303 (3d Cir. 2006). The critical inquiry is whether a prosecutor may be deemed to have "constructive possession" of the evidence, meaning that, "although a prosecutor has no actual knowledge, he should nevertheless have known that the material at issue was in existence." *Id.* (quoting *United States v. Joseph,* 996 F.2d 36, 39 (3d Cir. 1993)). And, a prosecutor has constructive possession when the information lies in the possession of individuals "acting on the government's behalf in the case, including the police," *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) – the "prosecution team." *Accord*, *Risha*, 445 F.3d at 304 ("whether the party with knowledge of the information is acting on the government's 'behalf' or is under its 'control'"); *Smith v. Secretary of N.M. Dep't of Corrections*, 50 F.3d 801, 824-25 (10th Cir. 1995); *U.S. v. Brooks*, 966 F.2d 1500, 1503 (D.C. Cir. 1992) (duty to search extends to "branches of government closely aligned with the prosecution"); *see* Justice Manual §§ 9-5.001(B)(2); 9-5.002(A).

Clearly, all DHS employees present at Delaney Hall on May 9, or involved in the investigation and prosecution of Congresswoman McIver, fall into this category.

DHS is the investigating agency in this case. Its agents – at the direction of the "Deputy Attorney General" (ECF 27 at 3; *see also* 19-5[9] at 1:17:05-1:17:30) – arrested Mayor Baraka and caused the scrum that led to the charges against the Congresswoman. Those agents then coordinated with the U.S. Attorney's Office and presumably gathered evidence that they considered relevant. One of its agents also swore to the allegations in the complaint that initiated this prosecution; another did the same for the complaint against Mayor Baraka. And, DHS personnel undoubtedly assisted in presenting this matter to the Grand Jury.

DHS likely would also be part of the government's trial team, should a trial be necessary. They would likely assist in any potential government trial presentation, and its agents would be trial witnesses. And DHS's actions would be front and center at trial. It is difficult to imagine a clearer example of individuals "acting on the government's behalf."[10] *Risha*, 445 F.3d at 303.

---

[9] ECF 19-5 is Exhibit B to Congresswoman McIver's pretrial motions. Exhibit B is available at https://www.njd.uscourts.gov/content/mciver-defense-exhibits-mtd.

[10] The Third Circuit in *Risha* articulated a three-factor test for determining whether a non-federal government actor could be deemed a member of a federal prosecution team. *Risha*, 445 F.3d at 303-04. Although that test is not relevant here, its application here would yield the same result—all DHS employees present at Delaney Hall on May 9, or involved in the investigation and prosecution of Congresswoman McIver, are members of the prosecution team.

Because those DHS employees are members of the prosecution team, the AUSAs have constructive knowledge of the discoverable information in their possession, and the U.S. Attorney's Office has a statutory and constitutional obligation to affirmatively identify it – whether it is stored in personal or official files and devices.

For example, the Ninth Circuit recently vacated an illegal entry conviction because the lower court denied the defendant's request for "information regarding the government's witnesses' membership and activity in [a] Facebook group, in which United States Border Patrol agents shared patently offensive material, including jokes about migrant deaths and racist and sexist slurs." *United States v. Tovar-Duran,* 2026 WL 2683739, at *2 (9th Cir. Sept. 14, 2026). Although the Facebook membership and postings were private, the court ruled that the government was obligated to disclose the evidence under *Brady* and Rule 16. *Id*. at 8-9. Similarly, in *United States v. David*,[11] the court ordered the government to

[11] The prosecution's conduct in *David* involved facts similar to those here. In that prosecution, which arose from a traffic stop, the government delegated its responsibility for identifying, preserving, and collecting discoverable information to the case agent, who initially represented that the officers involved in the traffic stop did not text each other about the case and thus had no electronic communications concerning it. *David*, 2026 WL 1880216, at *1. That was false. Indeed, the body-worn camera footage indicated that the officers were texting with each other on their personal devices during the traffic stop itself. *Id*. Only as a result of motions to compel and court hearings did the government eventually produce "hundreds" of relevant electronic communications, including ones from the officers' personal

forensically examine the personal and work devices of every officer who had communicated about the investigation, surveillance, stop, or search underlying the prosecution. 2026 WL 1880216, at *4, *6-*7 (W.D. Va., June 30, 2026). Both cases thus reaffirmed the fundamental principle that the government's discovery obligations under Rule 16, *Brady,* and *Giglio* turn on the *substance* of the information in the government's possession, not its location. Moreover, the government's duties under Rule 16 and *Brady* are "affirmative": the government must take steps to "learn of any favorable evidence known to the others acting on the government's behalf." *Dennis*, 834 F.3d at 284 (quoting *Strickler v. Greene*, 527 U.S. 263, 281 (1999)). In other words, it is the prosecutor's obligation – not the agents' – to search for discoverable information that the DHS officials may possess, *see, e.g.*, *Kyles*, 514 U.S. at 437-38, even if it is contained on personal devices.[12]

---

devices. *Id*. at *2. The court made it clear the government's discovery efforts were "wholly inadequate," *id*., and noted that a prosecutor's duty to learn of favorable evidence "is not satisfied merely by assuming that prosecution team members understand their obligations and will self-identify discoverable material." *Id*. at *3.

