**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Jamel K. Semper |
| | : | |
| v. | : | Crim. No. 25-00388 (JKS) |
| | : | |
| LAMONICA MCIVER | : | |

# MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANT'S MOTION TO COMPEL DISCOVERY

ROBERT FRAZER
United States Attorney
970 Broad Street
Newark, New Jersey 07102
(973) 645-2700

On the Brief:

Mark J. McCarren
Assistant U.S. Attorney

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES .......... ii

PRELIMINARY STATEMENT .......... 1

FACTUAL BACKGROUND .......... 5

I. Defendant McIver's Theory that DHS was Attempting to Thwart her from Conducting Her Congressional Oversight Duties is Irrelevant to the Charges She Faces and Therefore Does Not Provide a Legitimate Basis For Her Expansive Discovery Requests .......... 7

II. Case Law Does not Support Defendant's Expansive View of the Discovery to which She Believes She is Entitled .......... 11

III. Case law Does not Support Defendant's Claim That She is Entitled to Materials on the Personal Phones of the More than Two Dozen Agents and Officers at Delaney Hall on May 9, 2025 .......... 13

IV. Defendant McIver's Request for Evidence of Bias is Premature and is Classic Impeachment Material Which is Only Applicable for the Witnesses the Government Calls at Trial .......... 20

V. Defendant McIver's Request to Enlarge the Time Period Covered .......... 22

VI. Defendant McIver's Request to Include Numerous Additional Search Terms for the Search of the DHS Work Phones Should be Rejected .......... 23

CONCLUSION .......... 26

## TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

*Brady v. Maryland*,
373 U.S. 83 (1963) ........................................ 4, 5

*Giglio v. United States*,
405 U.S. 150 (1972) ........................................ 4, 20

*Holmes v. South Carolina*,
547 U.S. 319 (2006) ........................................ 10

*Kyles v. Whitley,*
514 U.S. 419 (1995) ........................................ 5

*Pennsylvania v. Ritchie*,
480 U.S. 39 (1987) ........................................ 6

*Riley v. Taylor*,
277 F.3d 261 (3d Cir. 2001) ........................................ 6

*United States v. Abdallah*,
911 F.3d 201 (4th Cir. 2018) ........................................ 6, 15

*United States v. Alayeto*,
628 F.3d 917 (7th Cir. 2010) ........................................ 10

*United States v. American Radiator & Standard Sanitary Corp.*,
433 F.2d 174 (3d Cir. 1970) ........................................ 6

*United States v. Bruce*,
984 F.3d 884 (9th Cir. 2021) ........................................ 14

*United States v.* Caro,
597 F.3d 608 (4th Cir. 2010) ........................................ 5, 6, 17

*United States v. Carr*,
424 F.3d 213 (2d Cir. 2005) ........................................ 10

*United States v. Cousin*,
2022 WL 314853 (D.Mass. Feb. 2, 2022) ........................................ 19

*United States v. David*,
2026 WL 1880216 (W.D. Va., June 30, 2026) ........................................ 16, 17, 18, 19

*United States v. Desmond*,
670 F.2d 414 (3d Cir. 1982)........................................................................10

*United States v. Doe*,
705 F.3d 1134 (9th Cir. 2013)........................................................................14

*United States v. Goodwin*,
440 F.2d 1152 (3d Cir. 1971)........................................................11, 12, 13

*United States v. King*,
628 F.3d 693 (4th Cir. 2011)........................................................................20

*United States v. McIver*,
141 F.4th (3d Cir. 2026)........................................................................3, 7

*United States v. Ramos*,
27 F.3d 65 (3d Cir. 1994)........................................................................6

*United States v. Risha*,
445 F.3d 298 (3d Cir. 2006)........................................................................5, 15

*United States v. Thomas*,
116 F.3d 606 (2d Cir. 1997)........................................................................10

*United States v. Tovar-Duran*,
2026 WL 2683739 (9th Cir., September 14, 2026)..................................13, 14, 15, 16

*United States v. Valenzuela-Bernal*,
458 U.S. 858 (1982)........................................................................6

*United States v. Washington*,
869 F.3d 193 (3d Cir. 2017)........................................................................9, 10

**Statutes**

18 U.S.C. § 111........................................................................11, 22

18 U.S.C. § 111(a)(1)........................................................................1

**Rules**

Fed. R. Crim. P. 16........................................................................*passim*

Fed. R. Crim. P. 403........................................................................10

## PRELIMINARY STATEMENT

On June 10, 2025, a grand jury sitting in Newark, New Jersey returned a three-count Indictment against Representative LaMonica McIver ("Defendant" or "defendant McIver"), charging her with three counts of assaulting, resisting, opposing, impeding intimidating and interfering with a federal officer, in violation 18 U.S.C. § 111(a)(1). On August 15, 2025, Defendant filed four separate pretrial motions seeking to: (1) dismiss the Indictment on the basis of selective prosecution, selective enforcement and vindictive prosecution; (2) dismiss the Indictment on the basis that she is immune from prosecution pursuant to the Speech or Debate Clause of Article I of the United States Constitution; (3) have the Court order additional enumerated discovery pursuant to Federal Rule of Criminal Procedure 16 in addition to discovery previously provided;[1] and (4) restrain the Government's extrajudicial statements. *See* ECF Nos. 19-22.