[12] This duty to inquire is not only mandated by law, it is DOJ policy. Justice Manual Section 9-5.002 provides, "[i]t is the obligation of federal prosecutors, in preparing for trial, to seek all exculpatory and impeachment information from all the members of the prosecution team .… This search duty also extends to information prosecutors are required to disclose under Federal Rules of Criminal Procedure 16 and 26.2 and the Jencks Act."

The government's position concerning personal devices is flatly inconsistent with these principles. The following hypothetical proves the point that ignoring personal devices defies common sense and would yield unjust results:

> CW is a cooperating witness. In return for a 5K motion, he has agreed to testify against his friend, D, who has been charged with firing a gun that killed V. After signing his cooperation agreement, CW stated on several occasions that D pulled the trigger that caused V's death.
>
> Shortly thereafter, however, CW sent a text message to the case agent's personal cell phone. In that message, CW described that he was not sure that D actually had fired the gun. He explained that, after thinking about it, he believes that X may have been the shooter. The case agent ascribed this change of heart to CW's nervousness and regret that his testimony could send D to jail for life. He reminded CW that he had previously identified D as the shooter and that he should "be confident about his original account." CW agreed and ultimately testified that D was the shooter.
>
> CW deleted this text exchange that night, but the case agent did not. It remained on his personal phone throughout the trial and sentencing.

Clearly, this text exchange would constitute both exculpatory and impeachment material under *Brady*, *Giglio*, and the Jencks Act. And, had the case agent informed the AUSA of this text exchange, the AUSA would have had a duty to disclose it to the defense, even though it was stored on the case agent's personal device.

But what if this text exchange had slipped the case agent's mind, and he did not disclose it to the AUSA? Applying the government's position in this case to these facts, the AUSA would have been under no obligation to inquire whether the case agent had used his personal devices to communicate about the case; the AUSA would

never have learned about the communications; and exculpatory evidence would have remained unavailable to D's attorney.

This scenario demonstrates the fallacy of the U.S. Attorney's Office's position that it has no obligation to inquire whether DHS personnel used personal devices to discuss this case. If any member of the prosecution team possesses discoverable information – in whatever form and in any location – the prosecutors are deemed to have constructive knowledge of it, and they have a legal and ethical duty to inquire.

The reasoning that drove the result in *David* applies with equal force here: the government's position that it need not even ask whether personal devices contain discoverable material is the same reliance on recollection, in place of a systematic search, that the *David* court found inadequate to satisfy Rule 16 and *Brady*. *David*, 2026 WL 1880216, at *4. The case for a forensic search here is equally strong[13] because there is already evidence that a prosecution team member diverted a conversation about this investigation to his personal phone, and the government has

[13] Although Congresswoman McIver did not initially request the imaging of personal devices, the government's noncompliance with its preservation obligations – *see* Section II, below – and its piecemeal production – *see* 11/17 Hr'g Tr. 12:5–14:16 – warrant additional relief. To that end, if an ICE official used a personal device to discuss the events of May 9 or Congresswoman McIver, the government should image that device to preserve the evidence and allow for appropriate searching and production.

already conceded that all of the data on the phone of a senior DHS official was deleted despite a preservation order. *See supra* n.6.

Therefore, Congresswoman McIver respectfully asks that the Court direct the government to take the steps outlined in paragraph 1 of the Proposed Order and to produce any discoverable material contained on the personal devices of those officials at DOJ or DHS who acted on the government's behalf in this case.

## II. The Court Should Order the Government to Comply with Its Preservation Obligations and Demonstrate that It Has Done So

Congresswoman McIver has repeatedly requested details about the government's preservation efforts – who gave the preservation directions, how and to whom they were directed, their scope, and the specific steps the government has taken to ensure compliance. *See, e.g.*, ECF 33 at 7-8; Letter Motion at 1, 8-10. Other than confirming on February 24 that the government has *not* imaged or collected any custodian's device as a preservation safeguard, the government has declined to share any information about its efforts. It has merely stated that the custodians have been "directed" to preserve their communications, and that the government "has assurances" that they are doing so. *See, e.g.*, ECF 27 at 74.