On October 21, 2025, the Court conducted oral argument as to these motions. On November 13, 2025, the Court issued its Opinion and Order denying the defendant's motions to dismiss on the basis of Speech or Debate Clause immunity and on the claims of selective/vindictive prosecution and selective enforcement.[2] ECF 44 & 45. The Court

---

[1] In response to the Court's oral directive on October 21, 2025, the Government produced approximately 54 screen shots of messages from the work phones of the Department of Homeland Security ("DHS") agents and Enforcement and Removal Operations ("ERO") officers present at Delaney Hall on May 9, 2025 which had been culled from those phones with the use of search terms selected by the Government. Those messages covered the period from May 9, 2025 through May 31, 2025.

[2] The November 13, 2025 Opinion and Order denied the motion to dismiss on the basis of the Speech or Debate Clause as to Counts One and Three. After further briefing, the Court denied the motion to dismiss Count Two on the basis of the Speech or Debate Clause by Opinion and Order dated January 5, 2026. ECF 63.

also denied Defendant's motions seeking discovery to support her motions to dismiss on the basis of selective and/or vindictive prosecution.[3] The Order also scheduled a status conference shortly thereafter to discuss, among other matters, outstanding discovery requests from the defendant.

At the status conference held by the Court on November 17, 2025, the Court directed the Government to produce all electronic messages from the phones of the DHS agents and officers present at Delaney Hall on May 9, 2025 for the period from 12:00 p.m. through 5:00 p.m. on that date, with the caveat that any law enforcement sensitive material that the Government sought to withhold from production could be provided to the Court for *in camera* inspection. On or about November 26, 2025, the Government produced the relevant material to defendant McIver subject to the terms of a corresponding protective order that entered into by the parties.

Defendant McIver filed an interlocutory appeal challenging the Court's order denying her motions to dismiss on the basis of the Speech or Debate Clause and selective/vindictive prosecution and selective enforcement. The Third Circuit conducted oral argument on this appeal on June 24, 2026 and, on August 26, 2026, issued its Opinion affirming the denial of the motion to dismiss on the basis of the Speech or Debate Clause as to Counts One and Two and remanding as to Count Three

[3] In denying this discovery request, the Court found that it "cannot find the Defendant's broad request for communications among top DOJ, DHS, and ICE officials beginning on January 20, 2025 is warranted for her selective enforcement claim," and that Defendant had accordingly "failed to offer the minimal required evidence of discriminatory effect." ECF 44, at 40.

for further findings of the District Court. *See United States v. McIver*, 141 F.4th 130 (3d Cir. 2026).[4]

On October 9, 2026, defendant McIver filed her petition seeking *en banc* review of her interlocutory appeal. This petition remains pending as of the submission of this brief.

On October 15, 2026, defendant McIver filed the instant motion to compel additional discovery far beyond that which had already been provided and which the Government has agreed to provide after consultation with counsel for the Defendant.[5] Defendant McIver's motion seeks, among many other things, to expand the universe of terms to be employed in searching these work phones while also expanding the time frame covered by the search. Specifically, defendant McIver contends that this Court should direct the search of those phones to reach back to February 3, 2025 (when defendant McIver conducted an inspection tour of an immigration detention facility in Elizabeth, New Jersey) and include the time period through at least July 15, 2025 (which coincides with a press release issued by DHS referring to Defendant McIver). Defendant McIver also asks this Court to direct the Government to: (i) interview all

---

[4] The Third Circuit determined that it lacked jurisdiction to hear the selective/vindictive prosecution claims as part of the interlocutory appeal.

[5] The Government is in the process of reviewing the contents of the previously imaged 22 work phones of DHS agents and ERO officers present at Delaney Hall on May 9, 2026 using a series of search terms of which defendant McIver is aware. The Government is searching those phones for the period from May 9, 2026 through May 31, 2026, using those search terms. One additional phone was wiped of its contents upon the retirement of the individual to whom it had been issued, so no relevant data can be extracted from it. The Government does not intend to call this individual as a witness.

the DHS and ERO personnel involved in the arrest at Delaney Hall on May 9, 2025 to determine whether they used their personal cell phones to communicate about the events of May 9, 2026; (ii) provide sworn statements memorializing those statements; (iii) image and search the personal phones of any agents or officers who state that they did use their personal phones; and (iv) provide documentation of all preservation orders and efforts regarding agents' and officers' cell phones.

The United States accordingly submits this brief in opposition to those requests, the scope of which is unprecedented and unsupported by existing case law. While the Government does not contest that it is bound by *Brady v. Maryland*, 373 U.S. 83 (1963), and that it must turn over impeachment material at the appropriate time for its witnesses pursuant to *Giglio v. United States*, 405 U.S. 150 (1972), the requests and demands of defendant McIver go far beyond *Brady* and *Giglio* materials. This is particularly true because there was no investigation of defendant McIver before, as alleged in the Indictment, she chose to interfere with the arrest of Mayor Baraka on May 9, 2026. The investigation that followed consisted almost entirely of gathering the videos from Delaney Hall surveillance camera and from the body-worn cameras of DHS personnel and viewing the contents of those videos. Further, defendant McIver's requests and demands beyond the scope of Federal Rule of Criminal Procedure 16, because the underlying theory which she invokes to justify her far-reaching discovery demands – namely, that DHS was attempting to thwart her oversight efforts – is belied by the facts and, in any event, immaterial because it does not constitute a viable or relevant defense to the charges she faces. In short, this Court should deny defendant

McIver's wide-reaching discovery requests because they represent the quintessential "fishing expedition" that courts are loathe to sanction.