Several disclosures have confirmed the inadequacy of those "assurances." For example, the government has conceded that phones of three custodians were entirely unavailable: (1) the information on the government device of the most senior DHS Official who was supervising the operations at Delaney Hall on May 9 was deleted

when he left government service – well after the government's purported preservation instruction; (2) another DHS officer's device cannot be accessed; and (3) still another DHS officer's device contains no data, suggesting that it had been wiped.[14] *See* Letter Motion at 8. To date, the government has offered no explanation for these preservation failures.

Moreover, because the government does not believe it has any obligation to inquire whether DHS officials, officers, or agents have any discoverable material on their personal devices, they have apparently given no direction to preserve materials on those devices. That failure leaves the Court and the defense in the dark about whether the government has lost discoverable material, and risks the "deletion" of "substantive case-related communications." *David*, 2026 WL 1880216, at *4.

Finally, it is apparent that simply telling DHS to preserve does not guarantee that it will do so. DHS now has a lengthy track record of ignoring or disobeying court orders, making misrepresentations to courts around the country, and ignoring federal record keeping laws. Indeed, the U.S. Attorney's Office filed a declaration in February 2026 admitting that DHS had committed at least *28 violations* of court orders issued by judges in this District, in just the first ten weeks of the year. *See*

[14] There is other evidence in the discovery that messages may have been deleted. For example, messages received by one custodian are sometimes missing from the sender's production.

Fox Decl., *Kumar v. Soto*, No. 2:26-cv-0777 (D.N.J., Feb. 13, 2026), ECF 21-1. Similarly troubling examples from across the country abound.[15] And disclosures by DOJ in another, unrelated litigation show that DHS and ICE have been ignoring the requirements of the Federal Records Act (FRA), which require federal agencies to "preserve electronic records." 36 C.F.R. § 1222.26(b); *see* 44 U.S.C. §§ 3101-3107. Weissman Decl. ¶ 9, *American Oversight v. DHS*, 25-cv-03699 (D.D.C. Nov. 5, 2025), ECF 14-3.

The reasoning of *United States v. Vaughn*, Crim. No. 14-23, 2015 WL 6948577, at *16 (D.N.J. Nov. 10, 2015) is instructive on this issue. In *Vaughn,* the court sanctioned the government because, among other things, potentially discoverable text messages on a New Jersey State Trooper's phone had been destroyed despite a direction by prosecutors to preserve them. *Id.* at *17. This happened in part because prosecutors allowed the Trooper to make relevance

---

[15] *See, e.g.*, *Almonte v. Genalo*, 2026 WL 2983349, at *1 (E.D.N.Y. Oct. 5, 2026) (finding that "ICE agents falsified official records" about their enforcement activities, in an attempt to "conceal their illegal actions"); Order Granting Mot. for Sanctions at 7–16, *Perdomo v. Mullin*, 2:25-cv-05605 (C.D. Cal. Aug. 14, 2026), ECF 668 (sanctioning the government for failing to properly search and preserve ICE devices); Order Granting Mot. to Dismiss at 6–7, *U.S. v. Garcia*, 5:25-cr-1289 (S.D. Tex. Jan. 12, 2026), ECF 41 (Customs and Border Patrol agent was found to have destroyed material and exculpatory evidence); *Mercado v. Noem*, 800 F. Supp. 3d 526, 552–54 (S.D.N.Y. 2025) (expressing concerns about an ICE official's misleading testimony).

determinations without prosecutors' input as to the messages to be saved. *Id*. at *17-*18. Moreover, "the Government never requested that [the Trooper] produce any text messages for review or safeguarding during the active phase of the investigation or for at least some time thereafter," even after messages were lost from multiple phones. *Id*. at *18-*19. The court concluded that the government's "lack of effort to ensure [preservation]" was a sanctionable violation of its duty. *Id*. at *19.

In this case, the government knew last year that DHS had not been preserving all potentially discoverable information, despite whatever preservation instructions were given. Those revelations of data loss should have put the government on high alert that their preservation instructions had been ineffective and that they had an obligation to take further steps. At the very least, the prosecutors should have collected and imaged all government devices from every member of the prosecution team. And the prosecutors should have interviewed all of those personnel to determine whether they possessed discoverable information on their personal devices or elsewhere.

Any lingering question as to the necessity of these steps should have been answered when the prosecutors learned that DHS had been repeatedly violating court orders in this District and elsewhere, and systematically ignoring the agency's statutorily mandated preservation obligations around the country. There is no justification for the government to sit back and hope that discoverable information

has not been lost, much less that it will identified, gathered, and produced.

Accordingly, the Court should order the government to provide its prior preservation instructions and take the preservation steps outlined in paragraphs 2-4 of the Proposed Order.