## FACTUAL BACKGROUND

In its initial Memorandum of Law in Opposition to the Defendant's omnibus motions to dismiss the Indictment, the United States included an extensive Factual Background section which does not bear repeating here but is realleged and incorporated hereto. Of significance to the instant motion, however, is the procedural history of this case and the discovery that has already been provided or which the Government has already agreed to provide after consultation with counsel for the Defendant.

## DISCUSSION

Under *Brady v. Maryland*, 373 U.S. 83 (1963), "the prosecution's suppression of evidence favorable to a criminal defendant violates due process when the evidence is material to guilt or punishment." *United States v. Risha*, 445 F.3d 298, 303 (3d Cir. 2006). "To establish a *Brady* violation, it must be shown that (1) evidence was suppressed; (2) the evidence was favorable to the defense; and (3) the evidence was material to guilt or punishment." *Id.* "Evidence is 'material' if there is a reasonable probability that pretrial disclosure would have produced a different result at trial. The question is not whether disclosure would have resulted in a different verdict, but whether suppression would have 'undermine[d] confidence in the outcome of the trial." *Id.,* at n.5 (*quoting Kyles v. Whitley,* 514 U.S. 419, 434-45 (1995)). There must be "some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor." *United States v.*

Caro, 597 F.3d 608, 621 (4th Cir. 2010). A defendant should identify the exculpatory material he seeks with some specificity so that "*Brady* obligations do not become unduly burdensome, and that the defendant does not conscript the court for a groundless fishing expedition." *United States v. Abdallah*, 911 F.3d 201, 218 (4th Cir. 2018). Moreover, as the Supreme Court held in *Pennsylvania v. Ritchie:*

> In the typical case where a defendant makes only a general request for exculpatory material under *Brady* [], it is the State that decides which information must be disclosed. Unless defense counsel becomes aware that other exculpatory evidence was withheld and brings it to the court's attention, the prosecutor's decision on disclosure is final. Defense counsel has no constitutional right to conduct his own search of the State's files to argue relevance.

480 U.S. 39, 59-60 (1987). Accordingly, even to obtain in camera review of a prosecutor's files for *Brady* material, a defendant must make an initial showing that such material exists and was withheld. "A defendant seeking an in camera inspection to determine whether files contain *Brady* material must at least make a 'plausible showing' that the inspection will reveal material evidence." *Riley v. Taylor*, 277 F.3d 261, 301 (3d Cir. 2001) (en banc), citing *Ritchie*, 480 U.S. at 58 n.15 (1987), quoting *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982). Mere speculation is not enough. *Riley*, 277 F.3d at 301; *Ramos*, 27 F.3d at 69-70; *United States v. Ramos*, 27 F.3d 65, 69-70 (3d Cir. 1994) *United States v. American Radiator & Standard Sanitary Corp.*, 433 F.2d 174, 202 (3d Cir. 1970).

## I. Defendant McIver's Theory that DHS was Attempting to Thwart her from Conducting Her Congressional Oversight Duties is Irrelevant to the Charges she Faces and therefore Does Not Provide a Legitimate Basis For Her Expansive Discovery Requests

Defendant McIver contends that the purportedly discoverable material which she seeks "is highly relevant to Congresswoman McIver's state of mind," Def. Br., at 26. Defendant McIver contends that she would be entitled to show that she did not intend to use force against anyone and that to further that argument, she would be entitled to show "that ICE's actions during her oversight visit on May 9 were part of an attempt to obstruct her legally authorized oversight inspection of Delaney Hall and to deter her and other Members from conducting future oversight visits." *Id.*, at 27. Defendant McIver goes so far as to argue that at the time the Mayor of Newark (the "Mayor") was arrested outside the fence that surrounds Delaney Hall, she "followed ICE officers into that crowd to monitor ICE's behavior and protect against ICE's deliberate and baseless interference with her oversight." *Id.*[6] She accordingly argues that she is entitled to show that her belief in this respect was not unreasonable and

[6] Defendant simply ignores this Court's finding in the context of her assertion of Speech or Debate Clause immunity wherein the Court found that "[n]o genuine legislative purpose was advanced by Defendant's alleged conduct" as alleged in Counts One and Three. Opinion, ECF 44, November 13, 2025, at 23. In rejecting Defendant's Speech or Debate Clause claims as to Count 2, this Court reiterated that "[h]er conduct was not tied to potential legislation or any other policy-making purpose," and that "[t]he physical contact she engaged in outside the facility lacked a legislative prerogative." Opinion, ECF 63, at 6-7. The Third Circuit affirmed, noting as to Count One that "the nature of the conduct charged in Count One is non-legislative" *United States v. McIver*, 141 F.4th 130, 141 (3d Cir. August 26, 2026), and that "[t]he acts alleged in Count Two fall outside the 'sphere of legitimate legislative activity. So we will affirm." *Id.*, at 44 (citations omitted).

that proving that ICE was in fact engaging in efforts to obstruct her oversight efforts would tend to prove the reasonableness of her belief.

The shortcomings of this argument are manifold, not the least of which is that immediately after the Mayor was arrested, defendant McIver and the other two members of the Congressional delegation received the inspection tour of Delaney Hall which they had sought. Thus, it would appear that any effort to thwart her inspection tour by DHS was ineffectual at best, and the fact that she was given the tour immediately after the arrest of the Mayor clearly undermines that claim.