## III. The Government Has Not Adequately Searched for Discoverable Material to which Congresswoman McIver Is Entitled

In accordance with the Court's instructions at the November 17 conference, Counsel for Congresswoman McIver proposed 55 search terms and twice conferred with the government about them. *See, e.g.*, Cortes Decl., Ex. 10 at 2. However, the government refused to engage in meaningful discussion. Rather, it announced on February 24 that it would use fewer than half of the suggested terms and would not negotiate as to the others. On February 27, the government memorialized its position in a letter listing the 26 terms it would run. Cortes Decl., Ex. 11 (DOJ's 2/27 letter of agreed terms). The government's search terms omitted any reference to Delaney Hall[16] and rejected the remainder of the terms suggested by Congresswoman McIver as "irrelevant" or privileged.[17] In addition, the government refused to share with

---

[16] Congresswoman McIver suggested that the government run the following "Delaney Hall" terms: Delaney, Dhall, DH. Cortes Decl., Ex. 10 at 2.

[17] During the February 24 call, the government also identified certain terms it deemed "overbroad." These terms include "Rob" (and other first names), "arrest," "SAIC," and "SAC." However, the government admitted that it had not conducted a hit count, much less provided one.

Congresswoman McIver the search terms it had used for its deficient November 4th Production.

Similarly, the government has unreasonably restricted the time parameters of its search. As described in Congresswoman McIver's motion to dismiss based on legislative immunity, she visited an ICE facility in Elizabeth on February 3, 2025, and, on March 28, 2025, she met to discuss her oversight responsibilities with some of the same DHS Officials who would later disrupt her inspection on May 9. *See* ECF 19-1 at 6. Although these prior visits and meetings were peaceful and cordial, the evidence is clear that, as soon as DHS learned on May 9 that Members were due to arrive at Delaney Hall, they responded with a small army of masked and armed ICE officers, began contemplating criminal charges, and tried to thwart the visit. *See, e.g.*, Cortes Decl., Exs. 6, 8, 13, 14. The only reasonable explanation for this drastic change from February to May is that DHS Officials were communicating among themselves and with their superiors about oversight visits by Congresswoman McIver and other Members.

In that light, it was entirely reasonable for Congresswoman McIver's January 26 letter to request that the government apply the search terms to the period between February 3, 2025 (the date Congresswoman McIver visited the ICE facility in Elizabeth) and July 15, 2025 (the last date on which DHS issued a press release falsely indicating that Congresswoman McIver had "stormed" the gate) for the

electronic communications of the seven management officials who were present at Delaney Hall on May 9 ("DHS Officials").

With respect to the sixteen ERO Deportation Officers or HSI Special Agents who were present at Delaney Hall on May 9, 2025 (the "ICE Officers"), Congresswoman McIver asked that the government also apply the search terms to the period between 7:00 a.m. on May 9, 2025, and June 10, 2025 (the date the Indictment was signed) because there is already incontrovertible evidence that at least some of the ICE Officers discussed potential and filed charges after May 9. *See* Cortes Decl., Exs. 1 & 2; Letter Motion at 2-3.

During the February 24 call, the government rejected Congresswoman McIver's proposed scope of review, and responded that it would search all custodians' messages only for the period between May 9 and May 31. The government stated that it need not look for any responsive or exculpatory material prior to May 9. Regarding the end dates, the government stated that May 31 was an adequate, if admittedly arbitrary, end date because it includes communications through some weeks after the event. In effect, the government was guessing that DHS employees would have stopped discussing the incident by then.

Congresswoman McIver recognizes that the government is under no legal obligation to conduct its searches according to the directions of defense counsel. But the government has a legal obligation to search for all discoverable material

regardless of its location and time of preparation. *See* Part I, above. And as discussed in more detail below, the search parameters suggested by the Defense are reasonably likely to yield information to which the defense is entitled. *See David*, 2026 WL 1880216 at *3-*4 (the government "fell woefully short" of its discovery obligations by failing to "search in a manner likely to lead to finding all relevant and material information"). There is no justification for the government's refusal to even look, and the Court should order it to do so.

### A. Information to Which the Defense is Entitled

The information sought by the defense is highly relevant to Congresswoman McIver's state of mind and to demonstrate bias on the part of DHS officers involved in this matter. It also constitutes impeachment material for prospective trial witnesses from DHS. For those reasons, among others, the government has an obligation to identify, collect, and produce that material under Rule 16, *Brady*, and *Giglio.*

#### *1. State of Mind*

At trial, the government would have to prove beyond a reasonable doubt that Congresswoman McIver acted with the necessary *mens rea*. Put simply, it would have to show that her incidental contact with DHS officials was an intentional, forcible assault. *See, e.g., United States v. Feola*, 420 U.S. 671, 684 (1975). To counter that narrative, the Congresswoman would be entitled to introduce evidence through cross-examination or in her direct case that she did not intend to use force against anyone. *See, United States v. Goodwin*, 440 F.2d 1152, 1156 (3d Cir. 1971).