More fundamentally, the basis on which Defendant grounds her request for such far-reaching discovery – namely, her state of mind at the time of her alleged criminal conduct – does not constitute a viable defense to the charges which she is facing. In short, even if her belief that ICE was attempting to thwart her efforts at oversight of Delaney Hall was substantially true, that fact would in no way entitle her to forcibly assault, impede or obstruct the arrest of the Mayor. Her justification defense is no justification under the law and thus cannot be the basis for transforming communications into *Brady* material that would not otherwise so qualify. Further, given that her state of mind as to whether she was being thwarted in her efforts to conduct oversight is not relevant to the crimes charged, it logically follows that communications that tend to make her belief seem more reasonable cannot be material to the defense, let alone be *Brady* material.

Finally, it should not be overlooked that Defendant McIver's request for expansive discovery based on the alleged "culture, attitudes, and biases" of other DHS

and ICE officials and employees serves as an end around to gain access to the discovery she unsuccessfully sought in conjunction with her selective/vindictive prosecution claims. Def. Brief, at 30. In the context of the discovery sought to support her selective/vindictive prosecution claims, Defendant was more explicit in seeking communications involving high-ranking figures such as the Attorney General, the Interim or Acting U.S. Attorney for the District of New Jersey and the DHS Secretary and all members of ICE leadership while here Defendant references in a more opaque fashion "evidence demonstrating DHS's or ICE's antipathy toward Congressional oversight of its immigration detention facilities in general," Def. Brief, at 30. However, the nature and intended use of the material sought is the same, namely, because the "jury should be able to fully and fairly evaluate the testimony of DHS officials, like Victim-1 and Victim-2, in light of the culture, attitudes, and biases of *their employer, superiors, and colleagues*." Def. Brief, at 30. (emphasis added). In other words, Defendant believes she is entitled to bias evidence not merely of the testifying witnesses but of a spectrum of high-ranking DHS and ICE officials and fellow employees with which to cross-examine the witnesses such as Victim-1 and Victim-2.

This Court appropriately denied the earlier request as to the selective prosecution claim because "Defendant has not offered 'credible' evidence that similarly situated individuals were not prosecuted . . ." ECF 44, at 40 (quoting *United States v. Washington*, 869 F.3d 193, 215 (3d Cir. 2017). Further, this Court found that Defendant McIver "has not offered 'some evidence' of her vindictive prosecution claim either," noting that the public statements from the President and Interim U.S.

Attorney were not "particularized as to her or her policy positions on immigration," and that "[t]o provide discovery based on statements made by executive branch officials related only to her partisan affiliation would render the discovery standard hollow because it would be universally applicable." *Id.* Defendant has offered nothing additional to bolster her claims of selective/vindictive prosecution, and the Court should not entertain those discovery requests under the guise of needing such discovery to establish that her belief that DHS officials were conspiring to impede her oversight efforts was reasonable. As has been stated before, that belief – whether accurate or not – does not form the basis of legal defense to the charges that she faces.[7]

---

[7] To the contrary, given that she can offer no proper basis for the admission at trial of much of the material she seeks in discovery – that material would seem likely to serve an improper end, namely, jury nullification. While every criminal defendant is unquestionably entitled to 'a meaningful opportunity to present a complete defense," *United States v. Alayeto*, 628 F.3d 917, 922 (7th Cir. 2010)(quoting *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006)(citations omitted), "well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Id.,* at 326. Evidence creating a risk of jury nullification – i.e., resolution of the case on grounds other than factual guilt – poses the very sort of "danger of . . . confusion of the issues" and "waste of time" that Federal Rule of Criminal Procedure 403 was designed to prevent. Courts "'categorically reject the idea that, in a society committed to the rule of law, jury nullification is desirable or that courts may permit it to occur when it is within their authority to prevent.'" *United States v. Carr*, 424 F.3d 213, 220 (2d Cir. 2005)(quoting *United States v. Thomas*, 116 F.3d 606, 614 (2d Cir. 1997)); *see also United States v. Desmond*, 670 F.2d 414, 417 (3d Cir. 1982)(finding that, while a jury may not be punished for nullification, it is long-settled that the jury's duty is to follow the law). Here, given that Defendant McIver cannot put forward a firmly rooted evidentiary basis for confronting the witnesses at her trial with "evidence demonstrating DHS's or ICE's antipathy toward Congressional oversight . . . in light of the culture, attitudes, and biases of their employer, superiors, and colleagues," the evidence she seeks would likely encourage jury nullification even assuming she could overcome the hurdle of its evidentiary infirmity.

## II. Case Law Does not Support Defendant's Expansive View of the Discovery to which She Believes She is Entitled

In support of her argument that she is entitled to communications that bolster her professed belief that DHS was attempting to obstruct her oversight efforts dating back as early as February 2025, Defendant relies heavily on the Third Circuit's holding in *United States v. Goodwin*, 440 F.2d 1152 (3d Cir. 1971). Defendant contends that the Government must prove that the actions with which she stands charged were intentional rather than, presumably, accidental. Defendant's reliance on *Goodwin*, however, is misplaced.