To prove that point, the defense would be entitled to show that Congresswoman McIver believed that ICE's actions during her oversight visit on May 9 were part of an attempt to obstruct her legally authorized oversight inspection of Delaney Hall and to deter her and other Members from conducting future oversight visits. Indeed, the Congresswoman believed that ICE's actions on May 9 were all part of that plan, and that belief was reinforced by her firsthand view of ICE's inexplicable and unjustified conduct. For example:

- the refusal to give the Members a tour and forcing them wait for over an hour in Delaney Hall's security screening area;
- the decision to arrest Mayor Baraka for trespassing when ICE and DHS were fully aware that the mayor had been invited to enter the facility and had left after Victim-1 directed him to do so; and
- the decision to effectuate that bogus arrest by sending a team of armed and masked agents into a crowd of peaceful protesters.

Congresswoman McIver followed the ICE officers into that crowd to monitor ICE's behavior and protect against ICE's deliberate and baseless interference with her oversight. When she did so, she believed that such steps were consistent with her oversight responsibilities and authority over DHS and ICE. *See Goodwin*, 440 F.2d at 1156.

To support that position, Congresswoman McIver is also entitled to show that her beliefs, perceptions, and actions were reasonable, and demonstrating that DHS and ICE were, in fact, engaged in such behavior would be relevant because it would prove the reasonableness of those beliefs, perceptions, and actions. Fed. R.

Evid. 401(a) (Evidence is relevant "if it has a tendency to make a fact more or less probable than it would be without the evidence.") Accordingly, communications, documents, and oral conversations evidencing or concerning the following points are material to the defense and discoverable:

- Knowledge that democratic lawmakers, such as Congresswoman McIver, objected to the opening of Delaney Hall in May 2025 or might seek to inspect it;
- Congressional inspections of immigration detention centers after the three Members' visit to the Elizabeth facility in February 2025;
- Congresswoman McIver's meeting with ICE officials in March 2025, where she described her oversight responsibilities and objectives;
- Any information about DHS's response to the Members' presence on May 9;
- Discussion of how to respond to Congresswoman McIver or other Members at oversight visits;
- Negative views of the Congresswoman or other Members, their political beliefs, or their stances on immigration enforcement, DHS, or ICE;[18]
- Discussions of Congressional oversight, including but not limited to the inspection of DHS immigration holding facilities;
- Discussions about Congresswoman McIver and the other Members' visit to Delaney Hall on May 9, including but not limited to efforts to interfere with or delay their legislative oversight responsibilities;

[18] Aside from demonstrating bias, negative or racist views concerning Congresswoman McIver or others is also relevant to provide context regarding ICE's otherwise inexplicably aggressive actions toward her and Mayor Baraka. As the Court recognized, at least one ICE officer physically assaulted the Congresswoman as she attempted to re-enter the gate after the mayor's arrest. ECF 63 at 2.

- Information that Mayor Baraka was not trespassing;
- Information about arresting Mayor Baraka, including the circumstances in which it occurred;
- Documents related to the press releases and public statements regarding the events of May 9 at Delaney Hall, including the sources of information for those releases or statements; and
- Documents regarding the effect that the arrest or prosecution of Mayor Baraka or Congresswoman McIver might have on others criticizing ICE or DHS, inspecting ICE detention facilities, or conducting congressional oversight.

***2. Bias***

Evidence of bias is always admissible and not subject to the strictures Rule 608(b). *See United States v. Abel*, 469 U.S. 45, 55-56 (1984); *Wilson v. Beard*, 589 F.3d 651, 665 (3d Cir. 2009); *Harshman v. Superintendent, State Corr. Inst. at Rockview*, 368 F. Supp. 3d 776, 790 (M.D. Pa. 2019).

*Abel* is the seminal case on point. There, the Supreme Court upheld the introduction of extrinsic evidence that the defendant and a defense witness were members of a secret prison gang, and that one of the gang's principles was its members' obligation to protect each other, including by lying. *Abel,* 469 U.S. at 47, 56. According to the Supreme Court, "[a] witness' and a party's common membership in an organization, even without proof that the witness or party has personally adopted its tenets, is certainly probative of bias." *Id*. at 52. The Court's reasoning was clear: any proof of institutional bias that might influence a witness's testimony is "relevant because the jury, as finder of fact and weigher of credibility,

has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." *Id*.; *Tovar-Duran*, 2026 WL 2683739, at *4.