In *Goodwin*, the defendant was convicted of violating 18 U.S.C. § 111 when he pushed and struggled with arresting FBI agents despite the defendant's alleged belief that the individuals arresting him were not law enforcement. Although the *Goodwin* Court held that "specific knowledge of the victim's status as a federal officer is not an essential element of the crimes enumerated in Section 111," the Court added that "we do not mean to indicate that a defendant is precluded from showing that his use of force was defensible and justified." 440 F.2d at 1156. The *Goodwin* Court held that if a defendant "acts in resistance to an arrest, on the other hand, he may justifiably use reasonable force in self-defense if he neither knows nor should know that he is being arrested and reasonably believes he is being subjected to a hostile attack against his person." *Id.* The *Goodwin* Court thus recognized a "mistake of fact defense," in the limited circumstance where a defendant reasonably believes he or she is being attacked rather than arrested. *Id.*

Defendant McIver's attempt to graft this limited "mistake of fact defense" on to her entirely different circumstances to justify her broad discovery requests misapplies the holding of *Goodwin* by expanding its reach far beyond the realm of self-defense. On the one hand, by invoking *Goodwin*, Defendant implies that her belief about DHS' intentions is a mistake of fact on her part – similar to the mistaken belief of the defendant in *Goodwin* that arresting officers were not law enforcement. On the other hand, she is invoking her "mistake of fact" in an effort to obtain DHS communications that tend to show that her belief was reasonable, i.e. to prove that she was not operating under a mistake of fact. Putting aside this inherent inconsistency between her claimed state of mind and the evidence she seeks, she is not putting forth a claim of self-defense. Unlike in *Goodwin*, she does not claim to have been confused about the status of the DHS agents and ERO officers as members of law enforcement. Nor does she claim that any of the members of law enforcement were attempting to arrest or otherwise assault her. More importantly, as previously stated, she is seeking evidence not to bolster a "mistake of fact" defense but to corroborate her claim that DHS was conspiring to undermine her oversight efforts – something that, even if true, does not constitute a defense to the allegations that she forcibly assaulted, impeded or obstructed law enforcement. As this Court noted in the context of her Speech or Debate Clause argument, "[i]mpeding an arrest, whether lawful or unlawful, goes beyond any reasonable definition of oversight and, accordingly, exceeds the safe harbor of legislative immunity." Opinion, ECF 44, November 13, 2025, at 19. Despite this clear ruling that impeding an arrest does not constitute oversight, Defendant is still

attempting to shoehorn this claim into the case, albeit now in service of her efforts to obtain far-reaching discovery to which she is not otherwise entitled. The Court should reject this claim, and *Goodwin* provides no support for her discovery demands.

### III. Case law Does not Support Defendant's Claim That She is Entitled to Materials on the Personal Phones of the More than Two Dozen Agents and Officers at Delaney Hall on May 9, 2025

Defendant's arguments fall short of justifying the broad sweep of materials to which she claims to be entitled from the work-issued phones of the DHS agents and ERO officers involved in the Mayor's arrest at Delaney Hall on May 9, 2026. Those arguments are particularly impotent when applied to Defendant's claims for materials from the personal phones of those agents and officers which are not in the possession of the Government.

To justify this exceedingly intrusive demand, Defendant points to two recent cases, one from the Ninth Circuit and one unpublished decision from the Western District of Virginia. Neither case supports the far-reaching discovery requests that Defendant forwards.

In *United States v. Tovar-Duran*, 2026 WL 2683739 (9th Cir., September 14, 2026), the defendant "specifically requested information regarding the government witnesses' membership and activity in the "I'm 10-15" Facebook group," in which U.S. Border Patrol agents were alleged to have shared offensive materials about migrants to include racial slurs. *Id.*, at *2. After the Government denied that any of its likely witnesses were members of this Facebook group, the defendant renewed his request for exculpatory and impeachment material, including whether any of the agents

involved were members of the Facebook group in question. On the eve of trial, the Government notified the defendant that two of the three Border Patrol witnesses it intended to call as witnesses at trial were members of the group. The magistrate judge presiding over the trial denied defendant's request for further discovery related to the Facebook group and the trial proceeded. *Id.* The *Tovar-Duran* Court reversed the conviction holding that the Government was obligated to disclose the evidence pertaining to membership in the Facebook group under *Brady* and Rule 16. In so doing, the Ninth Circuit reiterated the basic requirements that must be met to succeed on a *Brady* claim:

> (1) The evidence at issue was favorable to him, either because it was exculpatory or impeaching; (2) the evidence was suppressed by the State, either willfully or inadvertently; and (3) that he was prejudiced."

*Id.*, (quoting *United States v. Bruce*, 984 F.3d 884, 894-95 (9th Cir. 2021)). Further, the *Tovar-Duran* Court added that "[u]nder *Brady*, prejudice exists if 'there was a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.*, at 4 (quoting *United States v. Doe*, 705 F.3d 1134, 1152 (9th Cir. 2013)). The *Tovar-Duran* Court held that given that the Government had some knowledge in its possession that two of the three Border Patrol agents were members of the Facebook group, the judge should have ordered the government to review and disclose any evidence in its possession relating to the witnesses' membership and activity in the Facebook group. *Id.*, at 4.