As in *Abel,* evidence demonstrating DHS's or ICE's antipathy toward Congressional oversight of its immigration detention facilities in general, or toward Congresswoman McIver in particular, is highly relevant, and the jury should be able to fully and fairly evaluate the testimony of DHS officials, like Victim-1 and Victim-2, in light of the culture, attitudes, and biases of their employer, superiors, and colleagues. And of course, it would also be appropriate for the defense to question the witnesses about their own individual biases and views about Congresswoman McIver and Congressional immigration oversight. *Abel*, 469 U.S. at 56.

Accordingly, all the categories of information discussed in Part III (A)(1) are discoverable because they are probative not only of state of mind, but also of bias.

***3. Impeachment Material***

Such material is also potential impeachment evidence for *all* DHS witnesses who may testify at trial. Under section 527 of the appropriations statutes, DHS is prohibited from using any funds "to prevent" a Member of Congress "from entering, for the purpose of conducting oversight, any facility operated by or for the [DHS] used to detain or otherwise house aliens." FCAA § 527, 138 Stat. 460, 619 (2024). Yet, on May 9, DHS did exactly that.

Congresswoman McIver is thus entitled to cross-examine DHS witnesses,

such as Victim-1 and Victim-2, about their violation of this law and their interference with her statutory right to inspect Delaney Hall. Any evidence that bears on, illuminates, or explains those acts (including the evidence described above) constitutes material impeachment information that must be disclosed to the defense.

## B. The Government Should Expand its Searches and Productions in Order to Comply with its Discovery Obligations

### *1. The Government's Purported Justifications for Refusing to Use Some Search Terms are Baseless*

As described above, Congresswoman McIver is entitled to evidence the government possesses that might bear on her state of mind, the bias of the agents and officers who anticipated or were involved in the events of May 9, and the overall DHS and ICE attitude toward congressional oversight of detention facilities. However, the government rejected 18 search terms that are narrowly tailored to identify three particular categories of responsive evidence:

- DHS's efforts to plan for and impair the Members' oversight visit (Indict*, 18USC, Protest*, NPD, Charge*, Prosecut*[19]);
- Communications discussing, expressing, or commenting on political views – either those views of prosecution team members or discussing Congresswoman McIver's (Democrat*, Dem*, Lib*, Left*, Radical, Antifa); and
- Communications about the press releases that DHS prepared and published on and after May 9 that falsely described the Members' visit

[19] Although not included in the terms proposed by Congresswoman McIver on January 26, the government should also search "Prosecut*" for the reasons discussed below.

> to Delaney Hall (Trespass, Bus, Antifa, Storm*, Force*, "broke in", and ("press release" and (tricia or DHS or Delaney or hall or dhall))).[20]

These search terms could "hit" on documents relevant to the defense; indeed, they go to the core issues of state of mind, bias, and DHS's disregard of the law. Thus, the government's refusal to deploy such search terms is inappropriate: when "a request for relevant and specific information is received by a prosecutor, he must respond to that request as long as there is some substantial basis for claiming materiality." *United States v. Boffa*, 513 F. Supp. 444, 499 (D. Del. 1980); *see also, David*, 2026 WL 1880216, at *3.

More troubling is the government's purported justification for the refusal to use some search terms. According to the AUSAs, they will not run these search terms because, in their view, those terms would yield documents that include privileged material and others that contain policy and political viewpoints. Those purported justifications are completely inappropriate.

The government's refusal based on privilege fails for two reasons.

---

[20] The DHS Officials and ICE Officers at Delaney Hall knew that the Members did not "storm[] the gate" or "trespass[]," despite the press releases indicating otherwise. There also is evidence that DHS Officials present at Delaney Hall were instrumental in drafting and publishing the language anyway. *See, e.g.*, Cortes Decl., Ex. 8 at 1-7 (the senior DHS Official, whose phone was deleted, corrected the language of the false press release that originally stated the Members "broke into the detention facility" but approved the portion of the press release indicating they had "stormed the gate"); *Id.*, Ex. 12 at 1 (senior DHS Officials revising false press release).

First, the government's previous productions show that the use of these terms would yield at least some relevant material that is *not* privileged. For example:

- At 11:26 a.m. on May 9 – more than an hour before the members or the mayor arrived at Delaney Hall, high-ranking DHS Officials discussed which "section of **18USC** we would have to use to arrest someone," and how they could assure "the element(s) of the crime can be established" in order "to determine what can be **charged**." Cortes Decl., Ex. 6 at 1.

Use of the terms such as "charge*" and "18USC" would have independently led to the production of that nonprivileged document. It is irrelevant that the document was produced anyway. There may be others that the government has not already located that would "hit" on those terms and be equally material.