The *Tovar-Duran* case is notably distinguishable from the case at bar in several key respects. First, the Government had knowledge that there existed clear

impeachment material related to its witnesses in that case but did nothing to determine the nature of the material or disclose it to the defense. By way of contrast, Defendant McIver points to no specific area of potential impeachment material and seeks instead to cast as wide a net as possible in the hopes that something might surface. Defendant's request is the embodiment of the proverbial fishing expedition that courts have sought to curtail. *See, e.g.*, *Risha*, 445 F.3d at 304 (noting that "[w]e have also made clear that prosecutors are not required to undertake a 'fishing expedition'" in pursuit of impeachment materials in other jurisdictions); *Abdallah*, 911 F.3d at 218 ("Specificity [in requested exculpatory materials] ensures that the government's *Brady* obligations do not become unduly burdensome, and that the defendant does not conscript the court for a 'groundless fishing expedition.'") (internal citations omitted). Second, the inquiry in *Tovar-Duran* regarding this impeachment material was focused on a narrow topic – membership and participation in a specific Facebook group - and was not a generalized request seeking any and all impeachment material such as that sought by Defendant McIver. Third, the *Tovar-Duran* Court notably does not discuss the potential search of the Border Patrol agents' personal phones let alone direct that those phones be searched. Thus, *Tovar-Duran* can be said to stand for the proposition that the Government must turn over specified impeachment material of which it already has knowledge for witnesses it calls at trial, but it offers scant support for Defendant's request that the personal cell phones of law enforcement – whether they are likely to be witnesses or not – be subjected to general searches for any and all possible impeachment material. Even if *Tovar-Duran* were

binding precedent in this Circuit, it does not support Defendant McIver's request for the breathtakingly intrusive searches of the personal cell phones of law enforcement on the chance that impeachment material may be located upon them.

Unlike *Tovar-Duran*, the unpublished district court opinion in *United States v. David*, 2026 WL 1880216 (W.D. Va., June 30, 2026), cited by Defendant McIver, actually deals with personal cell phones, albeit in a scenario where there was no question that law enforcement had used their personal cell phones for work texts during the critical stages of an investigation and arrest. *David* involved a traffic stop of a vehicle which resulted in the recovery of two firearms and felon-in-possession charges against the defendant. The search of the vehicle had been preceded by two hours of surveillance conducted by officers who had been equipped with body worn cameras. When the videos produced by these body worn cameras were produced in discovery, defense counsel renewed its earlier request for text communications between the officers involving the surveillance and arrest given that the videos showed those officers using both work and personal phones to communicate during the operation. The *David* Court noted that these communications "were plainly obvious from the body-worn camera footage." *Id.*, at *4. The *David* Court found the efforts to preserve and collect these messages had been clearly inadequate with some messages having been erased via an automatic delete function. The Court attempted to fashion a discovery plan designed to ensure that the defendant received any exculpatory material to which he might be entitled.

However, in so doing, the Court rejected as "simply too broad" the defendant's request for "all communications 'that mention [him] or any other matters relevant to the investigation of this case.'" *Id.*, at 5. Rather, the Court held that communications among the officers about the traffic stop and the attendant investigation represented potentially discoverable material that might be relevant to the defendant's suppression motion which "turns on whether the stop and search were legal." *Id.* These communications could be material as to "whether the officers unlawfully prolonged the stop, whether the K9 alert was reliable and whether the officers were influenced by improper motives or coordination." *Id.* The *David* Court found that the defendant had "made a plausible showing with sufficient specificity, that communications about the traffic stop and the events immediately surrounding it are material under Rule 16 and potentially exculpatory under *Brady*," and found that the communications "must at least be reviewed for discoverability." *Id.*, at 6.

Nevertheless, as to the defendant's request for "communications that generally refer to him or his investigation," the *David* Court found that he had "not made a plausible showing as to such broad categories of evidence, which may encompass years of prior communications unrelated to the charged conduct." *Id.*, at *6. In rejecting this broader request, the *David* Court noted that the defendant had failed to explain "how communications unrelated to the stop and search would be favorable to him." *Id.* (citing *United States v. Caro*, 597 F.3d 608, 619 (4th Cir. 2010)("Because [the defendant] can only speculate as to what the requested information might reveal, he cannot satisfy

*Brady's* requirement of showing that the requested evidence would be 'favorable to [the] accused.'")(citations omitted).

Defendant McIver's requests for a review of the personal cell phones of the 23 agents and officers is distinguishable from the situation in *David* in several crucial respects. First, in *David*, there was no question about whether the officers had used their personal phones as the use of those personal phones had been documented via the body worn cameras during the operation which led to the search of the vehicle and the defendant's arrest. By way of contrast, defendant McIver has pointed to no footage demonstrating the use of personal phones by the agents and officers during the arrets of the Mayor outside Delaney Hall on May 9, 2025. The only evidence of the use of personal phones for work-related communications is a single text message received by one of the officers on his work phone regarding the arrest of the Mayor which prompted the officer to instruct another individual via text to call the officer back on the officer's personal phone so that the officer could "fill you in." Assuming this call even occurred, it is a reference to having an oral conversation which would not result in any written communication.[8] Other than the evidence that there may have been a conversation

[8] On or about April 16, 2026, an agent with DHS interviewed this officer in the presence of representatives of the U.S. Attorney's Office. The officer brought his personal cell phone with him and agreed to have it reviewed with search terms to determine whether there existed any work-related texts on the phone. The officer was asked about the text in question from May 9, 2025 and explained that he had been in contact with a member of local law enforcement whom he had worked with as part of a fugitive operations group. The officer could not recall whether any follow-up call had taken place regarding the text on May 9, 2025. The officer granted consent to search his personal cell phone which contained messages dating back to early 2023. He also consented to have the phone searched using a list of 26 terms relevant to the events of May 9, 2025 at Delaney Hall and have any texts produced by the search reviewed by the DHS agent in the presence of

over this particular officer's personal phone, defendant McIver's requests for the search of the personal phones of the other 22 officers is purely speculative in nature and lacks the specificity required to warrant such intrusive and burdensome efforts by the Government.