Similarly, another document in the government's previous production shows that DHS Officials were discussing prosecuting the Members on the basis of false information, even *before* the alleged assault took place:

- At 2:37 p.m., someone associated with DHS falsely reported to high ranking DHS officials that "2 Congressmen, 1 state legislator, and the Newark Mayor just trespassed beyond the gate at Delaney [Hall] (after two vehicles were let in to enter), and there was a shouting match, and SRT [ICE's Special Response Team] stopped them and pushed them back. ***I think we need to proactively hit back. HSI exploring prosecuting them (which I think they should)***." *See* Cortes Decl., Ex. 8 at 11 (emphasis added). Yet agents did not go through the gate to arrest the mayor until six minutes later, at 2:43 p.m.

Neither message is privileged. And both are clearly relevant because they show a plan by DHS to disrupt the oversight visit and to stage an arrest of the Members and the mayor. *See also* Cortes Decl., Ex. 1; Letter Motion at 2-3.

Second, it is routinely true – in both civil and criminal litigation – that search terms might result in the identification and collection of potentially privileged documents. That is never an excuse for rejecting the terms outright. While the government may ultimately claim privilege over some documents uncovered by the search, that does not relieve the prosecutors of their obligation to seek the materials, review them, and then (if appropriate) create a privilege log explaining the reasons they are attempting to withhold certain documents. *See U.S. v. Rabbitt*, No. CR 23-320 (MAS), 2024 WL 4041912, at *10 (D.N.J. Sept. 4, 2024). Simply saying that some terms "might" hit on a large number of privileged documents is not enough. Indeed, when dealing with constitutionally mandated discovery in a criminal case, that exercise is critical so that the defendant can challenge the assertion of privilege or argue that the privilege must yield to the defendant's constitutional right to receive exculpatory and impeachment evidence in the prosecution's possession. *Coyoy v. U.S.*, No. 2:20-CV-02501, 2024 WL 5232086, at *5 (D.N.J. Dec. 26, 2024) (deliberative process privilege "is not absolute" and can be overcome "by showing a sufficient need for the material in the context of the facts or nature of the case" (quotation omitted)); *Rabbitt*, 2024 WL 4041912, at *10.

The government has also rejected terms – including, but not limited to "Democrat*," "Lib*", "Protest*," and the terms regarding DHS' false press releases – on the basis that the results may elicit communications relating to policies or

political viewpoints. The fact that documents may concern policies or political viewpoints does not undermine either their relevance or their materiality to the defense. To the contrary, this is a circumstance in which the policies of the agencies and political views of their officials are likely probative of the views of agents and officers who interfered with the duties of elected members of Congress. Indeed, as discussed above, any bias on the part of the prosecution team is responsive and potentially exculpatory. The communications about the false press releases – authored by DHS Officials who knew they were false – similarly go to the bias and state of mind of those controlling the melee on May 9.

In addition, to the extent that the prosecution objects to producing particular documents, the appropriate and standard methodology is to identify that material, prepare a log, and seek the Court's intervention if necessary. Flat refusals to use particular terms are unjustified.

***2. The Government Should Re-Produce its November 4th Production and Share the Search Terms It Used***

On February 27, the government shared a list of search terms it agreed to run; "Delaney Hall" was not among those terms. *See* Cortes Decl., Ex. 11. When asked, the government claimed it had searched for "Delaney Hall" and similar terms prior to its November 4th Production. But it has not shared those terms with the defense. The Court should order the government to provide all search terms it used.

In any event, the government's November 4th Production of 56 screen shots

with no metadata was incomplete and inadequate. The Court should order the Court to reproduce that production entirely, with metadata and full text chains. More broadly, the government should re-run both its terms and the terms proposed by Congresswoman McIver for *every* custodian, including all those present at Delaney Hall and their superiors.

Accordingly, the Court should require the government to share with Congresswoman McIver all the terms it previously searched in accordance with paragraph 5.a, to run the search terms listed in paragraph 6,[21] and to supplement its previous productions in accordance with paragraph 5.b.

***3. The Government Should Expand the Time-Periods of its Searches***

Beyond its baseless refusal to use relevant search terms, the government has arbitrarily announced that it will limit its search for emails and other documents to only those created or sent between May 9 and May 31, 2025. By contrast, Congresswoman McIver has requested that the government apply two distinct timeframes for two different sets of personnel:

- For the 16 ICE Officers, defined above, present at Delaney Hall on May 9, the government should search for evidence from 7:00 a.m. on May 9, 2025, through June 10, 2025 (the date the Indictment was returned); and

[21] Although not included in the terms proposed by Congresswoman McIver on January 26, the government should also search "MacGiver" and "MacIver" to account for misspellings of the Congresswoman's name.