Further, in *David*, the defendant could articulate a specific need for the relevant communications within the timeframe of the investigation and arrest, namely, for purposes of the suppression motion challenging the basis for the search of his vehicle. Defendant McIver's broad request is not tethered to anything like a suppression motion and represents a more generalized search based on speculation. It is far more akin to the request in *David* for "communications that generally refer to [the defendant] or his investigation," that the *David* Court found would be "inconsistent with the specificity and materiality requirements under *Brady* and Rule 16." *Id.*, at * 6 (citing *United States v. Cousin*, 2022 WL 314853, at *25-26 (D.Mass. Feb. 2, 2022)(denying the defendant's request for all communications among law enforcement officers concerning the defendant"). Not only do defendant McIver's requests lack the specificity required to warrant a review of the personal cell phones of the DHS agents and ERO officers, the basis for seeking them – to bolster defendant McIver's belief that DHS was conspiring to thwart her oversight activities – does not constitute a viable defense to the charges with which she had been indicted. In other words, her sweeping request

---

two Assistant U.S. Attorneys. That search process turned up only one relevant message wherein a friend of the officer had texted "is the congresswoman going to get arrested." The officer had not replied to this text. There were no other relevant texts although a few of the search terms did produce hits. Based on this review, it does not appear that this officer used his personal cell phone to communicate about work-related matters in any meaningful way.

for discovery not only lacks specificity but also lacks materiality. On this basis, this Court should reject defendant McIver's additional discovery demands relating to the personal cell phones which represent the epitome of a fishing expedition.

### IV. Defendant McIver's Request for Evidence of Bias is Premature and is Classic Impeachment Material Which is Only Applicable for the Witnesses the Government Calls at Trial

Defendant McIver appropriately seeks evidence of bias but fails to acknowledge that such evidence applies only to the individuals the Government calls as witnesses at trial. While any such bias evidence will need to be produced, that request is clearly premature, especially given that: (i) there is a pending appeal; (ii) there is no trial date set; and (iii) the Court has, not surprisingly, set no date for the production of *Giglio* material.

First, it should be noted that impeachment material pertains to the witnesses the Government intends to call at trial per *Giglio v. United States*, 405 U.S. 150 (1972). Despite this, Defendant McIver seeks impeachment material from the more than 20 agents and officers who were present at Delaney Hall regardless of whether the Government intends to call them as witnesses. *See United States v. King*, 628 F.3d 693, 703-04 (4th Cir. 2011)("evidence that merely impeaches those who do not testify lacks relevance, much less materiality")(citations omitted). In light of those strictures, the following claim by Defendant McIver is extraordinarily overbroad:

> " . . . evidence demonstrating DHS's or ICE's antipathy toward Congressional oversight of its immigration detention facilities in general, or toward Congresswoman McIver in particular, is highly relevant, and the jury should be able to fully and fairly evaluate the testimony of DHS officials, like Victim-1 and Victim-2, in light of the culture, attitudes, and biases of their employer, superiors,

and colleagues.

Def. Brief, at 30. Although it is not entirely clear what defendant McIver is suggesting here, it seems that she is claiming entitlement to impeachment material of officials above Victim-1 and Victim-2, i.e., their superiors who were not present at the scene of the Mayor's arrest, for the purpose of impeaching Victim-1 and Victim-2 during Victim-1 and Victim-2's anticipated testimony at trial. In other words, it seems that Defendant McIver is claiming to be entitled to bias evidence of non-witnesses to cross the witnesses the Government will call. This is entirely improper and the Court should not countenance such efforts.[9] But for the immediate purposes of this motion, seeking the production of bias evidence for all 23 DHS agents and ERO officers, not to mention their superiors, is entirely beyond the scope of *Brady*, *Gigilo* and Rule 16. Although the Government has not compiled a final witness list, the witnesses present at Delaney Hall that day are likely to be limited to Victim-1 and Victim-2, and defendant will likely never be entitled to bias evidence pertaining to all of the more than 20 other DHS agents and ERO officers present during the Mayor's arrest at Delaney Hall on May 9,

---

[9] Defendant McIver claims that she is entitled to evidence that she was prevented "from entering, for the purpose of conducting oversight, any facility operated by or for the [DHS] used to detain or otherwise house aliens," in violation of FCAA § 527, 138 Stat. 460, 619 (2024). Defendant therefore claims that she is entitled to cross-examine any DHS witness, including Victim-1 and Victim-2, about their complicity in violating this law and interfering with her right to inspect the Delaney Hall facility. Def. Brief, at 30-31. This claim is absurd for a number of reasons, not the least of which is that she was granted the inspection tour so the premise of her claim is false. Second, as has been stated repeatedly in this brief, her belief that she was the victim of a concerted effort to prevent her from conducting her oversight responsibilities is not a viable defense to the charges which she faces. Evidence that might support that belief is immaterial to the defense as much as she might protest otherwise.

2025. Defendant's motion should be denied on this ground, and the request for appropriate bias evidence, i.e., for the impeachment material for actual witnesses the Government will call at trial, is clearly premature at this juncture.