- For the seven DHS Officials, defined above, present at Delaney Hall on May 9, the government should search for evidence from February 3, 2025 (the date Congresswoman McIver visited the ICE facility in Elizabeth) through July 15, 2025 (the last date on which DHS issued a press release falsely indicating that Congresswoman McIver had "stormed" the gate).

There is no basis to arbitrarily cut short the review of ICE Officers' communications at May 31. The indictment was returned against Congresswoman McIver on June 10, and it is reasonable to believe that the ICE Officers may have discussed that development. Indeed, shortly after the incident, the officers were already opining about whether a charge was warranted in the first place. Cortes Decl., Ex. 1; Letter Motion at 2-3. Later, they discussed the government's decision to drop the trespassing charge against Mayor Baraka. Cortes Decl., Ex. 2. Communications by the prosecution team about the merits of the prosecution are clearly material and potentially exculpatory.

During a discussion on February 24, the government acknowledged that such communications might exist after May 31, but still refused to search for them. When reminded that the government has an obligation to determine if there is discoverable material, whether it existed in May, June, or even later, the government still refused to expand the timeframe of its search. That position is untenable.

For the same reasons, the government's refusal to review messages sent by or to DHS Officials after May 31 also lacks merit. Although Congresswoman McIver requests the government search ICE Officers' communications through June 10, she

requests a longer timeframe for *only* seven DHS Officials: through July 15, the last day on which DHS issued a false press release about her.

The government incorrectly believes that communications regarding the DHS press releases, published through July, are irrelevant. But for the reasons previously stated, the press releases are probative of state of mind and bias, as they could confirm DHS's interest in consciously spreading misinformation to chill future oversight visits. *See* Cortes Decl., Ex. 8 at 1 (the most senior DHS Official present on May 9 wrote, about the already published press release, "[t]his needs to be redone . . . . I don't think they broke in"); *Id*., Ex. 12 at 1 (senior DHS Officials revised the press release without eliminating all of the falsehoods).

In addition, there is a strong likelihood that discoverable material generated prior to May 9 exists on DHS Officials' devices.[22] Congresswoman McIver and her colleagues were known to DHS long before their visit to Delaney Hall because she had been persistent in her questioning and criticism of ICE's facilities in New Jersey. For example, Congresswoman McIver sent a February 19, 2025 letter to then-DHS Secretary Kristi Noem expressing concern about ICE detention in New Jersey.

Moreover, DHS Officials were clearly aware that Delaney Hall was a

---

[22] During the February 24 discussion, the government acknowledged that it has not searched these early messages, but also declared—without basis—that the expected communications do not exist.

lightning rod and they certainly knew that Democratic Members from New Jersey would be conducting legislative oversight inspections of ICE facilities. Accordingly, it is entirely reasonable to expect that DHS Officials were communicating about their anticipated response. The relevance of such communications – and their potential exculpatory significance – is beyond dispute.

The government cannot rely on speculation that the search will not identify responsive information to refuse a reasoned and reasonable request for this material. "[I]f the subject matter of [a defense's] request is material, or indeed if a substantial basis for claiming materiality exists, it is reasonable to require the prosecutor to respond either by furnishing the information or by submitting the problem to the trial judge. When the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable." *U.S. v. Agurs*, 427 U.S. 97, 106 (1976), *holding modified by U.S. v. Bagley*, 473 U.S. 667 (1985).

It is beyond dispute that there was material and exculpatory evidence in the very limited communications that the government has already agreed to search. Congresswoman McIver's request is simple, and not unreasonably onerous: the government should expand the time frames of the search by a few short weeks to identity *Brady/Giglio* and material evidence. "Where, as here, . . . there is an explicit request for an apparently very easy examination, and a non-trivial prospect that the

examination might yield material exculpatory information, we think the prosecution should make the inquiry." *U.S. v. Brooks*, 966 F.2d 1500, 1504 (D.C. Cir. 1992).

Accordingly, as delineated in paragraphs 7 and 8 of Congresswoman McIver's Proposed Order, the government should be directed to search DHS Officials' communications from February 3, 2025 through at least July 15, 2025, and should be ordered to search ICE Officers' communications from 7:00 a.m. on May 9, 2025 through at least June 10, 2025.

## CONCLUSION

Congresswoman McIver respectfully requests that the Court issue the accompanying order to ensure that the government honors its discovery obligations.

Dated: October 15, 2026

ARNOLD & PORTER KAYE SCHOLER LLP

By: ______________________________

Paul J. Fishman
Lee M. Cortes, Jr.
One Gateway Center | Suite 1025
Newark, NJ 07102
Telephone: 973-776-1901
Paul.Fishman@arnoldporter.com
Lee.Cortes@arnoldporter.com

*Counsel for Congresswoman LaMonica McIver*