### V. Defendant McIver's Request to Enlarge the Time Period Covered by the Review of the DHS Work Phones Should be Rejected

Defendant also seeks to have the Court direct that the search of the work phones, to which the Government has agreed, be expanded from the period from May 9, 2025 through May 31, 2025 to include the nearly six-month period from February 3, 2025 through at least July 15, 2025. The start date coincides with defendant McIver's visit to the immigration detention facility in Elizabeth, New Jersey (well before the opening of Delaney Hall as an immigrant detention facility) while the end date represents the final date on which the DHS press office in Washington, D.C. issued a press release referencing defendant McIver as "storming" Delaney Hall.

Defendant once again is relying upon theories of the case which are not material to the defense and are irrelevant to the charges she faces. As previously stated, the belief that DHS was attempting to interfere or prevent her from exercising her oversight duties – whether true or not – is not a defense to assaulting law enforcement or impeding their efforts to effect an arrest. There is no safe harbor provision to 18 U.S.C. § 111 that allows an individual to engage in the conduct prohibited by the statute if the defendant believes that he or she is being thwarted from carrying out oversight duties. Defendant McIver's beliefs about DHS interference in this regard are irrelevant and cannot form the rationale for her far-reaching discovery requests.

Whether DHS was attempting to thwart her efforts prior to May 9, 2025 is of no consequence to the prosecution and likely inadmissible at trial. Thus her efforts to extend the search of the DHS work phones to cover the period from February 3, 2025 through May 9, 2025 is baseless. Likewise, efforts to extend the search period beyond May 9, 2025 to July 15, 2025 are similarly premised on matters that have no bearing on her guilt or innocence as required by *Brady*. That a DHS press officer based in Washington D.C. issued a press release that unfairly characterized defendant McIver's actions on May 9, 2025 has no relationship to whether there is *Brady* material on the phones of the DHS officers and agents present during the Mayor's arrest at Deaney Hall on May 9, 2025. The DHS press personnel responsible for issuing the press releases to which defendant McIver objects are certainly not members of the prosecution team and will obviously not be called as witnesses by the Government at trial. Thus, the issuance of the July 15, 2025 press release in question should have no bearing on the time frame employed for searching the work phones of the DHS agents and officers.

## VI. Defendant McIver's Request to Include Numerous Additional Search Terms for the Search of the DHS Work Phones Should be Rejected

Defendant McIver seeks to significantly increase the number of search terms to be employed for the searches on the DHS and ERO work phones. The Government previously consulted defense counsel on those terms, accepting certain of the terms suggested by defense counsel while rejecting others for various reasons. These terms were in addition to certain obvious terms that the Government was going to employ,

i.e., "Congress," "Representative," "McIver," "Baraka," etc. Nevertheless, defendant asserts that "the government refused to negotiate in good faith concerning appropriate search parameters," Def. Brief, at 1, a characterization with which the Government takes strong exception. The Government rejected some of the terms suggested by defendant for a variety of reasons. Some terms were rejected because of the likelihood that they would sweep too broadly and produce a large volume of false hits. Terms such as "Delaney," "DH" or "Dhall," are likely to generate a large number of hits because the work duties of the agents and officers present during the Mayor's arrest on May 9, 2025 revolve around Delaney Hall, not to mention that "DH" would hit on every reference to "DHS." Other terms suggested by defense counsel are designed to hit on references to press releases that are irrelevant to the charges brought against defendant McIver, including "press release," or "broke in," or "storm." Still other terms are designed to capture politics-related materials such as "Antifa," "Democrat," "Lib," "Radical," which are entirely unrelated to the charges against defendant McIver or her actions at Delaney Hall on May 9, 2025. Also, much as "DH" would hit on any reference to "DHS," the term "left," - presumably sought as a political term - will hit on a series of totally unrelated topics such as references to "turning left," or "he left the building," or "on your left." Finally, certain terms proposed by defense counsel, such as "18 USC," or "indict", are designed to generate hits on conversations that fall within the attorney-client privilege realm or discussions of investigative analysis.[10] In sum, the additional

[10] It is true that these terms will not necessarily generate privileged materials such as the example cited by Defendant McIver regarding "18USC" wherein one DHS agent wondered what charges under Title 18 of the United States Code might be applicable

terms sought by defendant are overbroad and/or irrelevant especially when compared to the more specific terms which the Government has agreed to run and which are more clearly tailored to finding communications that pertain to the events of May 9, 2025. The overbroad nature of the additional terms sought by defendant represent just another example of the "fishing expedition" which defendant McIver wishes this Court to sanction.

---

if some of the large number of anticipated protestors expected to gather at Delaney Hall committed crimes in the presence of DHS agents or ERO officers. Defendant McIver implies that this back-and-forth pertained to potential charges against any Members of Congress who arrived during the protest, but a much more plausible interpretation is that the DHS officers were referring to protestors. Nevertheless, references to Title 18 or "indict" are frequently going to involve privileged discussions involving attorneys.

## CONCLUSION

For the foregoing reasons, this Court should deny Defendant McIver's Supplemental Motion to Compel Discovery.

Respectfully submitted,

ROBERT FRAZER
United States Attorney

By: s/Mark J. McCarren
Mark J. McCarren

Assistant United States Attorney

Dated: November 16, 2026
Newark, New Jersey